**The UTE INDIAN TRIBE, Plaintiff,**

v.

**The STATE OF UTAH, defendant in intervention, Duchesne County, a political subdivision of the State of Utah, Uintah County, a political subdivision of the State of Utah, Roosevelt City, a municipal corporation, and Duchesne City, a municipal corporation, Defendants,**

**United States of America, Amicus Curiae,**

**Paradox Production Corporation, a Utah corporation, Amicus Curiae.**

Civ. No. C 75–408.

United States District Court,
D. Utah, C. D.

June 19, 1981.

Stephen G. Boyden, Boyden, Kennedy & Romney, Salt Lake City, Utah, Martin E. Seneca, Jr., Washington, D. C., Larry J. Echohawk, Richard Hill, Scott Pugsley, Salt Lake City, Utah, Daniel H. Israel, Native American Rights Fund, Boulder, Colo., for plaintiff Ute Indian Tribe.

Dallin W. Jensen, Michael M. Quealy, Denise Dragoo, Asst. Attys. Gen., State of Utah, Salt Lake City, Utah, for defendant State of Utah.

David L. Wilkinson, Atty. Gen., Richard Dewsnup, Asst. Atty. Gen., State of Utah, Clifford L. Ashton, Van Cott, Bagley, Cornwall & McCarthy, Sp. Asst. Attys. Gen., Salt Lake City, Utah, for defendants.

Tom G. Tobin, Tobin Law Offices, P. C., Winner, S. D., David Albert Mustone, Washington, D. C., for Duchesne & Uintah Co.

Whitney Hammond, Uintah County Atty., Vernal, Utah, for Uintah County.

Lynn Mitton, Roosevelt City Atty., Roosevelt, Utah, for Roosevelt City.

Francis M. Wikstrom, U. S. Atty., District of Utah, Salt Lake City, Utah, Anita Vogt, Dept. of Interior, Kenneth Marra, Land and Natural Resources Division, U. S. Dept. of Justice, Washington, D. C., for U. S. as amicus curiae.

Stewart M. Hanson, Jr., Salt Lake City, Utah, for Paradox Production Corp.

Lance Wilkerson, Duchesne, Utah, Dennis Draney, Roosevelt, Utah, for Duchesne Co.

JENKINS, District Judge.

The Ute Indian Tribe filed a complaint with this Court on October 15, 1975, seeking declaratory and injunctive relief establishing the exterior boundaries of the Uintah and Ouray Reservation, defining the force and effect of the Tribe's Law and Order Code within those boundaries, and restraining the defendants from interfering with the enforcement of that Code.[1] The Tribe, a federally recognized, sovereign Indian tribe,[2] operates under a constitution and by-laws adopted in 1936 and approved by the Secretary of the Interior in 1937.[3] Article I of the tribal constitution defines the territory claimed by the Tribe for jurisdictional purposes:

> The jurisdiction of the Ute Indian Tribe of the Uintah and Ouray Reservation shall extend to the territory within the original confines of the Uintah and Ouray Reservation as set forth by Executive Orders of October 3, 1861 and January 5, 1882, and by the Acts of Congress approved May 27, 1902, and June 19, 1902, and to such other lands without such boundaries as may hereafter be added thereto under any law of the United States, *except as otherwise provided by law.* [Emphasis added.]

Among the powers vested in the Tribal Business Committee, the Tribe's elected governing body, are the following:

Article VI—Powers of the Tribal Business Committee

> Section 1. Enumerated powers.—The Tribal Business Committee of the Uintah and Ouray Reservation shall exercise the following powers, subject to any limitations imposed by the statutes or the Constitution of the United States, and subject further to all express restrictions upon such powers contained in this Constitution and By-laws, and subject to re-

---

1. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1362:

 > The district courts shall have original jurisdiction of all civil actions, brought by any Indian tribe or band with a governing body duly recognized by the Secretary of the Interior, wherein the matter in controversy arises under the Constitution, laws, or treaties of the United States.

 Before it was served with process as a defendant, the State of Utah filed a motion to intervene on November 26, 1975, and a subsequent motion to quash the service of process accomplished on December 17, 1975. On January 15, 1976, this Court granted both motions. Since by its motion to intervene, the State waived its Eleventh Amendment immunity in this action, there is no further need to consider that jurisdictional issue. See *Petty v. Tennessee-Missouri Bridge Comm.*, 359 U.S. 275, 276–82, 79 S.Ct. 785, 787–790, 3 L.Ed.2d 804 (1959). Venue is proper. 28 U.S.C. § 1391(a) (1976).

2. *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 143, 100 S.Ct. 2069, 2075, 65 L.Ed.2d 10 (1980).

3. The tribal constitution was adopted pursuant to Section 16 of the Indian Reorganization Act of 1934, 48 Stat. 984, 25 U.S.C. § 476. Additionally, the Tribe is chartered as a federal corporation pursuant to § 17 of that Act, 25 U.S.C. § 477.

view by the Ute Bands themselves at any annual or special meeting:

\* \* \* \* \* \*

(h) To levy taxes upon members of the Ute Indian Tribe of the Uintah and Ouray Reservation, and to require the performance of community labor in lieu thereof, and to levy taxes and license fees, subject to review by the Secretary of the Interior, upon non-members doing business within the Reservation.

(i) To exclude from the territory of the Uintah and Ouray Reservation persons not legally entitled to reside therein, under ordinances which shall be subject to review by the Secretary of the Interior.

\* \* \* \* \* \*

(j) To enact resolutions or ordinances, not inconsistent with Article II of this Constitution governing adoption and abandonment of members, and to keep at all times a correct roll of the members of the Ute Indian Tribe of the Uintah and Ouray Reservation.

(k) To promulgate and enforce ordinances, which shall be subject to review by the Secretary of the Interior, governing the conduct of members of the Ute Indian Tribe of the Uintah and Ouray Reservation, and providing for the maintenance of law and order and the administration of justice by establishing a Reservation Indian Court and defining its duties and powers.

(*l*) To safeguard and promote the peace, safety, morals and general welfare of the Ute Indian Tribe of the Uintah and Ouray Reservation by regulating the conduct of trade and the use and disposition of property upon the Reservation, provided that any ordinance directly affecting nonmembers of the Reservation shall be subject to review by the Secretary of the Interior.

(m) To charter subordinate organizations for economic purposes, and to regulate the activities of co-operative associations of members of the Ute Indian Tribe of the Uintah and Ouray Reservation by ordinance, provided that any such ordinance shall be subject to review by the Secretary of the Interior.

(n) To regulate the inheritance of property, real and personal, other than allotted lands, within the territory of the Uintah and Ouray Reservation, subject to review by the Secretary of the Interior.

(*o*) To regulate the domestic relations of members of the Ute Indian Tribe of the Uintah and Ouray Reservation by ordinances which shall be subject to review by the Secretary of the Interior.

(p) To provide for the appointment of guardians for minors and mental incompetents by ordinances or resolutions which shall be subject to review by the Secretary of the Interior.

\* \* \* \* \* \*

For many years, it seemed to the Ute's non-Indian neighbors that these powers, as well as others, lay dormant as far as non-Indian affairs were concerned. To many, the concept of Indian tribal government seemed wholly irrelevant to their businesses and daily lives. Over those same years, however, the Ute Indian Tribe did not remain passive. The Utes, with the support and encouragement of their trustee, the United States government, have made continuous efforts to improve the sophistication and effectiveness of their tribal institutions in response to changing times and circumstances.[4] Naturally, as the Utes have gained the economic wherewithal to do so, they have sought a greater share of autonomy and control over their own lives and community affairs. It was inevitable that this quest for tribal autonomy would find expression in the promulgation of tribal law.[5]

The Tribe operated a tribal government and an Indian court for many years prior to

---

**4.** See F. O'Neil & J. Sylvester, eds., Ute People: An Historical Study 113–15 (3d ed. 1970); Ten Year Development Program for the Ute Indian Tribe (1957), JX No. 465.

**5.** *E. g.*, Trial transcript at 44–87 (Testimony of Wm. F. Streitz).

1975.[5A] As tribal operations expanded and the demand on tribal institutions increased, the Tribe sought to recodify and expand its growing body of ordinances, resulting in the enactment and publication of the Law and Order Code of the Ute Indian Tribe (hereinafter "Ute Law and Order Code") which was approved by the Secretary of the Interior through the Phoenix Area Director of the Bureau of Indian Affairs, Trial Transcript at 55 (Testimony of Wm. F. Streitz),

and became effective on September 15, 1975.[6]

Promulgation of the Ute Law and Order Code raised immediate protest from the defendant municipalities, Duchesne and Roosevelt, and defendant Duchesne County, all of which are within the original boundaries of the Uintah Indian Reservation.[7] The defendants complained that they were wrongfully included within the territorial jurisdiction of the Ute Tribe under the Ute Law and Order Code[8] and officials of the

---

**5A.** See Ute Indian Tribal Court, 1964 Report, Plaintiff's Exhibit 3.

**6.** The statement of tribal policy introducing the new code is enlightening as to the purposes intended to be served:

§ 1–2 1. *Jurisdiction—Tribal Policy.*

It is hereby declared as a matter of Tribal policy and legislative determination, that the public interest and the interests of the Ute Indian Tribe demand that the Tribe provide itself, its members, and other persons living within the territorial jurisdiction of the Tribe as set forth in Article I of the Constitution of the Ute Indian Tribe with an effective means of redress in both civil and criminal cases against members and non-Tribal members who through either their residence, presence, business dealings, other actions or failures to act, or other significant minimum contacts with this Reservation and/or its residents commit criminal offenses against the Tribe or incur civil obligations to persons or entities entitled to the Tribe's protection.

This action is deemed necessary as a result of the confusion and conflicts caused by the increased contact and interaction between the Tribe, its members, and other residents of the Reservation and other persons and entities over which the Tribe has not previously elected to exercise jurisdiction. The jurisdictional provisions of this Law and Order Code, to insure maximum protection for the Tribe, its members and other residents of the Reservation, should be applied equally to all persons, members and non-members alike.

**7.** See *e. g.,* Exhibit I–1A (map).

**8.** The territorial extent of tribal jurisdiction is defined by Ute Law and Order Code § 1–2–2 (1975) as follows:

*Territorial Jurisdiction.*

(1) The Jurisdiction of the Courts of the Ute Indian Tribe shall extend to the territory within the original confines of the Uintah and Ouray Reservation as set forth by Executive Orders of October 3, 1861, and January 5, 1882, and by the Acts of Congress approved May 27, 1902, June 19, 1902 and March 11,

1948, and to such other lands without such boundaries as have been or may hereafter be added to the Reservation or held in trust for the Tribe under any law of the United States or otherwise.

(2) The jurisdiction of the Courts of the Ute Indian Tribe shall extend beyond the territorial limitation set forth next above, to effectuate the jurisdictional provisions set forth below, to the greatest extent permissible by law.

[The personal jurisdiction asserted by the Tribe is expressed in expansive terms by § 1–2–3.]

The *subject-matter* jurisdiction of the Tribe, in contrast, is carefully limited:

§ 1–2–5. *General Subject Matter Jurisdiction; Limitations.*

Subject to any contrary provisions, exceptions, or limitations contained in either federal law, or the Tribal Constitution, the Courts of the Ute Indian Tribe shall have jurisdiction over all civil causes of action, and over all offenses prohibited by this Code *except the Courts of the Ute Indian Tribe shall not assume jurisdiction over any civil or criminal matter which does not involve either the Tribe, its officers, agents, employees, property or enterprises, or a member of the Tribe, or a member of a federally recognized tribe, if some other forum exists for the handling of the matter and if the matter is not one in which the rights of the Tribe or its members may be directly or indirectly affected.* [Emphasis added.]

Far from attempting a wholesale appropriation of governmental authority in the Uintah Basin, the Ute Indian Tribe expressed limitations on its own authority that presaged the latest expression on the subject by the Supreme Court. See *Montana v. United States,* —— U.S. ——, 101 S.Ct. 1245, 1257, 67 L.Ed.2d 493 (1981). Further, it is interesting to note that at least one defendant municipality had agreed years before to a limited exercise of tribal jurisdiction over Indians within the city limits. See Memorandum of Agreement between Roosevelt City and the Ute Tribe, Jan. 11, 1972, Joint Exhibit No. 476.

defendants urged their constituents to resist the enforcement of the new code. The State of Utah complained that its authority was likewise impaired.[9]

The Tribe, faced with mounting opposition to the exercise of its jurisdiction, commenced the above-entitled action in this Court against the named governmental defendants. The State of Utah intervened as a defendant and the United States of America and Paradox Production Corporation have subsequently entered these proceedings as *amici curiae*. By stipulation of the parties in the Pretrial Order, Uintah County, another political subdivision of the State of Utah, was joined as a defendant.[10]

## I. CLAIMS OF THE PARTIES

 To paraphrase the Pretrial Order, the plaintiff Ute Indian Tribe asserts that the Uintah and Ouray Indian Reservation

was created by the Executive Order of October 3, 1861,[11] as confirmed by the Act of May 5, 1864, 13 Stat. 63, by the Executive Order of January 5, 1882,[12] and by the Act of March 11, 1948, 62 Stat. 72, and that the original exterior boundaries as thus established continue to exist undiminished for purposes of defining the present boundary of the Uintah and Ouray Reservation. Plaintiff further asserts that all of the lands encompassed by that boundary are "Indian country" as defined by federal statute[13] and that the defendants may not exercise jurisdiction over members of the plaintiff Tribe for any criminal offense committed therein as that jurisdiction is reserved to the United States, or to the Tribe itself,[14] and that the Tribe may exercise the full panoply of its governing powers within those same boundaries free from interference by the defendants.[15]

**9.** See Letter of Governor Calvin L. Rampton to Attorney General Vernon B. Romney of Oct. 14, 1975, attached to Answers to Plaintiff's First Interrogatories, filed April 16, 1976.

**10.** By further stipulation it was agreed that "Grand County and/or Wasatch County, both political subdivisions of the State of Utah, may, without objection from the parties, petition the Court to be joined herein as parties" upon conditions. Pretrial Order at 7 (Apr. 2, 1979). Neither county has sought leave to intervene and consequently they are not parties to this case.

**11.** Reprinted in I C. Kappler, Indian Affairs: Laws and Treaties 900 (2d ed. 1904) (hereinafter cited as "—— Kapp. ——").

**12.** I Kapp. 901. Copies of these Executive Orders and Acts of Congress are annexed hereto in Appendix "A" of this Opinion.

**13.** 18 U.S.C. § 1151 (1976) provides:
Indian country defined.
Except as otherwise provided in sections 1154 and 1156 of this title, the term "Indian country", as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been ex-

tinguished, including rights-of-way running through the same.
See *United States v. John*, 437 U.S. 634, 647–49, 98 S.Ct. 2541, 2548–2549, 57 L.Ed.2d 489 (1978).

**14.** Language in the Pretrial Order notwithstanding, it has long been held that exclusive federal criminal jurisdiction over Indians in "Indian country" includes all persons found to be "Indian" under federal law, see *United States v. Broncheau*, 597 F.2d 1260, 1262–64 (9th Cir. 1979), *cert. denied*, 444 U.S. 859, 100 S.Ct. 123, 62 L.Ed.2d 80 (1980), notwithstanding specific tribal membership or lack thereof. See *e. g., id.*, at 1263; *United States v. Indian Boy X*, 565 F.2d 585, 594 (9th Cir. 1977), *cert. denied* 439 U.S. 841, 99 S.Ct. 131, 58 L.Ed.2d 139; *United States v. Ives*, 504 F.2d 935, 953 (9th Cir. 1974) vacated on other grounds, 421 U.S. 944, 95 S.Ct. 1671, 44 L.Ed.2d 97 (1975); *Ex parte Pero*, 99 F.2d 28, 30 (7th Cir. 1938). The Ute Law and Order Code § 1–2–5 (1975), *supra* note 8, includes any federally recognized Indian within its subject-matter jurisdiction.

**15.** While strictly speaking, 18 U.S.C. § 1151 (1976) defines "Indian country" for the Federal Criminal Code, it is well-settled that its definition applies as well to questions of civil jurisdiction. *DeCoteau. v. District County Court*, 420 U.S. 425, 427 n.2, 95 S.Ct. 1082, 1084, 43 L.Ed.2d 300 (1975), accord, *McClanahan v. Arizona State Tax Comm.*, 411 U.S. 164, 177–78 n.17, 93 S.Ct. 1257, 1265, 36 L.Ed.2d 129 (1973); *Kennerly v. District Court of Montana*, 400 U.S. 423, 424 n.1, 91 S.Ct. 480, 481, 27 L.Ed.2d 507 (1971); *Williams v. Lee*, 358 U.S.

In defense, all defendants assert that "Indian country" in the Uintah basin is confined to lands held in trust for individual Indians or for the Ute Indian Tribe, and beyond that, the area defined by the Act of March 11, 1948, 62 Stat. 72, more commonly known as the Hill Creek Extension. The State of Utah asserts alternatively that the original Uintah Valley Indian Reservation described in the Executive Order of October 3, 1861, is diminished by national forest and reclamation withdrawals and that diminished area combined with the Hill Creek Extension comprises "Indian country" under tribal and federal jurisdiction. See State's Post-Trial Brief at 55. All defendants assert that the Uncompahgre Reservation, delineated by the Executive Order of January 5, 1882, no longer exists. Implicit in the defense is the issue of the enforceability of the Ute Law and Order Code as against non-Indians, particularly on lands held in fee simple—"fee lands"—rather than on lands held in federal trust for use and occupancy by the Indians—"trust lands".

While plaintiffs seek both declaratory and injunctive relief, no claims for damages have been asserted by any party.

## II. PRELIMINARY INJUNCTION

This Court has already granted preliminary equitable relief to a limited extent in the above-entitled action. In an action arising in state court among persons who are not parties to these proceedings, some of the same jurisdictional questions were presented to the state court as are presented here. In a broadly worded opinion in *Brough v. Appawora*, 553 P.2d 934 (Utah 1976), a majority of the Utah Supreme Court held that a state district court had jurisdiction of a tort claim against a member of the Ute Indian Tribe arising from an automobile accident occurring within the original exterior boundaries of the Uintah Valley Reservation as defined by the Executive Order of October 3, 1861.

The plaintiff sought a temporary restraining order and a preliminary injunction forbidding the defendants or their officers, employees, etc. from (1) proceeding to enforce the judgment in *Brough v. Appawora*, or (2) relying on that decision to justify interference with the Tribe's asserted jurisdiction. The temporary restraining order was entered on September 6, 1976, and the preliminary injunction on October 14, 1976.[16] By its preliminary injunction this Court did not seek to enjoin the state proceedings in *Brough v. Appawora* or otherwise overrule that decision by the Utah Supreme Court, recalling that "lower federal courts possess no power whatever to sit in direct review of state court decisions." *Atlantic Coast Line R.R. v. Brotherhood of Locomotive Engineers*, 398 U.S. 281, 296, 90 S.Ct. 1739, 1747, 26 L.Ed.2d 234 (1970). Rather the preliminary injunction was issued to maintain the status quo in this litigation, avoiding potentially destructive conflicts among the parties hereto until this Court was able to conclusively resolve these jurisdictional questions upon the merits.

 Of course, this Court is in no way bound to follow the rule of *Brough v. Appawora*; the parties herein were not parties to that case, eliminating any question of *res judicata* or collateral estoppel, see *Kline v. Burke Const. Co.*, 260 U.S. 226, 230, 43 S.Ct. 79, 81, 67 L.Ed. 226 (1922), nor is this Court bound by the doctrine of *stare decisis* to follow state court interpretations of federal law, *Kansas City Steel Co. v. Arkansas*, 269 U.S. 148, 46 S.Ct. 59, 70 L.Ed. 204 (1925).

Any *persuasive* effect the opinion in *Brough v. Appawora* may have had was effectively negated by the United States Supreme Court, which vacated the opinion and remanded "for further consideration in light of *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660

217, 220–22 nn. 5, 6, & 10, 79 S.Ct. 269, 270–271, 3 L.Ed.2d 251 (1958).

**16.** By its terms, the preliminary injunction was narrower in scope than was the TRO; the defendants, their officers, employees, etc., were restrained from "exercising or assuming any form of criminal or civil jurisdiction based on the case *Brough v. Appawora*, or otherwise, ... pending a final determination of this action, ..."

(1977)." 431 U.S. 901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977). The threat of injury addressed by the preliminary injunction arguably became moot following the Supreme Court's action, and the preliminary injunction shall therefore be dissolved upon entry of final judgment in this action.

## III. TRIAL

The above-entitled action came before this Court for the purpose of trial without a jury on August 1 and 2, 1979. Testimony was taken from 18 witnesses and more than 800 documentary exhibits were admitted,[17] totaling more than 3,000 pages of text, plus photographs and dozens of maps. Besides giving careful scrutiny to these documents and the record at trial, this Court has studied the extensive pretrial memoranda and post-trial briefs submitted by the parties and the United States as *amicus,* and has examined numerous historical documents authenticated in the discovery process but not included in the compilation of joint exhibits offered at trial, and other learned treaties and historical works that are relevant to this Court's determinations.

## IV. HISTORICAL INQUIRY

In large part, the questions to be decided by this Court turn on the discovery of the intent of the United States Congress in the course of its dealings with the Ute Indians and their non-Indian neighbors, particularly as that intent has found expression in numerous statutes. As Chief Justice Marshall announced long ago, "Where the mind labors to discover the design of the Legislature, it seizes everything from which aid can be derived . . ." *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1905). In this case, this Court has been compelled to assemble and synthesize multiple fragments of a complex era of history in an attempt to reinfuse the words of the old documents we are considering with the weight and meaning they once carried and to do so "courts, in construing a statute, may with propriety recur to the history of the times when it was passed." *United States v. Union Pac. R.R.,* 91 U.S. 72, 79, 23 L.Ed. 224 (1875). Courts in cases such as this one must of necessity refer to that history to resolve the issues before them. See *Missouri-Kansas-Texas R.R. Co. v. Early,* 641 F.2d 856, 857 (10th Cir. 1981). As one distinguished commentator warned years ago: "Federal Indian law is a subject that cannot be understood if the historical dimension of existing law is ignored." N. Margold, *Introduction,* in F. Cohen, Handbook of Federal Indian Law at xxxvii (U.N.M. ed. 1971). In a very real sense history controls the meaning of law in this case.[18]

At the same time, however, neither history nor the law that it creates remain static, fixing words with a particular meaning assigned by the thinking of a particular era. Notions of jurisdiction, sovereignty, of enlightened governmental policy evolve in a state of flux generated by the changing perceptions and experiences of the people by whom these ideas are defined. Justice

---

17. In this Opinion, documents shall be both described specifically and referred to by their assigned exhibit numbers to avoid confusion. The 485 joint exhibits of the parties shall be cited as "JX [*number*]." The documents included in the Joint Compendium of Legislative Documents shall be cited as "LD [*number*]." Other documents, items, etc. shall be assigned similar designations, *e. g.,* such as those found in defendant's first request for admissions. "DFRA [*number*]."

18. See Deloria, "Indian Law and the Reach of History," 4 *J.Contemp.L.* 1 (1977). In *Mohegan Tribe v. State of Connecticut,* 638 F.2d 612 (2d Cir. 1981), the United States Court of Appeals for the Second Circuit commented:

As the Supreme Court has noted with respect to Indian legislation and treaties, "[t]hese instruments . . . cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them." *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed.2d 209 . . . (1978); accord, *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 . . . (1979). Certainly, courts should never ignore strong extrinsic evidence which may serve to explain the meaning of statutory enactments, particularly when the statutes are as deeply embedded in American history as are those relevant here.

*Id.,* 638 F.2d at 621 (citations omitted).

requires that courts temper the meaning of the fundamental documents with interpretations that serve the needs of people in circumstances beyond the imagination of those who framed the statutory language decades ago.[19] The architects of the policy of allotting Indian reservation lands in severalty to tribal members in no way foresaw the stubborn survival of American Indians as distinct, cultural and political communities who "cling so tenaciously to their lands and traditional tribal way of life." *Federal Power Comm. v. Tuscarora Indian Nation*, 362 U.S. 99, 142, 80 S.Ct. 543, 567, 4 L.Ed.2d 584 (1962) (J. Black, dissenting). Their concerns over matters of policy seem to have been much more immediate than dictating what would be the precise boundaries of an Indian reservation 80 years later. As Justice Marshall observed in a recent case raising similar issues,

> Ultimately, what the legislative history demonstrates, as co-counsel for the state has aptly concluded, is that Congress manifested an "almost complete lack of . . . concern with the boundary issue."[20] The issue was of no great importance in the early 1900's as it was commonly assumed that all reservations would be abolished when the trust period on allotted lands expired. There was no pressure on Congress to accelerate this time table, so long as settlers could acquire unused land. Accordingly, Congress did not focus on the boundary question.

**19.** For example, in *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n.*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979), the Supreme Court confronted the problems of enforcement of Indian fishing rights under treaties signed in the 1850's in the context of regulation of an international salmon fishery. Justice Stevens commented that

> In sum, it is fair to conclude that when the treaties were negotiated, neither party realized or intended that their agreement would determine whether, and if so how, a resource that had always been thought inexhaustible would be allocated between the native Indians and the incoming settlers when it later became scarce. . . . Unfortunately, that resource has now become scarce and the meaning of the Indians' treaty right to take fish has accordingly become critical.

*Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 629, 97 S.Ct. 1361, 1384, 51 L.Ed.2d 660 (1977) (J. Marshall, dissenting).

The task facing this Court is plagued by a similar lack of definitive expression by Congress on the specific boundary issues. The Court must make its own reasoned construction of the relevant statutory language based upon a careful evaluation of multiple factors, namely history, legal doctrine and precedent, public policy, past and contemporary circumstances of people, and common sense. Legal analysis of the evidence and issues in this case is further complicated by the fact that over the years, Congress has changed the rules defining the territorial limits of federal, state and tribal jurisdiction in a reservation context. Historical events that are now material to the question of jurisdiction were not material to the question of jurisdiction at the time those events occurred.

For example, "Indian Country" as a jurisdictional concept was first defined in general terms by Congress in the Indian Trade and Intercourse Act of 1834:

> Be it enacted, that all that part of the United States west of the Mississippi, and not within the states of Missouri and Louisiana, or the territory of Arkansas, and also that part of the United States east of the Mississippi River, and not within any state *to which the Indian title has not been extinguished*, for the purpose of this Act, be taken and deemed *Indian country*.[21]

*Id.* 443 U.S. at 669, 99 S.Ct. at 3066.
The Court proceeded to decree a practical mathematical apportionment of the resource based upon an equitable reading of the broad purposes of the treaty language. *Id.*, 443 U.S. at 674–685, 99 S.Ct. at 3069–3074.

**20.** At his footnote 20, Justice Marshall cites Comment, *New Town et al.: The Future of an Illusion*, 18 S.D.L.Rev. 85, 117 (1973). One author of that Comment, Tom Tobin, is also defense counsel in these proceedings.

**21.** Act of June 30, 1834, § 1, 4 Stat. 729 (emphasis added). Prior to this time, the Supreme Court had held that lands the Indian title to which had been extinguished by treaty were not "Indian country" for the purposes of the Indian Trade and Intercourse Act of 1802, Act

This statutory definition remained in force until it was repealed by the failure to include it in the U.S. Revised Statutes in 1874.[22] However, a number of other federal statutes were retained in the Revised Statutes which still made reference to transactions in "Indian country." *See e. g.*, R.S. §§ 2127–2148, 2150, 2152–2154 (1878). Notwithstanding the repeal of the statutory definition in the 1834 Act, the courts continued to apply the general thrust of that definition in cases arising under statutes which were retained. In *Bates v. Clark*, 95 U.S. 204, 24 L.Ed. 471 (1877), the Supreme Court first dealt with the problem of defining "Indian country" under the Revised Statutes. Justice Miller, writing for the Court, reviewed the 1834 Act's definition and commented:

> The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case.

95 U.S. at 208. In *Bates* the Court found the 1834 definition to be easily applied to the case before it:

> Notwithstanding the immense changes which have since taken place in the vast region covered by the act of 1834, by the extinguishment of Indian titles, the creation of states and the formation of territorial governments, Congress has not thought it necessary to make any new

definition of Indian country. Yet during all this time a large body of laws has been in existence, whose operation was confined to the Indian country, whatever that may be. And men have been punished by death, by fines, and by imprisonment, of which the courts who so punished them had no jurisdiction, if the offenses were not committed in the Indian country as established by law. These facts afford the strongest presumption that the Congress of the United States, and the judges who administered those laws, must have found in the definition of Indian country, in the Act of 1834, such an adaptability to the altered circumstances of what was then Indian country as to enable them to ascertain what it was at any time since then.

95 U.S. at 207. Thus it was that the 1834 definition of "Indian country" became a matter of federal common law.[23] The Court continued to apply the title-dependent definition of Indian country set forth in *Bates v. Clark* for a number of years, as in the case of *Ex parte Crow Dog*, 109 U.S. 556, 3 S.Ct. 396, 27 L.Ed. 1030 (1883), in which Justice Matthews wrote:

> In our opinion, that definition now applies to all the country to which the Indian title has not been extinguished within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of the Indians, ...

> This definition though not now expressed in the Revised Statutes, is implied in all those provisions, most of which were originally connected with it when first enacted, and which still refer to it.

of Mar. 30, 1802, 2 Stat. 139. *American Fur Co. v. United States*, 27 U.S. (2 Pet.) 358, 7 L.Ed. 450 (1829). Though sections of that Act referred to "Indian country" or "Indian territory", it made no effort to give a general definition of those terms, choosing instead to delineate a single boundary line which was variable by treaty provision.

**22.** See R.S. § 5596 (1878). The 1878 edition of the Revised Statutes corrected certain errors in the first edition and "remained the standard and only official compilation of federal statute

law" until 1901. A. Beardsley and O. Orman, Legal Bibliography and the Use of Law Books 77 (2d ed. 1947); See Act of Mar. 2, 1877, § 4, Ch. 82, 19 Stat. 268.

**23.** See H. Hart & H. Wechsler, The Federal Courts at the Federal System (2d ed. Bator 1973) at 770: "We will use the term, federal common law, loosely, ... to refer generally to federal rules of decision where the authority for a federal rule is not explicitly or clearly found in federal statutory or constitutional command."

It would be otherwise impossible to explain these references, or give effect to many of the most important provisions of existing legislation for the government of Indian country.

109 U.S. at 561–62, 3 S.Ct. at 399. In *Crow Dog*, the court held Sioux lands within the Dakota Territory to be "Indian country" for jurisdictional purposes. *United States v. LeBris*, 121 U.S. 278, 280, 7 S.Ct. 894, 895, 30 L.Ed. 946 (1887), extended "Indian country" to include lands held under Indian title within the boundaries of a state.

This title-dependent conception of what for jurisdictional purposes comprised "Indian country" governed, or should have governed, the perceptions of persons contemporaneous to the "opening" of the Uncompahgre Indian Reservation in the 1890's and the Uintah Valley Reservation in 1905. *Indian title, rather than reservation boundaries, was the material jurisdictional fact.*[24]

This distinction between "Indian country" and lands within the boundary of a reservation was acknowledged by the Supreme Court in *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195, decided in 1909, four years after the Uintah Valley Reservation was "opened" by Congress to settlement. In that case, the Court, referring to the 1834 statute defining Indian country, observed:

> Construing this section, it was decided, in *Bates v. Clark*, 95 U.S. 204, 209, [24 L.Ed. 471] that all the country described in the act as "Indian country" remains such "so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different pro-

vision by treaty or by act of Congress." The section was repealed by Rev.Stat., § 5596. Still, it was held that it might be referred to for the purpose of determining what was meant by the term "Indian country" when found in sections of the Revised Statutes which were reenactments of other sections of prior legislation. *Ex parte Crow Dog*, 109 U.S. 556, [3 S.Ct. 396, 27 L.Ed. 1030]; *United States v. Le Bris*, 121 U.S. 278, [7 S.Ct. 894, 30 L.Ed. 946]. But *the word "reservation" has a different meaning, for while the body of land described in the section quoted as "Indian country" was a reservation yet a reservation is not necessarily "Indian country." The word is used in the land law to describe any body of land, large or small, which Congress has reserved from sale for any purpose.* It may be a military reservation, or an Indian reservation, or, indeed, one for any purpose for which Congress has authority to provide, and *when Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress.*

215 U.S. at 285, 30 S.Ct. at 94 (emphasis added).

Support for any inference on the question of reservation boundaries cannot be drawn blindly from evidence of jurisdictional practice at the time the reservations were opened. Evidentiary exhibits that express contemporaneous opinions on jurisdiction are properly considered only within the context of the governing law as perceived at that time.[25]

---

**24.** As with many generalizations, there is at least one exception: the Seven Major Crimes Act, Act of Mar. 3, 1885, § 9, ch. 341, 23 Stat. 362, extended federal jurisdiction to specified offenses by Indians against Indians and other persons "within the limits of any Indian reservation," rather than within Indian country. See *United States v. Kagama*, 118 U.S. 375, 377–78, 6 S.Ct. 1109, 1110, 30 L.Ed. 228 (1886); *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909).

**25.** In *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977), the

majority opinion seems to overlook this distinction. In *Rosebud* the majority finds that because Congress expressly extended the operation of the Indian liquor laws to the "opened" areas of the reservation, Congress thought that those lands were no longer within the boundaries of the reservation—a weighty construction of the opening legislation. Of course, the Indian liquor laws addressed themselves to "Indian country", which at that time was defined by land title rather than reservation boundary.

"[T]he most reasonable inference from the inclusion of this provision is that Congress was aware that the opened unallotted areas

A few years later, the Supreme Court expanded the judicial definition of Indian country to include lands once a part of the public domain which have been reserved and set apart as an Indian reservation by Executive Order,[26] *Donnelly v. United States*, 228 U.S. 243, 269, 33 S.Ct. 449, 458, 57 L.Ed. 820 (1913). After *Donnelly*, reservation boundaries rather than unextinguished Indian title became the material jurisdictional facts, at least in some cases. The courts continued to expand the definition of Indian country [27] until 1948, when Congress codified these judicial expressions into statutory law as 18 U.S.C. § 1151.[28]

That definition is the one currently in force, defining "Indian country" in terms of the boundaries of an Indian reservation, regardless of title. 18 U.S.C. § 1151(a) (1976). It must be recalled that during this whole dynamic chain of events, federal, state and tribal officials were attempting to administer policies in light of the then-governing law. To be sure, as a practical matter, the subtle distinctions described above were sometimes lost upon those who actually lived and worked in the areas on or near the Indian reservations; the remote offices of an Indian agent or county prosecutor were not the likely repositories of complete

would henceforth not be "Indian country," because not in the reservation.
*Id.*, 430 U.S. at 613, 97 S.Ct. at 1376 (footnote omitted).

The appropriate inference would seem to have been that Congress included the liquor provision in the 1910 Rosebud Act because Congress was aware that the opened areas of the reservation would cease to be "Indian country" because land titles were to change hands, Indian to non-Indian.

The *Rosebud* majority draws its differing inference by overlooking or blurring the distinction between Indian country and reservations lands elucidated by the Court in *United States v. Celestine*, decided in 1909:

Indian country, however, did not apply to territory on which "the Indian title had been extinguished, and over the inhabitants of which ... the jurisdiction of the state was full and complete" *Dick v. United States*, [208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520 (1908),] *supra*, at 352, [28 S.Ct. at 402]. Land remaining within the boundaries of a reservation, of course, would not be subject to the "full and complete" jurisdiction of the state ... While prior to the statutory definition in 18 U.S.C. § 1151, the defined areas of Indian country may have been a bit vague, ... *Dick* was the most recent pronouncement on the subject at the time of the 1910 Act, and clearly *defined Indian country with reference to state jurisdiction.*

430 U.S. at 614-15 n.47, 97 S.Ct. at 1376-1377 (emphasis added and citations omitted). The *Dick* opinion exhibits no such emphasis on state jurisdiction; it cites *Bates v. Clark* and *Ex parte Crow Dog* as authority for the statement quoted in *Rosebud*, both of which define "Indian country" by land title. The *Rosebud* majority seems to overlook the careful distinctions expressed at that time by the court in *Celestine* as well as a revealing comment in *Clairmont v. United States*, 225 U.S. 551, 32 S.Ct. 787, 56 L.Ed. 1201 (1912), at 558-59, 32 S.Ct. at 789:

But, as was pointed out in *Bates v. Clark, supra*, ... "When the Indian title is extinguished it ceases to be Indian country, unless some such [statutory] reservation takes it out of the rule." The *same principle of decision* was recognized in *Dick v. United States*, 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520. [Emphasis added.]

The Court in *Clairmont* makes no reference to "full and complete" state jurisdiction or to the termination of reservation status in defining "Indian country" under the liquor laws. Continuing reservation status and state jurisdiction were not necessarily inconsistent. See *e. g., Louie v. United States*, 274 F. 47, 49 (9th Cir. 1921). That extinguishment of Indian title defined "Indian country" in 1910 renders it difficult for this Court to infer that Congress was aware of any other controlling principles in dealing with the Sioux, or the Utes, however meaningful that other rule is today. See *Rosebud Sioux Tribe v. Kneip, supra*, 430 U.S. at 623-24 n. 12, 97 S.Ct. at 1381-1382 (J. Marshall, dissenting).

26. Both the Uintah Valley and the Uncompahgre Reservations were created by Executive Orders.

27. See *e. g., United States v. Sandoval*, 231 U.S. 28, 34 S.Ct. 1, 58 L.Ed. 107 (1913) ("Indian country" includes "dependent Indian communities"); *United States v. Pelican*, 232 U.S. 442, 34 S.Ct. 396, 58 L.Ed. 676 (1914) (individual Indian trust allotments); *Pronovost v. United States*, 232 U.S. 487, 34 S.Ct. 391, 58 L.Ed. 696 (1914) (Indian reservation); *United States v. McGowan*, 302 U.S. 535, 58 S.Ct. 286, 82 L.Ed. 410 (1938) (Reno Indian colony).

28. See *United States v. John*, 437 U.S. 634, 648-49 & n.18, 98 S.Ct. 2541, 2548-2549, 57 L.Ed.2d 489 (1978); text of section at note 13, *supra*.

sets of United States Reports.[29] Conflicting jurisdictional practices of federal and state authorities in 1897, or 1905, or for decades thereafter may have institutionalized the erroneous exercise of jurisdiction as well as the valid exercise of jurisdiction.[30] The extensive "jurisdictional history" offered at trial by the parties is far more probative of the existence of an ongoing boundary conflict which requires resolution than it is evidence that one asserted boundary line prevails over another.

## V. GOVERNING PRINCIPLES

Litigation of the unique complexity of an Indian reservation disestablishment suit demands the application of specially adapted rules of statutory construction. Over the years, courts adjudicating such cases have formulated such principles.[31] This Court

has carefully reviewed the bulk of existing case law on reservation diminishment[32] in an effort to distill an analytical approach to the legal and historical materials in this case that would seem to make sense.

It is recognized as fundamental that Congress has primary authority over and bears overall responsibility for Indian affairs.[33] Decades ago, the Supreme Court recognized that such power governs the results of reservation boundary litigation. In *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909), Justice Brewer, writing for a unanimous Court, declared that, "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *Id.* 215 U.S. at 285, 30 S.Ct. at 94. This basic precept

29. The administrative process was often complicated by specific statutes that extended state jurisdiction within reservation boundaries. *E. g., Louie v. United States*, 274 F. 47, 49 (9th Cir. 1921).

30. The complex problems this Court has faced in evaluating the jurisdictional history of the Uintah and Ouray Indian Reservation only reaffirm the wisdom of an observation by Nathan Margold:

> [I]f the laws governing Indian affairs are viewed as lawyers generally view existing law, without reference to the varying times in which particular provisions were enacted, the body of the law thus viewed is a mystifying collection of inconsistencies and anachronisms. To recognize the different dates at which various provisions were enacted is the first step towards order and sanity in this field.

*Introduction*, in F. Cohen, Handbook of Federal Indian Law xxviii (N.M. ed. 1971).

31. Compare *e. g., Hatten v. Hudspeth*, 99 F.2d 501 (10th Cir. 1938) with *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977).

32. See *Rosebud Sioux Tribe v. Kneip*, 375 F.Supp. 1065 (D.S.D.1974) *affirmed*, 521 F.2d 87 (8th Cir. 1975), *affirmed*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975); *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973); *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962); *Clairmont v. United States*, 225 U.S. 551, 32 S.Ct. 787, 56 L.Ed. 1201 (1912); *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed.

195 (1909); *Dick v. United States*, 208 U.S. 340, 28 S.Ct. 399, 52 L.Ed. 520 (1908); *Russ v. Wilkins*, 624 F.2d 914 (9th Cir. 1980); *United States v. Minnesota*, 466 F.Supp. 1382 (D.Minn. 1979), *affirmed*, 614 F.2d 1161 (8th Cir. 1980) (*per curiam*); *United States v. A Juvenile*, 453 F.Supp. 1171 (D.S.D.1978) *reversed sub nom. United States v. Dupris*, 612 F.2d 319 (8th Cir. 1979), *vacated and remanded as moot*, 446 U.S. 980, 100 S.Ct. 2959, 64 L.Ed.2d 836 (1980); *United States v. Wounded Knee*, 596 F.2d 790 (8th Cir. 1979) *cert. denied*, 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289; *United States v. Long Elk*, 410 F.Supp. 1174 (D.S.D.1976), *reversed* 565 F.2d 1032 (8th Cir. 1977); *Beardslee v. United States*, 541 F.2d 705 (8th Cir. 1976); *United States ex rel. Cook v. Parkinson*, 396 F.Supp. 473 (D.S.D.1975), *affirmed*, 525 F.2d 120 (8th Cir. 1975), *cert. denied*, 430 U.S. 982, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States ex rel. Condon v. Erickson*, 344 F.Supp. 777 (D.S.D.1972), *affirmed*, 478 F.2d 684 (8th Cir. 1973); *New Town v. United States*, 454 F.2d 121 (8th Cir. 1972); *Ellis v. Page*, 351 F.2d 250 (10th Cir. 1965); *Hilderbrand v. United States*, 327 F.2d 205 (10th Cir. 1964); *Tooisgah v. United States*, 186 F.2d 93 (10th Cir. 1950); *Kills Plenty v. United States*, 133 F.2d 292 (8th Cir. 1943); *United States v. Frank Black Spotted Horse*, 282 F. 349 (D.S.D.1922); *United States v. Kiya*, 126 F. 879, 882 (D.N.D.1903); *Confederated Salish & Kootenai Tribe v. Namen*, No. 2343, et al. (D.Mont. Filed Sept. 20, 1979).

33. See *e. g.*, 1 American Indian Policy Review Comm'n, Final Report at 106–107 (comm. print 1977).

forms the foundation of the body of case law dealing with reservation disestablishment.

In *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), the Supreme Court, quoting the passage from *Celestine, supra*, held that the boundaries of the southern half of the Colville Indian Reservation remain intact notwithstanding the opening of the reservation to non-Indian settlement by Act of Congress in 1906, and the prior disestablishment of the northern half of the reservation.[34] Unlike the 1892 Act, which provided that the north half be "vacated and restored to the public domain,"[35] the 1906 Act[36] and the 1916 Presidential Proclamation[37] implementing the Act did not "purport to affect the status of the remaining part of the reservation..." *Id.*, 368 U.S. at 354, 82 S.Ct. at 426. Rather, the 1906 Act merely "opened" the Colville Reservation to non-Indian homesteading, consistent with the purposes of the allotment policy:

Consequently, it seems clear that the purpose of the 1906 Act was neither to destroy the existence of the diminished Colville Indian Reservation nor to lessen federal responsibility for and jurisdiction over the Indians having tribal rights on that reservation. The Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards.

*Id.* 368 U.S. at 356, 82 S.Ct. at 427.[38] Even townsites within the opened reservation were held to remain a part of the reservation, and therefore, "Indian country" under 18 U.S.C. § 1151. *Id.* 368 U.S. at 358–59, 82 S.Ct. at 428–429.

Important to the Court's determination of whether the Colville Reservation had been disestablished by the entry of non-Indians were several factors: (1) the express language of legislation effecting the reser-

---

**34.** See *Id.* 368 U.S. at 354–59, 82 S.Ct. at 426–429. Generally speaking, reservation disestablishment cases arise as a consequence of the efforts of Congress over a 30-year period to abolish the Indian reservation system by allotting tribal lands in separate parcels to individual tribal members and opening any surplus reservation lands remaining to non-Indian entry and settlement. In addition to the Dawes Act, or General Allotment Act of 1887, Act of Feb. 8, 1887, 24 Stat. 388, which provided general authority for allotment of reservations, Congress enacted 108 separate bills directing the allotment of specific reservations, some times under the provisions of the Dawes Act, often under their own specific terms. See 2 Task Force No. 9, American Indian Policy Review Comm.'s, Report on Indian Law Consolidation, Revision and Codification (Appendix) 235–246 (comm. print 1976). The purpose of the allotment program was to promote the assimilation of Indians into the dominant society by impressing them into the lifestyle of the yeoman farmer. An idealistic near-crusade by the "friends of the Indian" joined by railroads and mining companies, the allotment program was generally disastrous. See D. Otis, The Dawes Act and the Allotment of Indian Lands (Prucha ed. 1973). Between 1887 and 1934, when allotment ceased, 60 million acres of "surplus" reservation land had been sold to non-Indians, as had 27 million acres of lands allotted to individual Indians. W. Washburn, Red Man's Land— White Man's Law 145 (1971). The allotment

policy although repudiated as long ago as 1934, continues to have a profound effect on Indian reservation land tenure, having often created a "checkerboard" pattern of land ownership and given rise to boundary and jurisdictional disputes such as the case at bar.

**35.** Act of July 1, 1892, § 1, ch. 140, 27 Stat. 62, 63, I Kapp. 441–43 (2d ed. 1904). Proceeds from the sale of the restored lands were to go to the government, not the Indians. *Id.* § 2.

**36.** Act of Mar. 22, 1906, ch. 1126, 34 Stat. 80, III Kapp. 163–165 (1913).

**37.** Proclamation of May 13, 1916, 39 Stat. 1778, IV Kapp. 966–69 (1929).

**38.** The opening of the reservations to non-Indian settlement was theorized to be helpful to the Indians as they could learn by example the farming of their own allotments by observing the practices of their "civilized" white neighbors. It would promote co-operation between Indians and whites and ease tensions in reservation communities. The influx of whites, it was believed, would create markets and transportation facilities, would build schools and otherwise be advantageous to the Indians. See D. Otis, The Dawes Act and the Allotment of Indian Lands 17 (Prucha ed. 1973); H.Rep.No. 660, 53d Cong., 2d Sess. 3 (1894); 26 Cong.Rec. 6236 (remarks of Rep. Coffeen) (June 13, 1894).

vation; (2) the deposit of proceeds from the sale of reservation lands to non-Indians into tribal funds rather than the general funds of the United States; (3) subsequent legislation acknowledging by reference the continuing existence of the reservation; and (4) subsequent administrative determinations by the Department of the Interior and the Department of Justice recognizing continuation of reservation status.

■■■ The Supreme Court did not again decide a controversy involving reservation disestablishment until 1973 in the case of *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). In *Mattz,* a unanimous Court held that the Klamath River Indian Reservation continued to exist within its defined boundaries despite a number of attempts to end the reservation. Reaffirming the fundamental policy expressed in *Celestine* and *Seymour*, the Court in *Mattz* set forth this standard:

> A congressional determination to terminate [a reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history. See *Seymour v. Superintendent,* 368 U.S. 351[, 82 S.Ct. 424, 7 L.Ed.2d 346] (1962); *United States v. Nice,* 241 U.S. 591[, 36 S.Ct. 696, 60 L.Ed. 1192] (1916).

*Id.* 412 U.S. at 505, 93 S.Ct. at 2258 (footnote omitted). The *Mattz* opinion adds the factors of legislative history and "surrounding circumstances" to the criteria expressed in *Seymour*.[39] The court may thus look behind the written words of statutory law to determine their meaning and purpose within the spirit of their time, but that historical inquiry is to be carefully channeled. Repeated unsuccessful efforts by members of Congress to terminate a reservation cannot persuade a court that the ultimate legislation opening a reservation was intended to diminish its boundaries

without an additional showing of consistent intent. In *Mattz*, for example, the House had tried repeatedly to terminate the Klamath River Reservation but had failed at every attempt. In 1892, the House passed a bill ending the reservation. H.R. 38, 52d Cong., 1st Sess. See 23 Cong.Rec. 125, 1598–99 (1892). That bill was struck out by the Senate which substituted a more moderate bill mandating allotment of the reservation under the General Allotment Act of 1887, 23 Cong.Rec. 3918–19 (1892), a bill supported by the Interior Department. At conference, the Senate version as agreed to, with amendments, and then passed, becoming the operative legislation opening the reservation.[40] The *Mattz* Court cautioned against reliance on the legislative history of the unsuccessful House bills:

> [T]he respondent's reliance on the House Report and on comments made on the floor of the House is not well placed; although the primary impetus for termination of the Klamath River Reservation had been with the House since 1871, this effort consistently had failed to accomplish the very objectives the respondent now seeks to achieve. . . . The legislative history relied upon by the respondent does not support the view that the reservation was terminated; rather, by contrast with the bill as finally enacted, it compels the conclusion that efforts to terminate the reservation by denying allotments to the Indians failed completely.

*Id.* 412 U.S. at 503–504, 93 S.Ct. at 2257.

The Court further refused to draw a negative inference as to the effect of the actual allotment statute:

> A second conclusion is also inescapable. The presence of allotment provisions in the 1892 Act cannot be interpreted to mean that the reservation was to be terminated. . . . More significantly, throughout the period from 1871–1892

---

**39.** In footnote 23, the Court cites with apparent approval the opinion in *United States ex rel. Condon v. Erickson,* 478 F.2d 684 (8th Cir. 1973) in which that court concluded, *id.*, at 689, that a ruling favoring continuing reservation status "is required unless Congress has *expressly or by clear implication* diminished the

boundaries of the reservation opened to settlement" (emphasis in original). 412 U.S. at 505 n.23, 93 S.Ct. at 2258.

**40.** Act of June 17, 1892, ch. 120, 27 Stat. 52, I Kapp. 439 (2d ed. 1904).

numerous bills were introduced which *expressly* provided for the termination of the reservation and did so in unequivocal terms. Congress was fully aware of the means by which termination could be affected. But clear termination language was not employed in the 1892 Act. This being so, we are not inclined to infer an intent to terminate the reservation.[22]

[22] Congress has used clear language of express termination when that result is desired. . . . [Examples omitted.]

*Id.* 412 U.S. at 504, 93 S.Ct. at 2257.[41]

The *Mattz* opinion also treats with great care the subsequent legislative and administrative references to the Klamath River Reservation. Noting that "[a]lthough subsequent legislation usually is not entitled to much weight in construing earlier statutes, *United States v. Southwestern Cable Co.*, 392 U.S. 157, 179, 88 S.Ct. 1994, 2006, 20 L.Ed.2d 1001 (1968), it is not always without significance," *id.*, 412 U.S. at 505 n.25, 93 S.Ct. at 2258, the Court found support in legislation by which Congress extended the trust status of allotments within the reservation and restored undisposed-of lands within the boundaries to tribal ownership. At the same time, the Court discounted past-tense references to the reservation (*e. g.*, to "what was the Klamath River Reservation") in legislation as indicating disestablishment, noting that Klamath River had been annexed at that time to the larger Hoopa Valley Reservation and concluding that the past-tense reference "is not to be read as a clear indication of congressional purpose to terminate." *Id.*, 412 U.S. at 498, 93 S.Ct. at 2254.[42] *Mattz*, like *Seymour*, found additional support for continuing res-

ervation status in federal administrative treatment of the reservation.

*Mattz* elaborated upon the criteria set forth in *Seymour* setting the stage for decisions that followed. In 1975 the Supreme Court decided *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975), dealing with the Lake Traverse Indian Reservation in South Dakota. In 1891, Congress passed a law ratifying an 1889 agreement with the Sisseton and Wahpeton bands of the Sioux Nation which provided for the allotment of Lake Traverse Reservation lands to the Indians and the unqualified cession of the unallotted "surplus" lands to the United States in return for a sum-certain payment.[43] Those lands were subsequently opened to white settlement with disastrous consequences for the Indians. See D. McNickle, They Came Here First 220–224 (2d ed. 1975). In *DeCoteau*, a majority of the Court led by Justice Stewart found a number of factors that militated against a finding of continued reservation status: contemporaneous views of white and Indians alike tended strongly towards the conclusion that ratification of the 1889 Agreement would end the reservation. The Agreement recited cession language that was "precisely suited" to disestablishment by cession.[44] The 1889 Agreement was ratified in the same bill with similar agreements, the sponsors of the bill acknowledging that the agreements would return the ceded lands to the public domain. The "jurisdictional history" of the reservation offered little support for a finding of continu-

41. The stringent care with which the Court treats the legislative history of a conflict between houses in *Mattz* is of material importance to the case at bar. The 1905 Act that ultimately opened the Uintah Valley Reservation was a Senate substitution for a prior House bill containing clear language of disestablishment. See 1127–1131 *infra*. *Mattz* requires this Court to scrutinize the legislative history relevant herein with great care.

42. The defendants herein emphasize past-tense references to the Ute reservations in various acts and documents as indicative of congres-

sional intent that only the trust lands remain a reservation. See *e. g.*, State of Utah Post-Trial Brief at 18 & fig. 2, 42 & fig. 4; defendant Counties' Post-Trial Brief at 100–101. *Mattz* requires this Court to evaluate those references carefully in light of the specific history of the Ute lands.

43. Act of Mar. 3, 1891, §§ 26–30, 1, ch. 543, 26 Stat. 989, 1036, I Kapp. 429–32 (2d ed. 1904).

44. Cf. *Clairmont v. United States*, 225 U.S. 551, 556, 32 S.Ct. 787, 788, 56 L.Ed. 1201 (1912).

ing reservation status. *Id.* 420 U.S. at 431–449, 95 S.Ct. at 1086–1095.[45]

This Court does not lightly conclude that an Indian reservation has been terminated. "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine*, 215 U.S. 278, 285[, 30 S.Ct. 93, 94, 54 L.Ed. 195]. The congressional intent must be clear, to overcome "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan v. Arizona State Tax Comm'n.*, 411 U.S. 164, 174, [93 S.Ct. 1257, 1263, 36 L.Ed.2d 129], quoting *Carpenter v. Shaw*, 280 U.S. 363, 367[, 50 S.Ct. 121, 122, 74 L.Ed. 478]. Accordingly, the Court requires that the "congressional determination to terminate ... be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history." *Mattz v. Arnett*, 412 U.S. at 505[, 93 S.Ct. at 2258]. See also *Seymour v. Superintendent*, 368 U.S. 351, [82 S.Ct. 424, 7 L.Ed.2d 346], and *United States v. Nice*, 241 U.S. 591[, 36 S.Ct. 696, 60 L.Ed. 1192]. In particular, we have stressed that reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers are placed in trust by the Government for the Indians'

benefit. *Mattz v. Arnett, supra,* and *Seymour v. Superintendent, supra.*

But in this case, "the face of the Act," and its "surrounding circumstances" and "legislative history," all point unmistakably to the conclusion that the Lake Traverse Reservation was terminated in 1891. The negotiations leading to the 1889 Agreement show plainly that the Indians were willing to convey to the Government, for a sum certain, all of their interest in all of their unallotted lands.

*Id.* 420 U.S. at 444–445, 95 S.Ct. at 1092–1093.

The *DeCoteau* majority was not deterred by the fact that a finding of disestablishment left the Indians with only their allotments:

It is true that the Sisseton-Wahpeton Agreement was unique in providing for cession of all, rather than simply a major portion of, the affected tribe's unallotted lands. But, as the historical circumstances make clear, this was not because the tribe wished to retain its former reservation, undiminished, but rather because the tribe and the Government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs. In such a situation, exclusive tribal and federal jurisdiction is limited to the retained allotments.

*Id.* 420 U.S. at 446, 95 S.Ct. at 1094 (citations omitted).[46]

**45.** That the Indians were compensated for the cession of the unallotted lands by sum-certain payment of $2.50 per acre seemed material to the majority's conclusions in *DeCoteau.* See *id.*, 420 U.S., at 448, 95 S.Ct., at 1094. But sum-certain payment proved not to be an effective talisman for determining disestablishment in *Rosebud, supra,* 430 U.S. at 598–599 n. 20, 97 S.Ct. at 1368–1369. At best, sum-certain payment is a relevant "disestablishment factor" with meaning supplied by surrounding circumstances.

**46.** Justice Douglas, joined by two more Justices, dissented. Particularly troubling to the dissent were the jurisdictional effects of disestablishment:

If this were a case where a Mason-Dixon type of line had been drawn separating the land opened for homesteading from that re-

tained by the Indians, it might well be argued that the reservation had been diminished; but that is not the pattern that took place after 1891. Units of land suitable for homesteaders were scattered throughout the reservation. It is indeed difficult, looking at a current map, to find any substantial unit of contiguous Indian land left. The map picture, as stated in oral argument, shows a "crazy quilt pattern." The "crazy quilt" or "checkerboard" jurisdiction defeats the right of tribal self-government guaranteed by Art. X of the 1867 Treaty, 15 Stat. 510, and never abrogated.

\* \* \* \* \* \*

If South Dakota has its way, the Federal Government and the tribal government have no jurisdiction when an act takes place in a homesteaded spot in the checkerboard; and

Two years following *DeCoteau*, the Court decided *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). *Rosebud* presented the most complex factual situation considered by the Court so far, and required the construction of three separate Acts of Congress. In 1904, 1907 and 1910 Congress opened portions of the Rosebud Indian Reservation to non-Indian entry and settlement.[47] In determining whether the three acts diminished the boundaries of the Rosebud Indian Reservation, Justice Rehnquist, writing for the majority, synthesized the following guiding principles:

> In determining whether or not the 1889 Reservation boundaries were subsequently diminished by congressional enactments, we are guided by well-established legal principles. The underlying premise is that congressional intent will control. *DeCoteau v. District County Court, supra,* [420 U.S.] at 444, 449 [95 S.Ct. at 1092, 1095]; *United States v. Celestine,* 215 U.S. 278, 285 [, 30 S.Ct. 93, 94, 54 L.Ed. 195] (1909). In determining this intent, we are cautioned to follow "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan v. Arizona State Tax Comm'n.,* 411 U.S. 164, 174 [, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129]

(1973), quoting *Carpenter v. Shaw,* 280 U.S. 363, 367 [, 50 S.Ct. 121, 122, 74 L.Ed. 478] (1930); see also *Mattz v. Arnett, supra,* [412 U.S.] at 505 [, 93 S.Ct. at 2258]. The mere fact that a reservation has been opened to settlement does not necessarily mean that the opened area has lost its reservation status. *Mattz v. Arnett, supra;* see also *Seymour v. Superintendent,* 368 U.S. 351 [, 82 S.Ct. 424, 7 L.Ed.2d 346] (1962). But the "general rule" does not command a determination that reservation status survives in the face of congressionally manifested intent to the contrary. *DeCoteau v. District County Court, supra.* In all cases, "the face of the Act," the "surrounding circumstances," and the "legislative history," are to be examined with an eye toward determining what congressional intent was. *Mattz v. Arnett, supra,* [412 U.S.] at 505 [93 S.Ct. at 2258].

*Id.,* 430 U.S. at 586–587, 97 S.Ct. at 1362–1363.

Applying those principles to the facts of that case, the majority in *Rosebud* found that "the Acts of 1904, 1907 and 1910 did clearly evidence congressional intent to diminish the boundaries of the Rosebud Sioux Reservation." *Id.* at 587, 97 S.Ct. at 1363. In 1901 the Indians had consented to a cession of a portion of their reservation on terms similar to those in *DeCoteau.*[48] That

South Dakota has no say over acts committed on "trust" lands. But where in fact did the jurisdictional act occur? Jurisdiction dependent on the "tract book" promises to be uncertain and hectic. Many acts are ambulatory. In a given case, who will move—the State, the tribe, or the Federal Government? The contest promises to be unseemly, the only beneficiaries being those who benefit from confusion and uncertainty. Without state interference, Indians violating the law within the reservation would be subject only to tribal jurisdiction, which puts the responsibility where the Federal Government can supervise it. Checkerboard jurisdiction cripples the United States in fulfilling its fiduciary responsibilities of guardianship and protection of Indians. It is the end of tribal authority for it introduces such an element of uncertainty as to what agency has jurisdiction as to make modest tribal leaders abdi-

cate and aggressive ones undertake the losing battle against superior state authority. *Id.,* 420 U.S. at 466–67, 95 S.Ct. at 1103.

47. Procedurally, at least, the opening of the Uintah Valley Reservation in 1905 was deliberately patterned after the opening of the Gregory County portion of the Rosebud Reservation in 1904. See 1124–1125 & note 158, *infra.*

48. See Agreement, dated Sept. 14, 1901, between James McLaughlin, on the part of the United States, and the Sioux Tribe of Indians belonging on the Rosebud Reservation:

ARTICLE I. The said Indians belonging on the Rosebud Reservation, South Dakota, for the consideration hereinafter named, do hereby cede, surrender, grant, and convey to the United States all their claim, right, title, and interest in and to all that part of the Rosebud Indian Reservation now remaining unallotted, situated within the boundaries of Gregory County, South Dakota . . . .

Agreement failed of ratification in the Congress because of disagreement over the "sum-certain" method of payment. From this unratified Agreement, Justice Rehnquist discerned "an unmistakable baseline purpose of disestablishment." *Id.* at 592, 97 S.Ct. at 1366. A modified version of the Agreement was submitted to the Sioux in 1903 garnering only a simple majority of the Indians' approval. Though lacking the three-fourths majority previously understood to be required,[49] Congress enacted the 1903 "Agreement" into the 1904 Act, relying upon the Supreme Court's decision in *Lone Wolf v. Hitchcock*, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903) for authori-

> ARTICLE II. In consideration of the land ceded, relinquished, and conveyed by Article I of this agreement, the United States stipulates and agrees to expend for and pay to said Indians, in the manner hereinafter provided, the sum of one million and forty thousand (1,040,000) dollars.
> S.Doc. No. 31, 57th Cong., 1st Sess., 28 (1901).

**49.** Article 12 of the Fort Laramie Treaty of Apr. 29, 1868, 15 Stat. 635, II Kapp. 998, 1002 (2d ed. 1904), provides in part,

> No treaty for the cession of any portion or part of the reservation herein described which may be held in common shall be of any validity or force as against the said Indians, unless executed and signed by at least three-fourths of all the adult male Indians occupying or interested in the same; . . . . [Emphasis added].

The three-fourths ratification requirement was followed in most subsequent agreements with the Sioux including the 1901 Agreement. See Act of Mar. 2, 1889, § 28, ch. 405, 25 Stat. 888, I Kapp. 328, 339 (2d ed. 1904); Agreement of Sept. 14, 1901, Art. VI, S.Doc. 31, 57th Cong., 1st Sess. 28 (1901). But see *United States v. Sioux Nation of Indians*, 448 U.S. 371, 382–384, & nn. 13–14, 100 S.Ct. 2716, 2723–2724, 65 L.Ed.2d 844 (1980), discussing the Act of Feb. 28, 1877, ch. 72, 19 Stat. 254, I Kapp. 168–172 (2d ed. 1904).

**50.** See Act of Apr. 23, 1904, ch. 1484, 33 Stat. 254, III Kapp. 71–75 (1913). According to Justice Rehnquist,

> [A]s Inspector McLaughlin had explained to the Tribe, Congress understood that it was not bound by the three-fourths-consent requirement of the 1868 Treaty with the Sioux Nation. In *Lone Wolf v. Hitchcock*, 187 U.S., at 566, 568, [23 S.Ct., at 221, 222], this Court dealing with the validity of a cession of tribal lands enacted in contravention of a treaty requiring three-fourth Indian consent, held:

ty.[50] Noting that the 1904 Act contained cession language that seemed "precisely suited to disestablishment" under *DeCoteau*, the *Rosebud* majority found requisite congressional intent to diminish the reservation. The opinion buttresses this finding by observing that Congress provided that state school sections be selected in the opened area and by noting the "long-standing assumption of jurisdiction by the State" over the opened area. *Id.* 430 U.S., at 599–601,[51] 603–605, 97 S.Ct. at 1369–1370, 1371–1372. The majority further found that the same intent to diminish was embodied in the 1907 and 1910 Acts.[52]

> "The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress . . . .
> " . . . In any event, as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation."
> Although Inspector McLaughlin failed to garner the signatures of three-quarters of the Indians in consent of the proposed changes, Congress understandably relied on this holding as authorizing it to diminish unilaterally the Reservation boundaries.
> *Id.*, 430 U.S. at 599, 97 S.Ct. at 1369 (footnote omitted).
> Inspector McLaughlin similarly relied upon *Lone Wolf* in dealing with the Utes at Uintah. See Minutes of Council held with the Utes, May 18–23, 1903, JX 162.

**51.** It is interesting to note that state sections were not selected within the Uncompahgre Reservation area until the 1960's, and within the Uintah Reservation not at all. See 1146–1147 *infra*. The "jurisdictional history" is also far less clear herein. See 1146–1147 & notes 200–201A, *infra*.

**52.** See Act of Mar. 2, 1907, ch. 2536, 34 Stat. 1230, III Kapp. 307 (1913); Act of May 30, 1910, ch. 260, 36 Stat. 448, III Kapp. 459 (1913); *Rosebud, supra*, 430 U.S. at 605–615, 97 S.Ct. at 1372–1377. Justice Marshall, joined by Justices Brennan and Stewart (the author of *DeCoteau*) dissented, arguing that the evidence of congressional intent as to the Rosebud Reservation "is palpably ambiguous," 430 U.S. at 618, 97 S.Ct. at 1379.

Reading all of these cases together, this Court has sought to evaluate the record in this case pursuant to the following ladder of priorities: (1) the express language of Congress as found in the relevant statutes and its legal effect; (2) the legislative history of a statute, particularly where the language of the statute is ambiguous; (3) contemporaneous interpretations by the President and the executive branch; subsequent congressional and administrative actions and interpretations; other "surrounding circumstances," including school lands selections, "jurisdictional history" (disputed as it is), the intent and understanding of the Indians; and other factors, all weighed against the unique historical context in which they arise. At all times, the effort of this Court has been to harmonize its analysis herein with the principles expressed in *Rosebud, DeCoteau, Mattz* and *Seymour*, and by other courts in other cases, see note 32, *supra*, to the extent that an analogy can be drawn from each case based upon its particular facts. All of the factors considered in this case have been measured by the principle mandated by the Supreme Court as recently as *Rosebud, supra*, that " '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " *Id.*, 430 U.S. at 586, 97 S.Ct. at 1362, quoting *Carpenter v. Shaw*, 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930). *Rosebud* requires that "a congressional determination to terminate [an Indian reservation] must be expressed on the face of the Act or be clear from the surrounding circumstanc-

es and legislative history." *Id.*, 430 U.S. at 586, 97 S.Ct., at 1362, quoting *Mattz, supra*, 412 U.S., at 505, 93 S.Ct., at 2258.[53] Other cases generate a presumption that Congress does not intend the impractical result of "checkerboard jurisdiction" over trust and fee lands absent specific language to that effect. *Moe v. Confederated Salish & Kootenai Tribes*, 425 U.S. 463, 478, 96 S.Ct. 1634, 1643, 48 L.Ed.2d 96 (1976); *Seymour v. Superintendent, supra*, 368 U.S. at 358, 82 S.Ct. at 428; *United States v. Long Elk*, 565 F.2d 1032, 1039 & n.12 (8th Cir. 1977).

This Court's task has been to apply in a reasoned manner the principles described above to the historical record herein and to determine whether that record provides "the hard evidence necessary to overcome the general presumption against an intent to disestablish a reservation," *United States v. Long Elk*, 565 F.2d 1032, 1040 (8th Cir. 1977).

The pages that follow report this Court's findings and conclusions.

## IV. EARLY HISTORY OF THE UTE RESERVATIONS

At the time that Europeans made their first significant contact with the Ute Indians, the Utes dwelled within a territory that included large portions of Colorado, Utah and Northern New Mexico. The Ute economy was based largely upon hunting and gathering of food.

As hunters, the Utes used areas far beyond their borders, especially in the plains area around the eastern area of

---

**53.** Counsel for the defendant counties asserts that *Rosebud* and *DeCoteau* "represent a significant departure from the approach taken in *Seymour v. Superintendent* and *Mattz v. Arnett.*" Defendant Counties Post-Trial Brief at 6–11. The arguments presented are not persuasive. Referring to *Seymour* and *Mattz*, the majority opinion in *DeCoteau* commented,

The Court of Appeals thought that a finding of termination here would be inconsistent with *Mattz* and *Seymour*. This is not so. *We adhere without qualification to both the holdings and the reasoning of those decisions.* But the gross differences between the facts of those cases and the facts here cannot be ignored.

\* \* \* \* \* \*

Thus in finding a termination of the Lake Traverse Reservation, we are not departing from, but following and reaffirming, the guiding principles of *Mattz* and *Seymour*.

*DeCoteau, supra*, 420 U.S. at 447, 449, 95 S.Ct. at 1094 (emphasis added).

While the dissenting opinions extensively quoted by counsel indicate a disagreement, it is much more a disagreement among the Justices as to the application of accepted standards to specific facts than a demonstrated retreat from established principles. See *Rosebud, supra*, 430 U.S. at 586–588 & n.4, 97 S.Ct. at 1362–1363.

their residing area. The game which formed their principal subsistence included large game such as elk, deer, bear, antelope and buffalo. A wide variety of smaller animals were also a part of their diet, as well as trout, berries, and a variety of seeds.

F. O'Neil, "A History of the Ute Indians of Utah Until 1890," at 1 (unpub. Ph.D. dissert., Univ. of Utah 1973).

The Ute people were generally organized into several bands, which included (ca. 1830): Tumpanuwac, Pahvant (now Uintah), Yamparka (White Rivers), Wiminuc (now Ute Mountain), Taviwac (or Tabeguache, now Uncompahgre), Kapote (now Capote), and Muwac (Muache).[54] The plaintiff Ute Indian Tribe is comprised of the present Uintah, White River and Uncompahgre Bands.

While the Utes maintained significant contact with the Spanish settlements to the south, Spanish activities had negligible effect on the extent of the Ute territory. Trade and commerce dominated the relationship.[55]

The arrival thereafter of Anglo-American fur trappers and explorers heralded a different course of events. The early decades of the nineteenth century saw a scattering of white explorers, adventurers and mountain men burgeon into a steady flow of white intruders into Ute country. Conflicts developed between Indian and white, and relations decayed until the economic collapse of the fur trade in the 1840's.[56] The mountain men were followed by the Mormons, who sought to settle upon lands in Ute country and make them their home. The struggle for possession of the most fertile lands, those in Utah Valley and other locations commenced soon thereafter:

> The arrival of white settlers was not particularly disturbing to Utah's Indians since the Great Salt Lake was a border area between the Utes and the Shoshoni bands which ranged over the Great Basin west of there. As the Mormons moved south, however, taking up new land, the Indians were crowded off their central settlements, in Utah Valley and elsewhere. This southern thrust prompted Ute resistance—first at Battle Creek in 1850—and then the so-called "Walker War" of 1853–54.

O'Neil, "The Reluctant Suzerainty: The Uintah and Ouray Reservation," 39 *Utah Historical Quarterly* 129, 130 (Spring 1971).

Fort Utah, which became Provo, Utah, for example, was founded upon the central campsite of the Tumpanuwac Band of Utes. The lands were of considerable value to the Utes, being abundant in fish, game, forage for horses and fresh water. The Utes resisted and were either killed, or captured and removed from their homelands.[57] For a time, the federal Indian Agent for Utah, Dr. Garland Hurt, established a small system of three Indian farm reserves which were intended to provide support and sustenance for the Utes, Paiutes and others.[58]

---

54. J. Jorgensen, "A Ethnohistory and Acculturation of the Northern Ute" at 18 (unpub. Ph.D. dissert., Univ. of Indiana 1965). The Ute Mountain, Capote and Muache Bands of the Ute Indians reside on reservations located in southern Colorado and are not parties to this litigation. See generally, N. Wood, When Buffalo Free the Mountains (1980). Other Ute Bands designations have included Parianuche (or Grand River, consolidated at Uintah and Ouray Reservation), Timpanogos (now Uintah), Sambuawac (part of White River Band), Sheberetche (most killed; survivors scattered) and Weber (partly included in Uintah). F. O'Neil, "A History of the Ute Indians . . . ," *supra*, at App. A.

55. See *e. g.*, Tyler, "The Spaniard and the Ute," 22 *Utah Historical Quarterly* (Oct. 1954); Hill, "Spanish and Mexican Exploration and Trade Northwest from New Mexico into the Great Basin," 3 *Utah Historical Quarterly* (Jan. 1930).

56. F. O'Neil, "A History of the Ute Indians . . . ," *supra*, at 16–23.

57. *Id.* at 27–41; cf. A. Neff, History of Utah, 1847 to 1869, at 364–409 (1940).

58. Agent Hurt intended that the farms be made permanent reservations by treaty. As it stood, the farms rested solely upon the Agent's authority. *Id.* at 42–44. Agent Jarvis established a fourth "reservation" for the "Snakes and Gosi Uta," the Shoshones and Goshiutes, at Deep Creek in western Utah in 1859. C. Royce, Indian Land Cessions in the United States 831 (1900). The farm reserves have the

However, the farms were plagued by disorganization and funding problems and became entangled in the conflict between the Mormons and the federal government that surged in the late 1850's. Many Ute people died of starvation and exposure during the bitter winters of 1859–60 and 1860–61.[59] When a new federal Superintendent of Indian Affairs, Benjamin Davies, arrived in Utah in early 1861, the Utes were, according to Davies, in a "state of nakedness and starvation, destitute and dying of want."[60] Davies was forced to close the farms, selling the implements to buy food for the Indians.

By 1860, the traditional solution of Indian removal could no longer be delayed. The Mormon towns and villages had been generous in supplying food, but this could not serve as a permanent arrangement. After an experience of general disagreement, the federal officials and the Mormon settlers finally agreed that the Indians must be moved.

F. O'Neil, "A History of the Ute Indians of Utah . . .," *supra*, at 51.

The valley of the Uintah Basin had already been proposed as a possible reservation for the Indians of Utah by Superintendent Davies' predecessor. At the suggestion, Governor Brigham Young delegated a survey team to the basin to see whether the lands were suitable for settlement by the Mormons. Receiving a negative report,[61] the Governor did not oppose the federal officials' request to Washington that the basin be set aside as an Indian reservation. Less than a month after the survey team's return President Lincoln approved the Secretary of the Interior's proposal and designated the Uintah Basin as a reservation by the Executive Order of October 3, 1861.[62]

The federal government initially made little effort to provide a viable agency establishment on the Uintah Valley Reservation or to afford the Utes any incentive for moving there. Combined with the closing of the Indian farms, the Indian Bureau's neglect at Uintah left the Utes to their own devices. The bands scattered into loose associations of families which hunted, gathered and raided for food. A number of Utes prosecuted a series of raids upon white livestock and settlements.

Acting pursuant to congressional directive, O. H. Irish, new Superintendent of Indian Affairs for Utah, succeeded in securing the presence of many of the Utes at a treaty council at the old Indian farm at Spanish Fork, Utah, which was held in June, and included the presence of ex-Governor Brigham Young.[63] On June 8, 1865,

designations Royce Area 449–452 and are described, *id.* at 830, and mapped *id.* at pl. 165 "Utah 1" (map).

**59.** *Id.* at 42–50.

**60.** Letter from Sup. Davies to Comm. Dole of June 30, 1861, in Report of the Commissioner of Indian Affairs, 1861, at 129. Historian Hubert Howe Bancroft writes of those times:

The natives had no alternative but to steal or starve; the white man was in possession of their pastures; game was rapidly disappearing, in the depth of winter they were starving and almost unclad, sleeping in the snow and sleet, with no covering but a cape of rabbit's fur and moccasons [sic] lined with cedar bark.

H. Bancroft, History of Utah 629 (1890).

**61.** Upon return, the team reported its findings:
UINTAH NOT WHAT WAS REPRESENTED

The exploring and surveying party have returned with a very unfavorable report . . .

The fertile vales, extensive meadows, and wide pasture ranges so often reported to exist in that region were not found . . . The amount of land at all suitable for cultivation is extremely limited.

*Deseret News*, Sept. 25, 1861. The Secretary of the Interior, on the other hand reported the Uintah Basin was "abounding in valleys of great fertility . . ." Rept. of the Secretary of the Interior, 1864, JX 1, at 161. Agents delegated to the reservation gave no such glowing description. See e. g., J. J. Critchlow to Commissioner Walker, Sept. 1, 1872, in Rept. of the Secretary of the Interior, 1872, at 673.

**62.** See I Kapp. 900 (2d ed. 1904), or Appendix A, *infra*, for text.

**63.** Brigham Young was a key figure in the negotiations. On prior occasions Young had visibly been at odds with the federal agents in their dealings with the Utes. At Spanish Fork, Young and Irish presented a united front, which pleased the Indians assembled:

the assembled Utes concurred in a draft of a treaty by which they ceded all right, title and interest in their lands in Utah in return for the guarantee of possession of the Uintah Valley Reservation, to which they agreed to remove.[64] The treaty also made detailed provision for the staffing and operation of the Uintah Agency, and provided that the 291,480 acres of Indian farm reservations be sold, proceeds to be applied to improvements at the Uintah Reservation.[65] Superintendent Irish held a similar council with the Weber Utes, securing their agreement to the terms of the Spanish Fork Treaty under Article I of an abbreviated treaty of October 30, 1865.[66]

While Irish and Young were adamant in their insistence that the Indians sign the treaty, they apparently failed to indicate to the Indians that there was doubt as to ratification of the treaties by the Senate. After all, Congress on February 23, 1865 had authorized a budget of $25,000 to finance the negotiation of these treaties.[67] A year earlier, Congress had mandated the sale of the small "farm" reservations and had confirmed the establishment of the Uintah Valley Reservation.[68] Yet when submitted, the treaties failed of ratification.[69]

The uneasy peace generated by the Spanish Fork Council and agreement to the treaty by the Indians soon decayed again into armed conflict. Rejection of the treaty left the Utes without the promised economic support and with a strong sense of betrayal. The brush fire war that continued in the territory for the next four years came to be known by the name of its leader: the Black Hawk War.

The war was costly. Bancroft wrote that "more than fifty of the Mormon settlers were massacred, and an immense quantity of livestock captured, and so widespread was the alarm that many of the southern settlements were for the time abandoned, the loss to the community exceeding $1,000,000." [H. Bancroft, History of Utah 632–33 (1889).] The war dragged on until the Indians were forced into defeat by the superior power of the territorial militia. Under the leadership of Chief Tabby, who favored peace, the reluctant natives were removed to the Uintah Valley...

---

KON–OSH (Geo. Bean, Interp.): * * * I like this good friendly council, I always liked a council where it is good and friendly and where all agree together; and my friends like it. It pleases me very much to see Supt. Irish and Brigham agreeing on this treaty and traveling together and talking to the Indians. In former times it has been when an agent came here President Young would stay at one side; and I was sorry that they could not agree. * * *

*Quoted in* F. O'Neil, "A History of the Ute Indians ...," *supra*, at 66.

**64.** "In 1864, the Utah Legislature memorialized Congress for asking for the removal of the Indians to as far south as Sanpete. The document asked that the Indians be removed to the Uintah Valley which had been set apart as an Indian reservation by executive order of Abraham Lincoln in October, 1861." Ute People—An Historical Study 26 (O'Neil & Sylvester ed. 1969). By the treaty, the white people of the territory would have had what they wanted.

**65.** See V Kapp. 695–698 (1938), LD 6, or Appendix A, *infra*, for text.

**66.** See V Kapp. 698–699, or Appendix A, *infra*, for text.

**67.** See Act of February 23, 1865, ch. 45, 13 Stat. 432, LD 5. This Act authorized the President to enter into land cession treaties with Indian tribes in the Utah Territory, provided that any reservations created by treaty "shall be selected at points as remote as may be practicable from the present settlements in Utah Territory." *Id.*, § 1.

**68.** Act of May 5, 1864, ch. 77, 13 Stat. 63, LD 4; see Appendix A, *infra*, for text.

**69.** It is very likely that the conflict between the Mormons and the federal government interfered, but it is also true that Congress failed to ratify other treaties as well. The Mormons had "sat out" the Civil War. Less than two score of the Saints from Utah served that conflict, and those who did serve did so against the advice of Mormon leaders.... Congress was ill-disposed toward the Mormons; that was perfectly clear. How much that ill-disposition was involved in preventing the ratification of the treaty will remain conjecture. F. O'Neil, "A History of the Ute Indians ...," *supra*, at 67–68.

O'Neil, "The Reluctant Suzerainty: the Uintah and Ouray Reservation," 39 *Utah Historical Quarterly* 129, 131 (Spring 1971), JX 475.

Even those Indians who had removed to the Uintah Valley Reservation in 1866 were compelled by conditions there to venture on raids into the Heber Valley in search of food needed for bare survival. Even after hostilities had largely ceased, the early farming efforts at the parsimoniously funded Uintah Agency were largely a failure, leaving the Utes to hunt and forage for food, or continue raiding on a sporadic basis. On January 3, 1871 the *Deseret Evening News* published an editorial, "Brethren, Don't Kill the Deer," urging non-Indians to leave the available wild game for hunting by the Utes.

A new agent, J. J. Critchlow, was sent to the Uintah Agency in February, 1871. Over the next dozen years, Critchlow struggled to develop a viable agricultural economy on the reservation, constantly entreating the Utes to stay on the reservation long enough to farm so that they need not leave in search of food. He also engaged in an unending effort to secure adequate federal funding for agency operations. Critchlow's efforts soon began to bear fruit as some of the Utes made Uintah Valley their permanent residence.[70] In 1875, a federal surveyor, went to the Uintah Valley Reservation to delineate its boundaries.[71] Though the survey did no more than define those boundaries to a great extent, it added credibility to rumors circulating at the Uintah Agency that the reservation would soon be "opened" to white settlement. Agent Critchlow stiffly rebuffed any such effort:

> One Great source of discouragement and uneasiness [among the Utes] is the constant apprehension that some radical change, either in their location or in the administration of their affairs, will take place, and thus interfere with all their industrial pursuits. They are afraid that this reservation will be thrown open to white settlers, they be removed to some other place, and thus lose all their labor.... My own opinion is that any such change would work great injury and injustice to these Indians, yet I know that many in this Territory would do anything to bring it about....

Report of J. J. Critchlow to Commissioner of Indian Affairs, August 15, 1878, in the Rept. of Comm. of Ind. Aff., 1878, at 624. By 1880 the Utes were already feeling pressure upon their boundaries; trespassing was becoming a problem on the western end of the reservation, and the rise of non-Indian towns such as Ashley (now Vernal) presaged a growing white presence near the Utes.

At that same time, pressure on the Utes of Colorado at their large reservation created by the Treaty of March 2, 1868, 15 Stat. 619, II Kapp. 990 (2d ed. 1904), LD No. 7, was growing to firestorm proportions. The battle-cry "The Utes Must Go!" echoed across that state, fired by a combination of outrage over the 1879 killing of Nathan Meeker, the utopian Agent to the Colorado Utes, and his family by the White River Utes, and persistent rumors of mineral wealth underlying the Colorado Ute Reservation. In the view of Colorado's Governor Pitkin the Utes should either be removed or killed:

> My idea is that, unless removed by the government, they must necessarily be exterminated.... The state would be willing to settle the Indian trouble at its own expense. The advantages that would accrue from the throwing open of 12,000,-000 acres of land to miners and settlers would more than compensate all the expenses incurred.

---

**70.** See e. g., Letter from J. J. Critchlow to E. P. Smith, of Sept. 25, 1873, in Rept. of Comm. of Ind. Aff., 1873 at 628 (1873).

**71.** The surveyor, Charles L. DuBois, delineated the first authoritative boundary for much of the Uintah Valley Reservation. See Field Notes of a Survey of the [Uintah Valley Reservation], JX 2 (1875). The DuBois survey was "accepted and approved" on December 24, 1875. Letter of Commissioner of Indian Affairs [hereinafter "Comm. of Ind. Aff."] to the Secretary of the Interior of Mar. 25, 1898, JX 101. See also letter from Commissioner of the General Land Office to Comm. of Ind. Aff. of Mar. 11, 1902, JX 130.

*Quoted in* D. Brown, Bury My Heart at Wounded Knee 366 (1970).

Custer's defeat at the Battle of the Little Big Horn having happened a mere three years before, sympathy for the Indians was still scarce among influential politicians. The "Meeker Massacre" joined "Custer's Last Stand" as a popular pretext for coercing the cession of vast expanses of Indian real estate previously guaranteed by treaty.[72] Besides securing the removal of the White River Utes from Colorado and placing them upon the Uintah Valley Reservation over the protests of Agent J. J. Critchlow,[73] the government also secured the "consent" of the Uncompahgre Utes to a removal agreement signed March 6, 1880 and ratified by Congress on June 15. See Act of June 15, 1880, 21 Stat. 199, LD 11.

The text of that agreement provided for a new home for the Uncompahgres and White Rivers:

The Uncompahgres Utes agree to remove to and settle upon agricultural lands on Grand River near the mouth of the Gunnison River in Colorado, and such other unoccupied agricultural lands as may be found in that vicinity and in the territory of Utah.

The White River Utes agree to remove to and settle upon agricultural lands on the Uintah Reservation in Utah.

While the Uncompahgres Utes were originally intended to be resettled near the present location of Grand Junction, Colorado,[74] a federal commission selected a rectangular area of land in eastern Utah bordering on Colorado's western boundary.[75] The reservation selected for the Uncompahgres was largely comprised of arid lands barren of fertile soil, a sharp contrast to the rich forests, meadows and ranges that the Utes left behind in Colorado.[76]

The Ute Commission, which selected the lands for the Uncompahgres, made an important recommendation:

Until the Indians can be made somewhat familiar with their new relations, it is . . . of vital importance to maintain the exterior boundary limits of the lands upon which they dwell as a reservation, and within which white men may not be allowed to locate. This protection may be secured by legislation or possibly by executive order. For years to come these Indians should certainly have the aid of the government in protecting them from collision with white men.

Report of the Commissioner of Indian Affairs, 1881, at 383. An agency was established at Ouray in 1881 as well as a military post, Fort Thornburg. Non-Indians living in the region were paid the value of their

---

**72.** See R. Andrist, The Long Death 331 (pap.ed. 1964); Sprague, "The Bloody End of Meeker's Utopia," 8 *American Heritage* 36, 94 (Oct. 1957):

The punishment of the alleged guilty was all the land-grabbers could have asked. The two White River Bands were branded as criminals en masse by political commission without any judicial powers whatever. Though only twenty White River Utes had staged the massacre, all 700 were penalized in that money owed to them by the government was paid instead to the relatives of the victims. Chief Ouray's Uncompahgre Utes, who had nothing to do with the massacre or the "ambush" were held equally responsible. The 1868 treaty right of all three bands were cancelled. Their right to be Americans under the Fourteenth Amendment were ignored. Title to their ancient Colorado homeland was extinguished and they were moved at gun point to barren lands in Utah. By these means the last and largest chunk of desirable

Indian real estate was thrown open to white settlement.

**73.** See Rept. of the Comm. of Ind. Aff., 1881, JX 5, at 215.

**74.** See F. O'Neil, "A History of the Ute Indians . . .", *supra* at 147.

**75.** See Rept. of the Comm. of Ind. Aff., 1881, at 37.

**76.** With great irony, the Uncompahgres, who had remained at peace with their white neighbors and who had intervened in 1879 to avoid further violence involving the White River Band following the Meeker incident, were moved to a near-desert while the more contentious White River Band was moved to the relatively fertile acreage of the Uintah Valley Reservation. See also Rept. of the Comm. of Ind. Aff., 1881, JX 5, at 2.

improvements and removed.[77] By an Executive Order dated January 5, 1882 President Chester A. Arthur set apart the Uncompahgre lands as an Indian reservation. I Kapp. 901 (2d ed. 1904), LD 12 (see Appendix A for text).

The removal of the Uncompahgre Band to their new home in eastern Utah was plagued with a number of difficulties. In spite of the fact that the Uncompahgres were expected to found an agricultural economy upon lands that were "a wild and ragged desolation,"[78] Ouray Agent J. F. Minniss in his first report described the Uncompaghres as "orderly, quiet and peacefully disposed with a disposition to their welfare."[79] The reservation would not support them, their attitude notwithstanding; a number of Uncompahgre Utes ventured back into Colorado to hunt, giving rise to no small amount of excitement among the white settlers. See, e. g., O'Neil, "The Reluctant Suzerainty ...," supra, JX 475 at 136–137; Annual Rept. of the Secretary of the Interior, 1887, JX 14, at 283–286.

In 1886, the military post of Fort Duchesne was established and the Uintah Agency and the Ouray Agency were consolidated under its roof.[80] The move was made partly for administrative efficiency but also to enable the federal officials to exercise greater direct control—even military control—over all the bands. The Utes had barely begun to settle down on their reservation homes and farms when they began to feel the pressure of white encroachment upon their remaining lands.

As in Colorado, it was the discovery of mineral deposits in Utah which forced the Utes to lose more land. The mineral was gilsonite. Although the presence of gil-

sonite was well known in the 1860–1870's, it was not until the 1880's that two promoters, Sam Gilson and Bert Seabolt, publicized the materials and found uses for it. In January, 1886 Seabolt filed the first recorded gilsonite claims—all of them in the Carbon Vein, which was located on the Uintah Indian Reservation. He organized a group to begin commercial mining.

O'Neil and MacKay, "A History of the Uintah-Ouray Ute Lands," supra, JX 483 at 15 (footnote omitted).

The government opened a series of roads across the Uintah Valley Reservation. Ashly Valley, east of Fort Duchesne, was settled beginning in 1878 by a group of Mormon settlers. Even the establishment of Fort Duchesne attracted unsavory characters to Indian country, creating additional problems. See O'Neil, "A History of the Ute Indians ...," supra, at 181. The Utes also felt pressure on their western boundary as white ranchers from Heber ran their livestock onto the lands in the Strawberry Valley. Agent T. A. Byrnes confronted the cattlemen, demanding either payment of an informal "lease" fee or removal of stock. Byrnes estimated that there were 6,000 cattle illegally grazing on the Uintah Reservation in 1887 alone. Id., at 183–184. The "familiar forces"[81] of non-Indian ranchers, farmers, miners, railroads, etc. were closing in on Ute country as they had in other places, forcing the eventual reduction of the Indian land base.[82]

## VII. THE 1888 CESSION

In response to Ute complaints about white trespassing in the eastern end of the

---

**77.** O'Neil and MacKay, "A History of the Uintah-Ouray Ute Lands," at 14 & n.56 (Am.West Center Occas. Pap. 1977), JX 483.

**78.** H.Rep.No.3305, 51st Cong. 2d Sess. 4 (1890). Prophetically the reporting agent found the land "valuable for nothing unless it shall be found to contain mineral deposits"—which, indeed, it was.

**79.** Letter of J. F. Minniss to Comm. of Ind. Aff. of Aug. 30, 1882, in Rept. of the Comm. of Ind. Aff., 1882, at 208.

**80.** Annual Rept. of the Comm. of Ind. Aff., 1886, JX 12, at 127–129, O'Neil, "The Reluctant Suzerainty ...," supra, JX 475 at 137.

**81.** DeCoteau v. District County Court, 420 U.S. 425, 431, 95 S.Ct. 1082, 1086, 43 L.Ed.2d 300 (1975).

**82.** See e. g., Act of Mar. 3, 1887, ch. 368, 24 Stat. 548, LD 14 (granting railroad right-of-way).

Uintah Valley Reservation, Agent Byrnes recommended that the "Gilsonite Strip" be removed from the reservation; after all, the lands "are not, nor have they been, used or occupied by the Indians, for the reason that they are not fit for agricultural or grazing purposes." Letter of Agent Byrnes to J. Atkins of Feb. 18, 1888, *quoted in* JX 483 at 15.[83] Speaking of the Gilsonite Strip, Captain J. Randlett of Fort Duchesne observed:

> [D]etachment by sale will occasion no inconvenience to the tribes. If the Gilsonite enterprise proves a success, the Indians will see how profits are made from industry and will also to some extent find at the mines a market for their own products... It will be very agreeable to the isolated garrison to have a settlement near it.

Letter of Capt. Randlett to Agent Byrnes of Feb. 18, 1888, *quoted in* JX 483 at 15.

 Congress soon joined in the view that the best interests of everyone would be served by excising the Gilsonite Strip from the Uintah Reservation. See H.Rep.No.791, 50th Cong., 1st Sess. (1888) LD 15; S.Rep. No.1198, 50th Cong., 1st Sess. (1888) LD 17; 19 Cong.Rec. 1927–1929, 3776, 3821 (1888), LD 16. By the Act of May 24, 1888, ch. 310, 25 Stat. 157, I Kapp. 271 (2d ed. 1904) LD 18, Congress mandated that the 7,040-acre triangular Gilsonite Strip be "declared to be public lands of the United States and restored to the public domain." *Id.* § 1. The Act directed the Secretary of the Interior to procure the approval of a three-fourths ma-

jority of the adult male Indians on the reservation and upon such ratification, to sell the lands at not less than $1.25 an acre. *Id.* §§ 2, 3. After "much proselyting"[84] the ratification by the Indians was secured on October 8, 1888, and on October 22, the Secretary of the Interior restored the land to the public domain and ordered surveys to be conducted. See Letter of Acting Comm. of Ind. Aff. to Secretary of the Interior of Sept. 9, 1899, JX 116; Report of Uintah and Ouray Agency *in* Rept. of the Comm. of Ind. Aff., 1890, JX 18, at 280. By letter of July 9, 1895, JX 45, the Commissioner of Indian Affairs reported to Agent J. Randlett that sale of some of the lands had been completed and that the United States Treasury had credited $3,340 to the Utes. Other sales followed. It is abundantly clear to this Court that the 1888 cession area, known as the Gilsonite Strip, was restored to public lands status and that the boundaries of the Uintah Valley Reservation were diminished to that extent.[85] A congressional intent to diminish the reservation was indeed "expressed on the face of the Act" and is "clear from the surrounding circumstances and legislative history." *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973); *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977). The Ute Tribe asserts a contrary view, citing some congressional debate on whether the effect of the 1888 Act was to restore the strip to the public domain,[86] and arguing that only a

---

83. It apparently did not occur to Byrnes—or others—that the Indians might benefit from these mineral deposits in the same manner as their non-Indian neighbors. See *e. g.*, remarks of State Inspector of Mines Thomas Lloyd in an article in the *Salt Lake Tribune* of March 11, 1897:

> Certain sentimentalists have said it was a shame to rob the red man out of what the Government had set aside for his benefit.... Tell me how a man who has located a gilsonite claim has robbed an Indian? Why the loafer never was known to dig for anything, and can never be taught to....

Attachment to the letter of Agent Randlett to Comm. of Ind. Aff. of Mar. 15, 1897, JX 69. Of course, the Utes since then have pursued mineral development for years.

84. O'Neil & MacKay, "A History of Uintah-Ouray Ute Lands," JX 483, at 15 & n.65 (1977).

85. See C. Royce, "Indian Land Cessions in the United States," JX 119, at 926–927 (1900). Royce designates the 1888 cession within area No. 431 and it is depicted as a scarlet triangle on Pl. 165, the "Utah 1" map in that volume.

86. See *e. g.*, 19 Cong.Rec. 1928 (1888) (remarks of Rep. Holman), LD 16:

> \* \* \* \* \* \*
> If we buy [the lands] from the Indians, paying them a fair valuation for them, of course, the general land laws would apply. But here we are selling the land belonging to the Indians for the benefit of the tribe—these Utes— and we are not proposing to divest them of

change of land title was intended. Plaintiff's Post-Trial Brief at 57–59. In *Rosebud Sioux Tribe v. Kneip, supra,* the Supreme Court acknowledged the authority of the cases holding that ceded lands can remain in trust for the Indians until actually sold. See *Ash Sheep Co. v. United States,* 252 U.S. 159, 166, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920); *Minnesota v. Hitchcock,* 185 U.S. 373, 395, 401–402, 22 S.Ct. 650, 661, 46 L.Ed. 954 (1902); accord, *Hanson v. United States,* 153 F.2d 162, 163 (10th Cir. 1946) (Uintah lands). But the *Rosebud* majority found that question to be "logically separate from a question of disestablishment." *Rosebud, supra,* 430 U.S. at 601 n.24, 97 S.Ct. at 1370. While an inference can justifiably be drawn from the continuing trust status of the affected lands, that factor is one among many "surrounding circumstances." Here it is soundly refuted by clear expressions of legislative intent, the use of language precisely suited to disestablishment, cf. *Seymour v. Superintendent,* 368 U.S. 351, 354, 82 S.Ct. 424, 426, 7 L.Ed.2d 346 (1962), and unconflicting contemporaneous interpretations of the effect of the Act. In a November 18, 1895 letter to the Secretary of the Interior, the Commissioner of Indian Affairs comments that the 1888 Act

> had been fully executed in accordance with its intent so far as the securing of the consent of the Indians *to the diminution of their reservation and the restoration of said strip of land to the public domain,* and that, therefore, the jurisdiction of the United States Indian Agent are the same ceased from and after October 22, 1888. . . .

> the title, but our proposition is to sell them as their trustee for their benefit, . . . *So it does not become in any sense a part of the public domain.* [Emphasis added.]

**87.** See O'Neil & MacKay, "A History of the Uintah-Ouray Ute Lands," JX 483, at 15:
> Because the strip was a part of federal lands, but off the Indian and military reserves, it was not controlled by officials at Whiterocks or Fort Duchesne, nor by state, territorial, local or country [sic] authorities. This seemingly lawless territory "became the location of a tough class of squatters—men and women without means of existing except gam-

*Id.,* JX 50 at 1 (emphasis added). In fact, the federal officials had come to regret the withdrawal of the strip from the reservation because of problems caused by the influx of squatters onto the lands.[87] When several Uncompahgre Utes selected allotments that were found to be within the 1888 cession area, officials sought instructions on how to protect their rights. See Letter from Comm. of Gen. Land Off. to the Register and Receiver of April 27, 1899, JX 114. This evidence of the circumstances surrounding the 1888 cession is uncontroverted by the plaintiff and compels the conclusion that the strip was severed from the Uintah Reservation in 1888. See *Rosebud Sioux Tribe v. Kneip, supra.*[88]

## VIII. THE UNCOMPAHGRE RESERVATION

Contemporaneous with the 1888 cession, gilsonite veins were discovered on the Uncompahgre Reservation, touching off another drive to have the mineral lands ceded by the Indians.

> George W. Gordon was sent by the Interior Department in June [1889] to inspect the area. In his report of July 31, he described the area as containing second or third-rate pastureland, barren mountains, hills and alkaline patches. The report gave support to the rationale that the lands could be removed since "the Indians do not, and probably never will, need the lands embraced therein or make any use of them whatsoever."

O'Neil & MacKay, "A History of Uintah-Ouray Ute Lands," JX 483, at 16 (footnote

> bling, selling whiskey to Indians and prostitution." Indian agents and military men came to regret the strip's existence. It remained a wide-open area until it was sold by the government in May, 1906, at $1.25 per acre. See also, Letter from Comm. of Ind. Aff., JX 50, *supra*; Letter from Acting Comm. of Ind. Aff. to Secretary of the Interior of Sept. 9, 1899, JX 116.

**88.** This conclusion as a practical matter excludes the town of Gusher from the Uintah and Ouray Reservation. See Exhibit I–1A (map); Appendix B, *infra.*

omitted); see H.Rep.No.2967, 51st Cong., 1st Sess. LD 21 (1890). Almost immediately, Congress sought to excise a 12-mile strip of gilsonite lands from the Uncompahgre Reservation. See S. 1762, 51st Cong., 1st Sess., *reprinted in* S.Ex.Doc.No.157, 51st Cong., 1st Sess. (1890). On June 17, 1890, the bill was vetoed by President Harrison, who found it to be detrimental from a policy standpoint. See Veto Message of the President, June 17, 1890, LD 20. Three months later, S. 4242 was introduced "to change the boundaries of the Uncompahgre Reservation," see H.Rep.No.3305, 51st Cong., 2d Sess., LD 22 (1890), but it died at the end of the session. A similar bill, S. 574, was favorably reported by the Committee on Indian Affairs in February of 1892, see S.Rep.No.240, 52d Cong., 1st Sess. (1892), as was H.R. 69, another bill to "change the boundaries of the Uncompahgre Reservation." See H.Rep.No.1076, 52d Cong., 1st Sess. (1892). Neither of the bills passed.

At the same time, it was apparent to Robert Waugh, Indian Agent at Fort Duchesne, that any plans for allotment at Uncompahgre would face difficulties. See letter of Agent Waugh to Comm. of Ind. Aff. of Dec. 19, 1892, JX 29. But concern for the gilsonite and other minerals easily outweighed concern for the Utes in the minds of Washington officials. In 1893 the Secretary of the Interior secured the opinion of Assistant United States Attorney General Hall on the status of the Uintah and Un-

compahgre lands. While Hall determined that the Uintah reservation was "owned" by its Indian residents,

> It is clear to my mind that the Uncompahgre Utes have not title to the lands they occupy; that they occupy these lands as a temporary reservation, until such time as the President may require them by virtue of the agreement, and the Act of 1880, to take their allotments within the limits of said reservation.

Letter from Asst. Atty. Gen. Hall to Secretary of the Interior of Oct. 23, 1893, JX 30, at 8.[89] Hall relied upon language in the Agreement of 1880, LD 11, which indicated that the Uncompahgre lands were reserved for the purposes of making allotments and a provision requiring that the allotted lands be paid for out of a fund generated from the sale of the Ute lands in Colorado at the rate of $1.25 an acre.

In 1894, three bills were introduced providing "for opening the Uncompahgre and Uintah reservations." H.R. 4511, 6557; see S.Rep.No.450, 53d Cong., 2d Sess., 4027 (1894).[90] Though these bills were not enacted,[91] the Indian Appropriations Act for that year included H.R. 6557, with changes:

> Sec. 20. That the President of the United States is hereby authorized and directed to appoint a commission of three persons to allot in severalty to the Uncompahgre Indians within their reservation, in the Territory of Utah, agricultural and grazing lands according to the

---

**89.** Hall's opinion contradicted the views of the Commissioner of Indian Affairs Morgan that the Uncompahgres "owned", or held compensable title to, their lands, at least for the purposes of the Indian Leasing Act, Act of Feb. 28, 1891, ch. 383, 26 Stat. 794, I Kapp. 56, 57 (2d ed. 1904), LD 23, and could lease their lands for mining purposes, though mining operations might be undesirable for other reasons. Letter from Comm. of Ind. Aff. to Secretary of the Interior of Dec. 30, 1892, JX 36. Congress had already provided for compensating the Uintahs and the Uncompahgres for lands granted as a right-of-way to the Utah Midland Railway Co. Act of Mar. 3, 1887, ch. 368, 24 Stat. 548, I Kapp. 255–256 (2d ed. 1904), LD 14.

This contrast between the status of the Uintah and the Uncompahgre Reservations was to be relied upon again and again by those who

advocated the extinguishment of the Uncompahgre Reservation. *E. g.*, H.Rep.No.660, 53d Cong., 2d Sess., LD 30 (1894); 30 Cong.Rec. 107, 714–715, 718, 817, 831, (1897), LD 45.

**90.** Pressure for the opening of both reservations was mounting. See *e. g.*, "Petition to President Cleveland from Certain Uintah County Residents," JX 32 (1894).

**91.** Congressional debates on the bills focused more on the "rights" of those who had earlier located the gilsonite, asphaltum, etc. at Uncompahgre than upon the rights of the Utes whose reservation the minerals were located upon. See 26 Cong.Rec. 7032–7033, 7256–7260 (1894). The Commissioner of Indian Affairs recommended *against* passage of the bills. Report of the Comm. of Ind. Aff., 1894, JX 33, at 90.

treaty of eighteen hundred and eighty, as follows:

"Allotments in severalty of said lands shall be made as follows: To each head of a family one-quarter of a section, with an additional quantity of grazing land not exceeding one-quarter of a section; to each single person over eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each orphan child under eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each other person under eighteen years of age, born prior to such allotment, one-eighth of a section, with a like quantity of grazing land: *Provided,* That, with the consent of said commission, any adult Indian may select a less quantity of land, if more desirable on account of location: *And provided,* That the said Indians shall pay one dollar and twenty-five cents per acre for said lands from the fund now in the United States Treasury realized from the sale of their lands in Colorado as provided by their contract with the Government. All necessary surveys, if any, to enable said commission to complete the allotments shall be made under the direction of the General Land Office. Said commissioners shall, as soon as practicable after their appointment, report to the Secretary of the Interior *what portions of said reservation are unsuited or will not be required for allotments,* and thereupon such portions so reported *shall, by proclamation, be restored to the public domain* and made subject to entry as hereinafter provided."

Sec. 21. That the remainder of the lands on said reservation, shall, upon approval of the allotments by the Secretary of the Interior, be immediately open to entry under the homestead and mineral laws of the United States: Provided, That no person shall be entitled to locate more than two claims, neither to exceed ten acres, on any lands containing asphaltum, gilsonite, or like substances: *Provided,* That after three years actual and continuous residence upon agricultural lands from the date of settlement the settler may, upon full payment of one dollar and fifty cents per acre, receive patent for the tract entered. If not commuted at the end of three years the settler shall pay at the time of making final proof the sum of one dollar and fifty cents per acre.

Sec. 22. That said commission shall also negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the Territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians, and if possible, procure the consent of such Indians to such relinquishment, and for the acceptance by said Indians of allotments in severalty of lands within said reservation, and said commissioners shall report any agreement made by them with said Indians, which agreement shall become operative only when ratified by Act of Congress.

Sec. 23. That said commissioners shall receive six dollars per day each, and their actual and necessary traveling and ·incidental expenses while on duty, and to be allowed a clerk, to be selected by them, whose compensation shall be fixed by said commissioners, subject to the approval of the Secretary of the Interior: *Provided,* That the cost of executing the provisions of this Act shall not exceed the sum of sixteen thousand dollars, which sum is hereby appropriated for that purpose out of any moneys in the Treasury not otherwise appropriated.

Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 337–338, I Kapp. 546 (2d ed. 1904), LD 35. (emphasis added).

Agent Randlett soon informed the Secretary of the Interior that there were insufficient agricultural lands available on the Uncompahgre Reservation to fully comply with the intended allotment program. Randlett suggested that additional lands be made available on the more hospitable Uintah reservation. Letter of Agent Randlett

to Secretary of the Interior of Dec. 12, 1894, JX 35.[92] However, a three-man commission was appointed to carry out the 1894 Act provisions and began meeting with the Uncompahgre in January 1895. The Ute Commission struggled with a number of problems, including substantial Indian opposition to the Act's provisions.[93] The Commission's effort to carry out the 1894 Act failed. See H.Doc.No.191, 54th Cong., 1st Sess., LD 39 (1896); S.Doc.No.161, 54th Cong., 1st Sess., LD 41 (1896). The Commission was relieved of its duties on February 4, 1896, S.Doc.No.32, 55th Cong., 1st Sess., LD 46, at 3 (1897), while the Secretary sought additional funds to commence negotiations with the Utes at Uintah, see H.Doc.No.28, 54th Cong., 1st Sess., LD 40 (1896), which were appropriated in June. Act of June 10, 1896, ch. 398, 29 Stat. 321, 341–342, I Kapp. (2d ed. 1904), LD 42. By resolution of January 16, 1896, the House of Representatives asked of the Secretary the probable time for execution of statutes providing "for a restoration to the public domain of certain lands within the Uncompahgre Indian Reservation in the Territory of Utah." The Secretary recommended appointment of another commission to negotiate with the Uncompahgres. See 1 Report of the Secretary of the Interior, 1896, H.Doc.No.5, 54th Cong., 2d Sess., JX 52, at xlviii–li.[94]

In the meantime, the Uncompahgre Reservation remained under pressure from trespassers and the "familiar forces" of local non-Indian interests.[95] The trespass problem worsened in 1897; the agency found that a number of reservation boundary markers had been moved, necessitating resurvey of the lines.[96] One party of trespassing prospectors was financed by the Governor of Utah, and others, in order to provoke litigation testing the legality of the reservation itself. Report of Capt. Day, 9th Cavalry, JX 70; Letter from Agent Rand-

**92.** Capt. Randlett expressed another relevant view:

> I am of the opinion it will be unjust and it will be positively contrary to my sense of good faith on the part of the government to ask these Indians of the Uintah Reservation at the present time or in the near future to relinquish interest in their lands to any further extent than I have suggested. The minerals that have been or may be discovered on the remaining lands are the property of these Indians. The timber lands will eventually become very valuable and are their legal possessions; these possessions should not be taken from these Indians to their pecuniary disadvantage.

*Id.*, JX 35 at 3–4. The Commissioner of Indian Affairs later concurred in Randlett's view. See Letter from Comm. of Ind. Aff. to Secretary of the Interior of Jan. 14, 1896, JX 51 at 13.

**93.** See *e. g.*, Letter from Ute Commission to Comm. of Ind. Aff. of Mar. 22, 1895, JX 43, reporting that survey of Uncompahgre lands to identify surplus lands had been impossible due to heavy snow; Report of Agent Randlett, 1895, JX 47; Rept. of the Comm. of Ind. Aff., 1895, JX 49, at 32–33.

**94.** See Letter from Comm. of Ind. Aff. to Secretary of the Interior of Mar. 3, 1896, JX 54, at 2 (re: appropriations bill for Uncompahgre negotiations).

**95.** *E. g.*, Letter from Agent Randlett to Comm. of Ind. Aff. of Sept. 16, 1896, JX 56 (even Governor, Sec'y. of State involved in mineral location at Uncompahgre Reservation); Letter of Agent Randlett, Feb. 27, 1896, article, *Salt Lake Tribune*, Feb. 25, 1896 (opening of Uncompahgre lands demanded), JX 53; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of Aug. 13, 1895, JX 46. Considerable distrust and anxiety arose among the Utes concerning "opening" of the reservations. See Report of Agent Randlett, 1896, JX 55.

**96.** Letter from Agent Randlett to Comm. of Ind. Aff. of Jan. 19, 1897, JX 60; Letter from Comm. of Ind. Aff. to Agent Randlett of Feb. 11, 1897, JX 62. See also, Letter from Acting Comm. of Ind. Aff. to Agent Waugh of May 5, 1892, JX 26; Letter from Agent Randlett to Comm. of Ind. Aff. of Feb. 22, 1897, JX 64; Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 24, 1897, JX 72; Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 4, 1898, JX 97; Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 25, 1898, JX 101; Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of June 22, 1898, JX 105; Letter from Acting Comm. of Ind. Aff. to the Secretary of the Interior of Oct. 11, 1898, JX 110; Letter from Comm. of Ind. Aff. to Agent Myton of May 26, 1900, JX 120; Letter from Acting Comm. of Ind. Aff. to the Secretary of the Interior, July 28, 1900, JX 121; Letter from Comm. of Gen. Land Office to Comm. of Ind. Aff. of Mar. 11, 1902, JX 130.

lett to Comm. of Indian Aff. of March 15, 1897, JX 69. Federal prosecution of trespassers was repeatedly recommended [97] and federal troops were requested to support Agent Randlett.[98]

After extensive debate, which dealt more with the disposition of the Uncompahgre mineral deposits than with the welfare of the Uncompahgres,[99] Congress enacted provisions that mandated the allotment and opening of the Uncompahgre Reservation:

The Secretary of the Interior is hereby directed to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompahgre Ute Indian Reservation in the State of Utah, said allotments to be upon the Uncompahgre and Uintah Reservation or elsewhere in said State. *And all the lands* of said Uncompahgre Reservation *not theretofore allotted in severalty to said Uncompahgre Utes shall, on and after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States*; excepting, however, therefrom all lands containing gilsonite, asphalt, elaterite, or other like substances.

Act of June 7, 1897, ch. 3, 30 Stat. 62, 87, I Kapp. 621 (2d ed. 1904), LD 49 (emphasis added).

Allotment of the Uncompahgre Reservation was to be conducted under the 1897 Act, the 1894 Act and the 1880 Agreement, considered together. See Opinion of Ass't. Atty. Gen. Van Devante, 25 I.D. 97, JX 76 (1897).[100] It quickly became apparent that the allotment process at Uncompahgre could not be completed within the time allowed. When Agent Randlett reported on June 30, 1897, no allotments had yet been made. See Report of Agent Randlett *in* Rept. of the Comm. of Ind. Aff., 1897, JX 81, at 286.[101] The Uncompahgre Commission, James Jeffreys, Ross Guffin and Howell Myton, were directed to proceed with assignment of allotments under instructions approved August 27, 1897. See *id.*; Instructions to Uncompahgre Commissioners of Aug. 26, 1897, JX 77; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of Aug. 26, 1897, JX 78; Letter from the Comm. of Ind. Aff. to the Uncompahgre Commission of Aug. 31, 1897, JX 79; Rept. of the Comm. of Ind. Aff. 1897, JX 75 at 92–93. Troubled by these events, the Uncompahgres sent a delegation to Washington, D. C.,[102] where they tentatively

---

**97.** *E. g.*, Telegram from Gen. Wheaton to Adj. Gen. of Mar. 14, 1897, JX 68; Letter from Comm. of Ind. Aff. to Ass't. U. S. Atty. of Sept. 9, 1897, JX 82.

**98.** Letter from Agent Randlett to Comm. of Ind. Aff. of Jan. 13, 1897, JX 59; Letter from Comm. of Ind. Aff. to Secretary of the Interior of Jan. 30, 1897, JX 61; Letter from Comm. of Ind. Aff. to Agent Randlett of Mar. 6, 1897, JX 66; Letter of Comm. of Ind. Aff. to Secretary of the Interior of Mar. 6, 1897, JX 67; see also Letter from the Comm. of Ind. Aff. of Oct. 6, 1897, JX 86; of Oct. 27, 1897, JX 87; of Nov. 15, 1897, JX 88; of Oct. 1, 1897, JX 85.

**99.** See 30 Cong.Rec. 102–108, 712–720, 725, 814–821, 826–833, 1070, 1110–1120, 1130, 1208–1211, 1245, 1253, 1468 (1897), LD 45.

**100.** Cf. Rept. of the Comm. of Ind. Aff., 1897, JX 75 at 92–93. Plaintiff asserts that the 1897 Act repealed the 1894 Act and any intent therein to restore the unallotted lands to the public domain was thereby negated. Plaintiff's Post-Trial Brief at 46–47. The 1897 Act arguably voided entry into gilsonite lands as provided for under the 1894 Act. See 30 Cong.Rec. 1208,

LD 45, (1897). However, plaintiff cites no language indicating that Congress intended to preserve for the Indians anything more than the promised allotments as "an adequate fulcrum for tribal affairs." *DeCoteau v. District County Court*, 420 U.S. 425, 446, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975).

**101.** Capt. Randlett commented further:

It is true, as asserted in substance before Congress by an advocate for opening the Uncompahgre Reservation, men can be found that would make allotments to the Indians by shorthand process, but it is not believed that Congress intended or that the Secretary of the Interior will permit the wickedness of allotting lands on paper. . . .
*Id.* See also Rept. of the Secretary of the Interior, 1897, JX 89, at xli–xliii.

**102.** The Utes apparently paid their own way as well. See Letter from Acting Comm. of Ind. Aff. to Acting Agent Beck of Oct. 6, 1897, JX 86. The stated reason for the trip is significant:

The Indians gave as a reason for desiring the delegation that *the lines of their reservation have been established* by a man who

agreed to accept allotments on the Uintah Valley Reservation if adequate land could not be found at Uncompahgre. See Rept. of the Secretary of the Interior, 1897, H.Doc.No.5, 55th Cong., 2d Sess. at xlii–xlii. Even with tentative agreement by all three Ute bands to this allotment program,[103] it was clear to those involved that additional time was still needed. *Id.*; Letter from Acting Agent Cornish to Comm. of Ind. Aff. of Feb. 17, 1898, JX 93 (more time "absolutely essential to enable allotments to be made"). Deep snow and poor weather rendered the work of the Commission impossible for months.[104]

While the Indian Department had some success in pushing a six-month delay through the Senate,[105] the effort ultimately failed. The Uncompahgre Commission was so informed by telegram[106] and the "opening" went ahead on April 1, 1898 as scheduled. Federal troops were again called to the reservation, this time to keep order and prevent anyone from making unlawful claims.[107] The Uncompahgre Commission had failed to make a single allotment within the Uncompahgre Reservation prior to April 1. Rept. of the Comm. of Ind. Aff., 1898, JX 108, at 42, *in* H.Doc. No. 5, 55th

Cong., 3d Sess. The Commission proceeded in May to make 75 allotments on the Uncompahgre Reservation, but the Commissioner of Indian Affairs doubted the legality of making Indian allotments after the April 1 opening date, the lands having become a part of the "public domain." *Id.* at 43. By separate legislation, Congress ultimately confirmed 83 allotments made within the Uncompahgre Reservation. See Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 940–41, I Kapp. 686 (2d ed. 1904), LD 61; Letter from Comm. of Ind. Aff. to Secretary of the Interior of Apr. 12, 1899, JX 113; Rept. of the Comm. of Ind. Aff., 1899, JX 117, at 43–44. 584 Uncompahgre allotments on the Uintah Reservation were finally approved in 1905. See Rept. of the Comm. of Ind. Aff., 1905, JX 323, at 146; Letter from Secretary of the Interior of July 7, 1905, JX 281.

At the urging of the Secretary of the Interior, and after lengthy debate, Congress had withheld the gilsonite and other mineral lands from entry, frustrating the major object of the opening of the Uncompahgre Reservation. Over a year following the "opening" not a single non-Indian homestead entry had been made upon the Un-

---

said he came from Washington *and now these lines were taken away*; that they had signed many papers, but Washington says now they were not good. But if their chiefs and headmen could stand face-to-face with the Secretary and hear the words spoken, and he said for them to do so, *they would take allotment.*

Telegram of J. Jeffreys, Uncompahgre Commissioners, to Comm. of Ind. Aff. of Oct. 5, 1897, *quoted in* O'Neil & MacKay, "A History of the Uintah-Ouray Ute Lands," JX 483 at 21 (emphasis added). The greatest obstacle to allotment was not the boundary question; it was still the requirement that the Uncompahgres pay $1.25 an acre for their allotments. See Rept. of the Secretary of the Interior, 1897, JX 89, at xlii–xliii.

**103.** See Letter of Acting Comm. of Ind. Aff. to J. W. Davenport, Esq. of Feb. 8, 1898, JX 92 (tentative agreement with Uintah, White River Utes to allow Uncompahgre allotments at Uintah Reservation); S.Doc.No.80, 55th Cong., 2d Sess., LD 51 (1898) (text of agreement).

**104.** In its December 22, 1897 report the Commission complained:

The distance from proper shelter to Indian settlements over this reservation varies from 10 to 60 miles, the majority of the settlements being between 40 and 60 miles, and with the thermometer registering from zero to 36° below zero, it will be seen that camping out, even if the commission was provided with a camping outfit, would be dangerous to the health of the commission. . . .

*Quoted in* Letter from Acting Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 4, 1898, JX 98. One can only wonder as to how the Indians fared that winter, so far from "proper shelter."

**105.** Letter from Acting Comm. of Ind. Aff. to F. Kreider, Esq. of Feb. 24, 1898, JX 95 (six-month extension approved by the Senate); Letter from Acting Comm. of Ind. Aff., JX 98, *supra*, note 100.

**106.** Telegram of Comm. of Ind. Aff. to Comm. J. Jeffries of Mar. 31, 1898, JX 102.

**107.** See Letter from Comm. of Ind. Aff. to Acting Agent Cornish of Apr. 6, 1898, JX 103; Letter from Secretary of War to the Secretary of the Interior of Apr. 8, 1898, JX 104.

compahgre Reservation. The Agent (and former Uncompahgre Commissioner), H. P. Myton, recommended that either the lands be returned to the Utes, or the gilsonite and other mineral lands be opened. Report of Agent Myton, 1899, JX 115. In the meantime, the Uncompahgres ranged into Colorado hunting for food. Letter from the Comm. of Ind. Aff. of Dec. 11, 1899, JX 118. The lands were not then returned, nor were the mineral lands opened to entry until 1906. See Act of Mar. 3, 1903, ch. 994, 32 Stat. 982, 998, IV Kapp. 17–18 (1913), JX 332 (even-numbered sections of mineral land opened); Interior Dept. Circular of June 25, 1906, 34 I.D. 649 (1907), JX 333.

 The plaintiff Ute Indian Tribe argues herein that the original exterior boundaries of the Uncompahgre Reservation remain intact notwithstanding events that transpired at the turn of the century. Review of the applicable legislation, its legislative history and contemporaneous as well as subsequent interpretations of the legislation and of the status of the reservation compel this Court to conclude that the boundaries of the Uncompahgre Reservation set forth in the Executive Order of January 5, 1882 were extinguished by Congress under the Act of June 7, 1897.

The express terms of the Act of August 15, 1894, 28 Stat. 286, 337, LD 35, expressed in plain language congressional intent to disestablish the Uncompahgre Reservation following the distribution of allotments in severalty; the "surplus" unallotted lands were to be "restored to the public domain." 28 Stat. at 337. Express language restoring most of an Executive Order Indian Reservation to the public domain is plainly suited to disestablishment. In *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), a similar statute "vacated and restored to the public domain" the north half of the Colville Reservation in the State of Washington, diminishing the reservation to that extent.[108] *Id.*, 368 U.S. at 354–356, 82 S.Ct. at 426–427. The proponents of the 1894 Ute legislation repeatedly

characterized the reservation as a temporary one, intended to endure only until agricultural and grazing lands could be allotted to the Uncompahgre Utes. Correspondence contemporaneous with the establishment of the 1882 reservation supports the proponents' argument. For example, in a letter from the Commissioner of Indian Affairs to the Secretary of the Interior of July 18, 1884, it was said:

As a matter of fact the Uncompahgre Reservation so-called, was set apart simply to enable the Department to control without interference from white settlers, a sufficient quantity of land to give each individual Indian the quantity which it was agreed he should have by the terms of the Ute agreement [of 1880]. I do not think it was intended as a permanent reservation, and I presume that whenever the Indians are settled upon their allotments, the reservation as present existing will be discontinued.

*Quoted in* Memorandum Relating to the Proposed Withdrawal of Certain Lands for Uncompahgre Ute Indians, Office of Indian Affairs, 1931, JX 426, at 4. The 1894 Act was intended to fulfill that purpose, releasing the remaining lands for non-Indian exploitation. The plaintiff correctly observes that the 1894 Act was not successfully executed; allotments were not assigned, nor were the gilsonite deposits opened to lawful mining.

The reservation instead was opened under the provisions of the Act of June 7, 1897, 30 Stat. 62, 87, LD 49. The 1897 Act did not precisely mirror the "public domain" language of the 1894 Act. Plaintiff argues that the 1897 Act repealed the 1894 Act, defeating any "baseline purpose" of disestablishment arising from the public domain language. See Plaintiff's Post-Trial Brief at 45–47. However, the 1897 Act provides that the unallotted lands of the reservation were to "be open for location and entry under all the land laws of the United States," excepting lands containing gilsonite and related minerals. 30 Stat. at 87.

---

**108.** Act of July 1, 1892, ch. 140, 27 Stat. 62, 63, I Kapp. 441 (2d ed. 1904). See also *United States v. Pelican*, 232 U.S. 442, 445–446, 34 S.Ct. 396, 397, 58 L.Ed. 676 (1914).

The language is not identical, but the result under the 1897 Act would be the same as under the 1894 Act as far as the reservation is concerned. Restoring land "to the public domain" as a practical matter opens the land to location and entry under "all of the land laws" of the United States; "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." *Newhall v. Sanger,* 92 U.S. 761, 763, 23 L.Ed. 769 (1875). Statements in the congressional debate on the 1897 Act indicate that the main thrust of the 1897 Act was to mandate the execution of the purposes of the 1894 Act by the Executive Branch. See 30 Cong.Rec. 716–717, 817, 826 (1894), LD 45.

The significant change enacted in the 1897 Act dealt with the gilsonite and related mineral lands; limited entry was permitted under the 1894 Act, but was forbidden under the 1897 Act. To this extent the 1897 Act repealed the 1894 Act, as plaintiff asserts. The manner of disposition of these lands is, however, irrelevant to the question confronted here because in either instance, Congress intended that from the date of "opening" under either act the unallotted lands would no longer be part of an Indian reservation.

The Tribe relies upon statements in congressional debates on the legislation for support for a narrower view of the 1897 Act. Clearly the legislation raised doubts and inspired opposition. See 30 Cong.Rec. 712–720, 814–821, 826–833 (1897) LD 45.

The simple fact is that those who questioned, doubted and opposed the legislation *lost* ; the "familiar forces" prevailed, regardless of the apparent fairness or suitability of the legislation as far as the Indians were concerned. Plaintiff cites no statement by the proponents of the 1897 Act indicating that the Uncompahgre Reservation was intended to survive the opening, and this Court has found none.

That Congress was "satisfied that the retention of allotments would provide an adequate fulcrum for tribal affairs." *DeCoteau v. District County Court,* 420 U.S. 425, 446, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975), is borne out by the subsequent events surrounding the Uncompahgre lands. Counsel for the defendant state and counties have catalogued the past-tense legislative references to "the former Uncompahgre Reservation" in the briefs.[109] The treatment of the Uncompahgre lands following opening on April 1, 1898 confirms the above interpretation of the 1897 Act with startling uniformity. The record in this case offers no jurisdictional history contrary to the view that the 1882 boundaries were dissolved in 1897. Far from evidencing continuing recognition of the whole reservation, the administrative treatment of the lands following April 1, 1898 reflects the concern that even the few allotments reserved to the Uncompahgres would soon fail, leaving the Indians with nothing. The proposed solution was to consolidate the Uncompahgre band on allotments within

109. See Act of Mar. 3, 1903, ch. 994, 32 Stat. 982, 998, LD 91 ("... the former Uncompahgre Indian Reservation.") H.Doc.No.33, 58th Cong., 1st Sess., LD 92, at 1–2, 10 (1903); S.Doc.No.159, 58th Cong., 3d Sess., LD 101, at 16 (1905); 39 Cong.Rec. 1181 (Jan. 21, 1905) (remarks of Rep. Howell), LD 103; Act of Mar. 1, 1899, ch. 324, 30 Stat. 924, 940, LD 61; Act of Apr. 30, 1908, Pub.L., 60–104, 35 Stat. 70, 95, LD 135; S.Rep.No.1002, 63d Cong., 3d Sess., LD 150, (1915) ("Gilsonite Lands Within the Former Uncompahgre Indian Reservation, Utah"); H.Rep.No.642, 64th Cong., 1st Sess., LD 151 (1916); 53 Cong.Rec. 7862 (May 12, 1916) (remarks of Rep. Howell); H.Rep.No. 2399, 74th Cong., 2d Sess., LD 174 (1936); S.Rep.No.749, 80th Cong., 1st Sess., LD 184 (1947); H.Rep.No.1372, 80th Cong., 2d Sess.,

LD 186, at 4 (1948); Act of Mar. 11, 1948, Pub.L. 80–440, 62 Stat. 72, 77, LD 187. A number of these "legislative" past-tense references are quotations from administrative materials. This does not deprive them of their persuasiveness; it reflects congressional concurrence in the consistent administrative view that the "old" or "former" Uncompahgre Reservation did not survive its opening under the 1897 Act. See *e. g.,* Memorandum Relating to the Proposed Withdrawal of Certain Lands for Uncompahgre Ute Indians, 1931, JX 426; Letter of Comm. of Ind. Aff. to the Secretary of the Interior of June 12, 1933, JX 428; Ann. Rept. of the Comm. of Ind. Aff., 1898, JX 108, at 43; Ann. Rept. of the Comm. of Ind. Aff. to the Secretary of the Interior of April 12, 1899, JX 113; same, of July 27, 1903, JX 168.

the Uintah Valley Reservation, abandoning the 1882 lands altogether.[110] In large part, the Uncompahgres were given allotments on the Uintah Valley Reservation following agreement by the Uintah and White River Bands to the arrangement.[111] See Act of June 7, 1897, ch. 3, 30 Stat. at 87, I Kapp. 621, LD 49. Though some Indians continued to assert the claim that the 1882 reservation still existed, the Bureau of Indian Affairs apparently made a formal determination in 1929 that the reservation no longer existed.[112] Similarly, the Justice Depart-

ment, appearing herein as *amicus curiae* representing the United States, has remained silent on the continued reservation status of the 1882 lands. In other proceedings, the United States has steadfastly denied the reservation's continuing existence.[113] The plaintiff finds little support in the circumstances surrounding the opening of the 1882 reservation; the Tribe's interpretation of events and language is strained at best.

In this Court's opinion, any colorable ambiguity in the historical record is laid to rest

**110.** See Letter from Acting Agent Mercer to Comm. of Ind. Aff. of Sept. 9, 1903, JX 174; Letter from Agency Clerk to the Agent of Aug. 31, 1903, JX 173; Letter from the Comm. of Ind. Aff. to Acting Agent Mercer of July 28, 1903, JX 170; Letter from Acting Agent Mercer to Comm. of Ind. Aff. of Apr. 20, 1904, JX 180; Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Apr. 30, 1904, JX 181; Letter from the Comm. of Ind. Aff. to Agent Hall of July 6, 1904, JX 186. See Letter from the Comm. of Ind. Aff. to Agent Hall of Mar. 13, 1905, JX 232. On July 1, 1904, the Secretary of the Interior authorized the allotment of lands for the Uncompahgres on the Uintah Valley Reservation. Letter from Secretary of the Interior to the Comm. of Ind. Aff. of July 1, 1904, JX 185.

**111.** See H.Doc.No.80, 55th Cong., 2d Sess., LD 51 (1898). The Commissioner of Indian Affairs submitted a schedule of 591 Uncompahgre allotments at Uintah for secretarial approval by letter of July 15, 1905, JX 287. See also S.Rep. No.951, 57th Cong., 1st Sess., LD 69, at 3 (1902).

**112.** See "Statement Concerning the Uncompahgre Grazing Reserve," Feb. 6, 1943, JX 451, at 4:

While the Ute Indians maintained that they still had a legal claim to the 1,800,000 acres of the old Uncompahgre Reservation, the Office of Indian Affairs had determined in 1929 that the action of Congress in 1897 returning the unallotted lands of the reservation to the public domain had extinguished the legal claims of the Indians to the land, . . .

See also, Memorandum Relating to the Proposed Withdrawal of Certain Lands for Uncompahgre Ute Indians, Office of Indian Affairs, 1931, JX 426, at 12:

It is apparent from the foregoing that the Uncompahgres, in accordance with the 1880 agreement, were entitled only to allotments, and had no right to the surplus land within the Executive Order Reservation, . . . It unquestionably would have been greatly to the interest of the Indians, from a financial

standpoint, if they had been recognized as owners of the 2,000,000 acres included in the Executive Order Reservation. But for the Government to have taken such position would have been entirely contrary to the facts.

**113.** In *Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980), the Justice Department filed a memorandum on behalf of the Secretary of the Interior which commented as follows:

[I]n the view of the United States, the Tribe's claim that the Uncompahgre Reservation survives is both erroneous and irrelevant.

The fact is that, for several decades at least, the Department of the Interior has considered the Uncompahgre Reservation as disestablished. That remains its view today. Our own review of the evidence affords no basis for disagreeing with that conclusion. . . .

We simply list some of the impediments to the Tribal claim: (1) Both in the abortive 1894 Act . . . and in the 1897 Act . . . , Congress treated the Uncompahgre Reservation as a mere temporary asylum for the Ute Band of that name, denying them any claim to the proceeds derived from the sale of the surplus lands opened to entry; (2) in 1899 and 1903, after the Reservation was opened, it was referred to as "the former Uncompahgre Indian Reservation" . . .; (3) in 1948, Congress extended the Uintah and Ouray Reservation by including lands situated within the boundaries of the former Uncompahgre Reservation, a futile act if the latter reservation still subsisted . . . (6) at no time since 1897 does it appear that the Department of the Interior (or any other government agency) has treated the Reservation as still in existence . . .

Memorandum for the Petitioner in Response to the Motion of the Ute Indian Tribe, *Andrus v. Utah*, 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (citations omitted).

by the express language used by Congress in the Act of March 11, 1948, Pub.L. 80–440, 62 Stat. 72, VI Kapp. 375–381 (1980), LD 187. That Act provides as follows:

> *Be it enacted* . . . , That the exterior boundary of the Uintah and Ouray Reservation in Grand and Uintah Counties, in the State of Utah, for the benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation, is hereby extended to include the following area:
>
> \* \* \* \* \* \*

Omitted here is the legal description of the body of lands known as the Hill Creek Extension of the Uintah and Ouray Reservation. The described lands fall largely within the original boundaries of the Uncompahgre Reservation. If that reservation still remained intact, what purpose was served by the metes-and-bounds description of the "exterior boundary" of the Uintah and Ouray Reservation by Congress in the 1948 Act?

The legislative [114] and administrative history [115] that culminated in the 1948 legislation consistently regards the area of grazing lands set apart in the Hill Creek Extension as the "new" Ute Reservation, a resto-

ration of a portion of the "old" Uncompahgre Reservation to Indian use. For example, in response to an inquiry by the Interior Department's Director of Grazing regarding the status of the "old" reservation, Assistant Commissioner of Indian Affairs William Zimmerman, Jr., reported that "it is the belief of this office that the undisposed of lands within the former Uncompahgre Indian Reservation, Utah, have the status of public lands of the United States," temporarily withdrawn in aid of legislative efforts resulting in the 1948 Act, Letter from Ass't. Comm. of Ind. Aff. to Director, Div. of Grazing of Aug. 8, 1939, JX 447.

The same opinion is expressed in the committee reports explaining the enacted bill. See H.Rep.No.1372, 80th Cong., 2d Sess., LD 186 (1948); S.Rep.No.749, 80th Cong., 1st Sess., LD 184 (1947). The purpose of the bill, explains the House Committee Report, was "to enlarge the Uintah and Ouray Reservation by some 510,000 acres," LD 186, at 2, and, indeed, that is what the 1948 Act did. It did not establish a grazing reserve within an existing Indian reservation [116] because no such reservation re-

---

114. See H.Rep.No.1372, 80th Cong., 2d Sess., LD 186 (1948); S.Rep.No.749, 80th Cong., 1st Sess., LD 184 (1947); see also S.Rep.No.1188, 78th Cong., 2d Sess., JX 182 (1944); H.Rep.No. 143, 78th Cong., 1st Sess., JX 181 (1943); S.Rep.No.243, 77th Cong., 1st Sess., JX 180 (1941); H.Rep.No.70, 77th Cong., 1st Sess., JX 179 (1941); H.Rep.No.2399, 74th Cong., 2d Sess., JX 174 (1936).

115. Office of Indian Affairs Memorandum, JX 426, *supra*; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of June 12, 1933, JX 428; *Id.*, JX 429; Memorandum by the Director of Forestry, JX 433; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of July 19, 1925, JX 435; Letter from Ass't. Comm. of Ind. Aff. to the Secretary of the Interior of Nov. 17, 1936, JX 436; Letter from the Director of Forestry to Agency Superintendent of Dec. 4, 1936, JX 437; Report on Grazing Resources on Uintah and Ouray Reservation, JX 443 (Nov. 1938); Letter from Agency Superintendent to Bill Stringham of Mar. 21, 1939, JX 445; Letter from Agency Superintendent to the Comm. of Ind. Aff. of Oct. 18, 1939, JX 448; Letter from the Regional Forester to the Agency Superintendent of Oct. 25, 1939, JX 449; Letter from the Comm. of Ind. Aff. to the

Secretary of the Interior of June 19, 1941, JX 450; *contra*, Memorandum of Feb. 6, 1935, JX 434.

116. Cf. Plaintiff's Post-Trial Brief at 55. The Tribe's rationale regarding the 1948 Act is tenuous and unconvincing. The Tribe is correct when it points out that "title ownership to the beneficial Indian interest [in lands] is different from reservation status." *Id.*, at 54. Congress understood this at that time, as evidenced by the fact that it defined "Indian Country" by reservation boundaries rather than title in that same year. Act of June 25, 1948, ch. 645, 62 Stat. 683, 757 *codified at* 18 U.S.C. § 1151(a). The 1948 Act *extends the boundaries* of the Uintah and Ouray Reservation; *title to the Hill Creek Extension was restored to the Tribe by other means*, such as purchase using tribal funds. H.Rep.No.1372, LD 186, *supra*, at 2.

The distinction between title and territorial boundaries makes it unnecessary for this Court to reach the question of whether lands within Executive Order Indian Reservations may be expropriated by the Government without obligation to compensate the affected Indians. Cf. *Northern Paiute Nation v. United States*, 634 F.2d 594, 601–604, (Ct.Cl.1980); *Ute Indians v.*

mained in existence.[117]

■ Agent Myton understated the situation when he wrote in his report for August 21, 1899 that "I think the Uncompahgre Indians have been treated very badly," JX 117, at 351. The reservation, which had been created for the purpose of providing allotments to the Uncompahgre Utes under the Agreement of 1880, was restored to the public domain at the insistance of non-Indian interests before a single allotment had been made. Fifty years passed before a viable Indian land base was re-established in the area by the 1948 Act. That Act, and not the Executive Order of January 5, 1882, defines the territorial extent of the plaintiff's reservation in the vicinity of the former Uncompahgre Reservation. Based upon the express language of the 1897 Act, its legislative history, contemporaneous and subsequent legislative and administrative interpretations of its effect, and the jurisdictional history of the 1882 lands this Court is compelled to conclude that the 1882 Uncompahgre Reservation was disestablished by Congress pursuant to the Act of June 7, 1897.[118] *Rosebud Sioux*

---

*United States,* 330 U.S. 169, 176, 67 S.Ct. 650, 653, 91 L.Ed. 823 (1947); *Sioux Tribe v. United States,* 316 U.S. 317, 331, 62 S.Ct. 1095, 1101, 86 L.Ed. 1501 (1942); Note, 69 *Yale L.J.* 627 (1960).

**117.** Other circumstances surrounding the 1882 reservation lands harmonize with this conclusion: For example, (1) in 1965, the Ute Indian Tribe stipulated to a settlement of its claim before the Indian Claims Commission that the United States failed to provide the Uncompahgre Band with a reservation pursuant to the Agreement of 1880. 14 Ind.Cl.Comm. 707 (Dkt. No. 349, 1965). While the *stare decises* effect of a settlement agreement is necessarily extremely limited, the claim itself is indicative of the Tribe's prior understanding of historical events. (2) The 1882 boundaries do not appear on any recent map exhibit offered to this Court. (3) Article I of the Ute Tribal Constitution, LD 176, speaks of the Ute territory as including the 1882 reservation but does so "except as otherwise provided by law," see page 2, *supra,* rendering the language ambivalent at best. The works of learned scholars mirror the view that the conclusion that the 1948 boundaries rather than the 1882 boundaries define the extent of Ute territory in that area. See *e. g.,* O'Neil & MacKay, "A History of the Uintah-Ouray Ute Lands," JX 483, at 37 (1977). (4) Bills introduced prior to 1948, though not enacted, uniformly speak of extending the boundaries of the Uintah and Ouray Reservation to include the Hill Creek grazing lands. See *e. g.,* H.R. 9156, 74th Cong., 2d Sess.; H.Rep.No.2399, 74th Cong., 2d Sess., LD 174; beginning in 1965 the State of Utah began selecting indemnity school lands within the 1882 boundaries as well as elsewhere. (5) Under Utah's Enabling Act, Act of July 16, 1894, § 6, ch. 138, 28 Stat. 107, 109, LD 34, such selection is not permissible unless the 1882 Uncompahgre Reservation "shall have been extinguished and such lands [have been] restored to and become a part of the public domain." See *Andrus v. Utah,* 446 U.S. 500, 502–503 & n.1, 100 S.Ct. 1803, 1804–1805, 64 L.Ed.2d 458 (1980). (6) Rather than providing for a sum-certain payment to the Uncompahgre Band for the expropriation of the unallotted lands, or providing that the proceeds from the disposition of the unallotted lands were to be credited to the Utes by the U. S. Treasury, the 1897 Act makes no provision for paying the Uncompahgres at all. Restoration of Executive Order reservation lands to the public domain with no provision for payment of the Indians has been held to accomplish disestablishment of the restored lands. See *Seymour v. Superintendent,* 368 U.S. 351, 354–356, 82 S.Ct. 424, 426–427, 7 L.Ed.2d 346 (1962); *United States v. Pelican,* 232 U.S. 442, 445–446, 34 S.Ct. 396, 397, 58 L.Ed. 676 (1914).

None of these factors standing alone could conclude the ultimate question of the Uncompahgre boundaries. Each factor, however, generates an additional inference that the Uncompahgre Reservation was disestablished by Congress in 1897.

**118.** This conclusion is not founded upon a simple preponderance of the evidence. The legislative and historical materials have been evaluated pursuant to the fundamental principle that doubtful expressions in legislation affecting Indians are to be construed in their favor. See *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 484, 99 S.Ct. 740, 753, 58 L.Ed.2d 740 (1979); *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977); *Bryan v. Itasca County,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n.7, 96 S.Ct. 1793, 1796, 48 L.Ed.2d 274 (1976); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973); *Carpenter v. Shaw,* 280 U.S. 363, 366–67, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912); *The Kansas Indians,* 72 U.S. (5 Wall.) 737, 760, 18 L.Ed. 667 (1866); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832) (J. McLean, concurring). With the benefit of hindsight, the

*Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977); *Seymour v. Superintendent*, 368 U.S. 351, 354–56, 82 S.Ct. 424, 426–427, 7 L.Ed.2d 346 (1962).

## IX. THE UINTAH RESERVATION

Concurrent with the drive to open the Uncompahgre Reservation was a similar effort to negotiate an agreement with the Uintah and White River Bands providing for the allotment of their lands and the cession of the unallotted "surplus" acreage. Bills were introduced in Congress in 1894 providing for the allotment and opening of both reservations. *E. g.*, S. 1887, H.R. 4511, H.R. 6557, 53d Cong., 2d Sess. (1894); See Rept. of the Secretary of the Interior, 1894, JX 37, at 90, 469; S.Rep.No.450, 53d Cong., 2d Sess., LD 27 (1894); H.Rep.No.660, 53d Cong., 2d Sess., LD 30 (1894). As observed at pages 48–49, *supra*, the provisions of H.R.6557 were substantially included in the Indian Appropriations Act for 1894 as sections 20–23. See Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 337–338, I Kapp. 546 (2d ed. 1904), LD 35. Under the provisions of this Act a distinction appeared between the legislative approach to the Uncompahgre Reservation and the approach to the Uintah Valley Reservation. While section 20 of this Act ordered the appointment of a commission to proceed directly with allotment of the Uncompahgre lands, section 22 provided as follows:

Sec. 22. That said commission shall also negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the Territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians,

and if possible, procure the consent of such Indians to such relinquishment, and for the acceptance by said Indians of allotments in severalty of lands within said reservation, and said commissioners shall report any agreement made by them with said Indians, which agreement shall become operative only when ratified by Act of Congress.

The rationale for this contrasting treatment of the Uintah Reservation is expressed in House Report No. 660, LD 30, at 1–3:

The rights of the Indians upon the Uintah Reservation differ from those of the Indians upon the Uncompahgre Reservation. The Uncompahgre Indians have no title to any of the lands within the reservation, nothing more than the privilege of temporary occupancy. . . .

\* \* \* \* \* \*

As to the Uintah Indians the Assistant Attorney-General finds that the Indians are the owners of the lands within the reservation, because under the Act of Congress of May 5, 1864 (13 Stat. 64 [LD 4]), it was provided that the lands within the Uintah Reservation should be "set apart for the permanent settlement and exclusive occupation of the Indians." In order, therefore, to make available for settlement any portion of the lands within the Uintah Reservation, it is first necessary to obtain the consent of the Indians residing thereon. Accordingly, the bill provides that the commissioners appointed shall treat with the said Indians for the purpose of obtaining a relinquishment of their title to any lands not needed for allotment to Indians.

See also, Letter from Ass't. Atty. Gen. Hall to the Secretary of the Interior of Oct. 23,

---

Congress may have been better advised to have treated the Uncompahgre Reservation differently than it did. But this Court cannot now rewrite the statutes.

For the courts to reinstate the *entire* reservation, on the theory that retention of more allotments was ill-advised, would carry us well beyond the rule by which legal ambiguities are resolved to the benefit of the Indians. We give this rule the broadest possible scope, but it remains at base a canon for construing

the complex treaties, statutes, and contracts which define the status of Indian tribes. A canon of construction is not a license to disregard clear expressions of tribal and congressional intent.

*DeCoteau v. District County Court*, 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1775). In the 1897 Act Congress spoke clearly. "Some might wish they had spoken differently, but we cannot remake history." *Id.* at 429, 95 S.Ct. at 1085.

1893, JX 30; page 48 & note 89, *supra.* Far from unilaterally restoring all but the allotted lands to the public domain for wholly non-Indian exploitation, as was done at Uncompahgre, congressional intent in 1894 as to the Uintah Reservation pursued a different goal.

If the consent of the Indians upon the Uintah Reservation can be obtained, by which they will accept allotments of land in severalty, and the remainder of the lands is sold and the proceeds derived are used for the benefit of the Indians, this condition will be much better than it is at present. These Indians have already made considerable progress toward civilization, and are entirely competent to receive lands in severalty, and are in a condition to reclaim and improve them. *If the residue of the lands are settled by whites the Indians will be more directly brought in contact with civilization and be able to make greater progress by the example thus afforded them.*

H.Rep.No.660, 53d Cong., 2d Sess., LD 30, at 3 (1894) (emphasis added).[119] Though primary attention was directed to restoring the mineral lands at Uncompahgre to non-Indian entry, see 26 Cong.Rec. 7032–7033, 7256–7260 (June 30, 1894), LD 33, there was some pressure to open the Uintah Reservation as well.[120] Under the Indian Appropriations Act for 1896 an additional commission was directed to negotiate with, among others, "the Indians residing upon the Uintah Reservation in the State of Utah, for the surrender of any portion of their respective reservations, or for such modification of existing treaties as may be deemed desirable by said Indians and the Secretary of the Interior; . . ." Act of June 10, 1896, ch. 398, 29 Stat. 321, 341–342, LD 42.[121]

Progress on the negotiations was slow to commence. In a report to the Senate dated April 8, 1897, the Commissioner of Indian Affairs stated:

As a matter of fact, there was but very little correspondence between this office and the [Ute] commission directly relating to the negotiations with the Indians of the Uintah Reservation. It was made the first duty of the commission to deal with the Uncompahgre Indians in accordance with section 20 of the Act [of 1894]. Indeed, the work of the commission never progressed beyond that point, and about

---

**119.** In *Mattz v. Arnett,* 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973), the Supreme Court, indicated that pursuant to the General Allotment Act of 1887, 24 Stat. 388, LD 13, "Unallotted lands were made available to non-Indians with the purpose, in part, of promoting interaction between the races and of encouraging Indians to adopt white ways." Allotment under such legislation, *Mattz* ruled, "is completely consistent with continued reservation status." *Id.* at 497, 93 S.Ct. at 2254. The Supreme Court had observed in an analogous situation in *Seymour v. Superintendent,* 368 U.S. 351, 356, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962) that the legislation

"did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards."

Congressional intent regarding the Uintah Reservation in 1894 was far more consistent with its intent in *Seymour v. Mattz* than it was with its intent regarding the Uncompahgre Reservation or the Lake Traverse Reservation in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975). In 1894 Congress engaged in extensive debate on the proper means to "civilize" the Indians, including civilization by example:

Then I want to say again the Indians, like white people, learn more by example than by precept. Therefore, I shall favor . . . the interspersing of white settlement all through these Indian reservations, right alongside of the Indians; not to deprive them of any rights which they have, and not in any manner to endanger the rights of the Indians in their allotments. . . .

26 Cong.Rec. 6236 (June 13, 1894) (remarks of Rep. Coffeen), LD 32. See also *id.* 6234–6253, 7617, 7682–7708, 8263–8271, 9251–9253.

**120.** For example, the Governor and Legislative Assembly of the Territory of Utah sent petitions to Congress on the subject. 26 Cong.Rec. 2575–2576 (Mar. 5, 1894), LD 28.

**121.** The commission was appointed and sent into the field, see Letter from the Comm. of Ind. Aff. to J. P. Noonan, Esq. of Mar. 22, 1897, JX 71. See also H.Doc.No.248, 54th Cong., 1st Sess., LD 40 (1896) (appropriations for execution of § 22 of the 1894 Act requested; 32 Cong.Rec. 648–652 (1899), LD 60 (progress of 1896 commission).

all of the correspondence with them related to the Uncompahgres—the allotment of lands in severalty to them and the contemplated restoration to the public domain of the surplus not needed for allotment.

[T]hey were not expected to undertake the negotiations with the Uintah Indians until they had finished their labor with the Uncompahgres.

S.Doc.No.32, 55th Cong., 1st Sess., LD 46, at 2–3 (1897), JX 73, at 3. See H.Doc.No.101, 54th Cong., 1st Sess., LD 39 (1896) ("Uncompahgre Indian Reservation"). A month later, Senator Rawlins of Utah introduced S. 1883, a bill creating a new commission to make allotments in severalty to the Indians at the Uintah Reservation and to obtain the cession of any unallotted lands. 30 Cong. Rec. 880 (May 4, 1897), LD 47. Rep. King of Utah introduced an identical bill in the House, H.R. 7760. 31 Cong.Rec. 1486 (Feb. 5, 1898), LD 50. See H.Rep.No.1172, 55th Cong., 2d Sess., LD 53, (1898).[122] The bills were enacted as the Act of June 4, 1898, ch. 376, 30 Stat. 429, I Kapp. 642–43 (2d ed. 1904), LD 54 (see Appendix A for text).[123]

Negotiations on allotment with the Uintah and White River Utes were a total failure. The White River Band particularly was unalterably opposed to the allotment and cession of the Uintah Reservation lands. *E. g.*, Letter from Acting Agent Beck to the Comm. of Ind. Aff. of Sept. 1,

1897, JX 80. After holding meetings with "individual and influential" Uintah and White River Utes, Commissioner Ross Guffin wrote:

The Indians were unanimous and determined in their opposition to making cession to the government of any of their lands and to allowing an Uintah or White River Indian to take and hold an allotment in severalty on said reservation.

Letter from Comm. R. Guffin to the Comm. of Ind. Aff. of Jan. 7, 1899, *quoted in* JX 483, at 26.

A White River and Uintah Ute delegation travelled to Washington in November, 1898, emphasizing their opposition to the congressional proposal:

Our land is small and we do not want to sell it to anyone. We do not want any commission sent there; we are opposed to that. We have no more land than we want ourselves for our own use.

Statement of Sasanuckit, *et al.*, of November 24, 1898, *quoted in* JX 483 at 25–26 & n. 130.

In the meantime, the Office of Indian Affairs had begun the practice of leasing parcels of land on the Uintah Reservation for grazing and mining purposes. See O'Neil & MacKay, "A History of the Uintah-Ouray Ute Lands," JX 483, at 23–26 & nn. 110–134 (1977).[124] Leasing on the Uin-

---

**122.** The House Report states the bill's purpose in plain terms:

> The bill merely provides for the appointment of a commission . . . to allot lands to the Indians and obtain by a treaty a cession from them to the Government of the residue of the land upon the reservation. If the Indians refuse to take allotments or to cede any portion of the reservation, then this measure becomes inoperative. On the other hand, if the Indians receive the commissioners, accept the allotments in severalty and join in a treaty of cession to the Government, then, . . . if approved the Indians will be benefited, and the title . . . held by the Indians will be extinguished, and the lands not occupied by them will become a portion of the public domain of the United States.
>
> \* \* \* \* \* \*
>
> In order, therefore, to make available for settlement any portion of these lands it is neces-

sary to obtain consent of the Indians by treaty or otherwise.

H.Rep.No.1172, *supra*, at 2. See also 31 Cong. Rec. 511, 5155–5156, 5182–5183 (1898), LD 58, 59.

**123.** The Uncompahgre Commission members were appointed as the Uintah Commission on July 14, 1898. Rept. of the Comm. of Ind. Aff., 1898, JX 108, at 36. The Uintah Commission received its instructions by letter of Aug. 6, 1898, JX 107, from the Commissioner of Indian Affairs.

**124.** See also Letter from Comm. of Ind. Aff. to Agent Waugh of Mar. 1, 1892, JX 24; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of Apr. 23, 1892, JX 25. Rept. of the Comm. of Ind. Aff., 1901, JX 125, at 81.

The Interior Department, anticipating the cession negotiations directed by Congress, stated as a matter of policy that no leases for any

tah Reservation quickly aroused controversy; Senator Rawlins of Utah saw leasing as a major stumbling block in the path of his own legislative proposals, which sought to reduce the Uintah Reservation to merely its northeast corner, permitting the sale of the remainder. See S. 145, 57th Cong., 1st Sess. (1902) (The text of the bill is reproduced in S.Doc.No.212, 57th Cong., 1st Sess., LD 68, at 3–4 (1902).). Pressure from interested lessors rather than the Indians' own desires was perceived to be at the root of Indian opposition to the opening of the Uintah Reservation.[125] Hearings on leasing on the Uintah Reservation were held, see "Leasing of Indian Lands," Hearings, Sen. Comm. on Ind. Aff., S.Doc.No.212, 57th Cong., 1st Sess., LD 68 (1902), and documents were requested from the Interior Department. See S.Doc.No.154, 57th Cong., 1st Sess., LD 66 (1902); Letter from the Comm. of Ind. Aff. to Sen. Wm. Stewart, Chmn., Sen. Comm. on Ind. Aff. of Mar. 4, 1902, JX 126.

At the hearings, Indian Affairs Commissioner Jones commented,

> There is a sort of feeling among the ignorant Indians that they do not want to lose any of their land. That is all there is to it; and I think before you can get them to agree to open the reservation, you have got to use some arbitrary means to open the land.

S.Doc.No.212, LD 68, *supra*, at 5. The Utah congressional delegation eagerly sought such arbitrary means. Rep. George Sutherland spoke at the hearings, arguing that the Utes did not really "own" their reservation at Uintah and therefore that Ute consent need not be obtained to accomplish a cession. Referring to the termination of the four early Indian farm reserves, which Congress restored to the public domain in 1878,[126] Sutherland asserted that the same could be done at Uintah.[127] S.Doc.No.212, LD 68, *supra*, at 109–120.

Senator Rawlins' diminishment bill did not pass.[128] Other important language was,

> SENATOR PLATT, of Conn.: But in all of the negotiations we have had with them they have simply stood mute.
> COMMISSIONER JONES: No; they do not want to talk sale at all.
> THE CHAIRMAN: Has there been a cash offer made to these particular Indians?
> COMMISSIONER JONES: I do not know, Senator. They refuse to talk about it.

See also, *Deseret Evening News*, Mar. 7, 1902, JX 129 (Sen. Rawlins introduced bill prohibiting mineral leasing on Indian reservations); *Deseret Evening News*, Mar. 6, 1902, JX 128 (Florence Mining Co. lease on Uintah Reservation to be investigated).

purpose on the Uintah Reservation would be approved. Letter from Comm. of Ind. Aff. to Acting Agent Cornish of Mar. 5, 1898, JX 100. Subsequent leasing and contract proposals were stalled by the Commissioner's office. *E. g.*, Letter from Acting Comm. of Ind. Aff. to Agent Myton of Oct. 10, 1898, JX 109. See also, S.Doc.No.154, 57th Cong., 1st Sess., LD 66 (1902).

**125.** See *e. g.*, "Leasing of Indian Lands," Hearings, Sen. Comm. of Ind. Aff., S.Doc.No.212, 57th Cong., 1st Sess., LD 68 at 5:

> THE CHAIRMAN: Mr. Rawlins [of Utah] says that the effort to treat with [the Utes] failed several times. How is that?
> COMMISSIONER JONES: *It has failed twice* to my knowledge.
> SENATOR PLATT, of Conn.: What do they want?
> COMMISSIONER JONES: They do not want anything except to let it remain as it is.
> SENATOR RAWLINS: They will not agree at all. There has been so much agitation by people interested that we can never set any agreement with them. It is not because they do not know what their own interests are, but for other reasons it is impossible.
> THE CHAIRMAN: Speculators, persons wanting the land, are operating upon them?
> SENATOR RAWLINS: They are operating upon them constantly.
> SENATOR CLARK, of Mont.: They are trying to get a lease from them now.
> \* \* \* \* \* \*

**126.** Act of June 18, 1878, ch. 266, 20 Stat. 165, LD 9.

**127.** Rep. Sutherland also drew as analogy the Uncompahgre Reservation. S.Doc.No.212, LD 68, at 116. The Utah delegation now tried to justify the opening of the Uintah Reservation by urging its similarity to the status of the Uncompahgre Reservation. Earlier, the opening of the Uncompahgre Reservation had been justified by the congressmen because its status was so different from the Uintah Reservation. See note 89 *supra*, and accompanying text.

**128.** Had the Rawlins bill been enacted, the Uintah Reservation boundaries would clearly have been diminished. Compare *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51

however, included in the Indian Appropriations Act of 1902:

> That the Secretary of the Interior, *with the consent thereto of the majority of the adult male Indians* of the Uintah and the White River tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall cause to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date *all the unallotted lands within said reservation shall be restored to the public domain: Provided,* That persons entering any of the said land under the homestead law shall pay therefor at the rate of one dollar and twenty-five cents per acre; *And provided further,* That nothing herein contained shall impair the rights of any mineral lease which has been approved by the Secretary of the Interior, or any permit heretofore issued by direction of the Secretary of the Interior to negotiate with said Indians for a mineral lease; ...

Act of May 27, 1902, ch. 888, 32 Stat. 245, 263–264, I Kapp. 750, 753 (2d ed. 1904), LD 82 (emphasis added). The Act further provided that the mineral lessees and permittees in lieu of their leases could locate up to 640 acres of contiguous mineral lands upon the area to be restored to the public domain, with one exception: "the Raven Mining Company, which may in lieu of its lease locate *one hundred mining claims* of the character of mineral mentioned in its lease ..." *Id.*, 32 Stat., at 264 (emphasis added). Proceeds from the entry of the restored lands were to be used first to pay the expenses incurred under the Act; the remainder to be used for the benefit of the Utes. *Id.* The Act additionally provided for payment of $60,064.48 to the Uintah and White River Utes "on account of the allotment of lands on the Uintah Reservation to Uncompahgre Indians,"[129] and $10,000 for claims arising from the 1888 cession, discussed *supra.* Payment of the money was to be made "whenever a majority of the adult male Indians of said tribes shall have consented to the allotment of lands and the restoration of the unallotted lands ..." *Id.*

Though the legislative history of the 1902 Act is comparatively sparse, see 35 Cong. Rec. 3650–3651, 3711 (1902), LD 70; S.Rep. No.951, LD 69, *supra,* at 3,[130] it seems clear that Congress did not accept Rep. Sutherland's view that the reservation should be opened unilaterally; Indian consent conditioned all operative clauses of the Act. See *Deseret Evening News,* June 9, 1902, JX 148 at 1 (comments of Sen. Rawlins).[130A]

President Theodore Roosevelt signed the 1902 Act into law on May 28, 1902, 35 Cong.Rec. 6069 (1902), but not without serious concerns. The President objected in particular to the favored treatment that the Act afforded the mining lessees.[131] He

---

L.Ed.2d 660 (1977); *Russ v. Wilkins,* 624 F.2d 914 (9th Cir. 1980).

**129.** This was the amount paid to the United States from the Uncompahgre funds pursuant to the 1880 Agreement's and 1897 Act's requirement that they pay $1.25 an acre for their allotments. *Id.* 32 Stat. at 264; S.Rep.No.951, 57th Cong., 1st Sess., LD 69, at 3 (1902).

**130.** See also *Deseret Evening News,* Mar. 29, 1902, JX 131 at 1; *Id.,* Apr. 2, 1902, JX 132, at 5; *Salt Lake Herald,* May 2, 1902, JX 134, at 1, 3; *id.,* May 2, 1902, JX 136, at 1; *id.,* May 8, 1902, JX 137, at 2.

**130A.** The Tribe argues that the 1902 Act harmonizes with the provisions of the General Allotment Act of 1887, Act of Feb. 8, 1887, § 5, ch. 119, 24 Stat. 388, 389–390, I Kapp. 33 (2d ed. 1904), LD 13, whereas the Rawlins bill did not. Plaintiff's Post-Trial Brief at 67–68. This is correct. Cf. note 133, *infra.* From this, however, the Tribe infers that the intent of the 1902 Act necessarily intended to maintain the reservation's original boundaries. The Tribe carries the significance of the 1887 Act to the construction of the 1902 Act too far, as do the defendant counties. See pages 1150–1153 & notes 203–213, *infra.*

**131.** See *Salt Lake Herald,* May 23, 1902, JX 140, at 2. The President also opposed making the payment to the Indians on their claims contingent upon Indian consent to allotment, and the small size of the proposed allotments. *Salt Lake Herald,* May 25, 1902, JX 142, at 1. An amendatory resolution was proposed in the Senate to meet the President's objections, *id.;*

signed the bill upon assurances by influential congressmen that the Act would be amended to correct the offensive passages.[132] Some amendments were made by Joint Resolution of June 19, 1902:

> *Resolved* ... That the provisions of the Act [of 1902] ... are hereby supplemented and modified as follows:
>
> \* \* \* \* \* \*
>
> In addition to the allotments in severalty to the Uintah and White River Utes of the Uintah Indian Reservation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of non-irrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock.
>
> All allotments hereafter made to Uncompahgre Indians of lands in said Uintah Indian Reservation shall be confined to agricultural land which can be irrigated, and shall be on the basis of eighty acres to each head of a family and forty acres to each other Indian, and no more. The grazing land selected and set apart as aforesaid in the Uintah Indian Reservation for the use in common of the Indians of that reservation shall be equally open to the use of all Uncompahgre Indians receiving allotments in said reservation of the reduced area here named.
>
> \* \* \* \* \* \*

> The item of seventy thousand and sixty-four dollars and forty-eight cents appropriated by the Act which is hereby supplemented and modified, to be paid to the Uintah and White River tribes of Ute Indians in satisfaction of certain claims named in said Act, shall be paid to the Indians entitled thereto without awaiting their action upon the proposed allotments in severalty of lands in that reservation and the restoration of the surplus lands to the public domain.

32 Stat. 744, I Kapp. 799–800 (2d ed. 1904).[133]

The funding needed to execute the amended 1902 Act was not immediately forthcoming. A year later, in the Indian Appropriations Act of March 3, 1903, ch. 994, 32 Stat. 982, 997–998, III Kapp. 17–18 (1913), LD 91, Congress provided funds to do surveying and to carry out the 1902 Act. The 1903 Act further provided

> That the Secretary of the Interior shall forthwith send an inspector to obtain the consent of the Uintah and White River Ute Indians to an allotment of their lands as directed by the Act of May twenty-seventh, nineteen hundred and two, and *if their consent*, as therein provided, *cannot be obtained* by June first, nineteen hundred and three, then *the Secretary of the Interior shall cause to be allotted to each of said Uintah and White River Ute Indians* the quantity and character of land named and described in said Act ...

---

*Deseret Evening News,* May 23, 1902, JX 141, at 1; *Salt Lake Herald,* May 27, 1902, JX 143, at 1.

**132.** 35 Cong.Rec. 6869 (June 16, 1902), LD 84 (remarks of Rep. Sherman); *Deseret Evening News,* June 16, 1902, JX 149, at 2. The mineral lease provisions were scandalized in the press. *E.g., Deseret Evening News,* June 7, 1902, JX 147, at 1.

**133.** The Joint Resolution also provided that: Insofar as not otherwise specially provided, all allotments in severalty to Indians, outside of the Indian Territory, shall be made in conformity to the provisions of the Act approved February eighth, eighteen hundred and eighty-seven, entitled, "An Act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes," [the General Allotment Act] and other general Acts amendatory thereof or supplemental thereto, and shall be subject to all the restrictions and carry all the privileges incident to allotments made under said Act and other general Acts amendatory thereof or supplemental thereto. The significance of this statute in this case is discussed at 1152–1153, *infra.*

The provision, *supra,* dealing with establishment of a grazing reserve was repealed by the Act of Mar. 3, 1903, 32 Stat. 982, 997–998, III Kapp. 18 (1913), LD 91.

32 Stat., at 997–998 (emphasis added).[134] The time for opening the unallotted lands was extended to October 1, 1904. *Id.*

By letter of April 29, 1903, JX 133, 160, the acting Commissioner of Indian Affairs delivered formal instructions for allotting the Uintah Reservation to U. S. Indian Inspector James McLaughlin. See Instructions to J. McLaughlin, Esq., JX 133, 159. McLaughlin was instructed to meet in council with the Ute bands "and endeavor to obtain their consent to the allotment of lands." *Id.*, at 5.[135] He met with the Uintah and White River Utes at the Uintah and Ouray Agency from May 18 through May 23, 1903. McLaughlin was in the peculiar position of one who was delegated to negotiate Indian consent to a chain of events that would occur regardless of the outcome of the negotiations. Accordingly, he argued to the Utes that they had no choice but to agree:

INSPECTOR McLAUGHLIN: * * *

My friends, you want to get rid of this idea that you have the say whether your reservation can be opened or not. You are simply to say whether or not you will accept allotments. The survey for your reservation is already advertised for. The work will commence in a few months. After the survey is completed, allotments will be made.... This is the condition, my friends, and it is your duty to accept it gracefully because the law of the great council [Congress] has said so....

Minutes of councils with the Uintah and White River Ute Indians, JX 162, at 34 (1903).[136] The council reached immediate impasse, the Indians wholly opposed to the allotment and opening of the reservation and McLaughlin adamantly refusing to discuss the question. The Indians responded to McLaughlin's stubbornness with reciprocal obstinance, even humor:

QUINN: * * *

Where did you find the key to this reservation to open it? That's the reason I don't understand even if you do say it is provided for. I don't believe it. You say you are here, and that you have this paper as your authority.

---

**134.** The Act also limited the grazing lands provided for in the 1902 Joint Resolution to 250,000 acres, to be located south of the Strawberry River. *Id.*, 32 Stat. at 998. By an amendment offered by Senator Kearns of Utah, the Act opened mineral lands on the former Uncompahgre Reservation to entry. Senator Kearns commented,

> It has always been a pet scheme of mine to throw open these reservations, for I was convinced that the Indians were not making proper use of the land. And then again, I was opposed to such a large tract of land being practically unoccupied. You know a great deal of the best land in the state is embraced in these reservations, and we cannot well afford to keep out settlers.

*Deseret Semi-Weekly News,* Mar. 30, 1903, JX 157, at 1; see also, *id.,* Feb. 5, 1903, JX 156, at 5.

**135.** Of course, Indian consent was no longer necessary under the 1903 Act. On January 5, 1903, the Supreme Court announced its decision in *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). *Lone Wolf,* "the Indians' Dred Scott decision," *Sioux Nation of Indians v. United States,* 601 F.2d 1157, 1173 (Ct.Cl.1979) (J. Nichols, concurring), held that Congress could allot and open an Indian reservation without tribal consent. In the 1903 Act and subsequent legislation Congress relied on *Lone Wolf* to act unilaterally in dealing with reservation lands. See *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 593 & n. 13, 595–599 & nn. 17, 19–20, 97 S.Ct. 1361, 1366 & n. 13, 1367–1369, 51 L.Ed.2d 660 (1977).

**136.** Inspector McLaughlin's approach to the Utes was reminiscent of the Athenian's approach to the Melians recounted by Thucydides in his *History of the Peloponnesian War* (ca. 416 b.c.):

> *ATHENIANS*: Then we on our side will use no fine phrases saying, for example that we have a right to our empire because we defeated the Persians, ... a great mass of words that nobody would believe.... Instead we recommend that you should try to get what it is possible for you to get, taking into consideration what we both really do think; since you know as well as we do that when these matters are discussed by practical people, the standard of justice depends on the equality of power to compel and that in fact the strong do what they have the power to do and the weak accept what they have to accept.

Thucydides, The Peloponnesian War, 401–402 (Penguin ed. 1954). As the City of Melos was beseiged and captured by the Athenians, so the Uintah Reservation was allotted and opened by the Government against its residents' wishes.

If they find the key to this reservation, to open it we will give it to you. You come and throw it on the table and say, "Here, I have the key to this reservation. Throw it down here so I can see it. When you throw your key to the reservation out here, I will believe you.

\* \* \* \* \* \*

INSPECTOR McLAUGHLIN: * * *

I feel, my friends that I have done my duty in this matter. I have explained it so clearly that you cannot fail to understand it fully, but it is very difficult to convince persons who do not want to be convinced. . . .

*Id.*, JX 162, at 66, 71.

Inspector McLaughlin reported to the Secretary of the Interior on May 30, 1903 that of 280 adult male Uintah and White River Utes, he was able to secure the signatures upon the assent to the allotment statute of only 82 of the Indians:

I deemed it proper to transmit the same, but with the explanation that *the signers were as much opposed to the opening of the reservation* without consulting the Indians *as the non-signers were*, but they thus expressed their acceptance of the law to show their good will and readiness to comply with the wishes of the Government.

Letter from Insp. McLaughlin to the Secretary of the Interior of May 30, 1903, JX 165, at 5 (emphasis added), *reprinted in* H.Doc. No.33, 58th Cong., 1st Sess., LD 92, at 3–7 (1903). According to McLaughlin, the Indians were "unanimously opposed to the opening of their reservation under the provisions of the Act," *id.*, at 8.

Those of the Indians who signed the acceptance of the Act, did so, as heretofore stated, to show their good will, and many others would doubtless have signed

had there been anything to be gained by their doing so. They fully understood that they were to have land allotted to them whether they consented to the Act or not, and having nothing to lose by refusing to assent to the provisions of the Act they declined to sign and thus became a party to that which was distasteful to them. . . .

*Id.*, JX 165, at 9.

Indian consent to the opening of the Uintah Reservation was wholly lacking in 1903, and never subsequently appeared. While several exhibits make reference to the "ceded" lands of the Uintah Reservation, these references are erroneous.[137] No cession of Uintah Reservation lands after 1888 was agreed to by even a simple majority of the Utes. Nor was cession language used in any of the relevant legislation affecting the Uintah Reservation. The absence of those "disestablishment factors"[138] distinguishes at least in part the circumstances found in *DeCoteau v. District County Court*, 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975) and *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 97 S.Ct. 1361, 51 L.Ed.2d 660 (1977). Such an agreement of cession had been concluded by the Sioux and ratified by Congress in *DeCoteau* and had been agreed to by a majority of the Sioux and enacted in unilaterally amended form in *Rosebud*; both of those acts contained express language of cession. To the extent that Indian consent and express language of cession in *DeCoteau* and *Rosebud* aided the Court "in determining that congressional intent was to terminate the Reservation,"[139] that aid is wholly absent here.

The discussions in council did move Inspector McLaughlin to suggest amendments to the opening legislation to provide for creation of Indian timber and coal reserves

---

137. *E. g.*, Act of Apr. 4, 1910, ch. 140, 36 Stat. 269, 285, LD 139 (refers only to 1902 Act); Act of Mar. 3, 1911, 36 Stat. 1058, 1074, LD 141; H.Rep.No.70, 77th Cong., 1st Sess., LD 179, at 3 (1941); 74 Cong.Rec. 3408 (Jan. 28, 1931), LD 166 (remarks of Rep. Leavitt) (Reprinted document refers to nonexistent 1905 agreement. Cf. Rept. of the Comm. of Ind. Aff., 1906, JX 334, at 78); Letter from the Comm., Gen. Land

Off. to the Comm. of Ind. Aff. of Sept. 28, 1922, JX 403 ("ceded Uintah lands").

138. *Rosebud Sioux Tribe v. Kneip*, 430 U.S. 584, 599 n. 13, 97 S.Ct. 1361, 1369, 51 L.Ed.2d 660 (1977).

139. *Id.*, at 598 n. 13.

for use by the Utes following allotment. See also Letter from Comm. of Ind. Aff. to the Secretary of the Interior of July 18, 1903, JX 167 (transmitting McLaughlin's recommendations); Letter from the Secretary of the Interior to the Comm. of Ind. Aff. of Aug. 25, 1903, JX 172 (recommendations should be transmitted to next session of Congress). On November 23, 1903, Interior submitted an amendment to the Indian Appropriations bill for 1904 embodying McLaughlin's recommendations. S.Doc.No. 159, 56th Cong., 3d Sess., LD 101, at 3 (1905).

Though the timber and coal reserves proposal did not pass, Interior succeeded in securing congressional approval of an additional extension of the time for opening the reservation to March 3, 1905. Act of Apr. 21, 1904, ch. 1402, 33 Stat. 189, 207–208, III Kapp. 35, 53 (1913), LD 94. In July the Secretary authorized the Uintah agent to proceed with allotting lands at Uintah to the Uncompahgres, and in November, expanded that authority to include allotments for the Uintah and White River Utes. S.Doc.No.159, LD 101, *supra*, at 3.[140] Problems confronting the agent and the Office of Indian Affairs ranged from surveying matters,[141] to problems with mines and prospectors,[142] selection of the Indian grazing reserve[143] and protection of water rights for the Indian allottees.[144] Federal

**140.** See Letter from Acting Comm. of Ind. Aff. to Rep. Murdock of July 26, 1904, JX 189; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of Aug. 27, 1904, JX 193; Letter from Acting Agent Hall to Comm. of Ind. Aff. of Oct. 17, 1904, JX 199. The agent soon requested additional time, pointing out that the opening date of Mar. 10, 1905 required allotment to be completed in "the most extreme" weather. Letter from Acting Agent Hall to Comm. of Ind. Aff. of Dec. 14, 1904, JX 207. By letter of the same date, Hall requested that tracts of land be set aside for timber, coal, school grounds and other agency purposes. *Id.*, JX 208. Ten days later the Acting Commissioner informed Hall that a proposal for an extension until Oct. 1, 1905 had been submitted to Congress. Letter of Dec. 24, 1904, JX 209.

**141.** Letter from U.S. Surveyor-General for Utah to the Comm., Gen. Land Office of July 28, 1903, JX 169; Letter from Acting Comm., Gen. Land Office to Comm. of Ind. Aff. of Aug. 4, 1903, JX 171; Letter from Acting Comm. of Ind. Aff. to the Secretary of the Interior of Apr. 30, 1904, JX 181; Letter from the Acting Director, U.S.G.S. to the Secretary of the Interior of May 9, 1904, JX 182; Letter from Acting Agent Hall to the Comm. of Ind. Aff. of Aug. 15, 1904, JX 191; *id.*, Aug. 27, 1904, JX 194; Rept. of the Comm., Gen. Land Office, 1904, JX 196, at 1374. Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 31, 1905, JX 243; S.Doc.No.159, 58th Cong., 3d Sess., LD 101 (1905).

**142.** See Letter from Acting Comm. of Ind. Aff. to Messrs. Chrystie, Brightman & Douglass of July 28, 1904, JX 190; Letter from Acting Agent Hall to the Comm. of Ind. Aff. of Oct. 19, 1904, JX 202; Letter from Secretary of the Interior to Raven Mining Co. of Dec. 14, 1904, JX 206; Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 15, 1905, JX 233.

**143.** See Letter from Acting Agent Hall to the Comm. of Ind. Aff. of Oct. 17, 1904, JX 201; Letter from the Secretary of the Interior to the Comm. of Ind. Aff. of Dec. 13, 1904, JX 205; Letter from Acting Agent Hall to the Comm. of Ind. Aff. of May 13, 1905, JX 264; see also Petition to the Secretary of the Interior of Oct. 22, 1904, JX 203 (lands south of Strawberry River are rich in minerals; should not be reserved for Indian grazing).

**144.** Between 1899 and 1902, Cyrus Cates Babb was assigned to make a hydrological survey of the Uintah Reservation for the U.S. Geological Survey. In his report, Babb recommended that steps be taken to protect the Indians' rights to the water, a supply which would fall short of the demand if the reservation was opened. H.Doc.No.671, 57th Cong., 1st Sess., LD 86 (1902). Babb recommended that an Indian irrigation system be implemented quickly. *Id.* Water rights protection became a significant concern in the administration of the reservation. See Letter from the Director, U.S.G.S. to the Secretary of the Interior of May 15, 1903, JX 161; Letter from the Acting Secretary of the Interior to the Comm. of Ind. Aff. of May 21, 1903, JX 163 (no rights for taking water off of reservation should be granted); Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of July 27, 1903, JX 168; Letter from Director, U.S.G.S. to the Secretary of the Interior of May 9, 1904, JX 182; Letter from the Acting Comm., Gen. Land Off. to the Comm. of Ind. Aff. of June 6, 1904, JX 183; *id.*, June 27, 1904, JX 184; Letter from Acting Agent Hall to the Comm. of Ind. Aff. of Oct. 17, 1904, JX 200; *id.*, Jan. 23, 1905, JX 217; *id.*, Mar. 29, 1905, JX 241; *id.*, Apr. 7, 1905, JX 246; *id.*, Apr. 11, 1905, JX 248; Letter from Citizens' Committee to the Secretary of the Interior of Mar. 30, 1905, JX 242; Letter from Sen. Smoot to the Secretary of the Interior of Apr. 18, 1905, JX

troops were requested to aid Acting Agent Hall in patrolling the Uintah Reservation and expelling "sooners," prospectors and other unauthorized trespassers. Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of March 1, 1905, JX 226; *e. g.*, Letter from Secretary of Interior to the Comm. of Ind. Aff. of June 6, 1905, JX 272. While authority was granted to the Uintah Railway Co. to enter the reservation to survey a right-of-way to be secured under the Act of Mar. 2, 1899,[145] entry by other non-Indians was generally prohibited. The agent restricted travel upon roads passing through the reservation, with the approval of the Commissioner of Indian Affairs.[146]

Meanwhile, Congress was inquiring of the Secretary as to the progress being made towards opening. S.Res., 39 Cong.Rec. 1863 (Feb. 4, 1905). The Secretary submitted a report and documents indicating that more time was needed to complete the allotment process. S.Doc.No.159, 58th Cong., 2d Sess., LD 101 (1905). Senator Smoot further had introduced bills dealing with the opening of the Uintah Reservation. S. 6867 provided in part:

> That the said unallotted lands, excepting such tracts as may have been set aside as national forest reserve, shall be disposed of under the general provisions of the homestead and townsite laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied or entered by persons entitled to make entry thereof; . . .

S. 6867, 58th Cong., 3d Sess., LD 97, at 1–2. S. 6868 provided for reservation of Uintah timber lands for inclusion in the Uinta Forest Reserve. The described lands were to be "maintained as a national forest reservation," to be "subject to all the general laws, rules, and regulations now and hereafter in force for national forest reserves," and were to be "free from any claims of the Uintah and White River tribes of the Ute Indians except for rights and privileges specifically reserved to them in this Act; . . ." LD 98, at 6. The bill provided for creation of Indian timber and coal reserves within the Uintah Forest Reserve to be administered under forest reserve regulations. The

251; Letter from Ass't. Atty. Gen. to the Secretary of the Interior of May 11, 1905, JX 262; Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of May 11, 1905, JX 263; Letter from the Secretary of the Interior to the Comm. of Ind. Aff. of May 16, 1905, JX 268; Letter to Acting Agent Hall from Comm. of Ind. Aff. of May 17, 1905, JX 269. The agency officials were particularly concerned with the impact of state water law on Ute water rights. See Letter from Agency Engineer to the Secretary of the Interior of Apr. 24, 1905, JX 252; *id.*, May 4, 1905, JX 259; Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Apr. 27, 1905, JX 254; Letter from the Director, U.S.G.S. to the Secretary of the Interior of May 2, 1905, JX 258; Letter from State Engineer to Agency Engineer of May 15, 1905, JX 266; Letter from Agency Engineer to State Engineer of May 23, 1905, JX 270; Letter to Agency Engineer from State Engineer of June 8, 1905, JX 273; Letter from Agency Engineer to the Secretary of the Interior of June 15, 1905, JX 275; Letter from Acting Agent Hall to the Comm. of Ind. Aff. of Oct. 27, 1905, JX 325; *id.*, Nov. 17, 1905, JX 327; Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Oct. 13, 1906, JX 335. In a letter from Acting Agent Hall to the Comm. of Ind. Aff. of July 5, 1905, JX 279,

it was recommended that additional lands be reserved along the streams in order to control access to the streams by non-Indian users. Such lands were so reserved. Letter from Acting Comm. of Ind. Aff. to Acting Agent Hall of Aug. 5, 1905, JX 304; Presidential Proclamation of Aug. 3, 1905, 34 Stat., pt. 3, 3141, LD 112; *id.* of Aug. 14, 1905, 34 Stat., pt. 3, 3143 LD 114.

145. Ch. 374, 30 Stat. 990, I Kapp. 102–104 (2d ed. 1904); Letter from the Acting Comm. of Ind. Aff. to the Secretary of the Interior of Mar. 9, 1905, JX 231.

146. See Letter from Acting Comm. of Ind. Aff. to the Secretary of the Interior of June 23, 1905, JX 277. The Secretary of the Interior himself disapproved a proposal for a new state road from Vernal to Park City and Ogden, Utah on the ground that its construction "would be detrimental to the interests of the reservation, . . .". Letter from the Secretary of the Interior to the Comm. of Ind. Aff. of Mar. 18, 1905, JX 234; Application to the Secretary of the Interior, Nov. 21, 1904, JX 234; Letter from Acting Agent Hall to the Comm. of Ind. Aff. of Feb. 2, 1905, JX 234.

third bill, S. 6869, LD 99, consented to suit in the Court of Claims by the Utes on questions arising under the first two bills.

Though not enacted themselves, the provisions of S. 6867 and 6868 were substantially included in the Indian Appropriations Act of March 3, 1905, ch. 1479, 33 Stat. 1048, 1069–1070, III Kapp. 124, 146–147 (1913), LD 105 (see Appendix A for text). In pertinent part the 1905 Act provided:

> That the time for opening to public entry the unallotted lands on the Uintah Reservation in Utah having been fixed by law as the tenth day of March, nineteen hundred and five, it is hereby provided that the time for opening said reservation shall be extended to the first of September, nineteen hundred and five, unless the President shall determine that the same may be opened at an earlier date and that the manner of opening such lands for settlement and entry, and for disposing of the same, shall be as follows: *That the said unallotted lands*, excepting such tracts as may have been set aside as national forest reserve, and such mineral lands as were disposed of by the act of Congress of May twenty-seventh, nineteen hundred and two, *shall be disposed of under the general provisions of the homestead and town-site laws* of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; and no person shall be permitted to settle upon, occupy, or enter any of such lands, except as prescribed in said proclamation, until after the expiration of sixty days from the time when the same are thereby opened to settlement and entry: . . . .

> That before the opening of the Uintah Indian Reservation the *President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, and subject to the mineral rights granted by the act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary*, and he may also set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development, and may confirm such rights to water thereon as have already accrued: *Provided*, That the proceeds from any timber on such addition as may with safety be sold prior to June thirtieth, nineteen hundred and twenty, shall be paid to said Indians in accordance with the provisions of the act opening the reservation.

33 Stat., at 1069–1070 (emphasis added).

Additional provisions of the Act repealed the requirement that the Indian grazing lands be located south of the Strawberry River, protected the homestead rights of veterans, provided that unentered lands were subject to limited sale five years hence and readopted the 1902 Act's distribution of proceeds from entry into the lands. While preserving the mineral rights on the Uintah Reservation created by the 1902 Act's lease conversion provisions,[147] the 1905 Act mate-

---

147. Special provision was made for settling the mining claims of the major mineral operators on the Reservation, the Florence and Raven Mining Companies:

> That the Raven Mining Company shall, within sixty days from the passage of this act, file for record, in the office of the recorder of deeds of the county in which its claims are located, a proper certificate of each location; and it shall also, within the same time, file in the office of the Secretary of the Interior, in the city of Washington, said description and a map showing the locations made by it on the Uintah Reservation, Utah, under the act of Congress of May twenty-seventh, nineteen hundred and two; and thereupon the Secretary of the Interior shall forthwith cause said locations to be inspected and report made, and if found to contain the character of mineral to which said company is entitled by the act of Congress aforesaid and that each of said claims does not exceed the size of a regular mining claim, to wit, six hundred by fifteen hundred feet, he shall issue a patent in fee to the Raven Mining Company for each of said claims: *Provided*

rially altered the operative statutory language governing the opening of the Uintah Reservation to non-Indian entry and settlement.

Without much question, opening of the Uintah Reservation under the original terms of the 1902 Act [148] would have accomplished the termination of the reservation; the unallotted lands were to be "restored to the public domain"—language precisely suited to disestablishment under *Seymour v. Superintendent*, 368 U.S. 351, 354–356, 82 S.Ct. 424, 426–427, 7 L.Ed.2d 346 (1962), and *Mattz v. Arnett*, 412 U.S. 481, 504 n. 22, 93 S.Ct. 2245, 2257, 37 L.Ed.2d 92 (1975). The impact of the 1902 Act on the Uintah Reservation's boundaries was clear at least in the mind of Rep. Sutherland of Utah:

Mr. Chairman, at the last session of Congress [1902] we provided for opening the Uintah Indian Reservation. This bill makes an appropriation of a large part of the $175,000 mentioned in the preceding paragraph for this purpose. This is appropriated for making surveys for allotments and such other surveys as may be necessary to carry that out into operation. *If the Uintah reservation is opened, . . . this appropriation of $6,000 for reestablishing the boundary lines of the reservation is entirely useless.* The boundary lines have been in their present condition for many years, and if by any mischance the reservation should not be opened it will not hurt to let it wait for another year; and if the reservation is opened it is simply an appropriation of $6,000 without any useful purpose whatever. I think it should be stricken from this bill.

\* \* \* \* \* \*

*The reservation will be simply restored to the public domain. . . .*

36 Cong.Rec. 1388 (Jan. 28, 1903), LD 90 (emphasis added).

The Tribe argues to the contrary, relying heavily upon the repeated references to the "opening" of the reservation as mitigating the plain meaning of the 1902 Act; a reservation that is "opened", so the argument goes, is not abolished, disestablished, diminished, or terminated. Plaintiff's Post-Trial Brief at 65–80.

There is no question that the Uintah Reservation was "opened" to non-Indian entry and settlement. All of the reservations examined in *Rosebud*, *DeCoteau*, *Mattz*, *Seymour*, and *United States v. Celestine*, 215 U.S. 278, 30 S.Ct. 93, 54 L.Ed. 195 (1909), and in the numerous cases decided by the Courts of Appeals, were "opened" to non-Indian entry and settlement. Some of those reservations have been disestablished or diminished; others have not. The fact of opening merely leads to the next step in the inquiry. It is the substantive *manner* of opening that has been decisive in this

---

further, That the Florence Mining Company entitled under the act of Congress approved May twenty-seventh, nineteen hundred and two, to the preferential right to locate not to exceed six hundred and forty acres of contiguous mineral land in the Uintah Reservation, Utah, shall within sixty days from the passage of this act file in the office of the recorder of deeds of the county in which its location is made a proper description of its claim, and it shall within the same time file in the office of the Secretary of the Interior said description and a map showing the location made by it on the Uintah Reservation, Utah, and thereupon the Secretary of the Interior shall forthwith cause said location to be inspected and report thereon made, and if found not to exceed six hundred and forty acres he shall issue a patent in fee to said company for the said land: *And provided further,* That the extension of time for opening the unallotted lands to public entry herein granted shall not extend the time to make locations to any person or company heretofore given a preferential right, but the Raven Mining Company and the Florence Mining Company pending the time for opening to public entry the Uintah Reservation shall have the right to ingress and egress to and from their respective properties over and through said reservation. The press, particularly *The Denver Post*, had earlier styled the favored treatment of the mining companies as the foundation of "a gigantic land steal," *id.*, Jan. 16, 1905, JX 212. See also *Deseret Semi-Weekly News*, Jan. 19, 1905, JX 213, at 1; *id.*, Jan. 23, 1905, JX 215, at 5. Congress apparently was not dissuaded.

**148.** The reference herein to the "1902 Act" includes the relevant portions of the Act of May 27, 1902, 32 Stat. 245, LD 82, as amended by the Joint Resolution of June 19, 1902, 32 Stat. 744, LD 85.

line of cases and it is the *manner* of opening that is decisive here.

The manner of opening under the terms of the 1902 Act, restoration of unallotted lands to the public domain, by definition would have ended the reservation status of those lands. The 1903 and 1904 Acts speak of "opening" the Uintah Reservation under the 1902 Act rather than "terminating" it or "abolishing" it, but the operative 1902 public domain language remained in force. The Uintah Reservation, however, was not opened under the 1902 restoration language.[149] It was opened under the 1905 Act, which provides expressly that "the manner of opening such lands for settlement and entry, and for disposing of the same" shall be that the unallotted lands, excepting national forest [149A] and mineral lands, "shall be disposed of under the general provisions of the homestead and townsite laws of the United States"—not *all* the land laws of the United States, as at Uncompahgre in 1897: *only* the homestead and townsite laws.

In this respect the 1905 Act closely resembles the 1906 legislation that opened but did not disestablish the Colville Reservation in *Seymour*,[150] and the 1892 Act that opened but did not disestablish the Klamath River Reservation in *Mattz*.[151] In fact, the defendants cite no disestablishment case holding limited entry under the mineral, homestead and townsite laws to be statutory language "precisely suited to disestablishment," *Rosebud Sioux Tribe v. Kneip*, 430 U.S. at 597, 97 S.Ct. at 1368.[152] To the contrary, Indian reservations opened under such provisions have consistently been held to remain in existence. *United States v. Long Elk*, 565 F.2d 1032 (8th Cir. 1977) (surplus lands on Standing Rock Reservation disposed of "under the general provisions of the homestead and townsite laws of the United States," mineral lands to be reserved for late disposition. Act of Feb. 14, 1913, ch. 54, 37 Stat. 675, III Kapp. 555–558); *United States v. Dupris*, 612 F.2d 319 (8th Cir. 1979), *vacated as moot*, 446 U.S. 980, 100 S.Ct. 2959, 64 L.Ed.2d 836 (1980) (surplus land on the Cheyenne River Reservation disposed of "under the general provision of the homestead and town site laws of the United States," school sections and coal lands to be reserved. Act of May 29, 1908, ch. 218, 35 Stat. 460, III Kapp. 373–377 (1913)) *United States ex rel. Condon v. Erickson*, 478 F.2d 684 (8th Cir. 1973) cited with approval in *Mattz, supra*, 412 U.S. 481, 505 n.23, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973) (same); *City of New Town v. United States*, 454 F.2d 121 (8th Cir. 1972) (surplus lands of the Fort Bert-

---

**149.** As a practical matter, the effort to disestablish the Uintah Reservation under the 1902 Act failed of its purpose as similar legislative proposals abolishing the Klamath River Reservation had failed of enactment in *Mattz*. The 1905 Act herein reflects as much a retreat from the intent to terminate the affected reservation as the 1892 Act in *Mattz*.

**149A.** As to the status of the national forest lands, see 1135–1141, *infra*.

**150.** The Act of Mar. 22, 1906, § 3, ch. 1126, 34 Stat. 80 III Kapp. 163–165 (1913) provides that the unallotted lands of the Colville Reservation shall be classified by the Secretary as irrigable, grazing, timber, mineral, or arid lands and, except for the mineral lands which are to be entered under the general mining laws, "such surplus lands shall be open to settlement and entry under the provisions of the homestead laws ..." as well as to selection for townsite purposes under § 11 of the Act. *Seymour* found no intent to disestablish the opened reservation. 368 U.S. at 356, 82 S.Ct. at 427.

**151.** The Act of June 17, 1892, ch. 120, 27 Stat. 52, I Kapp. 439 (2d ed. 1904), provides that the unallotted lands of the Klamath River Reservation are "declared to be subject to settlement, entry, and purchase under the laws of the United States granting homestead rights and authorizing the sale of mineral, stone, and timber lands ..." The provisions of the 1892 Act, the Court said in *Mattz*, "do not, alone, recite or even suggest that Congress intended thereby to terminate the Klamath River Reservation." *Id.*, 412 U.S. at 497, 93 S.Ct. at 2254.

**152.** While the Act of Apr. 23, 1904, ch. 1484, 33 Stat. 254 III Kapp. 71, 74 (1913), construed by the Supreme Court in *Rosebud*, used homestead and townsite language, the Court cited express language of cession also found in that act as the "language precisely suited to disestablishment." The Supreme Court has never treated such limited provisions, standing alone, as express language of termination.

hold Reservation disposed of under "the provisions of the homestead, mineral and townsite laws of the United States," tribal forest lands and state school lands reserved. Act of June 1, 1910, §§ 8, 9, ch. 264, 36 Stat. 455, III Kapp. 462–466 (1913)).[153]

The Presidential Proclamation of July 14, 1905, 34 Stat. pt. 3, 3119, III Kapp. 605–608 (1913), LD 108,[154] opening the Uintah Reservation to non-Indian settlement parallels the terms of the 1905 Act:

> * * * I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said Acts of Congress, do hereby declare and make known that *all the unallotted lands in said reservation*, excepting such as have at that time been reserved for military, forestry and other purposes and such mineral lands as may have been disposed of under existing laws, will on and after the 28th day of August, 1905, in the manner hereinafter prescribed, and not otherwise, *be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws of the United States;* . . .

*Id.,* LD 108, 34 Stat., pt. 3, at 3120, III Kapp. at 606 (emphasis added).[155] Related proclamations issued in 1905 refer to provisions of the 1905 Act as authority, not the 1902 Act.[156]

Meanwhile, the Indian agency officials who formed an allotting commission had proceeded to complete the allotment distribution among the Uintah and White River Utes and other preparations for the opening pursuant to the 1905 Act and the proclamations issued under it.[157] A schedule of allot-

---

**153.** Interior Solicitor Mitchell Melich reached the same conclusion regarding Fort Berthold in a memorandum of March 13, 1970 which reversed an earlier Departmental position. M–36802 *in* 2 Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 2009–2013 (1979).

At least one court has concluded that specification of the townsite laws in the opening legislative justifies an inference of continued reservation status:

> [I]f the opened land was still a part of the Reservation, the townsite laws would not be applicable, and an express statement by Congress was required to make them applicable. It may reasonably be inferred that in including this provision, Congress recognized that the townsite laws would not otherwise have been applicable.

*Confederated Salish and Kootenai Tribes v. Namen,* Civ. No. 2343 (D.Mont., dec. Sept. 20, 1979) at 21.

**154.** See Appendix A, *infra,* for complete text.

**155.** This proclamation was amended on August 2, 1905 to expand the number of applications drawn at random on the first two opening days. 34 Stat., pt. 3, 3140, III Kapp. 610 (1913) LD 111.

**156.** Presidential Proclamation of July 14, 1905, 34 Stat., pt. 3, 3116, III Kapp. 602–605 (1913), LD 107 (Uintah forest reserve lands); *id.,* of Aug. 3, 1905, 34 Stat. pt. 3, 3141, III Kapp. 610–612 (1913), LD 112 (reservoir and agricultural lands); *id.,* of Aug. 14, 1905, 34 Stat. pt. 3, 3143, III Kapp. 612–613 (1913), LD 113 (additional townsites); *id.* of Aug. 14, 1905, 34 Stat., pt. 3, 3143, III Kapp. 613–614 (1913) LD 114 (reservoir lands). See Appendix A, *infra,* for the text of the proclamations.

**157.** The commission consisted of Acting Agent Hall, Agency Engineer W. H. Code, and Mr. Chas. Carter, a prominent local citizen. Rept. of the Comm. of Ind. Aff., 1905, JX 323, at 146. Some problems facing the commission were reported by the Chief Engineer for the Agency, W. H. Code:

> In company with Captain Hall I have spent a considerable time in examining the desirable lands of the reservation, and find the situation somewhat disappointing, as will many prospective settlers who now regard this as a land of milk and honey. The very best tracts of irrigable lands are located on the tops of high plateaus from two to four hundred feet higher than the adjoining river valleys. Water could only be placed on these plateaus at great expense, owing to the many miles of steep sidehill work, flumes, tunnels, etc., which it would be necessary to construct before water could reach the desired areas. The river valleys and lower benches near the streams upon which the Indians desire to be located, are interspersed with areas and ridges of rocky soil which would discourage any New England farmer. Much of the bench land joining the Uintah River on the west is practically a huge bed of boulders mixed with a small percentage of sand and clay and covered with a few inches of loam. On the valley lands immediately joining the streams, alkali is found in patches, and, in fact, the latter appears soon after irrigation begins even on the higher benches. Of course there are many tracts of very fair land, but it will not be easy to make the

ments was submitted by the Commission to the Commissioner of Indian Affairs on June 23, 1905. Letter from Ute Allot. Comm. to Comm. of Ind. Aff. of June 23, 1905, JX 278. The schedule was duly approved by the Secretary of the Interior on July 18, 1905. Letter from the Acting Secretary of the Interior to the Comm. of Ind. Aff. of July 18, 1905, JX 292. The reservation was to be opened pursuant to the "Rosebud Regulations," a random selection, controlled entry procedure applied the year before in the opening of the Rosebud Reservation in South Dakota.[158] See *Deseret Evening News*, July 8, 1905, JX 282, at p. 5; *Deseret Semi-Weekly News*, Mar. 20, 1905, JX 236 at 2; 39 Cong.Rec. 1183–1184 (Jan. 21, 1905), LD 103 (remarks of Rep. Sherman); note 169, *infra*.

While the press was reporting that the Indians were content with the ongoing process of allotment and opening of the Uintah Reservation, *e. g., Deseret Semi-Weekly News*, Apr. 13, 1905, JX 250, at 5, all was not well. A Ute delegation had traveled to Washington in March, communicating their strong opposition to the forth-

coming events. See *Deseret Evening News*, Mar. 18, 1905, JX 235, at 2; *id.*, Mar. 22, 1905, JX 237, at 2. As spring turned to summer, rumors of a possible armed uprising by the Utes circulated and were investigated and disproved by federal officials.[159]

By a series of proclamations issued by President Roosevelt, Uintah Reservation lands were withdrawn for incorporation in the Uintah Forest Reserve,[160] set aside for reservoir purposes[161] and designated as townsites.[162] Interior officials additionally designated reservation lands for various purposes relating to the Indians, exempting those lands from homestead entry.[163] Of the reservation area of over two million acres, 1,010,000 acres were added to the Uintah Forest Reserve, 2,100 acres designated in townsites, 60,160 acres set aside for reclamation and reservoir purposes, 2,140 acres entered as mining claims, and 1,004,285 were opened to homestead entry. 282,460 acres were reserved for various purposes as "unallotted tribal lands." Rept. of the Comm. of Ind. Aff., 1905, JX 323, at 501.

---

selections of good land in the limited time at our command.
Letter from Agency Engineer to the Secretary of the Interior of May 4, 1905, JX 259.

**158.** Counsel for the defendant counties asserts that use of the Rosebud Regulations is "particularly significant" to the boundary issue considered here. Counties' Post-Trial Brief at 46 n. 56. That *procedurally* the government provided for opening the reservation to less than a wholesale land rush indicates little about the *substantive* operation of the 1905 Act. See pages 1127–1133, *infra*.

**159.** See Letters from Acting Comm. of Ind. Aff. to the Secretary of the Interior of May 5, 1905, etc., JX 260 (6 documents). An agent of the American Asphaltum & Rubber Co. reported that the White River Utes were "purchasing astonishing quantities of rifles and ammunition" and also "indulging in war dances," with the intent "to clean out all the white men in sight." *Id.*, JX 260, at 1. Lt. Col. F. West, Inspector General for the Army's Southwestern Division, reported that though the White River Utes were talking of moving back to Colorado, the merchants in Vernal and elsewhere "claim that the sales to the Indians [of weapons] are not as large this year as they were last year." There would be no "uprising." *Id.*, JX 260.

See also Letter from Acting Agent Hall to the Comm. of Ind. Aff. of May 13, 1905, JX 265 (agent taking precautions to avoid incidents upon opening).

**160.** Presidential Proclamation of July 14, 1905, 34 Stat., pt. 3, 3116, III Kapp. 602–605, LD 107.

**161.** Presidential Proclamation of Aug. 14, 1905, 34 Stat., pt. 3, 3143, III Kapp. 613–614, LD 114, *modifying id.* of Aug. 3, 1905, 34 Stat., pt. 3, 3141, III Kapp. 610–612, LD 112.

**162.** Presidential Proclamation of July 31, 1905, 34 Stat., pt. 3, 3139, III Kapp. 609, LD 110, *id.* of Aug. 14, 1905, 34 Stat., pt. 3, 3143, III Kapp. 612–613, LD 113.

**163.** See Rept. of the Comm. of Ind. Aff., 1905, JX 328, at 1893:

The [Indian] grazing land, approximating but not exceeding 250,000 acres, for the most part lies along the boundary of the forest reserve in townships 1 and 2 north, ranges 1 to 9 inclusive, west, and also along the White Rock River. Small tracts have been reserved for timber, coal, burial grounds, school sites, and similar purposes necessary in aid of the civilization and uplifting of these people.

Even with the restraints applied under the Rosebud Regulations, the opening of the reservation on August 28, 1905 triggered its own land rush. Hundreds of people made homestead entries on the Uintah lands, far more than could be provided with good lands. Much of the intended farmland was at best marginal, as barren as Brigham Young's survey team had found it in 1860.

The new settlers were almost immediately in trouble. By 1912 enough of them were so poverty stricken they went to Senator Reed Smoot asking for an act of Congress to place a moratorium on land payment. O'Neil, The Reluctant Suzerainty: "The Uintah and Ouray Reservation," 39 *Utah Historical Quarterly* 129, 140 (Spring 1971), JX 478. A number of Utes felt wholly alienated by the situation. Over 400 Utes, mainly White Rivers led by Red Cap, left the Uintah Reservation in 1906 on an exodus to the Sioux Reservations of the Dakotas, hoping to enter into an alliance with the Indians there. No such alliance came to be. "After two years of dislocation, and poverty, the wandering Utes returned to Utah no better off than when they left. The only reason they refrained from fighting was the lack of any hope of success." *Id.*, JX 478, at 141 (footnote omitted). The

"Absentee Utes" returned to the Uintah Reservation in 1908. See O'Neil, "An Anguished Odyssey: The Flight of the Utes, 1906–08," 36 *Utah Historical Quarterly* 315 (Fall 1968), JX 472; Rept. of the Comm. of Ind. Aff., 1906, JX 334 at 78–79; *id.*, 1907, JX 337, at 121–127; *id.*, 1908, JX 342 at 120–123.

In his annual report for 1905, the Commissioner of Indian Affairs observed:

The future of these Indians depends upon a successful irrigation scheme, for without water their lands are valueless, and starvation or extermination will be their fate. The circumstances are such that delay or hesitation will be fatal because all rights to waters in Utah are based on the priority of use. It is believed that an appropriation of not less than $500,000 for irrigation for the Utes should be asked for at the next session of Congress. . . .

JX 328, at 1893.

Irrigation and water rights protection was a matter of constant concern to the Uintah and Ouray Agency.[164] The Commissioner's recommendation was realized in 1906 through the creation of the Uintah Irrigation Project. See Act of June 21, 1906, ch. 3504, 34 Stat. 325, 375–376, LD 127.[165]

---

**164.** See *e. g.*, Letter from the Acting Comm. of Ind. Aff. of Oct. 13, 1906, JX 335; Letter from Acting Comm. of Ind. Aff. to Supt. of Irrig., Uintah & Ouray Agency of Sept. 26, 1907, JX 336; Letter from Ass't. Secretary of the Interior to Comm. of Ind. Aff. of Nov. 8, 1907, JX 338; Letter from Chief Clerk, Off. of Ind. Aff. to Supt. of Irrig., Uintah & Ouray Agency of Nov. 11, 1907, JX 339; Letter from the Comm. of Ind. Aff. to the Secretary of the Treasury of Dec. 19, 1908, JX 341; Letter from Comm. of Ind. Aff. to the Secretary of the Interior of Feb. 3, 1911, JX 345; Letter from Ass't. Comm. to Engineer, Uintah Irrig. Proj. of June 7, 1913, JX 361; Rept. of the Secretary of the Interior, 1915, JX 369, at 54–55; Letter from the Ass't. Atty. Gen. to the Secretary of the Interior of Apr. 26, 1916, JX 377.

In July, 1916, the United States Attorney filed *United States v. Dry Gulch Irrigation Co.*, No. 4418 in this Court to enjoin interference by white homesteaders with the federal canals and rights-of-way in the Uintah Irrigation Project. Complaint, No. 4418, JX 379. See Rept. of the Comm. of Ind. Aff., 1916, JX 381, at 46; Letter

from Ass't. Secretary to Supt. of Irrig. of Feb. 23, 1917, JX 383; Rept. of the Comm. of Ind. Aff., 1917, JX 387, at 36 (U.S. Dist. Ct. issued restraining order, appt'd. commissioner); see also, H.Doc.No.1250, 63d Cong., 3d Sess., LD 149 (1914); O'Neil & Mackay, "A History of Uintah-Ouray Ute Lands," JX 483, at 34–35 (1977).

**165.** O'Neil & Mackay, "A History of the Uintah-Ouray Ute Lands," JX 483, at 34 (1977):

The project eventually covered 80,000 acres, most of the allotted lands, and contained 22 canal systems which diverted water from most of the streams in the Uintah Basin. A program was initiated to level, clear, plow, and fence the Indian allotments to get them into cultivation. Tribal funds were used for this purpose. By 1908 over $330,000 had been spent on the irrigation project; less than $7,000 had been paid to Indian laborers. Under the Act of April 30, 1908, authority was granted the Secretary of the Interior to lease any irrigable allotment with the consent of the allottee. At the same time

Under one of the Presidential Proclamations issued under the 1905 Act, approximately 56,000 acres in the Strawberry Valley had been reserved for use in Indian irrigation projects.[166] However, the land was already under study by the U. S. Reclamation Service for a major reservoir project, a project the plans for which were approved by the Secretary of the Interior in 1905. The Reclamation Service offered to purchase the reserved Ute lands at $1.25 per acre. The offer was refused. Ann. Rept. of the U. S. Reclamation Service, 1909–10, at 268–269. In 1910, Congress appropriated the lands by statute:

> [T]he Secretary of the Interior is hereby authorized to pay from the reclamation fund for the benefit of the Uintah Indians the sum of one dollar and twenty-five cents per acre for the lands in the former Uintah Indian Reservation, in the State of Utah, which were set apart by the President for reservoir and other purposes under the provisions of the Act approved March third, nineteen hundred and five, . . . *All right, title and interest of the Indians in the said lands are hereby extinguished, and the title management and control thereof shall pass to the owners of the lands irrigated from said project* whenever the management and operation of the irrigation works shall so pass under the terms of the Reclamation Act.

Act of Apr. 4, 1910, ch. 140, 36 Stat. 269, 285, III Kapp. 429, 445, LD 139 (emphasis added). See also S.Rep.No.214, 61st Cong., 2d Sess., LD 138 (1910). By 1910, the statutory framework governing the opening of the Uintah Reservation had been established. What was the legal impact of these statutes upon the territorial boundaries of the Uintah Reservation?

As discussed above, nothing in the operative language of the Act of March 3, 1905,

33 Stat. 1048, 1069, LD 105, expressly terminated the reservation status of the unallotted Uintah lands not withdrawn for forest reserve or reclamation purposes.[167] The applicable Presidential Proclamations track the language of the 1905 Act. No agreement for the cession of the unallotted lands was ever concluded, and the relevant statutes include no cession language. Cf. *Rosebud Sioux Tribe v. Kneip, supra.*

To find the disestablishment of the Uintah Indian Reservation that the defendants assert, the record herein must satisfy the requirement that "[a] congressional determination to terminate [an Indian reservation] must be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history," *Rosebud, supra,* 430 U.S. at 586, 97 S.Ct. at 1362, *quoting Mattz, supra,* 412 U.S. at 505, 93 S.Ct. at 2258. Such intent was not expressed on the face of the 1905 Act; this Court will now look to the legislative history and circumstances surrounding the opening of the Uintah Reservation in search of congressional intent.

The legislative history of the Act of Mar. 3, 1905, 33 Stat. 1048, commences with the introduction of the Indian Appropriations bill for 1905–1906, H.R.17474, in the House. See H.Rep.No.3472, 58th Cong., 3d Sess. (1905). Language had been included in the bill to change the existing law on the opening of the Uintah Reservation:

> That the time for opening the unallotted lands to public entry on the Uintah Reservation in Utah, as provided by the acts of May 27, 1902 and March 3, 1903, and April 21, 1904, be, and the same *is hereby, extended to October 1, 1905*: Provided, That so much of said land as will be under the provisions of said acts *restored to the public domain shall be open to settlement and entry by procla-*

---

the Ute people were permitted to sell allotments as soon as they were ready for farming. Out of 80,000 acres within the irrigation project, about 25,000 acres were sold to non-Utes.

**166.** Proclamation of Aug. 14, 1905, 34 Stat., pt. 3, 3143, III Kapp. 613–614, LD 114.

**167.** The status of the national forest and Strawberry Reservoir lands is determined *infra*, at 1135–1142.

*mation of the President of the United States*, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied and entered by persons intending to make entry thereon;

. . .

39 Cong.Rec. 1180 (Jan. 21, 1905), LD 103 (emphasis added). Amendments were offered on the floor of the House to modify the proposed language. One offered by Representative Sherman and passed by the House added to the date extension the following language: "unless the President shall determine that the same may be opened at an earlier date." *Id.* Representative Howell of Utah offered substitute language which read in part as follows:

That the time for opening the unallotted lands to public entry on the Uintah Reservation in Utah having been fixed as the 10th day of March, 1905, it is hereby provided that so much of said lands as will be under the provisions of said acts *restored to the public domain shall be open to settlement and entry by proclamation of the President of the United States*, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied and entered by persons intending to make entry thereon; . . . and further provided, *That for one year immediately following the restoration of said lands to the public domain said lands shall be subject to entry only under the homestead, townsite and mineral laws of the United States.*

39 Cong.Rec. 1180 (Jan. 21, 1905), LD 103, *supra* (emphasis added). While Rep. Howell objected to any further extension of time because it would involve "the loss of practically one year to the settlers and home makers," he advocated the change in the manner of disposing of the lands restored to the public domain:

In this connection there is another matter of great importance and one which should receive the earnest attention of Congress. In the pending bill these lands, when restored to the public domain, are subject to entry under the general land laws of the United States, coupled with such rules and regulations as the President may prescribe. In my humble judgment there should be some provision such as is embodied in my amendment, limiting the lands in the reservation to entry under the homestead, townsite and mining laws alone for one year from the date of opening.

With the full development of the resources of this portion of the State of Utah will come also a capacity for supporting a numerous and thrifty population. Congress should see to it that until such time as those lands easy of access, reclamation and irrigation are settled by actual home makers the provisions of the homestead law alone shall prevail. . . .

39 Cong.Rec. 1182 (Jan. 21, 1905), LD 103 (remarks of Rep. Howell). Rep. Sherman opposed the Howell substitute, defending the need for an extension for the date of opening.[168] The bill was amended to read "September 1" instead of "October 1," and the substitute was rejected. 39 Cong.Rec. 1185, LD 103, *supra.* Rep. Howell then reasserted the last clause of the substitute as a separate amendment:

"And further provided, That for one year immediately following the restoration of said lands to the public domain, said and shall be subject to entry only under the homestead, townsite and mining laws of the United States."

Mr. SHERMAN. We have already provided in this amendment that they shall be opened under the regulations prescribed by the President, under a proclamation in which he can cover every-

---

**168.** During the debate, Rep. Howell inquired,

Mr. HOWELL of Utah. I would like to ask the chairman of the Committee on Indian Affairs what the reasons are that occur to his mind that would injure the Indians to have these lands, for the first year, at least, pre-

served for actual homebuilders rather than to be entered under the present land laws and the timber and stone act, etc? I see no reason why it should injure the Indians.

Mr. SHERMAN. I do not see any reason myself, so far as that is concerned. . . .

thing.[169] I think we ought not to adopt that amendment.

Mr. HOWELL of Utah. It seems to me that the amendment is of great importance for the reason that it limits the choicest lands on that reservation to entry and location by actual home seekers and home builders, and restricts those who might desire to acquire title to land there under any other of the land laws of the United States at least for one year after the opening of the reservation....

39 Cong.Rec. 1186 (Jan. 21, 1905), LD 103 *supra.* The amendment was rejected.

Two weeks later, Senator Smoot of Utah introduced two bills, S. 6867 and S. 6868. S. 6867 provided:

That the time for opening to public entry the unallotted lands on the Uintah Reservation in Utah having been fixed by law as the tenth day of March, nineteen hundred and five, it is hereby provided that the manner of opening such lands for settlement and entry, and for disposing of the same shall be as follows: That *the said unallotted lands,* excepting such tracts as may have been set aside as national forest reserve, *shall be disposed of under the general provisions of the homestead and townsite laws of the United States;* and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; ...

S. 6867, 58th Cong., 3d Sess., LD 97 at 1–2 (emphasis added). S. 6868 provided for the withdrawal of specifically described timber lands as an addition to the Uintah forest reserve. S. 6868, 58th Cong., 3d Sess., LD 98.

In hearings held a few days later by a subcommittee of the Senate Committee on Indian Affairs, the inclusion of S. 6867 in the Indian Appropriations bill for the next year was discussed by Chairman Stewart, Senators Kearns and Smoot of Utah, and Senator Teller of Colorado:

The CHAIRMAN. Suppose we do not put anything in with regard to extending the time there and leave that for the conference; strike it all out.

Senator SMOOT. Senator Kearns had the matter under consideration, and if he is satisfied with the bill I would like to have it go in.

Senator KEARNS. I would prefer not to load up the bill. *I would like to cut out all the House amendments.* If Mr. Newell recommends the withdrawal of the reservoir site I would consent to that, but I would like to see the reservation opened at the date set in the last act—in March. If that is impossible, then leave it to the President.

Senator SMOOT. That is what my bill says, to leave it to the President, *with this added, that there shall be no lands settled there except under the homestead and townsite entry.*

Senator TELLER. *I want that in, myself.*

Senator SMOOT. That is all there is to this bill.

Senator TELLER. I have a memorandum to put that in.

The CHAIRMAN. Then we can not settle it this morning. I think we will have to strike that out.

---

39 Cong.Rec. 1183, LD 103, *supra.*

**169.** The "regulations prescribed by the President" Rep. Sherman refers to were likely the Rosebud Regulations:

Mr. SHERMAN. This amendment under consideration proposes to open them under a proclamation by the President, which shall lay down rules and regulations for their opening, the idea being to have such rules and regulations as were prescribed, for instance, in the Rosebud Reservation opening and have been used as the rules and regulations in the opening up of the Indian lands for the last two or three years, and which have proved to be not only beneficial to the Indians, but of advantage to the would-be settlers.

39 Cong.Rec. 1183 (Jan. 21, 1905) LD 103, *supra*; see also Letter from the Secretary of the Interior to the President of Nov. 25, 1904, *reprinted in* 39 Cong.Rec. 1184, LD 103, *supra* (remarks of Rep. Sherman).

Senator TELLER. I think Senator Smoot and Senator Kearns and Mr. Pinchot can get up something.

Senator SMOOT. The only difference between Senator Kearns and me on this whole proposition is this, that this bill that I ask be inserted in the appropriation bill says it shall be left to the President to open it—that he shall issue a proclamation: *but it adds further, Mr. Chairman, that no land shall be located there except under the homestead and town-site laws.*

\* \* \* \* \* \*

Senator TELLER. *We want that provision in about the homestead or town-site entries. I am not going to agree to any entry of that land except under the homestead and town-site entries.*

Senator SMOOT. *That is exactly what my bill is,* and leaving the President to issue the proclamation.

Senator TELLER. *I am not going to consent to any speculators getting public land if I can held it.*

Senator KEARNS. Will the committee go into the matter of reserving that forest reservation? Could we not safely leave that with the Department?

Senator TELLER. I do not believe we ought to go into that, but, as this is an Indian reservation, we should authorize the President to reserve what he thinks is proper, or, more properly speaking, the Secretary of the Interior.

"Indian Appropriation Bill, 1906," Hearings, Subcomm. of the Sen. Comm. of Ind. Aff., 58th Cong., 3d Sess., LD 100, at 29–30 (1905) (emphasis added).

Following the hearings, the Secretary of the Interior reported to the Senate on the progress being made in preparing to open the Uintah Reservation, see S.Doc.No.159, 58th Cong., 3d Sess., LD 101 (1905), and the Committee on Indian Affairs reported out the Indian Appropriations bill. S.Rep.No. 4240, 58th Cong., 3d Sess., LD 102 (1905).

The Committee had agreed to Commissioner Leupp's recommendation that the time for opening be extended to September 1, 1905, unless the President determines an earlier date to be appropriate. *Id.* at 14. In a letter reprinted by the Committee the Commissioner advised that

As the manner of opening Indian reservations to entry and settlement after the lands are restored to the public domain is a matter that comes within the jurisdiction of the General Land Office, it is suggested that the bill be referred to that office.

*Id.,* LD 102, at 14. The Commissioner's reading of the bill apparently saw the Senate provisions as supplementing the restoration to be accomplished under the 1902 Act, as did the Howell substitute that failed in the House, rather than as amending or repealing its opening provisions. The Commissioner of the General Land Office took a different view.

Attention is called to the fact that under act of May 27, 1902 (32 Stat. 263), these lands were to be simply "restored to the public domain," and could, consequently, under that statute be appropriated under any of the public-land laws, while the pending bill provides that they "shall be disposed of under the general provisions of the homestead and town-site laws of the United States."

Possibly doubt may arise in determining *whether the proposed bill will repeal the act of May 27, 1902,* in so far as that act would permit entries under other than the homestead and town-site laws, and for the purpose of removing any possible doubt on this subject I would suggest that the word "only" be inserted between the words "of" and "under" . . .

*Id.,* LD 102, at 15 (emphasis added).[170] Though "only" was not added by the Com-

---

170. The Commissioner further commented that "The provisions of this bill prescribing the manner in which the lands are to be opened are similar to the provisions under which the Rosebud Indian Reservation, in South Dakota, and the Devil's Lake Indian Reservation,

in North Dakota, were opened during the past year." *Id.,* LD 102. These comments should not be read too broadly. While it is true that both Rosebud and Devil's Lake were opened under the homestead and townsite laws, with school

mittee to the Senate version, the subsequent legislative history of the 1905 Act tacitly acknowledges the observation by the Land Office Commissioner that the 1905 Act repealed the public domain language of the 1902 Act. References to the Uintah Reservation being restored to the public domain all but vanish from the legislative material. It was clear to Congress that the reservation was to be "opened" under the homestead and town-site laws.

The Indian Appropriations Bill, H.R. 17474, was without debate amended on the floor to substitute the modified versions of S. 6867 and S. 6868. 39 Cong.Rec. 3522 (Feb. 27, 1905), LD 103, *supra*.[171]

The House objected to the multiple amendments made by the Senate and the bill was referred to a conference committee. 39 Cong.Rec. 3751, LD 103, *supra*. Senators Stewart, McComber and DuBois and Representatives Sherman, Curtis and Stephens were appointed to the committee, 39 Cong. Rec., LD 103, at 3751, 3792. The conference report struck the House version, substituting the Senate language, 39 Cong.Rec., LD 103, at 3919, and this version was enacted as the Act of March 3, 1905, Stat. 1048, 1069, LD 105. The legislative history of the 1905 Act parallels that of the 1892 Act construed in *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). As in *Mattz*, a House effort that could have disestablished the Uintah Reservation failed to accomplish its objective, for the Senate bill's language was substituted for that of the House. The Senate version, like the Act in *Mattz*, allowed entry of the opened reservation only under the homestead and other specified laws. Compare *Mattz v. Arnett, supra*, 412 U.S. at 501–504, 93 S.Ct. at 2256–2257.

Here, as the Supreme Court pointed out in *Mattz*, "Congress was fully aware of the means by which termination could be effected." *Id.*, at 504, 93 S.Ct. at 2257. But clear termination language was *not* employed in the 1905 Act. Indeed, it was purposefully rejected.

Senator Henry M. Teller, a primary advocate of the Senate language, had long opposed the allotment of Indian lands and wholesale opening of Indian reservations to white settlement under the allotment bills, charging that such legislation was in the interests of non-Indian land speculators. See 11 Cong.Rec. 783 (Jan. 20, 1881) (remarks of Sen. Teller) *id.* at 780–781, 934–935; D. Otis, The Dawes Act and the Allotment of Indian Lands 12, 18, 44, 46, 50 (Prucha ed. 1973).[172] During the Senate debate on the Indian Appropriations bill in 1905, Senator Teller vehemently attacked the allotment program:

Mr. TELLER. * * * I have the satisfaction, Mr. President, when I look over the present condition of Indian affairs in this country to remember that I have never voted for the allotment of an acre of Indian land; and I think upon all occasions, when reasonable opportunity presented itself, and sometimes when it was not reasonable, I have protested against such action. . . .

39 Cong.Rec. 3515 (Feb. 27, 1905), LD 103. The 1905 Act reflects more the conservative approach expressed by Senator Teller, who insisted on the homestead and townsite language in committee, than the wholesale opening advocated earlier by, for example, Rep. Sutherland of Utah. Cf. Sen.Doc.No. 212, 57th Cong., 1st Sess., LD 68, at 111–120 (1902) (remarks of Rep. Sutherland).[173]

sections reserved to the states, both of those acts included express language *ceding* the unallotted lands. See Act of Apr. 23, 1904, ch. 1484, 33 Stat. 254, III Kapp. 71–75 (Rosebud); Act of Apr. 27, 1904, ch. 1620, 33 Stat. 319, III Kapp. 83–87 (Devil's Lake). The 1905 Ute Act did not. The bill was indeed similar, but certainly was not the same.

**171.** The Senate versions are identical to this legislation as enacted.

**172.** Senator Teller, for example, commented on an earlier allotment bill:

This is a bill that, in my judgment, ought to be entitled "A bill to despoil the Indians of their lands and to make them vagabonds on the face of the earth," because, in my view, that is the result of this kind of legislation. . . .

*Id.* 11 Cong.Rec. at 934.

**173.** Commissioner of Indian Affairs Francis Leupp expressed a similarly critical viewpoint

Nothing in the legislative history of the 1905 Act approaches a clear expression of congressional intent to disestablish the Uintah Reservation, particularly under the Senate language. Cf. *Rosebud Sioux Tribe v. Kneip, supra.* The "public domain" language of the 1902 Act and the 1905 House proposals was deliberately rejected in favor of the more limited homestead and town site language.

The distinction between the 1905 Uintah legislation and contemporaneous legislation that expressly disestablished other reservations seems to be discerned in executive documents reporting on the opening of those reservations. For example, the Secretary of the Interior comments,

> The opening to settlement and entry under the homestead law of the Rosebud Indian *lands* in South Dakota and of the Devil's Lake *lands* in North Dakota, . . . , respectively, was successfully accomplished, and the entry of the lands in said reservations is still in progress. Equally successful was the opening to settlement and entry under the homestead laws on August 28, 1905, of the unreserved and unallotted land of the Uintah Indian *Reservation* in Utah under the act of March 3, 1905 (33 Stat.L., 1069).

Report of the Secretary of the Interior, 1905, JX 328, at 1495 (emphasis added). Both the Rosebud and Devil's Lake "lands" were governed by express language of cession, while the opening at Uintah was of a "reservation." Similarly a report by the Assistant U. S. Attorney General for Public Lands draws a distinction between the opening of Rosebud and Devil's Lake and the opening of Uintah: while opened lands at Rosebud and Devil's Lake are said to be "restored to the public domain," Uintah lands are said "to be disposed of under the provisions of the Act of March 3, 1905 . . . ," and to be "opened to homestead entry." See *id.*, JX 328, at 1501–1502.

▉ Simple logic commands the conclusion that an opening of a reservation to entry under two specified statutes is, by definition, not a restoration to the status of "public lands" or public domain: "The words 'public lands' are habitually used in our legislation to describe such as are subject to sale or other disposal under general laws." *Newhall v. Sanger*, 92 U.S. 761, 763, 23 L.Ed. 769 (1875).

▉ The opening of the Uncompahgre Reservation to entry under all the land laws of the United States was tantamount to a restoration to public domain status; opening of the unallotted lands of Uintah Reservation under only two of those laws was not.[173A] Reservation lands remain such until expressly withdrawn from that status by Congress. *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909); *Rosebud Sioux Tribe v. Kneip, supra.*

The defendant State and counties assert that congressional intent to disestablish the unallotted Uintah lands is proven through reflection in subsequent references in legis-

---

on the subject of "opening" legislation, particularly the opening of the Uintah Reservation:

> There are two general methods of making allotments. . . .
> The Uintah Reservation, in Utah, furnishes an example of the rushing and haphazard method. The allotments there had to be made very hastily, because the act directing the opening of the reservation did not allow a reasonable time. It was impossible to survey the lands before the opening, much less before the allotments were made, . . .
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> Not uncommonly nowadays reservations are opened by special act of Congress, and in almost every instance, as I have pointed out elsewhere, the primary object seems to be to hasten the date when the surplus unallotted

lands can be taken by the homeseeker. This is not unnatural, in view of all the circumstances, but it is unwise nevertheless. Too little thought is given to the condition of the Indians to be allotted, and, incidentally to this, not enough regard is paid to the ultimate welfare of the whites who will try to acquire homes on the coveted lands or of those who will ultimately succeed to a large part of the allotments. . . .

**173A.** When Congress desire that other of the public land laws apply to the Uintah lands it expressly legislated to that effect. See *e. g.*, Act of Apr. 4, 1910, ch. 140, 36 Stat. 269, 285, III Kapp. 429, 445, LD 139 (Carey Act, 28 Stat. 442, as amended, 29 Stat. 434, extended to Uintah desert lands).

lative materials to the "former" Uintah Reservation, the "late" Uintah Reservation, etc. The briefs offer an impressive catalog of citations to past-tense references. See State of Utah Post-Trial Brief at 42–43; Defendant Counties' Post-Trial Brief at 100–101. A careful analysis of those items discloses a common source, a source not necessarily representative of past or present congressional intent. Senator (formerly Representative) George Sutherland introduced three bills between 1906 and 1910 dealing within the Uintah Reservation lands. Each of the bills includes a reference to the "former" Uintah Indian Reservation in the title. Congressional committee reports and references to the bills on the floor of either house track the language of the bill titles in making shorthand descriptions of the bills or their purposes. S. 3935, 59th Cong., 1st Sess., a bill "to authorize Indians on the former Uintah Reservation to cut and sell cedar and pine timber for posts and fuel," was reported in S.Rep. No.823, 59th Cong., 1st Sess., LD 122 (1906). The report itself includes references to the Uintah Reservation in the present tense ("Very little of this class of timber is to be found upon other parts of the reservation available to the settlers," "land of the Uintah Indian Reservation," "Indians of the Uintah Indian Reservation"). S. 6375, 59th Cong., 1st Sess., a bill "granting lands within the former Uintah Indian Reservation" to the Episcopal Church was reported from committee in S.Rep.No.4263, 59th Cong., 1st Sess., LD 126 (1906). References in the committee report to the "former" reservation are descriptions identifying the bill by tracking its operative language. The same is true of the House Committee report, see H.Rep.No.5010, 59th Cong., 1st Sess., LD 128 (1906) and of discussion of the bill on the Senate and House floor. See 40 Cong. Rec. 8306 (remarks of Sen. Sutherland), 9386 (remarks of Rep. Howell). The bill passed both houses without debate and was enacted in the form proposed by Sen. Sutherland. Act of June 29, 1906, ch. 3599, 34 Stat. 611, LD 129. S. 5926, 61st Cong., 2d Sess., a bill "to make available certain lands on the former Uintah Indian Reservation

under the reclamation act," was reported from committee in S.Rep.No.219, 61st Cong., 2d Sess., LD 138 (1910). The past-tense references in the report merely recite the bill's language. They do not reflect an informal congressional evaluation of the effect of the 1905 Act. The language of the bill was carried on to the final version of the bill, which became law. Act of Apr. 4, 1910, ch. 140, 36 Stat. 269, 285, LD 139.

On the floor of the Senate on March 8, 1906, Senator Sutherland offered an amendment to the Indian appropriations bill for that year which dealt with canals and ditches on grazing lands upon the "former" Uintah Reservation. 40 Cong.Rec. 3500 (Mar. 8, 1905), LD 123. The bulk of the past-tense legislative references, in fact, arise from the activities of Senator Sutherland. He and his relatively anti-Indian views had not yet joined the Senate in the session that enacted the 1905 language. What is most revealing, however, is the fact that following his departure from the Senate in 1917, references to the "former" Uintah Reservation fade from the legislative materials. Commencing with the Indian Appropriations Act of 1921, Act of Mar. 3, 1921, ch. 119, 41 Stat. 1225, IV Kapp. 282, 312, LD 157, reference is made to the "Uintah and Ouray Reservation," and made consistently in the present tense. See e. g., Act of Mar. 4, 1929, ch. 705, 45 Stat. 1562, 1584, V Kapp. 92, 111, LD 164 (reference to "the State Experimental Farm, . . . within the Uintah and Ouray Indian Reservation."); Act of Apr. 22, 1932, ch. 125, 47 Stat. 91, 111, V Kapp. 257, 274, LD 170 (same); H.Rep.No.2399, 74th Cong., 2d Sess., LD 174 (1936) ("These lands join the Uintah and Ouray Reservation . . ."); Act of Aug. 9, 1937, ch. 570, 50 Stat. 564, 573, LD 177 ("Indians of the Uintah and Ouray Reservation"); H.Rep.No.370, 77th Cong., 1st Sess., LD 179, at 3 (1941) ("The Uintah and Ouray Indian Reservation . . ."); S.Rep.No.243, 77th Cong., 1st Sess., LD 180 (1941) (same); H.Rep.No.143, 78th Cong., 1st Sess., LD 181 (1943) ("add certain public lands to the Uintah and Ouray Reservation"); S.Rep.No. 1188, 78th Cong., 2d Sess., LD 182 (1944)

(same); S.Rep.No.749, 80th Cong., 1st Sess., LD 184 (1947) ("the exterior boundary of the Uintah and Ouray Reservation"); 94 Cong.Rec. 84, 1943, 1960 (1948), LD 185 (same); H.Rep.No.1372, 80th Cong., 2d Sess., LD 186 (1948) (same); Act of Mar. 11, 1948, ch. 108, 62 Stat. 72, LD 187 (same); Act of Mar. 16, 1950, ch. 59, 64 Stat. 19, LD 188 ("Uintah and Ouray Reservation"); S.Rep.No.602, 82nd Cong., 1st Sess., LD 189 (1951) (same); Act of Aug. 21, 1951, P.L. 82–120, 65 Stat. 193, LD 190 (same); H.Rep. No.2503, 82d Cong., 2d Sess., LD 192 (1952) (same); S.Rep.No.1632, 83d Cong., 2d Sess., LD 193 (1954) (same); 100 *Cong.Rec.* 9720–9725, 13124 (1954), LD 194 (same); Act of Aug. 27, 1954, P.L. 83–671, 68 Stat. 868, LD 197 (same); S.Rep.No.841, 84th Cong., 1st Sess., LD 195 (1955) ("exterior boundaries of the Uintah and Ouray Reservation"); H.Rep.No.1479, 84th Cong., 1st Sess., LD 196 (1955) (same); Act of Sept. 18, 1970, P.L. 91–403, 84 Stat. 843, LD 209 ("Uintah and Ouray Reservation").

The legislative documents also disclose a few references to the Uintah Indian Reservation in the present tense. See *e. g.*, H.Doc.No.892, 62d Cong., 2d Sess., LD 146 (1912) ("Conditions on Uintah Indian Reservation, Utah"); [174] 53 *Cong.Rec.* 7863 (May 12, 1916), LD 152 ("the opening to settlement of the Uintah Indian Reservation"); [175] Act of Aug. 1, 1914, ch. 222, 38 Stat. 582, 604, LD 148 ("of the bridge at Myton, on the Uintah Indian Reservation, Utah"); 53 Cong.Rec. 7863 (May 12, 1916),

LD 152 (remarks of Rep. Howell); S.Doc. No.414, 66th Cong., 3d Sess., LD 156 (1921) ("leasing of irrigable Indian land on the Uintah Reservation, Utah"); Act of Mar. 4, 1931, ch. 522, 46 Stat. 1552, 1567, LD 168 ("Irrigation system, Uintah Reservation, Utah"); Act of Feb. 2, 1932, ch. 12, 47 Stat. 15, 22, LD 169 (same); Act of June 19, 1934, ch. 648, 48 Stat. 1021, 1033, LD 173 (same); 74 Cong.Rec. 3406 (Jan. 28, 1931) LD 166 ("the opening of the Uintah Indian Reservation").

The proposals of Senator Sutherland were not the only source of past-tense references; three bills offered by Senator Smoot of Utah included past-tense descriptions as did the discussion surrounding them.[176] Debates on the bills prove palpably ambiguous; comments by Senator Smoot, Representative Howell, and others include present as well as past-tense references.[177] See 40 Cong.Rec. 1064, LD 116, (remarks of Sen. Smoot); *id.*, at 1332 (remarks of Rep. Howell); S.Rep.No.139, 59th Cong., 1st Sess., LD 117 (1906); 40 Cong. Rec. 3553 (1906), LD 131 (remarks of Rep. Howell); S.Rep.No.893, 62d Cong., 2d Sess., LD 142 (1912); H.Rep.No.443, 62d Cong., 2d Sess., LD 143 (1912); 48 *Cong.Rec.* 9101–9102, 9107, (July 15, 1912) LD 144 (remarks of Rep. Howell, *e. g.*, "The Uintah Indian Reservation is an arid region. . . .") Other references in the legislative documents include both present and former designations. See *e. g.*, Act of Apr. 30, 1908, ch. 153, 35

**174.** That report also includes references to "the former Uintah Indian Reservation" and an erroneous reference to Uintah Reservation lands having been "restored to the public domain." *Id.* at 2. That reference, repeated verbatim in H.Doc.No.1250, 63d Cong., 2d Sess., LD 149, at 2 (1914) comprises the only legislative reference to the Uintah lands having been so restored under the 1905 Act.

**175.** A memorial from the Utah Legislature reprinted *id.*, refers to lands "formerly within the boundaries of the Uintah Reservation" but is referring to the Indian grazing lands reserved under the 1905 Act—by definition, *Indian reservation lands.*

**176.** See S. 321, 59th Cong., 1st Sess., ("lands which were heretofore a part of the Uintah Indian Reservation"); S.Rep.No.139, 59th

Cong., 1st Sess., LD 117 (1906) (same); 40 *Cong.Rec.* 144, 1064, 1465 (1906), LD 116; S. 3016, 66th Cong., 2d Sess., ("Unsold lands formerly included in the Uintah Indian Reservation"); H.Rep.No.901, 66th Cong., 2d Sess., LD 154 (1920); Act of May 14, 1920, ch. 187, 41 Stat. 599, LD 155. S. 6934, 62d Cong., 2d Sess. (lands "formerly a part of the Uintah Indian Reservation"); S.Rep.No.893, 62d Cong., 2d Sess., LD 142 (1912); Act of July 20, 1912, ch. 244, 37 Stat. 196, LD 145.

**177.** House Report No. 291, 59th Cong., 1st Sess., LD 119 (1906) includes both past and present-tense references to the Uintah Reservation alongside past-tense references to lands within the Rosebud and Devil's Lake reservations.

Stat. 70, 95, LD 135; Act of Mar. 3, 1911, ch. 210, 36 Stat. 1058, 1071, LD 141 (both "ceded" and current references).

This history of past-tense and present-tense references highlights the importance of the oft-repeated warning by the Supreme Court that "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Philadelphia National Bank*, 374 U.S. 321, 348–349, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963), *quoting United States v. Price*, 361 U.S. 304, 313, 80 S.Ct. 326, 331, 4 L.Ed.2d 334 (1960); see *United States v. Southwestern Cable Co.*, 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968); *Rainwater v. United States*, 356 U.S. 590, 593, 78 S.Ct. 946, 949, 2 L.Ed.2d 996 (1958); *United States v. United Mine Workers*, 330 U.S. 258, 282, 67 S.Ct. 677, 690, 91 L.Ed. 884 (1947); cf. *United States v. E. I. duPont de Nemours & Co.*, 353 U.S. 586, 590, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957). In *Mattz v. Arnett, supra,* the Supreme Court found similar past-tense references "to have been a natural, convenient, and shorthand way of identifying the land subject to allotment" under the applicable legislation. *Id.,* 412 U.S. 498, 93 S.Ct. at 2254. In *Seymour v. Superintendent, supra,* the Court regarded "former" references in some legislation against the backdrop of a record of more recent, present-tense references as evidencing "some congressional confusion." *Id.,* 368 U.S. at 356–357 & nn. 12, 13, 82 S.Ct. at 427. In *City of New Town v. United States,* 454 F.2d 121 (8th Cir. 1972), the United States Court of Appeals for the Eighth Circuit found "inconsistent and confusing" present and past-tense references to the Fort Berthold Reservation to have little weight:

> By 1916, however, inconsistencies began to creep into the legislation and the reservation was sometimes referred to as the "former" Fort Berthold Reservation. However these later statutes are not always consistent, even within themselves. *Thus we can find no clear intent by Congress to diminish the Fort Berthold Reservation from these later statutes.*

*Id.,* 454 F.2d at 125–126 (emphasis added & footnote omitted); see *id.,* at 126 & nn. 9, 10.

Likewise, this Court can discern no clear legislative intent to disestablish the unallotted lands of the Uintah Indian Reservation evidenced by past-tense, "former" references. Not only are the references grossly inconsistent when considered together, they arise from a specific source, the Utah delegation, ca. 1906, and they virtually cease after the retirement of Senator Sutherland from the Senate in 1917, and furthermore, are merely passing references in text, not deliberate expressions of informal conclusions about congressional intent in 1905. Compare *United States v. E. I. duPont de Nemours & Co.*, 353 U.S. 586, 590–593, 77 S.Ct. 872, 875–877, 1 L.Ed.2d 1057 (1957). The citations here lack the consistency of the past-tense references to the "old" Uncompahgre Reservation that permeate the historical record. Nor do they have the clarity of remarks such as those made by Representative Bell of California in 1905 concerning the Round Valley Reservation:

> Mr. BELL of California. Mr. Chairman, I offer the following amendment.
>
> The CLERK read as follows:
>
> Add a new paragraph, after line 25, page 24, to read as follows:
>
> > "For fencing division-line between *relinquished and diminished portions* of the Round Valley Indian Reservation, Cal., $2,500."
>
> Mr. SHERMAN. I desire to hear some explanation of the amendment of the gentleman from California.
>
> Mr. BELL of California. I intend to make an explanation. I would state, Mr. Chairman, that a few years ago, by act of Congress, *a portion of the Round Valley Indian Reservation was relinquished and was placed upon the market for sale.* Only a few of the lands were sold, and here recently—a few weeks ago—we passed an act through the House authorizing the Secretary of the Interior to resurvey and reappraise the relinquished portions and offer them for public sale. The proceeds of this sale are to go to the

Indians of the Round Valley Indian Reservation, so that when we appropriate this money—$2,500—for the purpose of fencing the division line between the reservation as it now is and *the portion that has been relinquished, that will pass to private ownership*, this money will be returned to the Treasury from the sale of *these outside lands.*

39 Cong.Rec. 1149 (Jan. 20, 1905), LD 103 (emphasis added). The "relinquished" Round Valley lands were disestablished from that reservation, see *Russ v. Wilkins*, 624 F.2d 914, 921–926 (9th Cir. 1980); such language in reference to the "opened" Uintah Reservation lands is notably absent.

▮▮▮▮ This Court has little trouble reconciling the continuing reservation status of opened lands on the "former" Uintah Reservation for another reason: by the Act of March 3, 1905, Congress expressly provided for the withdrawal of timber lands from the Uintah Reservation for inclusion in the Uintah Forest Reserve. 1,010,000 acres were set aside—nearly half of the reservation. *Rosebud Sioux Tribe v. Kneip* and the related case law is not enlightening on the impact on Indian reservation boundaries of the withdrawal of lands for national forest purposes.[178] The express language, legislative history and surrounding circumstances of the Act of Mar. 3, 1905, 33 Stat. 1048, 1069, however, justify the conclusion of this Court that the Uintah Indian Reservation was diminished by the withdrawal of timber lands for national forest purposes.

The 1905 Act itself provides as follows:

That before the opening of the Uintah Indian Reservation the President is hereby authorized *to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules and regulations governing forest reserves,* . . . such portion of the lands within the Uintah Indian Reservation as he considers necessary; . . .

33 Stat., LD 105, at 1070 (emphasis added). By proclamation [179] President Theodore Roosevelt withdrew 1,010,000 acres from the reservation for this purpose, pursuant to his authority under the 1905 Act and the more general Act of March 3, 1891, § 24, ch. 561, 26 Stat. 1095, 1103, LD 25. That section empowered the President to

set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, *as public reservations*, and the President shall, by public proclamation, declare the establishment of such reservations and the limits thereof. [Emphasis added.]

The original Senate version of the 1905 Act's forest provisions, S. 6868,[180] proposed by Senator Smoot, had included additional language directing that the forest lands be set aside be "free from any claims of the

---

**178.** Counsel for the defendants and for *amicus* Paradox Production Corp. make repeated reference to *United States v. Pueblo of San Ildefonso*, 513 F.2d 1383 (Ct.Cl.1975) *United States v. Gemmill*, 535 F.2d 1145 (9th Cir. 1976), and to *Uintah and White River Bands of Ute Indians v. United States*, 139 Ct.Cl. 1 (1957) and *id.*, 152 F.Supp. 953 (Ct.Cl.1957), as being dispositive of the reservation status of the national forest lands. In its reply brief, the Tribe correctly points out that

[T]his citation is totally irrelevant to the issues in this case, since even the extinguishment of statutorily recognized titles (which is of greater legal magnitude than aboriginal title), as by the granting of land to homesteaders, does not terminate Indian Reservation status.

*Id.*, at 25. It is fundamental that extinguishment of Indian title to lands within a reserva-

tion by itself does not withdraw those lands from a reservation. See *Seymour v. Superintendent*, 368 U.S. 351, 357–358, 82 S.Ct. 424, 427–428, 7 L.Ed.2d 346 (1962); *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909); 18 U.S.C. § 1151(a) (1976); see also *Ellis v. Page*, 351 F.2d 250, 252 (10th Cir. 1965); *Hilderbrand v. United States*, 287 F.2d 886 (10th Cir. 1961), *affirming United States v. Hildebrand*, 190 F.Supp. 283, 286–287 (D.Kan.1960). Indian title is not at issue here; territorial boundaries are, and are determined by separate rules and principles.

**179.** Proclamation of July 14, 1905, 34 Stat., pt. 3, 3116, III Kapp. 602–605, LD 107.

**180.** 58th Cong., 3d Sess., LD 98.

Uintah and White River tribes of the Ute Indians except for rights and privileges specifically reserved to them in this Act; . . ." *Id.*, LD 98, at 6.[181] That language, which would have been conclusive of the diminishment issue, was deleted in committee, as was much of the lengthy proposal. It seems clear from the committee hearings that the Senators perceived an obvious conflict between the withdrawal of the timber lands as a national forest and their continued reservation for Indian purposes:

> Senator TELLER. Why do we have to do anything about that forest reserve? Can not the President do it?
>
> Senator SMOOT. This authorizes the President to do it.
>
> Senator TELLER. Has he not the authority to do so?
>
> Senator SMOOT. *It is Indian Land, and he can not do it.*
>
> \* \* \* \* \* \*
>
> The CHAIRMAN. *You could say in three lines that the President shall have the same right to declare a forest reserve there as he would have if there were no Indian reservation.*
>
> \* \* \* \* \* \*
>
> Senator DUBOIS. You can go into any forest reserve now and locate a mining claim.
>
> Senator SMOOT. Yes, sir; anyone can.
>
> The CHAIRMAN. Then it seems to me that if you will just authorize the President to make the reserve and leave it entirely to him, *notwithstanding it is an Indian reservation,* that would be sufficient.
>
> Senator SMOOT. And say nothing as to the Indians' rights?
>
> The CHAIRMAN. Nothing at all.
>
> Senator TELLER. What have you said about the Indians' rights?
>
> Senator SMOOT. As to the sale of timber; all sales of timber shall go to the credit of the Indians.

> Senator TELLER. Do you want to sell any timber?
>
> Senator SMOOT. Yes; \* \* \*
>
> Senator TELLER. Can you not do that now under the general law?
>
> Mr. [Gifford] PINCHOT. No, sir.
>
> Senator TELLER. You can on public lands.
>
> Mr. PINCHOT. *The trouble is that these are treated as Indian land.*
>
> Senator TELLER. Can you not say in this bill in a general way that the President shall set aside this land and let it go at that?
>
> \* \* \* \* \* \*
>
> Senator DUBOIS. Do not put anything in that is covered by existing law. Do not re-enact, but simply say—
>
> Senator TELLER. *That the present law shall apply to this case.* Then, if you have to put in something about payments to the Indians for timber, put that in.

"Indian Appropriations Bill, 1906," Hearings, Sub Comm. of the Sen. Comm. on Indian Affairs, 58th Cong., 3d Sess., LD 100, at 26, 28–29 (emphasis added). In earlier discussion on the House floor, Representative Howell of Utah had commented:

> The northern part of this reservation is of great altitude and is densely wooded; it is in this part that all water courses draining the reservation find their source. This particular portion will not be thrown open to entry, but is to be set aside as a forest reserve *and will later be incorporated with the present Uintah Forest Reserve.*

39 Cong.Rec. 1180 (Jan. 2, 1905), LD 103 (emphasis added). The Senate amendments, enacted as law, provided for that incorporation.

■ While it is true that Congress may disestablish or diminish an Indian reservation by restoring the lands to the public

---

**181.** Section 8 of the bill provided for establishment of an Indian timber and coal reserve. Section 9 protected Indian grazing rights in the forest lands that overlapped into the designated Indian grazing reserve. Section 11 provided

that proceeds from forest activities above actual expenses would be used for the Utes' benefit. The final version of the Act retained a modified clause governing the proceeds from timber sales. See 33 Stat., at 1070.

domain, it is also true that Congress may diminish an Indian reservation by withdrawing and reserving the lands for an inconsistent purpose. Cf. *United States v. Wounded Knee*, 596 F.2d 790, 792–796 (8th Cir. 1979). The status and purposes of national forest lands are distinct from the status and purposes of Indian reservations, or federal reservations for other purposes. The Act of March 3, 1891, *supra*, defines national forests as *public* reservations. National forests have from before 1905 until now been governed by laws, regulations and an administrative structure separate from those governing Indian affairs intended to serve specific, narrow purposes.[182] A month prior to the enactment of the 1905 Ute Act, Congress had substituted the Secretary of Agriculture for the Secretary of the Interior in the administration of the national forests, transferring those powers to a different Executive department. Act of Feb. 1, 1905, ch. 288, 33 Stat. 628. Clearly the lands included in the Uintah Forest Reserve would be administered wholly apart from the lands remaining a part of the Uintah Indian Reservation. The Act expressly provides that the Uintah forest lands would be "subject to the laws, rules, and regulations governing forest reserves," *not* the laws, rules and regulations governing "Indian country", or Indian reservations.

This dissonance between national forest and Indian reservation status is highlighted by subsequent actions taken by Congress in dealing with the Uintah lands. In 1915, a move arose to attach the Indian grazing lands reserved from entry at Uintah to the Ashley National Forest Reserve and place them thereby under the control of the Forest Service. See 53 Cong.Rec. 7863–7865, LD 152 (May 12, 1916). Both the Indians and officials in the Interior Department opposed the plan. See Letter from Ute Indians to Agent Kneale of Jan. 10, 1916, JX 374 (Indian protests); Letter from Agency Supt. to the Comm. of Ind. Aff. of Jan. 31, 1916, JX 375; Letter from the Comm. of Ind. Aff. to Sen. Meyers, Chmn., Comm. on Publ. Lands, of Apr. 15, 1916, JX 376. In a letter to Rep. Howell dated February 28, 1916, Commissioner of Indian Affairs Cato Sells wrote:

> The proposed action would place the tribal grazing reserve entirely under the control and management of the Forest Service, whose primary concern is the conservation of the forests of the United States rather than the welfare of the Indians.
>
> \* \* \* \* \* \*
>
> Based on official reports, the land is apparently not such as would properly be included within a national forest reserve. The entire grazing reserve is absolutely essential for Indian stock and that of white lessees. This service, rather than the forest service, is responsible for the proper and efficient management of Indian affairs. The Indian Service is now engaged in an aggressive campaign to save the water rights on this reservation, the success of which, so necessary to the future industrial welfare and progress of the Indians, depends upon its undisputed control of all contributory factors, including the tribal grazing reserve.
>
> For these reasons, it is my opinion that the proposal necessarily involves such elements of danger to the welfare and program of the Indians, which must at all times be my primary concern, that I cannot consistently give it my approval.

*reprinted in* 53 Cong.Rec., 7864–7865, *supra*, LD 152. The effort subsequently failed, see O'Neil and MacKay, "A History of the Uintah-Ouray Ute Lands," JX 483, at 35 (1977), was revived briefly in the 1920's and failed again. See Letter from Senator William King to the Secretary of the Interior of July 18, 1922, JX 402; Letter from Agency Supt. to the Comm. of Ind. Aff. of Jan. 23, 1924, JX 405; Letter from Wm. Wash to the Comm. of Ind. Aff. of Jan. 23, 1924, JX 406; Letter from the Comm. of Ind. Aff. to

---

**182.** See *e. g., United States v. New Mexico*, 438 U.S. 696, 705–718, 98 S.Ct. 3012, 3016–3023, 57 L.Ed.2d 1052 (1978); 16 U.S.C. §§ 471 *et seq.*

Wm. Wash of Feb. 9, 1924, JX 407; Letter from the Acting Comm., Gen. Land Off. to E. Moosman of July 27, 1927, JX 413; Letter from Chief Clerk to Agency Supt. of Aug. 4, 1927, JX 414.

Over the years, it became apparent that the Utes were not receiving the benefits of the proceeds of the activities (timber sales, etc.) in the national forest as provided for by the 1905 Act. When a bill, S. 615, 71st Congress, 2d Sess., in 1930, was introduced to consent to a suit for the proceeds by the Uintah, Uncompahgre and White River Utes in the United States Court of Claims, the Senate Committee on Indian Affairs reported out a substitute measure that provided for the direct payment of $1,262,500 in satisfaction of the Utes' claims. S.Rep. No.725, 71st Cong., 2d Sess., LD 165 (1930). The Committee also reported the recommendation of Secretary of the Interior Roy L. Wilbur, joined by a subcommittee, that the forest lands be returned to the Utes in lieu of monetary compensation.[183] House debates on the measure reflect the understanding of the members that the lands were held in a national forest reservation rather than an Indian reservation:

> Mr. LEAVITT. * * * There has been a proposal that *the national forest area be given back to the Indians and made an Indian forest* instead of the government paying for it.
>
> That is an entirely impractical proposition. *The area has been,* since the proclamation by President Roosevelt, *a national forest,* and there have grown up in connection with it certain uses on the part of the people living in that section. It

would be entirely out of the question to uproot all of these conditions. The only thing to do is to pay the Indians as is proposed in this bill.

> \* \* \* \* \* \*
>
> Those of us on the committee who come from the kind of country which is being considered here know that the return to the Indians of a national forest area, after *it has been a national forest since the administration of President Roosevelt,* would be an impractical proposition. . . .
>
> Mr. STAFFORD. Will the gentleman inform the House as to *whether there is any such character of reserve as an Indian forest reserve*—referred to by the Secretary?
>
> Mr. LEAVITT. Yes; one was established by the present Congress out in the Yakima country in the State of Washington. The Yakima Indians own a considerable area of rough land, the greatest value of which is for forest and grazing purposes. I myself introduced a bill which had the approval of those Indians, of Representative SUMMERS of Washington, and of the department, to set that area aside as an Indian forest. From it the returns secured will go into the tribal fund, and with regard to grazing and other uses the Indians shall have preference.[184]
>
> Mr. STAFFORD. That is the only instance in the government where we have established a distinct Indian forest reserve?

---

**183.** In a letter to Indian Committee Chairman Frazier dated Apr. 10, 1930, Secretary Wilbur wrote:

> MY DEAR MR. CHAIRMAN: Further reference is made to your request for report on Senate bill 615, which would authorize the Uintah Uncompahgre and White River Bands of Ute Indians to bring suit in the Court of Claims. One of the principal claims to be filed under this bill would be for payment to the Indians for 1,010,000 acres of their reservation lands in Utah which were withdrawn from entry and sale and included within the Uintah National Forest.
>
> I have to inform you that the Director of the Bureau of the Budget reports that Senate

bill 615 would not be in accord with the financial program of the President, *but that legislation which would restore these lands to Indian ownership and place them in an Indian forest reserve* would be in accord with his financial program.

*Reprinted in* S.Rep.No.725, LD 165, *supra,* at 3 (emphasis added).

**184.** A search of volumes III—V of Kappler's *Indian Affairs: Laws and Treaties* reveals no special legislative reference to a Yakima "Indian Forest Reserve." Such reserves, to say the least, appear to be rare.

Mr. LEAVITT. That is true....

\* \* \* \* \* \*

Mr. GREENWOOD. And during that period that the government has held this [Uintah] land *as a forest reservation* has there been any valuable timber cut off the reserve by the government?

\* \* \* \* \* \*

I can understand that an Indian forest reserve might be made where the value of the timber cut could accrue to the Indians, but if during these years the timber had been cut off by the government, then *to turn it back to an Indian reserve* would not be just.

Mr. LEAVITT. It has been handled according to proper forestry practice, and it probably has as much timber value now as it ever had....

Mr. GREENWOOD. And the committee after hearing all of these facts, in view of the fact that the government held it for some 25 years, deem it better to go through with the original contract *than to turn it back to an Indian reservation.*

Mr. LEAVITT. Oh, it is much better to pay for it.

\* \* \* \* \* \*

74 Cong.Rec. 3409–3410 (Jan. 28, 1931), LD 166 (emphasis added). The payment option was favored, and enacted into law. See Act of Feb. 13, 1931, ch. 124, 46 Stat. 1092, LD 167.[185] That the national forest lands are not a continuing part of the Uintah and Ouray Reservation is further confirmed by congressional action taken twenty-five years later. The 1931 Act had settled much of the Utes' claim arising from the taking of the national forest lands. A claim for more than 36,000 acres of coal lands included within the forest withdrawals remained uncompensated.[186] This time it seemed more expedient to return the subsurface

mineral estate to the Utes than to incur the burden of an "expensive and detailed appraisal of mineral and oil and gas resources" in measuring damages. H.Rep.No. 2171, 84th Cong., 2d Sess., LD 200, at 3 (1956). The proposal was also favored from an administrative standpoint:

> The Department of Agriculture desires to retain the administration and control of the surface of the land in order to protect the national forest and the important watersheds. The bill would restore to the Indians the mineral and oil and gas resources and retain in the United States the ownership and control of the surface rights which would be administered under the supervision of the Secretary of Agriculture.

*Id.* The legislative materials refer to the 36,000 acres of national forest mineral lands as being "formerly a part of the Uintah Indian Reservation." *Id.,* at 2, 4, 6. At the same time, the House Committee makes reference to the "Uintah and Ouray Reservation" in the present tense. *Id.,* at 4, 7. The Senate Committee indicates that the "Uintah and Ouray Reservation" is the current designation for the "former" Uintah Indian Reservation, which was diminished by the 1,010,000 acres of national forest withdrawals. See S.Rep.No.2372, 84th Cong., 2d Sess., LD 201 (1956). The Act of July 14, 1956, Pub.L.84–717, 70 Stat. 546, restores the mineral estate beneath the 36,000 acres to tribal ownership and vests the resources in the United States "in trust for the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah"—with no reference to the "former" Uintah Reservation.

■ Besides the legislative materials, the administrative exhibits evidence the implicit understanding that the forest lands were withdrawn from the Uintah and Our-

---

**185.** Congress appropriated $1,217,221.25, which was deposited in the U.S. Treasury to the credit of the plaintiff Tribe. H.Rep.No. 2171, 84th Cong., 2d Sess., LD 200, at 3 (1956).

**186.** By special jurisdictional act, Congress consented to suit by the Ute bands on their remain-

ing claims in the Court of Claims. See Act of June 28, 1938, ch. 776, 52 Stat. 1209, V Kapp. 619–621. *Uintah and White River Band of Ute Indians v. United States,* 139 Ct.Cl. 1 (1957), concluded that litigation.

ay Reservation.[187] Had they remained a part of the reservation would not the Interior Department rather than the Department of Agriculture have been charged with supervision of the timber lands? The trust responsibility of the federal government for management of the Indian forest reserves is primarily administered through Interior and the Bureau of Indian Affairs.[187A] See 1 American Indian Policy Review Commission, Final Report 325–328 (comm. print 1977); F. Cohen, Handbook of Federal Indian Law 312–316 (1942); and *e. g.*, 25 U.S.C. § 466; cf. *United States v. Mitchell*, 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980). The Uintah forest lands included in the designated national forest reserves are not administered in that fashion,[188] a fact buttressing this Court's conclusion that the Uintah Indian Reservation was expressly diminished to the extent of the withdrawal of the national forest lands.[189] See Map, Appendix B, *infra*.

■ The withdrawal of the 56,000 acres of the Ute lands by Presidential proclamation for the purpose of the Strawberry Reservoir Project ultimately led to the disestablishment of such lands from the Uintah and Ouray Reservation. Under the terms of the 1905 Act and the proclamation, the setting aside of the Strawberry acreage was arguably for Indian purposes, consistent with continuing reservation status. However, by language in the Act of April 4, 1910, ch. 140, 36 Stat. 269, 285, III Kapp. 429, 445, LD 139, discussed *supra* at page 1127, Congress provided that "All right, title and interest of the Indians in the same lands are hereby extinguished, and *the title management and control thereof shall pass to the owners of the lands irrigated* from said project" as provided under the terms of the Reclamation Act. *Id.* (emphasis added). Though arguably the legislative history indicates that the reservoir lands remained a part of the Uintah Indian Reservation until operated upon by the 1910 legislation, see S.Rep.No.219, 61st Cong., 2d Sess., LD 138 (1910) (*e. g.*, "lands on the former Uintah Reservation"), the transfer of all management and control of the lands to private parties, compounded with the express extinguishment of the Indians' interest, is inconsistent with continuing Indian reservation status. But see *United States v. Wounded Knee*, 596 F.2d 790, 794–796 (8th Cir. 1980),[190] *cert. denied* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed.2d 289.

187. See, *e. g.*, 53 I.D. 128 (June 14, 1930) JX 421 (Uintah Indian Reservation was reduced by the withdrawal of the forest lands); Letter from Sp. Agent Early to Comm. of Ind. Aff. of June 1, 1912, JX 356; Letter from Asst. Comm. of Ind. Aff. to Forester, U.S. Forest Service of July 12, 1912, JX 357; Letter from the Asst. Secretary of Agriculture to the Secretary of the Interior of Dec. 19, 1963, JX 467; Letter from Area Director, Bureau of Ind. Aff. to Agency Supt. of Jan. 10, 1964, JX 467; Letter from Asst. Secretary of the Interior to the Secretary of Agriculture of June 24, 1964, JX 468; Memorandum, Solicitor to Comm. of Ind. Aff. of Nov. 18, 1964, JX 469; Letter from the Secretary of the Interior to the Secretary of Agriculture of Aug. 2, 1966, JX 471.

187A. Of course, the actions of the U.S. Forest Service in its dealings with Indians are also subject to being "judged by the most exacting fiduciary standards," *Seminole Nation v. United States*, 316 U.S. 286, 297, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480 (1942), of the federal trust responsibility to Indians. As the United States Court of Appeals for the Ninth Circuit observed in *Nance v. Environmental Protection Agency*, 645 F.2d 701 (9th Cir. 1981), "It is fairly clear

that *any* federal government action is subject to the United States' fiduciary responsibilities toward the Indian tribes. *Seminole Nation v. United States*, 316 U.S. 286, 297 [, 62 S.Ct. 1049, 1054, 86 L.Ed. 1480] ..." *Id.*, at 711 (emphasis in original). Accord, *Eric v. Secretary of the U.S. Dep't. of HUD*, 464 F.Supp. 44 (D.Alas.1978); see also American Indian Religious Freedom Act, 42 U.S.C. § 1996; H.Rep. No.1308, 95th Cong., 2d Sess. (1978).

188. See also 16 U.S.C. § 480 (1976) (jurisdiction over national forests).

189. It comes as no surprise that a 2,000,000 acre reservation that has been reduced by half its area might have been referred to as the "former" Uintah Reservation. The consistent pattern of present-tense references to the Uintah and Ouray Reservation since 1921 justifies drawing an inference that the remaining lands retain their reservation status.

190. Cf. "Oil and Gas Leases on the Strawberry Valley Reclamation Project," M–36051 (Supp.) (Nov. 1, 1951), II Opinions of the Solicitor of the Department of the Interior Relating to Indi-

With the diminishment of the Uintah Indian Reservation by the withdrawal of the national forest and reclamation lands, it is not surprising that the administrative materials include references to the "former" Uintah Indian Reservation as well as to the present-tense Uintah or Uintah and Ouray Reservation.[191] More significant, however, is executive departmental action taken in regards to the Uintah lands because of their apparent reservation status. A number of administrative reports on reservation land management recognize the continuing reservation status of at least the trust lands, which of course the federal government was duty-bound as the Indians' trustee to manage to the benefit of the Indians. See e. g., Report on Grazing Lands on the Reservation, Nov., 1931, JX 424; Ann. Report of the Uintah and Ouray Agency, 1931, JX 425; *Id.*, 1932, JX 427. Indian Service forestry officials recommended in 1931 that the Office of Indian Affairs actively see to the management of the "ceded, unappropriated lands within the boundary of the former Uintah Reservation." Letter from J. P. Kinney to the Comm. of Ind. Aff. of Sept. 22, 1931, JX 423, at 2. When the

Indian Office reassumed such a posture in 1937 white ranchers protested. See O'Neil & MacKay, "A History of the Uintah-Ouray Ute Lands," JX 483, at 35–36 (1977). In a court test of the asserted federal authority, the United States Court of Appeals for the Tenth Circuit held that the Utes retained a beneficial interest in the unallotted and unentered lands sufficient to justify the Indian Bureau's proprietary management of the lands, issuance of use permits, etc. *Hanson v. United States*, 153 F.2d 162, 163 (10th Cir. 1946); see *Ash Sheep Co. v. United States*, 252 U.S. 159, 166, 40 S.Ct. 241, 242, 64 L.Ed. 507 (1920).[192]

At various times, pursuant mainly to the provisions of the Indian Reorganization Act of 1934, Act of June 18, 1934, ch. 576, 48 Stat. 984, V Kapp. 378, 25 U.S.C. §§ 461 *et seq.*, LD 172, the Secretary of the Interior has restored to tribal ownership much of the unallotted acreage within the Uintah and Ouray Reservation that remained unentered. On August 25, 1945, Secretary of the Interior, Harold L. Ickes, issued an Order of Restoration upon the recommendation of Commissioner of Indian Affairs John Collier,[193] which reads as follows:

an Affairs, 1917–1974, at 1558–1559 (1979); "Reservation Boundaries—Regulation of Hunting and Fishing—Colville and Spokane Reservations," (June 3, 1974), *id.*, at 2062–2071; "Jurisdiction of Flathead Tribal Council to Regulate Hunting on . . . Reservoir Sites," M–34739 (Jan. 3, 1947), *id.*, at 1429–1431.

**191.** *E. g.*, Letter from Comm. of Ind. Aff. to Secretary of the Interior of Feb. 9, 1915, JX 366 ("the former Uintah Indian reservation"); Report of the Secretary of the Interior, 1915, JX 369 at 54 ("the Uintah and Ouray Indian Reservation"); Letter from Supt. Wright to Regional Forester of Jan. 24, 1929, JX 444 ("the Uintah Reservation"); Letter from Asst. Comm. of Ind. Aff. to Dir., Div. of Grazing of Aug. 8, 1939, JX 447 ("the Uintah Reservation"); Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of June 19, 1941, JX 450 ("the Uintah and Ouray Reservation").

Like similar references discussed by the Court in *DeCoteau v. District County Court*, 420 U.S. at 442 n.27, 95 S.Ct. at 1091, "the authors of these documents appear to have put no particular significance on their choice of a label."

**192.** It is worthwhile to note that the issues raised in the *Hanson* litigation deal with retained *proprietary* interests in the unallotted

lands rather than with the *jurisdictional boundary* issues raised in this case. Cf. *Rosebud Sioux Tribe v. Kneip, supra*, 430 U.S. at 601 nn. 23–24, 97 S.Ct. at 1370. However, if the 1905 Act had operated to restore the land to the public domain, events may have taken a different course. Cf. F. Cohen, Handbook of Federal Indian Law 334–336 (1942); *Hanson, supra*.

**193.** Letter from the Comm. of Ind. Aff. to the Secretary of the Interior of June 19, 1941, JX 450. While Collier's letter recommends restoration of "all the undisposed of opened lands lying within the former boundaries of the Uintah and Ouray Indian Reservation," he cites as authority Section 3 of the Indian Reorganization Act, which authorizes the Secretary to restore to tribal ownership "the remaining surplus lands of any Indian reservation heretofore opened, or authorized to be opened, to sale or any other form of disposal . . . See also S.Rep. No.1080, 73d Cong., 2d Sess. (1934). Later in the letter, Collier refers to the lands as the surplus *opened* lands of the Uintah and Ouray Indian Reservation—not "ceded", "former" or some similar designation.

It is important to remember that the restoration of lands was mainly a *proprietary* rather than *jurisdictional* transaction. As to the *juris-*

WHEREAS, pursuant to the provisions of the Act of May 27, 1902 (32 Stat. 263), as amended, *the unallotted lands of the Uintah and Ouray Indian Reservation* in the State of Utah, were made subject to disposal under the laws of the United States applying to public lands, and

WHEREAS, *there are now remaining undisposed-of within said area* approximately 217,000 acres of unallotted lands, which need closer administrative control in the interest of better conservation practices, and

WHEREAS, by relinquishment and cancellation of homestead entries within this area a limited additional acreage of land of similar character may later be included within *this class of undisposed-of opened land*, and

WHEREAS, the Tribal Council, the Superintendent of the Uintah and Ouray Agency, and the Commission of Indian Affairs have recommended restoration to tribal ownership of such undisposed-of *surplus unallotted lands in the said reservation*;

NOW, THEREFORE, by virtue of the authority vested in the Secretary of the Interior by sections 3 and 7 of the Act of June 18, 1934 (48 Stat. 984), I hereby find that the restoration to tribal ownership of all lands which *are now or may hereafter be classified as undisposed-of opened lands of the Uintah and Ouray Reservation* will be in the public interest, and the said lands are hereby restored to tribal ownership for the use and benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah, *and are added to and made a part of the existing reservation*, subject to any valid existing rights.

10 Fed.Reg. 12409, LD 183 (emphasis added).

While the Order itself is somewhat ambiguous as to whether the lands restored were thought to be within the political boundaries of the reservation, related departmental documents indicate that Interior deliberately distinguished between the "opened" lands within the continuing boundaries of existing Indian reservations and "ceded" lands purchased by the United States and no longer within such boundaries; opened lands could be withdrawn from entry and restored to tribal ownership, while "ceded" lands could not. See Instructions, Restoration of Lands Formerly Indians to Tribal Ownership, 54 I.D. 559, 560, JX 431 (1934).[194] While a subsequent opinion by the Solicitor seems to add ambiguity by holding that the Utes "ceded" lands in Colorado, though not within an existing reservation, could be restored under Section 3 of the Indian Reorganization Act, see 56 I.D. 330, JX 442 (1938), they were perceived as an exception to the general rule. Instructions, JX 431, *supra*, at 562.

*dictional* boundaries question, the Collier letter is, at best, ambiguous.

**194.** *Id.*: This brings us up to the period of about 1890, at which time there was adopted the plan of opening to entry, sale, etc., the lands of reservations that were not needed for allotment, the Government taking over the lands only as trustee for the Indians. Under this plan the Indians were to be credited with the proceeds only as the lands were sold, the United States not to be bound to purchase any portion of the lands so opened. Undisposed of lands of this class remain the property of the Indians until disposed of as provided by law (*Ash Sheep Company v. United States*, 252 U.S. 159 [, 40 S.Ct. 241, 64 L.Ed. 507]). Such lands are usually referred to as surplus lands of Indian reservations opened to public entry, and undoubtedly comprise the class of lands from which restorations of tribal ownership are to be made under the said Section 3, if in the public interest. It can safely be said that it would not be to the interest of the public to restore to the Indians all undisposed of public lands that at one time were in Indian ownership but afterwards became the property of the United States by outright cessions from the Indian owners, because, as stated above, such action would mean the withdrawal in many States of all lands now available for entry as public domain. Such action undoubtedly would raise strong opposition in the various localities affected and have an undesirable bearing on the new Indian legislation. Though the Supreme Court in *Rosebud* indicated that this document offered "no clear view" on the boundary question, 430 U.S. at 604 n.27, 97 S.Ct. at 1372, it does shed some light on the issue.

A number of other parcels of land within the reservation were restored to trust status by subsequent orders. See Public Land Order No. 2713, 18 Fed.Reg. 426 (Jan. 20, 1953); Public Land Order No. 1310, 21 Fed. Reg. 5015, LD 202 (July 6, 1956); Public Land Order No. 2002, 24 Fed.Reg. 8175, LD 207, (Oct. 8, 1959); Public Land Order No. 2269, 26 Fed.Reg. 1718, LD 208 (Feb. 28, 1961).

The conclusion that the lands restored to tribal ownership were within the existing boundaries of an Indian reservation is buttressed by a formal opinion by the Solicitor for the Department of the Interior construing the scope of the 1945 Secretarial Order. The Solicitor concluded that the order had restored to tribal ownership the mineral estate underlying *fee-patented lands* as well as the whole of the unallotted and unappropriated lands of the reservation:

> The order restores "all lands which are now or may hereafter be classified as undisposed-of opened lands" of the reservation. The minerals in place are a part of the land. The fact that a lesser estate, the surface, has been carved out of the land and disposed of does not make that which is left, the mineral estate, any the less "lands." *British-American Oil Producing Co. v. Board of Equalization of Montana et al.*, 299 U.S. 159 [, 57 S.Ct. 132, 81 L.Ed. 95] (1936).
>
> One of the purposes of the order was to insure closer administrative control of the tribe's property in the interest of better conservation practices. As pointed out above, the beneficial title to the minerals has always been in the Indians. Certainly the Indians' mineral estate can be administered more effectively if the whole estate—the minerals underlying the patented lands—can be administered as a unit rather than by having the minerals underlying the patented lands adminis-

tered under one set of laws and regulations and the minerals underlying the unpatented lands administered under another set of laws and regulations.

> The order should be construed in such a manner as will result in the accomplishment of its broad purpose. That was to restore to tribal ownership all lands, or interest in lands, to which the superior rights of third parties had not attached.
>
> Therefore, as previously indicated, it is my opinion that the minerals underlying *the patented lands within the Uintah and Ouray Indian Reservation* were restored to tribal ownership by the order of August 25, 1945.

59 I.D. 393, 396 (1947), II Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs, 1917–1974, at 1434, 1435–1436 (1979), JX 454 (emphasis added). The Solicitor reached a similar conclusion as to certain lands within the town of Myton, Utah, "Restoration of Land to Tribal Ownership Under Indian Reorganization Act," M–34912 (Apr. 11, 1947), II Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs, 1917–1974, at 1450–1451 (1979), and applied a similar analysis to mineral rights underlying certain reclamation withdrawals within the reservation boundaries. "Restoration to Tribal Ownership of Lands Included in a Reclamation Withdrawal," M–36142 (Oct. 29, 1952) in *id.*, at 1589–1591. While the statutory references in the 1945 Order itself may be ambiguous, see *Russ v. Wilkins*, 624 F.2d 914, 925 (9th Cir. 1980),[195] the contemporaneous construction of the Order by the Solicitor tends strongly to support this Court's inferences and conclusions. See *Mattz v. Arnett*, 412 U.S. 481, 505, 93 S.Ct. 2245, 2258, 37 L.Ed.2d 92 (1973).

The "jurisdictional history" of the Uintah and Ouray Reservation is less than clear or consistent. Plaintiff offers evidence of the

---

**195.** The Order refers both to section 3 of the Indian Reorganization Act, which authorizes restoration of unsold, opened lands, and § 7, which authorizes the addition of new lands to existing reservations. 25 U.S.C. §§ 463, 467. Further the Commission of Indian Affairs recommended restoration of the lands citing sec-

tion 3 as authority without reference to section 7, JX 450, *supra*. Counsel for the defendant counties erroneously asserts that the restoration was made under *section 7 without mention* of section 3. Counties' Post-Trial Brief at 91. Counsel's related arguments are, therefore, properly disregarded.

exercise of federal and tribal criminal jurisdiction over the reservation since 1921; see plaintiff's Exs. 2–15; the defendants offer a similar collection of state prosecutions beginning in 1915 and ending in 1967. See defendants' Ex. DU–9 through DU–33. The annual reports of the Uintah and Ouray Agency range in reference from an acknowledgment of state jurisdiction over the reservation to the assertion of exclusive federal jurisdiction.[196] Other historical exhibits run either direction.[197]

The defendant State of Utah places heavy reliance upon the history of regulation of hunting and fishing on the reservation as "jurisdictional history" probative of their views on the boundary question in general, that the Uintah and Ouray Reservation is confined to the Ute trust lands. See State of Utah Post-Trial Brief at 47–53, A80–A96; trial transcript at 115–133, 153–154, 175–176, 164–166, 216–218, 238–246, 258–265; Ex. I–5—I–15.

The history of hunting and fishing jurisdiction in "Indian country" is unique and anomalous, a hybrid mixture of Indian jurisdictional and proprietary interests. See *United States v. Minnesota*, 466 F.Supp. 1382, 1385 (D.Minn.1979), *affirmed, Red Lake Band of Chippewa Indians v. State of Minnesota*, 614 F.2d 1161 (8th Cir. 1980) (*per curiam*), *cert. denied*, 450 U.S. 905, 101 S.Ct. 279, 66 L.Ed.2d 136; *Mescalero Apache Tribe v. State of New Mexico*, 630 F.2d 724 (10th Cir. 1980), *vacated*, 450 U.S. 1036, 101 S.Ct. 1752, 68 L.Ed.2d 234; F. Cohen, Handbook of Federal Indian Law 285–286 (1942); "Jurisdiction—Hunting and Fishing on the Wind River Reservation," M–31480 (Feb. 12, 1943), II Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs 1185, 1186–1194 (1977). Indian-owned, or trust lands rather than "reservation" lands have often served as the fulcrum in the balance struck between jurisdictions regarding hunting and fishing. Interior Solicitor Mitchell Melich wrote in an opinion on jurisdiction over hunting on the Uintah and Ouray Indian Reservation that it is "well settled that state game laws do not apply to Indians on trust lands within the Indian reservation." M–36813 (Mar. 29, 1971), II Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs, 1917–1974, at 2030, 2031 (1979) (citations omitted). Further, 18 U.S.C. § 1165 provides:

> Whoever, without lawful authority or permission, willfully and knowingly goes upon *any land that belongs to any Indian or Indian tribe, band or group* and either are held by the United States *in trust* or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon or for the removal of game, paltries, or fish therefrom shall be fined.... [Emphasis added.]

See also H.Rep.No.2593, 85th Cong., 2d Sess. (1958); H.Rep.No.625, 86th Cong., 1st Sess. (1959); S.Rep.No. 1686, 86th Cong., 2d Sess. Cf. *United States v. Sanford*, 547 F.2d 1085, 1089 (9th Cir. 1976).

---

**196.** Annual Rept. of the Uintah and Ouray Agency, 1910, JX 344 (state jurisdiction); *id.*, 1911, JX 354 (state, federal jurisdiction); *id.*, 1915, JX 368 (jurisdiction somewhat confused); *id.*, 1916, JX 380 (state jurisdiction); *id.*, 1917, JX 386 (state jurisdiction); *id.*, 1918, JX 393 (state jurisdiction); *id.*, 1919, JX 396 (state laws *inapplicable* to Indian activities on restricted lands); *id.*, 1920, JX 397 (cooperation between agency, county officials); *id.*, 1921, JX 399 (same); *id.*, 1927, JX 415 (federal, state and county jurisdiction; establishment of Indian court recommended); *id.*, 1928, JX 417 (Indian court advocated; federal jurisdiction); *id.*, 1929, JX 420 (Indian court recommended; federal, state laws apply); *id.*, 1930, JX 422 (Indian court recommended; state not interested in offenses within reservation; federal jurisdiction applies to all serious crimes).

**197.** See *e. g.*, Opinion of Asst. Utah Atty. Gen. of Aug. 14, 1975, JX 478 (no county jurisdiction); *Uintah Basin Standard*, Nov. 18, 1965, JX 470 (Roosevelt, Utah within "Indian Country"); Letter from Dist. Supt., Indian Field Service to the Comm. of Ind. Aff. of Aug. 5, 1926, JX 412 (opened Uintah Reservation governed by state law). It should be remembered that during this entire period the definitions of jurisdiction in "Indian Country" did not remain static. See pages 1081–1085, *supra*.

Finally, in *Montana v. United States,* 450 U.S. 544, 557–567, 101 S.Ct. 1245, 1254–1259, 67 L.Ed.2d 493 (1981), the Supreme Court expressly held tribal jurisdiction over hunting and fishing to be confined to Indian-owned and "trust" lands.

The unique controversies surrounding the territorial extent of tribal control of hunting and fishing now settled by the rule of *Montana v. United States* is independent of reservation disestablishment in the *Rosebud* sense and does not, therefore, advance this Court's inquiry in any ultimate way.[198]

The older judicial decisions cited by the parties as well carry reduced precedential value, as the United States Court of Appeals for the Tenth Circuit held in *Ute Indian Tribe v. State Tax Comm. of Utah,* 574 F.2d 1007, 1009 (10th Cir. 1978) that the issue of the boundaries of the Uintah and Ouray Reservation is "a matter which required the proof of facts and the application of law." The trial court in that case was reversed because the Court of Appeals was "unable from the record to find any evidence or basis for the determination by the trial court as to the boundaries of the reservation or what might constitute trust lands." *Id.*

Likewise, this Court is unable to discern any substantial evidentiary basis for the statements as to reservation status made in the judicial opinions cited by the parties.[199] The demanding analysis mandated by *Rosebud Sioux Tribe v. Kneip* and related cases cannot be circumvented by reliance upon cursory or presumptive statements in cases litigating other questions. See *Appawora v. Brough,* 431 U.S. 901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977), *vacating and remanding,* 553 P.2d 934 (Utah 1976).

One thing is certain: the jurisdictional history of the Uintah and Ouray Reservation is not one of "unquestioned" exercise of state authority. Cf. Counties' Post-Trial Brief at 68. The record evidences substantial jurisdictional contradictions and confusion, which are now to be resolved by the judgment of this Court.

Other factors not decisive standing alone, when taken together with the record and analysis set forth above, lend support to the conclusion that the Uintah and Ouray Reservation survives, diminished by the national forest and Strawberry Project withdrawals. For example, the immunity of the reservation to selection of state school and indemnity lands[200] justifies an inference

---

**198.** See also, Letter from Asst. Comm. of Ind. Aff. to Agency Supt. of Dec. 26, 1924, JX 408 (w/attachments); Letter from Asst. Secretary of the Interior to Sen. Smoot of Feb. 6, 1926, JX 409; Letter from the Comm. of Ind. Aff. to Agency Supt. of May 29, 1926, JX 410; *id.,* of July 28, 1926, JX 411; memorandum to the Solicitor of Dec. 8, 1927, JX 416. The state also relies heavily upon the presence of various signs which indicate that one is "entering", "leaving" or "on Indian land" or "the Uintah and Ouray Reservation." See State of Utah Post-Trial Brief at 44–45.

The general sense of the trial testimony indicates that more often than not the signs were understood to mark the boundary of "Indian land" in a *proprietary* sense, see e. g., Trial Transcript at 137, 155–157, 159–160, 169–170, 176–177, 275–276, 304 so as to put persons on notice, for example, that further ingress on the land might be an unlawful trespass. See Trial Transcript at 276, 299–301, 304; 18 U.S.C. § 1165. Of course, that purpose is defeated if signs are posted at political rather than proprietary boundary lines.

Very little documentary and testimonial evidence was offered as to the *specific* purposes and understandings underpinning the posting

of the signs which indicated more than *proprietary* motivations. Cf. Trial Transcript at 160–173.

**199.** See *United States v. Fitzgerald,* 201 F. 295, 296 (10th Cir. 1912); *United States v. Boss,* 160 F. 132, 133 (D.Utah 1906); *Whiterocks Irrigation Co. v. Mooseman,* 45 Utah 79, 82, 141 P. 459, 460 (1914); *Sowards v. Meagher,* 37 Utah 212, 216–217, 108 P. 1112, 1114 (1910); *contra, State v. Roedl,* 107 Utah 538, 543, 155 P.2d 741, 743 (1945).

The summary "judicial notice" approach to the boundary issue found in these cases was apparently disapproved by the United States Supreme Court in *Brough v. Appawora,* 553 P.2d 934 (Utah 1976), which it vacated and remanded "for consideration in light of *Rosebud Sioux Tribe v. Kneip* ..." 431 U.S. 901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977). That case is now here by removal. See *Brough v. Appawora,* 431 U.S. 901, 97 S.Ct. 1690, 52 L.Ed.2d 384 (1977).

**200.** State school land selections have never been made within the boundaries of the Uintah Indian Reservation. See Trial Transcript at 241

that the reservation was not disestablished and its "surplus" acreage "restored to the public domain." While the state asserts alternative reasons for the apparent immunity in an attempt to diminish its probative value herein as a "disestablishment factor,"[201] the fact is that school sections have not been selected and the Interior Department early on took the position that they could not be selected.[201A] The Utah Enabling Act, Act of July 16, 1894, ch. 138, 28 Stat. 107, 109, LD 34, provided that school or indemnity sections could not be selected upon Indian reservation lands "until the reservation shall have been extinguished and such lands be restored to and become a part of the public domain." *Id.*, § 6. The Uintah lands have never been so restored, and remain in continuing reservation status. The disestablishment factor of school lands selection within the "opened" area, which supported an opposite conclusion in *Rosebud Sioux Tribe v. Kneip, supra,* is simply lacking here.

Press coverage of the opening of the Uintah Indian Reservation also reflects the continued reservation status of the opened lands. Multiple references are made to "homesteads on the reservation," *e. g., Deseret Evening News,* July 29, 1905, JX 301, at 1, *Deseret Semi-Weekly News,* Sept. 14, 1905, JX 321, at 3; *id.*, Aug. 31, 1905, JX 318, at 3; *id.*, Aug. 28, 1905, JX 316, at 6; *id.*, Aug. 17, 1905, JX 312, at 1; "home-getting on the reservation," *e. g., Deseret Semi-Weekly News,* Aug. 14, 1905, JX 307,

(testimony of Donald Prince). None were ever asked for. *Id.* at 247. See also *Andrus v. Utah,* 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980).

**201.** See State of Utah Post-Trial Brief at 60–62; Trial Transcript at 241–247; Transcript of Final Arguments at 61–62.

**201A.** On April 27, 1905, the Governor of Utah received a communication from Commissioner W. A. Richards of the General Land Office informing him that the State of Utah was not entitled to select sections 2, 16, 32 and 36 in the townships on the reservation because of the status of the lands. While the state consequently could select "in lieu" lands to compensate for those sections, the indemnity selection could not be made within the opened unallotted lands of the Uintah Reservation:

It follows also that no disposition of the lands can be made that will impair the interests of the Indians, these lands are not subject to selection by the state as indemnity, but must be disposed of in the manner and for the purpose designated by Congress.

Letter of Comm. W. A. Richards, *quoted in Deseret Semi-Weekly News,* Apr. 27, 1905, JX 255, at 5; *Salt Lake Herald,* Apr. 27, 1905, JX 256, at 8.

Commissioner Richards' Opinion was affirmed by the Secretary of the Interior in Instructions issued June 13, 1905, to the Commissioner:

The second question presented affects the rights of the State under its grant in support of common schools. In regard to the grant in place, which grant was made by the act of July 16, 1894 (28 Stat., 107), of sections numbered 2, 16, 32 and 36 in each township in said State, it is the opinion of this Department that not only technical rules of statutory construction but also the general scope of legislation bearing upon the disposal to be made of the unallotted portion of this reservation, and the policy of the United States in respect to public schools and also to Indians, call for the denial of any claim on the part of the State to any portion of its school grant in place within the limits of this reservation. Further, that the reasons controlling the decision just arrived at prevent the recognition of any claimed right on the part of the State to select indemnity from the surplus lands of this reservation in further satisfaction of its school grant, prior to the opening thereof, under the provisions of the act of March 2, 1895 (28 Stat., 876, 899), or at all. See *Minnesota v. Hitchcock* (185 U.S. 373). The Department concurs also in your recommendations covering these matters.

33 I.D. 610, 611, JX 274.

The denial of indemnity selections within the opened Uintah lands is consistent with 43 U.S.C. § 851, which provides that "such selections may not be made within the boundaries of said reservation: . . . ," if the reservation continues to exist.

Section 851 also provides

That nothing in this section contained shall prevent any state from awaiting the extinguishment of any such military, Indian, or other reservation and the restoration of the lands therein embraced to the public domain and then taking the sections sixteen and thirty-six in place therein.

No such extinguishment and restoration has taken place at Uintah. In contrast, state selections have been made within the restored Uncompahgre lands. See Trial Transcript at 240–241, 244; Exhibit I–17; see also *Andrus v. Utah,* 446 U.S. 500, 100 S.Ct. 1803, 64 L.Ed.2d 458 (1980).

at 5; *id.,* Aug. 7, 1905, JX 305, at 1; "filing for lands on the reservation," *e. g., Deseret Semi-Weekly News,* Sept. 4, 1905, JX 319, at 5; *id.,* Aug. 24, 1905, JX 314, at 2; *id.,* Sept. 7, 1905, JX 320, at 2 ("lands on the reservation"); and other on-reservation matters, *e. g., Deseret Evening News,* July 7, 1905, JX 280, at 1 (townsites set aside "within the reservation"); *Deseret Semi-Weekly News,* Oct. 30, 1905, JX 326, at 1 (Ft. Duchesne townsite "in Uintah Indian Reservation"); *id.,* Sept. 21, 1905, JX 322 at 3 (80-acre farm "in the Uintah Reservation, Utah," awarded to daughter of Jim Bridger); *id.,* Sept. 14, 1905, JX 321, at 3 ("settlers of the reservation," "settlers on the reservation"); *id.,* Aug. 28, 1905, JX 317, at 6 (townsite "in Uintah Reservation"); *id.,* Aug. 14, 1905, JX 306, at 2 (newspaper editor will "go on the reservation" to start paper); *id.,* July 27, 1905, JX 298, at 1 (rights in streams "of the Uintah Reservation"); *id.,* July 20, 1905, JX 294, at 3 ("unallotted land in the Uintah Reservation"); *Deseret Evening News,* July 19, 1905, JX 293, at 1 ("filing on water of the Uintah Reservation"); *id.,* July 18, 1905, JX 290 ("all eyes now on the reservation"); *Salt Lake Herald,* July 17, 1905, JX 289 at 3 (farming lands "on the Uintah Reservation"); *id.,* July 11, 1905, JX 286, at 1 (old soldiers' colony "on Uintah Reservation"). A well-read public was surely aware that homesteads were being made available *upon an Indian reservation*—not on lands once possessed by Indians now dispossessed, and merely a part of the unreserved public domain.

Another factor is the reference in the 1948 Act adding the Hill Creek Extension to the Uintah and Ouray Reservation. Act of Mar. 11, 1948, ch. 108, 62 Stat. 72, VI Kapp. 375, LD 187. By that legislation, Congress "extended" the "exterior boundary" of the Uintah and Ouray Reservation to include the Hill Creek lands. How could Congress *extend* a boundary that did not exist?

While this Court disagrees with the United States as *amicus* to the extent that the Government asserts that the original boundary of the Uintah Valley Reservation

remains undiminished, it is significant that the United States, the Indians' trustee, has asserted that the reservation was not disestablished by Congress under the criteria expressed in *Rosebud* and related cases. The United States' views have carried some weight in other disestablishment cases. See *e. g., Seymour v. Superintendent,* 368 U.S. 351, 357, 82 S.Ct. 424, 427, 7 L.Ed.2d 346 (1962). They are afforded significance herein as well.

Some categories of evidence presented at trial have proven less than illuminating. For example, a map exhibit can be found in the record to stand for any of several propositions that one could make regarding the boundary issues. The maps themselves shine little light on the intent of their makers vis-a-vis the specific issue now before this Court. Their probative value is, therefore, weaker than that of other exhibits and testimony.

What can be generalized from the maps is that for many years the former Uncompahgre Reservation has not been thought to deserve map notation, while at the same time, some version of the Uintah or Uintah and Ouray Reservation has been regularly indicated. This Court's conclusions on the boundary issues find approximate reflection, for example, in the U.S. Geological Survey Maps, see Exhibit I–1A (map; 1959 ed.); P.Ex. 1 (map, 1976 ed.), and in the Bureau of Indian Affairs' "Indian Land Areas" Map, JX Map 21 (1971). See also, Ex. I–3 (BLM Map, 1974 ed). Other Maps such as Ex. I–1B, (BLM Map, 1977 ed.), and Ex. I–4A (BLM Map, 1967 ed.), do not indicate those boundaries because they are maps of proprietary tenure, not legal jurisdiction. Some maps are so poorly reproduced that they are valueless, *e. g.,* JX Map 20; some are useless because their definitive color distinctions have been lost in photo-copying, *e. g.,* JX Maps 1, 9, 11 and 13.

Considerable testimony as well was elicited at trial on the availability of federal services to Indians "on or near" the Uintah and Ouray Reservation, and on the alleged "reputation" in the community as to bound-

aries of the reservation. Since eligibility of Indians for Federal services is not strictly reservation boundary-dependent, see *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1973), testimony on that subject is at best ambiguous on reservation boundary issues.

The reputation evidence is also afforded less weight than other evidence in the record. While, as counsel for the counties points out, such reputation evidence is generally admissible in federal court under Rule 803(20),[202] its reliability in these specific circumstances is suspect.

▌ While a long-standing reputation may serve as important evidence of the status of a boundary of immediate personal importance, *e. g.*, a private property line among neighbors, or of more universal importance, such as a national or state boundary, reputation in a *non-Indian* community as to *Indian* boundaries, rights, etc., is indeed a treacherous ground for decision. As the Advisory Committee Notes to the Federal Rules of Evidence, Rule 803(20), point out:

> Trustworthiness in reputation evidence is found "when the topic is such that the facts are likely to have been inquired about and that persons having personal knowledge have disclosed facts which have thus been discussed in the community; and thus the community's conclusions if any has been found, is likely to be a trustworthy one." 5 Wigmore § 1580, p. 444, . . .

To have significant probative value, the matter in question "must be one of general interest, so that it can accurately be said that there is a high probability that the matter underwent general scrutiny as the community reputation was formed." McCormick on Evidence § 324, at 750 (2d ed. 1972) (footnote omitted). Wigmore states this "general interest" requirement even more emphatically:

> [T]he facts for which such an opinion or reputation can be taken as trustworthy must . . . be such facts as have been of interest to *all members of the community* as such, and therefore have been so likely to receive general and intelligent discussion and examination by competent persons, so that the community's received opinion on the subject cannot be supposed to have reached the condition of definite decision until the matter had gone, in public belief, beyond the stage of controversy and had become settled with fair finality.

5 Wigmore on Evidence § 1598, at 564–565 (Chadbourn rev. 1974) (emphasis in original); see also *id.*, §§ 1583–1597.

Applying the theoretical underpinnings of Rule 803(20) to the record herein, the reputation in the non-Indian community as to Ute boundaries, *arising before this controversy*, seems as much based upon the proprietary nature of "Indian lands" as anything else, *e. g.*, Trial Transcript 175–180, diminishing its trustworthiness on the jurisdictional question. Tribal jurisdiction was not an issue before the commencement of this controversy simply because it was not asserted over non-Indians before then to any great extent. Thus tribal jurisdiction was not a topic "likely to have been inquired about" by the non-Indian community; counsel for the State himself asserts that something as significant to Indians as the organization of the tribe under a constitution in 1937 was an event that "didn't get any publicity or attention" in the local non-Indian communities, nor did it "attract the attention of the State." Transcript of Final Arguments at 37 (argument of Mr. Dewsnup).

Furthermore, the evidence of reputation among that segment of the community that is the most likely to inquire about tribal jurisdiction, *i. e.*, the Indians, is largely absent from the record herein. Trial testimo-

---

**202.** Rule 803(20) of the Federal Rules of Evidence provides this exception to the Hearsay Rule (see Rule 802, F.R.Ev.):

*Reputation concerning boundaries or general history.* Reputation in a community, arising before the controversy, as to boundaries of or customs affecting lands in the community, and reputation as to events of general history important to the community or State or nation in which located.

ny indicates that discussion of such subjects between Indians and non-Indians was extremely limited. *E. g.*, Trial Transcript at 175 (testimony of Gordon Harmston.[202A] The Federal courts have eschewed the use of boundary by acquiescence, mutual reliance, or estoppel in cases involving the determination of Indian reservation boundaries, see *Sekaquaptewa v. MacDonald*, 626 F.2d 113, 117–118 (9th Cir. 1980), and with good reason. Federal Indian law is a field of unique texture and complexity and, recalling that the primary focus of the inquiry herein is congressional intent, *Rosebud Sioux Tribe v. Kneip, supra*, the reputation evidence found in the record here is of less than material importance.[202B]

Finally, this Court has reached the conclusions on the reservation status of the Uintah lands based upon the overall sense of the historical record concerning the Uintah Reservation in contrast to the treatment of the old Uncompahgre Reservation over the same period. To say that both reservations were disestablished by Congress would require this Court to ignore the marked distinctions, contrasts, and inconsistencies that characterize the respective approaches to each reservation. The overall tone of the evidentiary record harmonizes with a finding that the Uintah and Ouray Reservation continues in Indian reservation status, diminished only by the na-

tional forest and Strawberry Project withdrawals.

## X. THE GENERAL ALLOTMENT ACT

Both plaintiff and defendants in this case assert that the legislation dealing with the Uintah and Uncompahgre Reservations should be construed in light of the provisions of the Dawes Act, or General Allotment Act of 1887, Act of Feb. 8, 1887, ch. 119, 24 Stat. 388, I Kapp. 33 (2d ed. 1904), LD 13. See Plaintiff's Post-Trial Brief at 19–22 ff; Defendant Counties' Post-Trial Brief at 6–18; Transcript of Final Arguments at 63–81. Plaintiff argues that the general operation of the General Allotment Act was to allot and open the Indian reservations while continuing the reservation status of the lands. Defendant Counties assert that the general operation of the Act was the opposite, to reduce the territorial boundaries of reservations following allotment through the restoration of the "surplus" unallotted lands to the public domain. Each party would resolve ambiguities in the legislative materials in its own favor by infusing the specific language at issue with its chosen interpretation of the operative effect of the General Allotment Act. This Court has reviewed the general descriptions of allotment policy expressed in a number of the exhibits.[203] Further, this Court has

---

**202A.** Trial Transcript at 175:

> \* \* \* \* \* \*
>
> Q Did you have occasion to talk about boundary questions with any of those people?
> A Indians are rather non-communicative, and unless you ask direct questions, you do not get an answer. So I don't ever recall discussing that with anyone of Indian extraction.
>
> \* \* \* \* \* \*

It must also be observed that with unfortunate consistency, the assertion of Indian tribal rights and powers to their lawful extent puts Indians at odds with their non-Indian neighbors. *E. g., Washington v. Washington State Commercial Passengers Fishing Vessel Association*, 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979). Non-Indians in an Indian reservation setting are often far from being dispassionate observers of historical events. Cf. *United States v. Kagama*, 118 U.S. 375, 384, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886).

**202B.** The offer of a local cafe's dinner table placemat, JX 485, *as indirect corroboration of a* specific congressional intent to disestablish the Uintah Indian Reservation presses the admissibility of the joint exhibits to the limits of Rule 401 of the Federal Rules of Evidence.

**203.** See generally, Ann. Rept. of the Comm. of Ind. Aff., 1880, JX 4 at xvii; Rept. of the Secretary of the Interior, 1885, JX 9, at 24–28; Proceedings of the Third Ann. Lake Mohonk Conference (Oct. 1885), JX 11, at 34–59; Rept. of the Secretary of the Interior, 1886, JX 13, at 3–4; Ann. Rept. of the Comm. of Ind. Aff., 1887, JX 16, at iv–xiv; Rept. of the Secretary of the Interior, 1888, JX 17, at xxviii–xxxiii; Rept. of the Comm. of Ind. Aff., 1890, JX 18, at 3–4; Rept. of the Secretary of the Interior, 1890, JX 19, xxiii–xxiv; *id.*, 1891, JX 22, at vi; *id.*, 1892, JX 28 at vii–viii, xxxii–xxxiii; *id.*, 1894, JX 34, at iv; Rept. of the Comm. of Ind. Aff., 1891, at 4–9, 26, 44–47; *id.*, 1892, JX 27, at 5, 74; *id.*, 1893, JX 31, at 30; *id.*, 1905, JX 328, at 1784–

looked to treatises and scholarly works dealing with the allotment program in search of such a generalized effect of the General Allotment Act on reservation boundaries. See D. S. Otis, The Dawes Act and the Allotment of Indian Lands (Prucha ed. 1973); F. Cohen, Handbook of Federal Indian Law 334–336, 206 ff (1942); S. L. Tyler, A History of Indian Policy 95–124 (1973); W. Washburn, The Indian in America 233–249 (1975); F. Prucha, ed., Americanizing the American Indians (1973); D. Getches, et al., Cases and Materials on Federal Indian Law (1979); M. Price, Law and the American Indian (1973); 1 American Indian Policy Review Commission, Final Report 61–69 (comm. print 1977); F. Prucha, ed., Documents of United States Indian Policy 153–214 (1975); I, II W. Washburn, ed., The American Indian and the United States: A Documentary History 282–904 (1973).

No doubt the General Allotment Act was understood as a method for ultimately ending the Indian reservation system. President Theodore Roosevelt colorfully described the General Allotment Act as "a mighty pulverizing engine to break up the tribal mass." [204] As Secretary of the Interior Carl Shurz explained in 1880:

[Allotment] will eventually open to settlement by white men the large tracts of land now belonging to the reservations, but not used by the Indians. It will thus put relations between the Indians and their white neighbors in the western country upon a new basis, *by gradually doing away with the system of large reservations*, which has so frequently provoked those encroachments which in the past have led to so much cruel injustice and so many disastrous collisions.

Rept. of the Secretary of the Interior, 1880, H.Exec.Doc.No.1, pt. 5, 46th Cong., 3d Sess. at 3 (emphasis added). The processes of the General Allotment Act were indeed understood to be gradual. [205] The annual report of the influential Board of Indian Commissioners commented:

This bill, which became a law on the 8th of February, 1887, is a great step in advance in our Indian policy, and the day when it was approved by the President may be called the Indian emancipation day.

\* \* \* \* \* \*

It is plainly the ultimate purpose of the bill to abrogate the Indian tribal organization, to abolish the reservation system and to place the Indians on an equal footing with other citizens of the country.

*We do not look for the immediate accomplishment of all this. The law is only the seed, whose germination and growth will be a slow process, and we must wait patiently for its mature fruit.*

Ann. Rept. of the Board of Indian Commissioners, 1888, *quoted in* Tyler, A History of Indian Policy 95–96 (1973) (emphasis added). As the Supreme Court explains in *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), "Under the 1887 Act, ..., the President was not required to open reservation land for allotment; he merely had the discretion to do so. In view of the discretionary nature of this presidential power, Congress occasionally enacted special legislation in order to assure that a particular reservation was in fact opened to allotment." *Id.*, 412 U.S. at 497, 93 S.Ct. at 2254 (footnote omitted). In fact, Congress enacted 108 separate pieces of legislation directing the allotment of specific reservations. See 2 American Indian Policy Re-

1793; *id.*, 1906, JX 334, at 80–85; 26 Cong.Rec. 6233–6252, 7683–7708, 8251–8253, 8263–8271 (1894), LD 32.

**204.** President's First Annual Message to Congress, Dec. 3, 1901, *reprinted in* 35 Cong.Rec. 81, 90, LD 64 (1902).

**205.** Consider the colloquy with Professor James B. Thayer of the Harvard Law School as to the effect of the General Allotment Act:

Q "When would the reservation cease to be a reservation?"
A [Thayer] "It would cease to be a reservation when the tribe ceases to be."

\* \* \* \* \* \*

Proceedings of the Fifth Ann. Lake Mohonk Conference (Sept. 1887), JX 15, at 84.

view Commission, Task Force No. 9, Report on Federal Indian Law Consolidation, Revision and Codification 235–246 (comm. print 1976). The manner of opening the "surplus" unallotted lands of the reservations to white settlement under those acts was hardly uniform or consistent. Some of the acts provided for the outright cession of the unallotted lands;[206] some provided for a cession in trust;[207] some provided that the unallotted lands would be "restored to the public domain"[208] or to status as "public lands;"[209] other acts simply provided that the unallotted lands would be opened for settlement;[210] and still other of the acts mandated allotment without opening the reservations at all.[211] Reviewing this significant body of legislation as a whole, no single, specific pattern emerges. Not even the exhaustive study of allotment prepared by Dr. D. S. Otis offers a universal rule of construction of those statutes based upon the operation of the General Allotment Act.[212] Instead, the courts must look to the particular terms of statute or statutes affecting the reservation lands under consideration, the legislative history of the statutes and the unique historical circumstances surrounding them.

This Court has no problem with the proposition that the Uintah Indian Reservation was allotted pursuant to the general principles of the General Allotment Act as applied by the 1902–1905 Ute legislation. Congress expressly provided for that, and the Court of Appeals for this Circuit has found that to be the case. See Joint Resolution of June 19, 1902, Res. No. 31, 32 Stat. 744 I Kapp. 799, 800 (2d ed. 1904), LD 85, and page 1116 n. 133, *supra*; *United States v. Gray*, 201 F. 291, 292 (8th Cir. 1912). Even if this Court adopts the approach of courts in other cases and construes the Ute legislation *in pari materia* with the General Allotment Act,[213] the operation of the 1887 Act is no interpretative talisman compelling this Court to reach one result as opposed to any other.

## XI. SUMMARY and CONCLUSION

In deciding the issues presented in this case, the Court has undertaken a fairly meticulous review of the legal and historical materials concerning the status of the Uintah and Ouray Reservation as it has evolved

**206.** See *e. g.*, Act of Mar. 3, 1891, ch. 543, 26 Stat. 989, 1022, 1026, 1032, 1035, 1039, I Kapp. 407–437 (6 cession agreements ratified); Act of Aug. 15, 1894, ch. 290, 28 Stat. 286, 326, I Kapp. 520, 536–541; Act of June 6, 1900, ch. 813, 31 Stat. 672, I Kapp. 704; Act of Mar. 3, 1905, ch. 1479, 33 Stat. 1048, 1078, III Kapp. 124, 155–156; Act of Apr. 27, 1904, ch. 1624, 33 Stat. 352, III Kapp. 87.

**207.** See *e. g.*, Act of Mar. 2, 1889, ch. 405, 25 Stat. 888, I Kapp. 328 (ceded lands "restored to the public domain"); Act of Apr. 23, 1904, ch. 1484, 33 Stat. 254, III Kapp. 71; Act of Mar. 3, 1905, ch. 1452, 33 Stat. 1016, III Kapp. 117.

**208.** See *e. g.*, Act of July 1, 1892, ch. 140, 27 Stat. 62, I Kapp. 441; Act of Feb. 20, 1895, ch. 113, 28 Stat. 677, I Kapp. 555; Act of May 29, 1908, ch. 216, 35 Stat. 444, 457, III Kapp. 356, 370.

**209.** See *e. g.*, Act of Feb. 13, 1891, art. V, ch. 165, 26 Stat. 749, I Kapp. 389.

**210.** *E. g.*, Act of June 17, 1892, ch. 120, 27 Stat. 52, I Kapp. 439; Act of May 29, 1908, ch. 217, 35 Stat. 458, III Kapp. 371; Act of Dec. 21, 1904, ch. 22, 33 Stat. 595, III Kapp. 110; Act of Feb. 14, 1913, ch. 54, 37 Stat. 675, III Kapp. 555.

**211.** *E. g.*, Act of Mar. 2, 1889, ch. 422, 25 Stat. 1013, I Kapp. 344; Act of Jan. 12, 1891, ch. 65, 26 Stat. 712, I Kapp. 383; Act of Mar. 2, 1895, ch. 188, 28 Stat. 876, 907, I Kapp. 559, 566–567; Act of Feb. 11, 1901, ch. 350, 31 Stat. 766, I Kapp. 713; Act of Mar. 3, 1911, ch. 210, 36 Stat. 1058, 1063, III Kapp. 487, 492–493.

**212.** See D. Otis, The Dawes Act and the Allotment of Indian Lands (Prucha ed. 1973), originally printed as a "History of the Allotment Policy," *in* "Readjustment of Indian Affairs," Hearings, House Committee on Indian Affairs, 73d Cong., 2d Sess., pt. 9, at 428–489 (1934). This work is cited with approval in *Mattz v. Arnett*, 412 U.S. 481, 496 n.18, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973).

**213.** See *United States v. Jackson*, 280 U.S. 183, 196, 50 S.Ct. 143, 147, 74 L.Ed. 361 (1930); *Stevens v. Commissioner of Internal Revenue*, 452 F.2d 741, 746 (9th Cir. 1971); *Kirkwood v. Arenas*, 243 F.2d 863, 866 (9th Cir. 1957); cf. *DeCoteau v. District County Court*, 420 U.S. 425, 432, 95 S.Ct. 1082, 1087, 43 L.Ed.2d 300 (1975); *Mattz v. Arnett*, 412 U.S. 481, 496, 93 S.Ct. 2245, 2253, 37 L.Ed.2d 92 (1973).

over the past 120 years.[214] As the Supreme Court has long recognized:

> [W]e are not limited to the lifeless words of the statute and formalistic canons of construction in our search for the intent of Congress. The Act was the product of a period, and, "courts, in construing a statute may with propriety recur to the history of the times when it was passed." *United States v. Union Pacific R. Co.*, 91 U.S. 72, 79, [23 L.Ed. 224].

*Great Northern Ry. Co. v. United States,* 315 U.S. 262, 273, 62 S.Ct. 529, 533, 86 L.Ed. 836 (1942); see also *Winona and St. Peter R. Co. v. Barney,* 113 U.S. 618, 625, 5 S.Ct. 606, 609, 28 L.Ed. 1109 (1885); *Smith v. Townsend,* 148 U.S. 490, 494, 495, 13 S.Ct. 634, 635, 37 L.Ed. 533 (1893); *United States v. Denver & Rio Grande Ry. Co.,* 150 U.S. 1, 14, 14 S.Ct. 11, 15, 37 L.Ed. 975 (1893); *supra,* notes 18–20 and accompanying text. This is particularly true where legislation affecting Indians is concerned. See *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 665–669, 99 S.Ct. 2529, 2536–2538, 61 L.Ed.2d 153 (1979); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 206, 98 S.Ct. 1011, 1019, 55 L.Ed. 209 (1978); *Mohegan Tribe v. State of Connecticut,* 638 F.2d 612, 621–623 (2d Cir. 1980). At the same time the limitations inhering in the use of the historical materials remain apparent; this Court is called upon to determine the present meaning of statutes under circumstances not imagined by their draftsmen. Members of Congress in 1905 firmly believed that the "Indian Problem" would dissipate in a short time:

> I believe that if we follow the policy which has been inaugurated within the last ten or twelve years, and which the members of the Committee on Indian Affairs in the House and in the Senate have supported, within a generation there will be no Indian problem, no Indian question of any magnitude.

39 Cong.Rec. 1139 (Jan. 20, 1905) (remarks of Rep. Lacey), LD 103. Of course, that has not been the course of events resulting from the allotment program. See e. g., S. L. Tyler, A History of Indian Policy (1973); 1 American Indian Policy Review Commission, Final Report (comm. print 1977); E. Kickingbird and K. Ducheneaux, One Hundred Million Acres (1973); F. Cohen, Handbook of Federal Indian Law (1942). The allotment program was probably one of the best-intentioned grievous errors in the history of American policy-making. By the 1920's, the mistake had become obvious to observers, e. g., L. Meriam, ed., The Problem of Indian Administration (1928), and Congress expressly abandoned allotment as a policy in 1934. See Act of June 18, 1934, § 1, ch. 576, 48 Stat. 984, LD 172, *codified* at 25 U.S.C. § 461 (1976); F. Cohen, Handbook of Federal Indian Law 83–88 (1942). Allotment as a policy remains abandoned, but its voluminous legacy of legislation survives, awaiting interpretation by the courts based upon the intent of congressmen long since gone. In subsequent administrative documents the Court is asked to perceive fine shadings of meaning as to what was or was not an Indian reservation at a time when the executive officials were themselves uncertain. See "Judicial and Departmental Construction of the Words 'Indian Reservation'" (Dec. 29, 1945), II Opinions of the Solicitor of the Department of the Interior Relating to Indian Affairs, 1917–1974, at 1378–1379 (1979).

Even conceding the theoretical limitations of the evidentiary record, important findings can be extracted and sound conclusions can be rationally arrived at. Four of these conclusions are: (1) That the original boundaries of the Uncompahgre Reservation as established by Executive Order in 1882 have been disestablished by Congress and no longer exist, Act of June 7, 1897, 30 Stat. 62, 87; (2) That the original boundaries of the Uintah Valley Indian Reservation have been diminished by Congress through the withdrawal of the Gilsonite Strip in 1888 by agreement with the Utes, through the withdrawal of 1,010,000 acres

---

**214.** While this Court has consistently advocated the value of brevity in legal writing, I also recognize that in any given case one must cut the cloth to fit the pattern. The above-entitled action offers a pattern that is unusual in its extent and complex detail.

of timber land and their inclusion in the contiguous national forest reservations pursuant to the Act of Mar. 3, 1905, 33 Stat. 1048, and through the withdrawal of nearly 56,000 acres of land for the Strawberry reclamation project by the Act of April 4, 1910, 36 Stat. 269, 285; (3) Save as thus expressly diminished, the lands of the Uintah Valley Indian Reservation retain continuing status as lands within the boundaries of an Indian reservation, and are "Indian Country" as a matter of federal law, see 18 U.S.C. § 1151(a) (1976); and (4) That the reservation boundaries of the former Uintah Valley Reservation, now the Uintah and Ouray Indian Reservation, have been extended by Congress to include the lands known as the Hill Creek Extension pursuant to the Act of Mar. 11, 1948, 62 Stat. 72.

The map annexed to this opinion as Appendix B and thereby made a part hereof generally outlines the boundary described by these four conclusions.[215]

Standing on its own, each separate conclusion finds solid support in the record in this case. Taken together they effectively summarize the preponderant sense of the evidence on the boundary issues. This Court's findings and conclusions on the present territorial extent of the Uintah and Ouray Indian Reservation have strength beyond that afforded by the clear preponderance of the evidence; they are fortified "by that 'eminently sound and vital canon'," *Northern Cheyenne Tribe v. Hollowbreast,* 425 U.S. 649, 655 n.7, 96 S.Ct. 1793, 1796, 48 L.Ed.2d 274 (1976), that 'statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians.' *Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 84, 39 S.Ct. 40, 63 L.Ed. 138 (1918); *Bryan v. Itasca County, Minn.,* 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); accord, *Rosebud Sioux Tribe v. Kneip,* 430 U.S. 584, 586, 97 S.Ct. 1361, 1362, 51 L.Ed.2d 660 (1977): (In determining [congressional] intent, we are cau-

tioned to follow "the general rule that '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'" *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129 (1973), quoting *Carpenter v. Shaw,* 280 U.S. 363, 367, 50 S.Ct. 121, 122, 74 L.Ed. 478 (1930); . . .); *Wilson v. Omaha Indian Tribe,* 442 U.S. 653, 666, 99 S.Ct. 2529, 2537, 61 L.Ed.2d 153 (1979); *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 484, 99 S.Ct. 740, 753, 58 L.Ed.2d 740 (1979); *McClanahan v. Arizona State Tax Comm'n,* 411 U.S. 164, 173–175 & n.13, 93 S.Ct. 1257, 1262–1263, 36 L.Ed.2d 129 (1973); *Menominee Tribe of Indians v. United States,* 391 U.S. 404, 406 n.2, 88 S.Ct. 1705, 1707, 20 L.Ed.2d 697 (1968); *Squire v. Capoeman,* 351 U.S. 1, 6–7, 76 S.Ct. 611, 614–615, 100 L.Ed. 883 (1956); *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 353–354, 62 S.Ct. 248, 255, 86 L.Ed. 260 (1941); *Choate v. Trapp,* 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912); *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 90, 30 L.Ed. 306 (1886); *The Kansas Indians,* 72 U.S. (5 Wall.) 737, 760, 18 L.Ed. 667 (1866); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 582, 8 L.Ed. 483 (1832) (J. McLean, concurring).

Federal Indian law applies a second relevant canon of construction forbidding any assumption "that Congress would intend to change the reservation to an area without defined boundaries and, in addition, create a confusing checkerboard pattern of jurisdiction." *United States v. Long Elk,* 565 F.2d 1032, 1039 (8th Cir. 1977). The strong policies against "checkerboard" jurisdiction are described by Justice Douglas in his dissenting opinion in *DeCoteau v. District County Court,* 420 U.S. 425, 95 S.Ct. 1082, 43 L.Ed.2d 300 (1975).[216] The Supreme Court has indicated that such an impractical

---

**215.** If the parties hereto so desire, a stipulated legal description of the boundary determined herein, expressed in metes and bounds, may be submitted for approval by this Court.

**216.** See note 46, *supra.*

result is not to be imputed to Congress without specific language to that effect. See *Moe v. Confederated Salish and Kootenai Tribes*, 425 U.S. 463, 478, 96 S.Ct. 1634, 1643, 48 L.Ed.2d 96 (1976); *Seymour v. Superintendent*, 368 U.S. 351, 358, 82 S.Ct. 424, 428, 7 L.Ed.2d 346 (1962); *United States v. Long Elk, supra*, 565 F.2d at 1039 & n.12.[217] No such specific language, or clear intent to that effect, is found here.

Instead it is readily apparent that the opening of the Uintah Reservation under the 1905 Act, like the opening in *Mattz v. Arnett*, 412 U.S. 481, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973), was "completely consistent with continued reservation status." *Id.*, at 497, 93 S.Ct. at 2254. As in *Seymour v. Superintendent*, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), "the Act did no more than open the way for non-Indian settlers to own land on the reservation in a manner which the Federal Government, acting as guardian and trustee for the Indians, regarded as beneficial to the development of its wards." *Id.* at 356, 82 S.Ct. at 427. Someone who regularly read the *Deseret Evening News* in 1905 would know that. It is equally apparent to this Court.

"[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress." *United States v. Celestine*, 215 U.S. 278, 285, 30 S.Ct. 93, 94, 54 L.Ed. 195 (1909). *Mattz, supra*, 412 U.S. at 504–505, 93 S.Ct. at 2257–2258.[217A] The "face of the legislation" its "legislative history" and the "surrounding circumstances" as evidenced by the record in this case wholly lack the clear expression of congressional intent to disestablish the diminished Uintah reservation under the

principles of *Rosebud Sioux Tribe v. Kneip, supra*. The "hard evidence" necessary to overcome the construction of ambiguities in favor of the Indians, *United States v. Long Elk, supra*, is simply not there.

■ Declaratory relief on the boundary questions is, therefore, granted in favor of the plaintiff Ute Indian Tribe as to the lands within the Uintah and Ouray Reservation as defined above. Declaratory relief is granted in favor of the defendants as to the national forest, Strawberry project, 1888 "gilsonite strip" lands, and the lands of the 1882 Uncompahgre Reservation not included within the 1948 Hill Creek Extension.[218]

■ The Tribe's prayer for injunctive relief, however, is another matter. The Tribe's allegations of immediate, irreparable harm not remediable at law, a necessary foundation of federal injunctive relief, are nearly six years old. No hard evidence of an immediate threat of irreparable injury to the Tribe at the hands of the defendants appears in the present record. Nor *should* evidence of such a grave threat arise.

Two of the jurisdictional issues most important to the parties, tribal criminal jurisdiction over non-Indians and tribal regulation of non-Indian hunting and fishing off of tribal lands, have already been resolved by the United States Supreme Court. In *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), the Court held that the Indian tribes do not have inherent power to try and punish non-Indians for criminal offenses. In *Montana v. United States*, 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981),

---

**217.** As the map exhibits demonstrate, disestablishment of the Uintah reservation would indeed result in checkerboard jurisdiction in the Uintah basin. This contrasts with the settlement pattern in *Rosebud*, which left the reservation "compact and in a square tract." 430 U.S., at 595, 97 S.Ct. at 1367. Congress rejected a bill introduced by Senator Rawlins in 1901 that would have resulted in a similar pattern at Uintah. See 1112–1114 & note 128, *supra*.

**217A.** This remains true today. Congress may still determine or modify the boundaries of the

Uintah and Ouray Reservation by appropriate legislation.

**218.** To the extent that the Tribe's complaint seeks declaratory relief affirming the validity of the Ute Law and Order Code in all of its specific provisions, an advisory opinion is asked for and is hereby denied. The validity of given sections of the Ute Code, or any statutory code, are best evaluated in case-by-case litigation. Tribal *jurisdiction* within the reservation boundaries as a general concept, however, is expressly affirmed.

the Court restricted tribal control of hunting and fishing to Indian-owned and Indian trust lands.

Of course, an expansive reservoir of sovereign tribal authority remains intact. See *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978). The scope of tribal civil jurisdiction over non-Indians within Indian country was expressed in *Montana v. United States, supra*, by Justice Stewart:

> To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. *Williams v. Lee*, 358 U.S. 217, 223 [79 S.Ct. 269, 272, 3 L.Ed.2d 251]; *Morris v. Hitchcock*, 194 U.S. 384 [24 S.Ct. 712, 48 L.Ed. 1030]; *Buster v. Wright*, 135 F.2d 947, 950 (CA8); see *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, [100 S.Ct. 2069, 65 L.Ed.2d 10]. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe. See *Fisher v. District Court*, 424 U.S. 382, 386 [96 S.Ct. 943, 946, 47 L.Ed.2d 106]; *Williams v. Lee*, 358 U.S. 217, 220 [79 S.Ct. 269, 270, 3 L.Ed.2d 251]; *Montana Catholic Missions v. Missoula*

*County*, 200 U.S. 118, 128–129 [26 S.Ct. 197, 200–201, 50 L.Ed. 398]; *Thomas v. Gay*, 169 U.S. 264, 273 [18 S.Ct. 340, 343, 42 L.Ed. 740].

450 U.S., at 565, 101 S.Ct., at 1258. See also Collins, "Implied Limitations on the Territorial Jurisdiction of Indian Tribes," 54 *Wash.L.Rev.* 479 (1970). The Supreme Court has expressly confirmed the power of Indian tribes to tax non-Indians entering the reservation to engage in economic activity, *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152–154, 100 S.Ct. 2069, 2080–2081, 65 L.Ed.2d 10 (1980); see also *Merrion v. Jicarilla Apache Tribe*, 617 F.2d 537 (10th Cir. 1980) (en banc), *cert. granted*, 449 U.S. 820, 101 S.Ct. 71, 66 L.Ed.2d 21, as well as to regulate at least some forms of activity on fee lands. *United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). See also Indian Child Welfare Act, 25 U.S.C. §§ 1901 *et seq.*[219]

▋ The determination herein of the territorial extent of the Uintah and Ouray Indian Reservation bears important implications for the allocation of jurisdiction among federal, tribal, state and local authorities in the Uintah basin. See e. g., *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980); *Central Machinery Co. v. Arizona State Tax Comm.*, 448 U.S. 160, 100 S.Ct. 2592, 65 L.Ed.2d 684 (1980); *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *McClanahan v. Arizona State Tax Comm.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); *Williams v. Lee*, 358 U.S. 217, 219–220, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1958).[219A] Far from engen-

**219.** As Justice Stewart commented in *United States v. Montana, supra*, "this Court has held that the Indian tribes retain rights to river waters necessary to make their reservations livable, *Arizona v. California*, 373 U.S. 546, 599 [83 S.Ct. 1468, 1497, 10 L.Ed.2d 542]." *Id.*, 450 U.S., at 566 n.15, 101 S.Ct., at 1258. This apparently includes the power to control the use of that water. See *Colville Confederated Tribes v. Walton*, 460 F.Supp. 1320, 1332 (E.D. Wash.1978) *affirmed in part, reversed in part*

*and remanded*, 647 F.2d 42 (9th Cir. 1981); 46 Fed.Reg. 944 (Jan. 5, 1981).

**219A.** Of course, criminal cases arising upon the reservation among non-Indians remain within the exclusive jurisdiction of the State, *United States v. McBratney*, 104 U.S. 621, 26 L.Ed. 869 (1881), *New York ex rel. Ray v. Martin*, 326 U.S. 496, 66 S.Ct. 307, 90 L.Ed. 261 (1946), as do civil matters not involving Indians or Indian interests. Cf, *Utah & Northern Ry. v. Fisher*, 116 U.S. 28, 31, 6 S.Ct. 246, 247, 29 L.Ed. 542

dering "absolute chaos and disastrous consequences"[220] this Court's determination of the boundaries of the Uintah and Ouray Indian Reservation should simplify the administration of the law by resolving the nagging disputes that have marked the "jurisdictional history" of that area for years. The evolving principles of federal Indian law and jurisdiction, while not quite a clockwork free of internal frictions,[221] offer the guidance needed to settle in an orderly fashion future jurisdictional disputes that may arise.

The denial of injunctive relief at this point is, however, a denial without prejudice. If circumstances shall arise that justify invoking the exercise of this Court's equitable powers, this Court stands ready to exercise such continuing jurisdiction upon the making of an appropriate record, and to enter such orders as are necessary in order to effectuate its judgment, or as needed in aid of its jurisdiction. *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658,

692–696 & nn. 32, 36, 99 S.Ct. 3055, 3078–3080, 61 L.Ed.2d 823 (1979); *United States v. Michigan*, 508 F.Supp. 480 (W.D.Mich. 1980). The defendants are reminded that a refusal of their officers to recognize legitimate tribal judicial and governmental authority on the reservation is at least to some extent state interference with tribal sovereignty. "While it is clear that tribal reservation sovereignty is not congruent with state sovereignty, such sovereignty as the tribes do possess is entitled to recognition and respect both by state and federal governments." *Davis v. Muellar*, 643 F.2d 521, 525–526 & nn. 8–9 (8th Cir. 1981).[222]

With confidence that the effectuation of this Court's judgment will be approached by all parties with a spirit of open-minded cooperation, this Court hereby ORDERS that this Opinion serve as findings of fact and conclusions of law pursuant to Rule 52, Federal Rules of Civil Procedure, and that judgment be entered consistent with these findings and conclusions, pursuant to Rule 58, Federal Rules of Civil Procedure.

## APPENDIX A

1. Executive Order of October 3, 1861, I Kapp. 900 (2d ed. 1904), LD 2:

DEPARTMENT OF THE INTERIOR,
*Washington, October 3, 1861.*

SIR: I have the honor herewith to submit for your consideration the recommendation of the Acting Commissioner of Indian Affairs that the Uintah Valley, in the Territory of Utah, be set apart and reserved for the use and occupancy of Indian tribes.

In the absence of an authorized survey (the valley and surrounding country being as yet unoccupied by settlements of our citizens), I respectfully recommend that you order the entire valley of the Uintah River within Utah Territory, extending on both sides of said river to the crest of the first range of contiguous mountains on each side, to be reserved to the United States and set apart as an Indian reservation.

Very respectfully, your obedient servant,

CALEB B. SMITH, *Secretary.*

The PRESIDENT.

EXECUTIVE OFFICE, *October 3, 1861.*

Let the reservation be established, as recommended by the Secretary of the Interior.

A. LINCOLN.

(1885); *Langford v. Monteith*, 102 U.S. 145, 26 L.Ed. 53 (1880); Ute Law and Order Code § 1–2–5 (1975). Nothing in this Court's judgment herein relates in any way to land titles or proprietary interests in lands. Compare *Oneida Indian Nation v. County of Oneida, N. Y.*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); "Symposium on Indian Law: The Eastern Land Claims," 31 *Maine L.Rev.* 5–211 (1979). The issues herein involve legal *jurisdiction*, not ownership.

220. Letter from Ass't. Utah Atty. Gen. R. Dewsnup to the Court, June 25, 1980, at 3.

221. See R. Barsh and J. Henderson, The Road: Indian Tribes and Political Liberty (1980).

222. As the United States Court of Appeals for the Eighth Circuit notes in *Davis v. Muellar, supra*, "the trust responsibility of the Federal Government includes protecting tribal sovereignty." *Id.* at 525.

2. Act of May 5, 1864, ch. 77, 13 Stat. 63, LD 3:

CHAP. LXXVII.—*An Act to vacate and sell the present Indian Reservations in Utah Territory, and to settle the Indians of said Territory in the Uinta Valley.* May 5, 1864.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Interior be, and he is hereby, authorized and required to cause the several Indian reservations heretofore made, or occupied as such, in the territory of Utah, excepting Uinta valley, to be surveyed into tracts or lots, not exceeding eighty acres each, under the direction of the commissioner of the general land-office, and upon the completion of such surveys shall cause said tracts or lots to be sold, upon sealed bids, to be duly invited by public advertisement, for a period not less than three months, in a newspaper of general circulation published in the territory of Utah, and also a newspaper published in Washington, to the highest and best bidder; said bids may be filed with the governor of said territory at the seat of government thereof, and with the Secretary of the Interior in Washington; such bids as may be received by said governor shall, without opening the same, be forwarded to the Secretary of the Interior, when the same, with the bids filed with him, shall be opened in the presence of the Secretary of the Interior, the commissioner of public lands, and the commissioner of Indian affairs, and any bidders who may choose to be present at the opening thereof; and the Secretary of the Interior shall apply the proceeds of such sales to the construction of improvements upon the reservations which may be established under the provisions of this act, or by other lawful authority, or to the purchase of stock, agricultural implements, or such other useful articles as to him may seem best adapted to the wants and requirements of the Indians: *Provided,* That no tract of land shall be sold under the provisions of this section for less than its appraised value in cash, to be duly ascertained by commissioners appointed by the Secretary of the Interior for that purpose.

SEC. 2. *And be it further enacted,* That the superintendent of Indian affairs for the territory of Utah be, and he is hereby, authorized and required to collect and settle all or so many of the Indians of said territory as may be found practicable in the Uinta valley, in said territory, which is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same.

SEC. 3. *And be it further enacted,* That, for the purpose of making agricultural improvements in the Uinta valley for the comfort of the Indians who may inhabit the same, and to enable them to become self-sustaining by means of agriculture, there is hereby appropriated, out of any money in the treasury not otherwise appropriated, the sum of thirty thousand dollars, which sum shall be expended by the superintendent of Indian affairs for said territory, under the instruction of the Secretary of the Interior.

APPROVED, May 5, 1864.

*Margin notes:* Indian reservations in Utah Territory to be surveyed and sold. Uinta valley excepted. Mode of sale. Proceeds of sales, how to be applied. Minimum price. The Indians in the territory to be settled in Uinta valley. Appropriation for agricultural improvements therein.

3. Act of June 15, 1880, ch. 223, 21 Stat. 199, I Kapp. 180 (2d ed. 1904), LD 11:

June 15, 1880.
21 Stat., 199.

CHAP. 223.—An act to accept and ratify the agreement submitted by the confederated bands of Ute Indians in Colorado, for the sale of their reservation in said State, and for other purposes, and to make the necessary appropriations for carrying out the same.

Preamble.
See note to 1874, ch. 136, ante, p. 151.

Whereas certain of the chiefs and headmen of the confederated bands of the Ute tribe of Indians, now present in the city of Washington, have agreed upon and submitted to the Secretary of the Interior an agreement for the sale to the United States of their present reservation in the State of Colorado, their settlement upon lands in severalty, and for other purposes; and

See 1895, ch. 113, post, p. 555.

Whereas the President of the United States has submitted said agreement, with his approval of the same, to the Congress of the United States for acceptance and ratification, and for the necessary legislation to carry the same into effect: Therefore

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That said agreement be, and the same is hereby, accepted, ratified, and confirmed: *Provided*, That the said agreement shall be amended by adding to the first clause thereof, after the words "guilty parties", the words following, to wit: "Until such surrender or apprehension, or until the President shall be satisfied that the guilty parties are no longer living or have fled beyond the limits of the United States, the proportion of the money, hereinafter provided, coming to that portion of the Ute Indians known as the White River Utes, except for removal and settlement, shall not be paid"; and by adding to the third express condition of said agreement after the word "forever", the words following, to wit: "*Provided*, That the President of the United States may, in his discretion, appropriate an amount thereof, not exceeding ten thousand dollars, for the education in schools established within or beyond the limits of the lands selected, of such youths of both sexes as in his judgment may be best qualified to make proficiency in practical industries and pursuits necessary for their self-support, and out of the portion of said moneys coming to the White River Utes, the United States shall pay annually to the following-named persons, during the period of twenty years, if they shall live so long, the following sums respectively: To Mrs. Arivella D. Meeker, five hundred dollars; to Miss Josephine Meeker, five hundred dollars; to Mrs. Sophronia Price, five hundred dollars; to Mrs. Maggie Gordon, five hundred dollars; to George Dresser, two hundred dollars; to Mrs. Sarah M. Post, five hundred dollars; to Mrs. Eaton, mother of George Eaton, two hundred dollars; to the parents of Arthur L. Thompson, two hundred dollars; to the father of Fred Shepard, two hundred dollars; to the parents of Wilmer Eskridge, two hundred dollars"; and by adding to the fifth express condition of said agreement after word "reaffirmed", the words following to wit: "This sum, together with the annuity of fifty thousand dollars hereinbefore provided, may, in the discretion of Congress, at the end of twenty-five years, be capitalized, and the principal sum be paid to said Indians per capita in lieu of said annuities": *And provided also,* That three-fourths of the adult male members of said confederated bands shall agree to and sign said agreement, upon presentation of the same to them, in open council, in the manner hereinafter provided: *Provided further*, That nothing in this act contained, or in the agreement herein set forth, or in the amendments herein proposed to said agreement, shall be so construed as to compel any Ute Indian to remove from any lands that he or she claims in severalty. Said agreement is in words and figures as follows, namely:

The chiefs and headmen of the confederate bands of the Utes now present in Washington, hereby promise and agree to procure the surrender, to the United States, for trial and punishment, if found guilty, of those members of their nation, not yet in the custody of the United States, who were implicated in the murder of the United States Indian Agent N. C. Meeker and the murder of a • outrages upon the employees at the White River Agency on the twenty-ninth day of September, eighteen hundred and seventy-nine, and in case they do not themselves succeed in apprehending the said parties, presumably guilty of the above-mentioned crime, that they will not in any manner obstruct, but faithfully aid any officers of the United States, directed by the proper authorities, to apprehend such presumably guilty parties.

The said chiefs and headmen of the confederated bands of Utes also agree and promise to use their best endeavors with their people to procure their consent to cede to the United States all the territory of the present Ute Reservation in Colorado, except as hereinafter provided for their settlement.

The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata River, in Colorado; and if there should not be a sufficiency of such lands on the La Plata River and in its vicinity in Colorado, then upon such other unoccupied agricultural lands as may be found on the La Plata River or in its vicinity in New Mexico.

The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand River, near the mouth of the Gunnison River, in Colorado, if a sufficient quantity of agricultural land shall be found

**Margin notes:**

Ute Indians in Colorado.

Proviso.

Agreement for sale of lands.

Amended and ratified.

Proviso.

Schools.

Payment annually for twenty years to certain persons.

Agreement further amended.

Proviso.

[21 Stat., 200.]

Proviso.

Agreement.

Murderers, etc., to be surrendered for trial and punishment.

Amended by Congress.

Southern Ute to remove and settle upon lands on the La Plata River, Colorado.

Uncompahgre Ute to remove to Grand River, etc.

there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah.

**White River Ute to remove to Uintah Reserve.** The White River Utes agree to remove to and settle upon agricultural lands on the Uintah Reservation in Utah.

**Allotments to be made.** Allotments in severalty of said lands shall be made as follows:

**How made.** To each head of a family one-quarter of a section, with an additional quantity of grazing land not exceeding one-quarter of a section.

To each single person over eighteen years of age one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section.

To each orphan child under eighteen years of age one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; and to each other person, under eighteen years, now living, or who may be born prior to said allotments, one-eighth of a section, with a like quantity of grazing land.

**Made with the advice of a commission.** All allotments to be made with the advice of the commission (*a*) hereinafter provided, upon the selection of the Indians, heads of families selecting for their minor children, and the agents making the allotment for each orphan child.

**Chiefs and headmen not to interfere with travel, etc.** The said chiefs and headmen of the confederated bands of Utes further promise that they will not obstruct or in anywise interfere with travel upon any of the highways now open or hereafter to be opened by lawful authority in or upon any of the lands to be set apart for their use by virtue of this agreement.

**Conditions of agreement.** The said chiefs and headmen of the confederated bands of Utes promise to obtain the consent of their people to the cession of the territory of their reservation as above on the following express conditions:

**Lands to be surveyed and alloted.** First. That the Government of the United States cause the lands so set apart to be properly surveyed and to be divided among the said Indians in severalty in the proportion hereinbefore mentioned, and to

**[21 Stat. 201.]**

**Patents to issue.** issue patents in fee simple to them respectively therefor, so soon as

**Title acquired.** the necessary laws are passed by Congress. The title to be acquired by the Indians shall not be subject to alienation, lease, or incumbrance, either by voluntary conveyance of the grantee or by the judgment, order, or decree of any court, or subject to taxation of any

**Not subject to alienation or tax.** character, but shall be and remain inalienable and not subject to taxation for the period of twenty-five years, and until such time thereafter as the President of the United States may see fit to remove the restriction, which shall be incorporated in the patents when issued, and any contract made prior to the removal of such restriction shall be void.

**Annuity, when distributed.** Second. That so soon as the consent of the several tribes of the Ute Nation shall have been obtained to the provisions of this agreement, the President of the United States shall cause to be distributed among them in cash the sum of sixty thousand dollars of annuities now due and provided for, and so much more as Congress may appropriate for

**Commission for removal.** that purpose; and that a commission (*a*) shall be sent to superintend the removal and settlement of the Utes, and to see that they are well provided with agricultural and pastoral lands sufficient for their future support, and upon such settlement being duly effected, that they are furnished with houses, wagons, agricultural implements, and stock cattle sufficient for their reasonable wants, and also such saw and grist mills as may be necessary to enable them to commence farming oper-

**Distribution of appropriation.** ations, and that the money to be appropriated by Congress for that purpose shall be apportioned among the different bands of Utes in the

**One-third to those on La Plata River, one-half to those on Grand River, one-sixth to those on Uintah Reserve.** following manner: One-third to those who settle on the La Plata River and vicinity, one-half to those settling on Grand River and vicinity, and one-sixth to those settling on the Uintah Reservation.

**Perpetual trust fund, in consideration of cession of lands.** Third. That in consideration of the cession of territory to be made by the said confederated bands of the Ute Nation, the United States, in addition to the annuities and sums for provisions and clothing stipulated and provided for in existing treaties and laws, agrees to set apart and hold, as a perpetual trust for the said Ute Indians, a sum of money, or its equivalent in bonds of the United States, which shall be sufficient to produce the sum of fifty thousand dollars per annum, which sum of fifty thousand dollars shall be distributed per capita to them annually forever.

**Removal of agencies of Uncompahgre and Southern Ute.** Fourth. That as soon as the President of the United States may deem it necessary or expedient, the agencies for the Uncompahgres

and Southern Utes be removed to and established at suitable points, to be hereafter selected, upon the lands to be set apart, and to aid in the support of the said Utes until such time as they shall be able to support themselves, and that in the mean time the United States Government will establish and maintain schools in the settlements of the Utes, and make all necessary provision for the education of their children.

*Schools to be established.*

Fifth. All provisions of the treaty of March second, eighteen hundred and sixty-eight, and the act of Congress approved April twenty-ninth, eighteen hundred and seventy-four, not altered by this agreement, shall continue in force, and the following words from article three of said act, namely, "The United States agrees to set apart and hold, as a perpetual trust for the Ute Indians, a sum of money or its equivalent in bonds, which shall be sufficient to produce the sum of twenty-five thousand dollars per annum, which sum of twenty-five thousand dollars per annum shall be disbursed or invested at the discretion of the President, or as he may direct, for the use and benefit of the Ute Indians forever", are hereby expressly reaffirmed.

*Provisions for perpetual annuity in treaty of Mar. 2, 1868, vol. 2, p. 765, and act of 1874, c. 136, ante, p. 151, reaffirmed.*

Sixth. That the commissioners above mentioned shall ascertain what improvements have been made by any member or members of the Ute Nation upon any part of the reservation in Colorado to be ceded to the United States as above, and that payment in cash shall be made to the individuals having made and owning such improvements, upon a fair and liberal valuation of the same by the said commission, taking into consideration the labor bestowed upon the land.

*Commissioners to ascertain what improvements have been made by Indians.*

*Payment therefor.*

Done at the city of Washington this sixth day of March anno Domini eighteen hundred and eighty.

*[21 Stat., 202.]*

 Signed

| | |
|---|---|
| CHAVANAUX | his X mark |
| IGNATIO | his X mark |
| ALHANDRA | his X mark |
| VERATZITZ | his X mark |
| GALOTA | his X mark |
| JOCKNICK | his X mark |
| WASS | his X mark |
| SAWAWICK | his X mark |
| OURAY | |

Witnesses:

 WILL F. BURNS, Interpreter.
 W. H. BERRY, Interpreter.
 OTTO MEARS, Interpreter.
 HENRY PAGE, United States Indian Agent, Southern Utes.
 CHARLES ADAMS, Special Agent.

*Commissioners appointed, compensation, expenses.*

SEC. 2. That the President of the United States be, and he is hereby, authorized and empowered to appoint, by and with the advice and consent of the Senate, five commissioners, who shall receive compensation for their services at the rate of ten dollars per diem while actually engaged, in addition to their actual traveling and other necessary expenses; and said commissioners shall, under such instructions as the Secretary of the Interior may give them, present said agreement to the confederated bands of the Ute Indians in open council for ratification, as provided in the first section of this act; and said commissioners shall have a clerk, at a salary of two hundred dollars per month, in addition to his actual traveling and other necessary expenses, and who shall give bond in an amount to be fixed by the Secretary of the Interior, and shall act also as disbursing-officer for said commissioners. And upon the ratification of said agreement by said tribe as herein provided, said commissioners shall, under the direction of the Secretary of the Interior, appraise the improvements belonging to said Ute Indians

*Clerk's salary, bond, duties.*

upon the lands surrendered by them as provided in said agreement, and report the same to the Secretary of the Interior for settlement. It shall be their duty to take a careful census of said Indians, separating them under said census as follows:

First. Those known in the agreement above referred to as Southern Utes.

Second. Those known as Uncompahgre Utes.

Third. Those known as White River Utes.

Said census shall also show separately the name of each head of a family, and the number of persons in such family, distinguishing those over eighteen years of age from those under eighteen years of age, and giving the names of each separately; also, said census shall show separately the orphan children in each of said classes of Utes described in the foregoing agreement, and they shall make an accurate register of the names, ages, occupations, and general condition of each of the above classes as aforesaid, specifying particularly the number and names of said Indians incapable by reason of orphanage, minority, or other disability of managing their own affairs, and they shall also select lands and allot them in severalty to said Indians, as herein provided, and superintend the removal, location, and settlement of the Indians thereon, and do and perform such other services as the Secretary of the Interior may consider necessary for them to do in the execution of the provisions of this act.

And after the said commissioners shall have performed the duties specifically assigned to them by this act, and such other duties as the Secretary of the Interior may require of them, they shall make a full report of their proceedings to the Secretary of the Interior, which shall set forth, among other things, the name of each person to whom they may have apportioned and allotted lands as herein provided for, with the name and condition of such person, showing who, upon proofs, are considered incompetent to take charge of their property, either as orphans, minors, or for other causes; and shall also exhibit the quantity of land assigned to each person, with the metes and bounds of such allotments. And said commissioners shall make an accurate map of the whole survey and proceeding, showing the partition and division aforesaid, a copy of which map shall be filed with said report; and the Secretary of the Interior shall cause a copy to be filed in the General Land Office, and copies shall also be filed in the office of the surveyors-general of Utah, Colorado and New Mexico, and also in the office of the register and receiver of the land district in which such lands or any portion of them may be situate. Said commissioners shall further report the total number of acres alloted and set apart as provided by the foreging agreement, the amount of such land tillable without irrigation, the amount of irrigation required, and the probable cost thereof. They shall also locate the agencies for the Southern Utes and the Uncompahgre Utes, shall furnish an estimate of the number of houses required, the cost of each, the number of school-houses required and the number of teachers, and the number of children of school age, and such other data as the secretary of the Interior may require to enable him to make judicious expenditure of the money appropriated in section nine of this act; and said commissioners shall exercise direct supervision and control of all expenditures under this act during the time they remain in the Ute country, under the general direction of the Secretary of the Interior; and they shall render a full and detailed account of such expenditure, with the vouchers therefor, as now provided by law.

SEC. 3. That the Secretary of the Interior be, and he is hereby, authorized to cause to be surveyed, under the direction of said commissioners, a sufficient quantity of land in the vicinities named in said agreement, to secure the settlement in severalty of said Indians as therein provided. And upon the completion of said survey and enumeration herein required, the said commissioners shall cause allotments of lands to be made to each and all of the said Indians, in quantity and character as set forth in the agreement above mentioned, and whenever the report and proceedings of said commissioners, as required by this act, are approved by the President of the United States, he shall cause patents to issue to each and every allottee for the lands so allotted, with the same conditions, restrictions, and limitations mentioned therein as are provided in said agreement; and all the lands not so allotted, the title to which is, by the said agreement of the confederated bands of the Ute Indians, and this acceptance by the United

*Margin notes:*
To report.
Census of Indians.
Particulars of census.
(21 Stat., 203.) Lands allotted in severalty.
Commissioners to make full report.
Map of survey.
Further report of acres allotted.
Agencies located.
Estimate of school-houses and school children.
To supervise and control expenditures and render accounts and vouchers.
Survey of land for the settlement in severalty of Indians.
Allotment of land in severalty.
Patents issued to allottee.
Lands not allotted, released, and conveyed to United States.

To be held and disposed of as other public lands.

Not subject to homestead entry.

Proceeds of sales, distribution of.

[21 Stat., 204.]

Remainder deposited in Treasury in trust for Indians.

Proviso.

Lands with improvements thereon sold at public sale.

R. S., 1977.

Indians subjected to provisions of.

Allotments not subject to tax, etc.

Perpetual trust-fund, interest $50,000 paid per capita annually.

Salaries to Ute continued ten years longer than stipulated in treaties.
$4,000 per annum to be distributed by the President.

R. S., title 28, extended to lands allotted to Indians.

Appropriations.

Expenses of commissioners.

Removal, etc., Ute.

[21 Stat., 205.]

Per capita to Utes.

States, released and conveyed to the United States, shall be held and deemed to be public lands of the United States and subject to disposal under the laws providing for the disposal of the public lands, at the same price and on the same. terms as other lands of like character, except as provided in this act: *Provided*, That none of said lands, whether mineral or otherwise, shall be liable to entry and settlement under the provisions of the homestead law; but shall be subject to cash entry only in accordance with existing law; and when sold the proceeds of said sale shall be first sacredly applied to reimbursing the United States for all sums paid out or set apart under this act by the Government for the benefit of said Indians, and then to be applied in payment for the lands at one dollar and twenty-five cents per acre which may be ceded to them by the United States outside of their reservation; in pursuance of this agreement. And the remainder, if any, shall be deposited in the Treasury as now provided by law for the benefit of the said Indians, in the proportion hereinbefore stated, and the interest thereon shall be distributed annually to them in the same manner as the funds provided for in this act: *Provided further*, That the subdivisions upon which are located improvements to be appraised, as provided for in section two of this act, shall he offered to the highest bidder at public sale, after published notice of at least thirty days by the Secretary of the Interior, and the same shall be absolutely reserved from occupation or claim until so sold.

SEC. 4. That upon the completion of said allotments and the patenting of the lands to said allottees, each and every of the said Indians shall be subject to the provisions of section nineteen hundred and seventy-seven of the Revised Statutes and to the laws, both civil and criminal, of the State or Territory in which they may reside, with the right to sue and be sued in the courts thereof: *Provided*, That their lands and personal property shall not be subject to taxation or execution upon the judgment, order, or decree of any court obtained on any cause of action which may arise during the period named in the above recited agreement.

SEC. 5. That the Secretary of the Treasury shall, out of any moneys in the Treasury not otherwise appropriated, set apart, and hold as a perpetual trust-fund for said Ute Indians. an amount of money sufficient at four per centum to produce annually fifty thousand dollars, which interest shall be paid to them per capita in cash, annually, as provided in said agreement.

SEC. 6. That all salaries paid to any member or members of the Ute tribe under existing treaty stipulations shall be continued for the term of ten years beyond the time fixed in said treaties. And the sum of four thousand dollars per annum for the term of ten years shall be distributed by the President at his discretion to such of said Indians as distinguished themselves by good sense, energy, and perseverence in the pursuit of civilized life, and in the promotion of a good understanding between the Indians and the Government and people of the United States, and there is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, four thousand dollars as the first installment for such purpose.

SEC. 7. That the provisions of title twenty-eight of the Revised Statutes shall extend over and be applicable to every allotment of land provided for in the foregoing agreement, and to the administration of the affairs of said Indians, so far as said provisions can be made applicable thereto.

SEC. 8. [*Repealed by 1884, ch. 50, post, p. 217.*]

SEC. 9. That for the purpose of carrying the provisions of this act into effect, the following sums, or so much thereof as may be necessary, be, and they are hereby, appropriated, out of any moneys in the Treasury not otherwise appropriated, to be expended under the direction of the Secretary of the Interior as follows, namely:

For the payment of the expenses of the commissioners herein provided, the sum of twenty-five thousand dollars.

For the cost of removal and settlement of the Utes, surveying their lands, building houses, establishing schools, building mills and agency buildings, purchasing stock, agricultural implements, and so forth, as provided in said agreement and in this act, the sum of three hundred and fifty thousand dollars.

For the sum to be paid to said Ute Indians, per capita, in addition to the sixty thousand dollars now due and provided for, the sum of fifteen thousand dollars.

For the payment of the appraised value of individual improvements as provided herein, the sum of twenty thousand dollars.

For the care and support of the Ute Indians in Colorado for the balance of the current fiscal year, the sum of twelve thousand dollars: *Provided*, That with the exception of the appropriation for expenses of the commissioners, the above appropriations shall become available only upon the ratification of said agreement by three-fourths of the male adult members of the Ute Indians as provided in this act, and the certification of such fact to the Secretary of the Treasury by the Secretary of the Interior.

SEC. 10. If the agreement[a] as amended in this act is not ratified by three-fourths of the adult male Indians of the Ute tribes within four months from the approval of this act the same shall cease to be of effect after that day.

Approved June 15, 1880.

---

4. Executive Order of January 5, 1882, I Kapp. 901 (2d ed. 1904), LD 12:

EXECUTIVE MANSION, *January 5, 1882.*

It is hereby ordered that the following tract of country, in the Territory of Utah, be, and the same is hereby, withheld from sale and set apart as a reservation for the Uncompahgre Utes, viz: Beginning at the southeast corner of township 6 south, range 25 east, Salt Lake meridian; thence west to the southwest corner of township 6 south, range 24 east; thence north along the range line to the northwest corner of said township 6 south, range 24 east; thence west along the first standard parallel south of the Salt Lake base-line to a point where said standard parallel will, when extended, intersect the eastern boundary of the Uintah Indian Reservation as established by C. L. Du Bois, United States deputy surveyor, under his contract dated August 30, 1875; thence along said boundary southeasterly to the Green River; thence down the west bank of Green River to the point where the southern boundary of said Uintah Reservation, as surveyed by Du Bois, intersects said river; thence northwesterly with the southern boundary of said reservation to the point where the line between ranges 16 and 17 east of Salt Lake meridian will, when surveyed, intersect said southern boundary; thence south between said ranges 16 and 17 east, Salt Lake meridian, to the third standard parallel south; thence east along said third standard parallel to the eastern boundary of Utah Territory; thence north along said boundary to a point due east of the place of beginning; thence due west to the place of beginning.

CHESTER A. ARTHUR.

---

5. Act of May 24, 1888, ch. 310, 25 Stat. 157, I Kapp. 271 (2d ed. 1904), LD 18:

CHAP. 310.—An act to restore to the public domain a part of the Uintah Valley Indian Reservation, in the Territory of Utah, and for other purposes.[a]

May 24, 1888.

25 Stat., 157.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That so much of the Uintah Valley Indian Reservation, in the Territory of Utah, established by proclamation of the President, of date of October third, eighteen hundred and sixty-one, as lies within the following boundary, namely: Beginning at mile-post numbered nineteen, Du Bois' survey, from the initial point established in township eight south, range twenty east, Salt Lake meridian; thence southerly to the northeast corner of township two south, range one east, Uintah special meridian; thence south along the east boundary of township two south, range one east, Uintah special meridian, to the south-east corner of township two south, range one east, Uintah special meridian; thence east along the north boundary of township three south, range two east, Uintah special meridian, to its intersection with the east boundary of the Uintah Indian Reservation, thence in a north-west direction with the eastern boundary line of said reservation to the beginning, be, and the same is hereby, declared to be public lands of the United States and restored to the public domain.

Uintah Valley Indian Reservation.

Portion of, restored to public domain.

Boundaries.

SEC. 2. That said lands shall be disposed of at public or private sale in the discretion of the Secretary of the Interior, and upon his order, in quantities not exceeding one quarter of a section to any one purchaser, the non-mineral lands for not less than one dollar and twenty-five cents per acre, and not otherwise than for cash: *Provided*, That any location, entry, or entries, mineral or non-mineral, heretofore made or attempted to be made on said lands, or any part thereof, by any qualified person, shall bear date and be allowed the same as if said lands had been public lands at the time of said attempted location or institution of said proceedings, but said mineral entries shall not be completed except upon the payment of twenty dollars an acre, or at that rate for the amount taken up by the claim: *And provided further*, That all moneys arising from the sales of this land shall belong to said Indians and be paid into the Treasury of the United States and held or added to any trust funds of said tribes now there. `Sale of lands.` `Provisos. Prior locations, etc.` `Proceeds to go to Indians.`

SEC. 3. That the Secretary of the Interior shall submit this act to the adult male Indians on said reservation, and the restoration shall take effect on a ratification by three-fourths thereof, and the Secretary of the Interior shall prescribe rules for ascertaining the wishes of said Indians and to secure their free action touching the proposed disposal of said lands. `Ratification by Indians.`

Approved, May 24, 1888.

---

6. Act of August 15, 1894, ch. 290, 28 Stat. 286, 337–338, I Kapp. 520, 546 (2d ed. 1904), LD 35:

SEC. 20. That the President of the United States is hereby authorized and directed to appoint a commission of three persons to allot in severalty to the Uncompaghre Indians within their reservation, in the Territory of Utah, agricultural and grazing lands according to the treaty of eighteen hundred and eighty, as follows: `Uncompaghre Indians, Utah.` `Vol. 21, p. 200.`

"Allotments in severalty of said lands shall be made as follows: To each head of a family one-quarter of a section, with an additional quantity of grazing land not exceeding one-quarter of a section; to each single person over eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each orphan child under eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each other person under eighteen years of age, born prior to such allotment, one-eighth of a section, with a like quantity of grazing land: *Provided*, That, with the consent of said commission, any adult Indian may select a less quantity of land, if more desirable on account of location:" *And provided*, That the said Indians shall pay one dollar and twenty-five cents per acre for said lands from the fund now in the United States Treasury realized from the sale of their lands in Colorado as provided by their contract with the Government. All necessary surveys, if any, to enable said commission to complete the allotments shall be made under the direction of the General Land Office. Said commissioners shall, as soon as practicable after their appointment, report to the Secretary of the Interior what portions of said reservation are unsuited or will not be required for allotments, and thereupon such portions so reported shall, by proclamation, be restored to the public domain and made subject to entry as hereinafter provided. `Allotments in severalty.` `Provisos. Special selections.` `Payment.`

SEC. 21. That the remainder of the lands on said reservation, shall, upon the approval of the allotments by the Secretary of the Interior, be immediately open to entry under the homestead and mineral laws of the United States: *Provided*, That no person shall be entitled to locate more than two claims, neither to exceed ten acres, on any lands containing asphaltum, gilsonite, or like substances· *Provided*, That after three years actual and continuous residence upon agricultural lands from date of settlement the settler may, upon full payment of one dollar and fifty cents per acre, receive patent for the tract entered. If not commuted at the end of three years the settler shall pay at the time of making final proof the sum of one dollar and fifty cents per acre. `Lands not allotted open to entry.` `Provisos. Mineral claims.` `Commutation of agricultural entries.`

SEC. 22. That said commission shall also negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the Territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians, and if possible, procure the consent of such Indians to such relinquishment; and for the acceptance by said Indians of allotments in severalty of lands within said reservation, and said commissioners shall report any agreement made by them with said Indians, which agreement shall become operative only when ratified by Act of Congress. *[margin: Uintah Reservation, Utah, negotiation for cession of lands.]*

SEC. 23. That said commissioners shall receive six dollars per day each, and their actual and necessary traveling and incidental expenses while on duty, and to be allowed a clerk, to be selected by them, whose compensation shall be fixed by said commissioners, subject to the approval of the Secretary of the Interior: *Provided*, That the cost of executing the provisions of this Act shall not exceed the sum of sixteen thousand dollars, which sum is hereby appropriated for that purpose out of any moneys in the Treasury not otherwise appropriated. *[margin: Commissioners' salaries, etc.]*

Approved, August 15, 1894.

---

7. Act of June 7, 1897, ch. 3, 30 Stat. 62, 87, I Kapp. 619, 621 (2d ed. 1904), LD 49:

The Secretary of the Interior is hereby directed to allot agricultural lands in severalty to the Uncompahgre Ute Indians now located upon or belonging to the Uncompahgre Indian Reservation in the State of Utah, said allotments to be upon the Uncompahgre and Uintah reservations or elsewhere in said State. And all the lands of said Uncompahgre Reservation not theretofore allotted in severalty to said Uncompahgre Utes shall, on and after the first day of April, eighteen hundred and ninety-eight, be open for location and entry under all the land laws of the United States; excepting, however, therefrom all lands containing gilsonite, asphalt, elaterite, or other like substances. *[margin: Uncompahgre Ute Indians. Allotment to. Unallotted lands open for location, etc. Gilsonite, etc., lands excepted.]*

And the title to all of the said lands containing gilsonite, asphaltum, elaterite, or other like substances is reserved to the United States. *[margin: Title to gilsonite, etc., lands.]*

\* \* \* \*

8. Act of June 4, 1898, ch. 376, 30 Stat. 429, I Kapp. 642 (2d ed. 1904), LD 54:

*[margin: June 4, 1898. 30 Stat., 429.]*

CHAP. 376.—An act for the appointment of a commission to make allotments of lands in severalty to Indians upon the Uintah Indian Reservation in Utah, and to obtain the cession to the United States of all lands within said reservation not so allotted.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the President of the United States is hereby authorized and directed to appoint a commission consisting of not more than three persons, who shall, with the consent of the Indians properly residing on the Uintah Indian Reservation in Utah, allot in severalty to the said Indians, and to such of the Uncompahgre Indians as may not be able to obtain allotments within the Uncompahgre Indian Reservation, agricultural and grazing lands as follows: To each head of a family, one-quarter of a section, with an additional quantity of grazing land not exceeding one-quarter of a section; to each single person over eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each orphan child under eighteen years of age, one-eighth of a section, with an additional quantity of grazing land not exceeding one-eighth of a section; to each other person under eighteen years of age born prior to such allotment, one-eighth of a section, with a like quantity of grazing land: *Provided*, That with the consent of said commission any adult Indian may select a less quantity of land, if more desirable on account of location. *[margin: Uintah Indian Reservation, Utah. Commission to allot lands to Indians. See note to 1874. c. 136, ante, p. 151. 1894, ch. 290, ante p. 545. Allotments. See also note, 1888, c. 310, ante, p. 271. Proviso. Desirable sites.]*

All necessary surveys to enable said commission to complete the allotments shall be made under the direction of the General Land Office. *[margin: Surveys.]*

SEC. 2. That said commission shall also obtain, by the consent of a majority of the adult male Indians properly residing upon and having an interest in the said Uintah Indian Reservation, the cession to the United States of all the lands within said reservation not allotted or needed for allotment as aforesaid. The agreement for such cession shall be reported by said commission and become operative when ratified by Act of Congress; and thereupon such ceded lands shall be held in trust by the United States for the purpose of sale to citizens thereof: *Provided,* That the United States shall pay no sum or amount whatever for said lands so ceded. Said lands shall be sold in such manner and in such quantities and for such prices as may be determined by Congress: *Provided,* That the amounts so received shall, in the aggregate be sufficient to pay said Indians in full the amount agreed upon for said lands. All sums received from the sales of said lands shall be placed in the Treasury of the United States for said Indians, and shall be exclusively devoted to the use and benefit of the Indians having interests in the lands so ceded.

SEC. 3. That said commissioners shall receive six dollars per day each, and their actual and necessary traveling and incidental expenses while on duty, and to be allowed a clerk to be selected by them, whose compensation shall be fixed by said commissioners, subject to the approval of the Secretary of the Interior: *Provided,* That the cost of executing the provisions of this Act shall not exceed the sum of five thousand dollars, which sum is hereby appropriated for that purpose, out of any moneys in the Treasury not otherwise appropriated.

Approved, June 4, 1898.

*Margin notes: Cession to United States of unallotted lands. —ratification, etc. Provisos. Payment. Sale. Aggregate amount from sales, etc. Pay of commissioners. —clerk. Proviso. Limit for expenses etc.*

---

9. Act of May 27, 1902, ch. 888, 32 Stat. 245, 263-264, I Kapp. 750, 753 (2d ed. 1904), LD 82:

That the Secretary of the Interior, with the consent thereto of the majority of the adult male Indians of the Uintah and the White River tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall cause to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date all the unallotted lands within said reservation shall be restored to the public domain: *Provided,* That persons entering any of said land under the homestead law shall pay therefor at the rate of one dollar and twenty-five cents per acre: *And provided further,* That nothing herein contained shall impair the rights of any mineral lease which has been approved by the Secretary of the Interior, or any permit heretofore issued by direction of the Secretary of the Interior to negotiate with said Indians for a mineral lease; but any person or company having so obtained such approved mineral lease or such permit to negotiate with said Indians for a mineral lease on said reservation, pending such time and up to thirty days before said lands are restored to the public domain as aforesaid, shall have in lieu of such lease or permit the preferential right to locate under the mining laws not to exceed six hundred and forty acres of contiguous mineral land, except the Raven Mining Company, which may in lieu of its lease locate one hundred mining claims of the character of mineral mentioned in its lease; and the proceeds of the sale of the lands so restored to the public domain shall be applied, first, to the reimbursement of the United States for any moneys advanced to said Indians to carry into effect the foregoing provisions; and the remainder, under the direction of the Secretary of the Interior, shall be used for the benefit of said Indians. And the sum of seventy thousand and sixty-four dollars and forty-eight cents is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, to be paid to the Uintah and the White River tribes of Ute Indians, under the direction of the Secretary of the Interior, whenever a majority of the adult male Indians of said tribes shall have consented to the allotment of lands and the restoration of the unallotted lands within said reservation as herein provided.

*Margin notes: Uintah and White River Utes. Allotment of irrigable land. Post, pp. 744, 997. Unallotted lands restored to public domain. Provisos. Homestead entries. Mineral leases. Raven Mining Company. Application of proceeds from sales. Post, p. 745.*

Said item of seventy thousand and sixty-four dollars and forty-eight cents to be paid to the Uintah and White River Utes covers claims which these Indians have made on account of the allotment of lands on the Uintah Reservation to Uncompahgre Indians and for which the Government has received from said Uncompahgre Indians money aggregating sixty thousand and sixty-four dollars and forty-eight cents; and the remaining ten thousand dollars claimed by the Indians under an Act of Congress detaching a small part of the reservation on the east and under which Act the proceeds of the sale of the lands were to be applied for the benefit of the Indians.

Payments to Indians.<br>Vol. 30, p. 87.<br>Post, p. 744.

\* \* \* \*

10. Joint Resolution of June 19, 1902, No. 31, 32 Stat. 744, I Kapp. 799–800 (2d ed. 1904), LD 85:

June 19, 1902.
[Pub. Res., No. 31.]

[No. 31.] Joint Resolution Supplementing and modifying certain provisions of the Indian appropriation Act for the year ending June thirtieth, nineteen hundred and three.

Indian appropriation act. Corrections.

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the provisions of the Act "Making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth, nineteen hundred and three, and for other purposes," are hereby supplemented and modified as follows:

Spokane Indian Reservation, Wash.

Land not allotted open to purchase, etc. *Ante,* p. 266.

The Secretary of the Interior is directed to make allotments in severalty to the Indians of the Spokane Indian Reservation in the State of Washington, and upon the completion of such allotments the President shall by proclamation give public notice thereof, whereupon the lands in said reservation not allotted to Indians or used or reserved by the Government, or occupied for school purposes, shall be opened to exploration, location, occupation, and purchase under the mining laws.

Walker River Indian Reservation. Nonirrigable grazing lands. *Ante,* p. 260.

In addition to the allotment in severalty of lands in the Walker River Indian Reservation in the State of Nevada, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock.

Uintah and White River Utes. Nonirrigable grazing lands. *Ante,* p. 263. *Post,* p. 997.

In addition to the allotments in severalty to the Uintah and White River Utes of the Uintah Indian Reservation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law, select and set apart for the use in common of the Indians of that reservation such an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of live stock.

Uncompahgre Indians. Allotments confined to agricultural lands.

Grazing lands. *Ante,* p. 264.

All allotments hereafter made to Uncompahgre Indians of lands in said Uintah Indian Reservation shall be confined to agricultural land which can be irrigated, and shall be on the basis of eighty acres to each head of a family and forty acres to each other Indian, and no more. The grazing land selected and set apart as aforesaid in the Uintah Indian Reservation for the use in common of the Indians of that reservation shall be equally open to the use of all Uncompahgre Indians receiving allotments in said reservation of the reduced area here named.

Allotments in severalty to Indians outside Indian Territory. Vol. 24, p. 388.

*Ante,* p. 260.

Insofar as not otherwise specially provided, all allotments in severalty to Indians, outside of the Indian Territory, shall be made in conformity to the provisions of the Act approved February eighth, eighteen hundred and eighty-seven, entitled "An Act to provide for the allotment of lands in severalty to Indians on the various reservations, and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes," and other general Acts amendatory thereof or supplemental thereto, and shall be subject to all the restrictions and carry all the privileges incident to allotments made under said Act and other general Acts amendatory thereof or supplemental thereto.

The item of seventy thousand and sixty-four dollars and forty-eight cents appropriated by the Act which is hereby supplemented and modified, to be paid to the Uintah and White River tribes of Ute

Indians in satisfaction of certain claims named in said Act, shall be paid to the Indians entitled thereto without awaiting their action upon the proposed allotment in severalty of lands in that reservation and the restoration of the surplus lands to the public domain.

Approved, June 19, 1902.

---

11. **Act of March 3, 1903, ch. 994, 32 Stat. 982, 997–998, III Kapp. 14, 17–18 (1913), LD 91:**

To enable the Secretary of the Interior to do the necessary survey- *Walker River Indians, Nev.* ing and otherwise carry out the purpose of so much of the act of *Uintah and White River Utes, Utah.* May twenty-seventh, nineteen hundred and two, making appropria- *Survey, etc., of irrigable lands.* tion for the current and contingent expenses of the Indian Department *32 Stat., 260, 742.* for the fiscal year nineteen hundred and three, and for other purposes, *Vol 1, p. 751, 799.* as provides for the allotment of the Indians of the Walker River Reservation in Nevada, and the Uintah and White River Utes in Utah, and the joint resolution of June nineteenth, nineteen hundred and two, providing for the allotment of the Indians of Spokane Reservation in *32 Stat., 993.* Washington, to be immediately available, one hundred and seventy- *Proviso. Obtaining consent to allotment.* five thousand dollars: *Provided, however,* That the Secretary of the *1904, ch. 1402, 33 Stat., 207, post, p. 53.* Interior shall forthwith send an inspector to obtain the consent of the Uintah and White River Ute Indians to an allotment of their lands as directed by the act of May twenty-seventh, nineteen hundred and two, and if their consent, as therein provided, can not be obtained by June first, nineteen hundred and three, then the Secretary of the Interior shall cause to be allotted to each of said Uintah and White River Ute Indians the quantity and character of land *Grazing lands. Restriction.* named and described in said act: *And provided further,* That the graz- *1905, ch. 1479, 33 Stat., 1069, post, p. 146.* ing lands to be set apart for the use of the Uintah, White River Utes, and other Indians, as provided by public resolution numbered thirty-one, of June nineteenth, nineteen hundred and two, be confined to the lands south of the Strawberry River on said Uintah Reservation, and shall not exceed two hundred and fifty thousand acres: *And provided* *Unallotted lands. Time of opening to further,* That the time for opening the unallotted lands to public entry *settlement extended.* on said Uintah Reservation, as provided by the act of May twenty- *32 Stat., 261, vol. 1, p. 732.* seventh, nineteen hundred and two, be, and the same is hereby, extended to October first, nineteen hundred and four. *Uncompahgre Indian Reservation.* That in the lands within the former Uncompahgre Indian Reserva- *Mining claims located on, prior to Janu-* tion, in the State of Utah, containing gilsonite, asphaltum, elaterite, *ary 1, 1891, valid.* or other like substances, which were reserved from location and entry by provision in the act of Congress entitled "An act making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the fiscal year ending June thirtieth, eighteen hundred and *30 Stat., 87, vol. 1, p. 621.* ninety-eight, and for other purposes," approved June seventh, eighteen hundred and ninety-seven, all discoveries and locations of any such mineral lands by qualified persons prior to January first, eighteen hundred and ninety-one, not previously discovered and located, who recorded notices of such discoveries and locations prior to January first, eighteen hundred and ninety-one, either in the State of Colorado, or in the office of the county recorder of Uintah County, Utah, shall have all the force and effect accorded by law to locations of mining *Patents to issue on claims upon the public domain. All such locations may hereafter be *relocation, etc., of claims.* perfected, and patents shall be issued therefor upon compliance with the requirements of the mineral land laws, provided that the owners of such locations shall relocate their respective claims and record the same in the office of the county recorder of Uintah County, Utah, *Claims located after within ninety days after the passage of this act. All locations of any *January 1, 1891, in-* *valid.* such mineral lands made and recorded on or subsequent to January first, eighteen hundred and ninety-one, are hereby declared to be null *Sale of remainder of and void; and the remainder of the lands heretofore reserved as afore- *mineral lands.* said because of the mineral substances contained in them, in so far as the same may be within even numbered sections, shall be sold and dis- *Restrictions.* posed of in tracts not exceeding forty acres, or a quarter of a quarter of a section, in such manner and upon such terms and with such restrictions as may be prescribed in a proclamation of the President of the United States issued for that purpose not less than one hundred and

**1170**

[black redaction bar]

<span style="margin">Balance of lands reserved.</span> twenty days after the passage of this act, and not less than ninety days before the time of sale or disposal, and the balance of said lands and also all the mineral therein are hereby specifically reserved for future action of Congress.

\* \* \* \*

12. Act of April 21, 1904, Ch. 1402, 33 Stat. 189, 207–208, III Kapp. 35, 53 (1913), LD 94:

<span style="margin">Uintah Reservation, Utah. Time of opening unallotted lands extended. 1902, ch. 888, 32 Stat., 263, vol. I, p. 753. 1903, ch. 994, 32 Stat., 998, ante, p. 18. 1905, ch. 1479, 33 Stat., 1069, post, p. 146.</span>

That the time for opening the unallotted lands to public entry on the Uintah Reservation, in Utah, as provided by the acts of May twenty-seventh, nineteen hundred and two, and March third, nineteen hundred and three, be, and the same is hereby, extended to March tenth, nineteen hundred and five, and five thousand dollars is hereby appropriated to enable the Secretary of the Interior to do the necessary surveying, and otherwise carry out the purposes of so much of the act of May twenty-seventh, nineteen hundred and two, making appropriation for the current and contingent expenses of the Indian Department for the fiscal year nineteen hundred and three, and for other purposes, as provides for the allotment of the Indians of the Uintah and White River Utes in Utah. <span style="margin">33 Stat., 208.</span>

\* \* \*

13. Act of March 3, 1905, ch. 1479, 33 Stat, 1048, 1069–1070, III Kapp. 124, 146–147 (1913), LD 105:

<span style="margin">Uintah Reservation Utah. Restriction on grazing lands repealed. 1902, J. R. 31, 32 Stat., 744, vol. 1, p. 799. 1903, ch. 994, 32 Stat., 998, ante, p. 17.</span> That so much of the act of March third, nineteen hundred and three, as provides that the grazing lands to be set apart for the use of the Uintah, White River Utes, and other Indians on the Uintah Reservation, as provided by public resolution numbered thirty-one of June nineteenth, nineteen hundred and two, shall be confined to the lands south of the Strawberry River, be, and the same is hereby, repealed.

<span style="margin">Unallotted lands. Time extended for opening, to entry. 1904, ch. 1402, 33 Stat., 207, ante, p. 53.</span> That the time for opening to public entry the unallotted lands on the Uintah Reservation in Utah having been fixed by law as the tenth day of March, nineteen hundred and five, it is hereby provided that the time for opening said reservation shall be extended to the first of September, nineteen hundred and five, unless the President shall determine that the same may be opened at an earlier date and that the manner of opening such lands for settlement and entry, and for disposing of the same, shall be as follows: That the said unallotted lands, excepting such tracts as may have been set aside as national forest reserve, and such mineral lands as were disposed of by the act of Congress of May twenty-seventh, nineteen hundred and two, shall be disposed of under the general provisions of the homestead and town-site laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; and no person shall be permitted to settle upon, occupy, or enter any of such lands, except as prescribed in said proclamation, until after the expiration of sixty days from the time when the same are thereby opened to settlement and entry: <span style="margin">Provisos. Soldiers' and sailors' rights. R. S. secs. 2304, 2305. 33 Stat., 1070.</span> *Provided,* That the rights of honorably discharged Union soldiers and sailors of the late Civil and the Spanish War or Philippine insurrection, as defined and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes, as amended by the act of March first, nineteen hundred and one, shall not be abridged: *And provided further,* That all lands opened to settlement <span style="margin">Sale of remaining lands.</span> and entry under this act remaining undisposed of at the expiration of five years from the taking effect of this act shall be sold and disposed of for cash, under rules and regulations to be prescribed by the Secretary of the Interior, not more than six hundred and forty <span style="margin">Proceeds of sale. 1902 ch. 888, 32 Stat., 263, vol. 1, p. 753.</span> acres to any one person. The proceeds of the sale of such lands shall be applied as provided in the act of Congress of May twenty-seventh, nineteen hundred and two, and the acts amendatory thereof and supplemental thereto.

<span style="margin">1902, ch. 888, 32 Stat., 263, vol. 1, p. 753.</span>

That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, and subject to the mineral rights granted by the act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary, and he may also set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development, and may confirm such rights to water thereon as have already accrued: *Provided,* That the proceeds from any timber on such addition as may with safety be sold prior to June thirtieth, nineteen hundred and twenty, shall be paid to said Indians in accordance with the provisions of the act opening the reservation.[1]

That the Raven Mining Company shall, within sixty days from the passage of this act, file for record, in the office of the recorder of deeds of the county in which its claims are located, a proper certificate of each location; and it shall also, within the same time, file in the office of the Secretary of the Interior, in the city of Washington, said description and a map showing the locations made by it on the Uintah Reservation, Utah, under the act of Congress of May twenty-seventh, nineteen hundred and two (Statutes at Large, volume thirty-two, page two hundred and sixty-three); and thereupon the Secretary of the Interior shall forthwith cause said locations to be inspected and report made, and if found to contain the character of mineral to which said company is entitled by the act of Congress aforesaid and that each of said claims does not exceed the size of a regular mining claim, to wit, six hundred by fifteen hundred feet, he shall issue a patent in fee to the Raven Mining Company for each of said claims: *Provided further,* That the Florence Mining Company entitled under the act of Congress approved May twenty-seventh, nineteen hundred and two, to the preferential right to locate not to exceed six hundred and forty acres of contiguous mineral land in the Uintah Reservation, Utah, shall within sixty days from the passage of this act file in the office of the recorder of deeds of the county in which its location is made a proper description of its claim, and it shall within the same time file in the office of the Secretary of the Interior said description and a map showing the location made by it on the Uintah Reservation, Utah, and thereupon the Secretary of the Interior shall forthwith cause said location to be inspected and report thereon made, and if found not to exceed six hundred and forty acres he shall issue a patent in fee to said company for the said land: *And provided further,* That the extension of time for opening the unallotted lands to public entry herein granted shall not extend the time to make locations to any person or company heretofore given a preferential right, but the Raven Mining Company and the Florence Mining Company pending the time for opening to public entry the Uintah Reservation shall have the right of ingress and egress to and from their respective properties over and through said reservation.

*Marginal notes:* Uintah Forest Reserve. Additional land reserved. 32 Stat., 263. — Reservoir site. — Proviso. Proceeds of timber sales. — Raven Mining Co. Certificate of location of claims, etc. — 1902, ch. 888, supra. — Patent to. Provisos. Florence Mining Co. Certificate of location of claim. — Patent to. Right of ingress, etc.

\* \* \* \*

14. Presidential Proclamation of July 14, 1905, 34 Stat., pt. 3, 3116, III Kapp. 602 (1913), LD 107:

July 14, 1905.

Proclamations, 34 Stat., Part 3, 3116.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

WHEREAS, the Uintah Forest Reserve, in the State of Utah, was established by proclamation dated February twenty-second, eighteen hundred and ninety-seven, under and by virtue of section twenty-four of the Act of Congress, approved March third, eighteen hundred and ninety-one, entitled, "An act to repeal timber-culture laws, and for other purposes", which provides, "That the President of the United States may, from time to time, set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations, and the President shall, by public proclamation, declare the establishment of such reservations and the limits thereof";

*Marginal notes:* Uintah Forest Reserve, Utah. Preamble. 29 Stat., 895. 26 Stat., 1103. Proclamations, 34 Stat., pp. 200–201.

33 Stat., Part I, 1070.

And whereas, it is provided by the Act of Congress, approved March third, nineteen hundred and five, entitled, "An Act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth, nineteen hundred and six, and for other purposes," that "before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules, and regulations governing forest reserves, and subject to the mineral rights granted by the Act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary";

And whereas, it is considered necessary for the public good that certain lands in the Uintah Indian Reservation be set apart and reserved as an addition to the Uintah Forest Reserve;

Lands added to forest reserve from Uintah Indian Reservation.

Now, therefore, I, Theodore Roosevelt, President of the United States, by virtue of the power in me vested by the aforesaid act of Congress, approved March third, nineteen hundred and five, do hereby make known and proclaim that certain lands in the said Uintah Indian Reservation are hereby added to and made a part of the Uintah Forest Reserve, and that the boundary lines of the said forest reserve are, accordingly, so changed and extended as to read as follows:

Description.

Beginning at the north-west corner of Township one (1) South, Range seven (7) East, Salt Lake Meridian, Utah; thence easterly along the Base Line to the south-west corner of Township one (1) North, Range nine (9) East; thence northerly to the north-west corner of said township; thence easterly to the south-west corner of Township two (2) North, Range fourteen (14) East; thence northerly to the north-west corner of said township; thence easterly to the middle of the channel of the Green River; thence in a general south-easterly direction along the middle of the channel of said river to the range line between Ranges twenty-two (22) and twenty-three (23) East; thence southerly along the range line, allowing for the proper offset on the Base Line, to the south-east corner of Township two (2) South, Range twenty-two (22) East; thence westerly to the north-west corner of Township three (3) South, Range nineteen (19) East; thence southerly to the eastern boundary of the Uintah Indian Reservation; thence north-westerly along said Indian reservation boundary to the section line between Sections twenty-one (21) and twenty-eight (28), Township two (2) North, Range one (1) East, Uintah Meridian; thence westerly to the south-west corner of Section nineteen (19), Township two (2) North, Range one (1) West; thence northerly to the south-east corner of Section thirteen (13), Township two (2) North, Range two (2) West; thence westerly to the south-west corner of said section; thence northerly to the north-west corner of Section twelve (12), said township; thence westerly to the south-west corner of Section four (4), said township; thence northerly to the north-west corner of said section; thence westerly to the north-east corner of Section four (4), Township two (2) North, Range three (3) West; thence southerly to the south-east corner of Section thirty-three (33), said township; thence westerly to the north-east corner of Township one (1) North, Range six (6) West; thence southerly to the south-east corner of Section thirteen (13), said township; thence westerly to the south-west corner of said section; thence northerly to the north-west corner of said section; thence westerly to the south-west corner of Section eleven (11), said township; thence northerly to the north-west corner of said section; thence westerly to the north-east corner of Section eight (8), said township; thence southerly to the south-east corner of Section seventeen (17), said township; thence westerly to the north-east corner of Section twenty-one (21), Township one (1) North, Range nine (9) West; thence southerly to the south-east corner of said section;

Uintah Forest Reserve—Continued.

thence westerly to the south-west corner of Section nineteen (19), said township; thence southerly along the range line, allowing for the proper offset on the Base Line, to the north-west corner of Section eighteen (18), Township one (1) South, Range nine (9) West; thence easterly to the north-east corner of Section sixteen (16), Township one (1), South, Range eight (8) West; thence southerly to the south-east corner of Section thirty-three (33), said township; thence

westerly to the north-east corner of Section four (4), Township two (2) South, Range ten (10) West; thence southerly to the south-east corner of Section sixteen (16), said township; thence westerly to the south-west corner of Section eighteen (18), said township; thence southerly to the south-east corner of Township two (2) South, Range eleven (11) West; thence westerly to the south-west corner of Section thirty-three (33), said township; thence northerly to the south-east corner of Section twenty (20), said township; thence westerly to the south-west corner of said section; thence northerly to the south-east corner of Section seven (7), said township; thence westerly to the south-west corner of said section; thence northerly to the north-west corner of said township; thence westerly to the north-east corner of fractional Section four (4), Township two (2) South, Range twelve (12) West; thence southerly to the south-east corner of Section thirty-three (33), said township; thence easterly to the north-east corner of Section three (3), Township three (3) South, Range twelve (12) West; thence southerly to the south-east corner of said section; thence easterly to the north-east corner of Section eleven (11), said township; thence southerly to the south-east corner of said section; thence easterly to the north-east corner of Section thirteen (13), said township; thence southerly to the south-east corner of Township four (4) South, Range twelve (12) West; thence easterly to the south-west corner of Section thirty-three (33), Township four (4) South, Range eleven (11) West; thence northerly to the north-west corner of said section; thence easterly to the south-west corner of Section twenty-five (25), said township; thence northerly to the north-west corner of said section; thence easterly to the north-east corner of Section thirty (30), Township four (4) South, Range ten (10) West; thence southerly to the south-east corner of Section thirty-one (31), said township; thence easterly to the south-west corner of Township four (4) South, Range nine (9) West; thence northerly to the north-west corner of Section thirty (30), said township; thence easterly to the north-east corner of Section twenty-five (25), said township; thence southerly to the south-east corner of said township; thence easterly to the north-east corner of Section five (5), Township five (5) South, Range eight (8) West; thence southerly to the south-east corner of Section seventeen (17), said township; thence westerly to the south-west corner of Section eighteen (18), said township; thence southerly to the south-east corner of Section twenty-four (24), Township five (5) South, Range nine (9) West; thence westerly to the north-east corner of Section

twenty-eight (28), said township; thence southerly to the south-east corner of said section; thence westerly to the south-west corner of Section twenty-nine (29), said township; thence southerly to the north-west corner of Section twenty-nine (29), Township six (6) South, Range nine (9) West; thence easterly to the south-west corner of Section twenty-one (21), Township six (6) South, Range eight (8) West; thence northerly to the north-west corner of Section four (4), said township; thence easterly to the eastern boundary of the Uintah Indian Reservation; thence in a general south-westerly and north-westerly direction along said Indian reservation boundary to the range line between Ranges six (6) and seven (7) East, Salt Lake Meridian; thence northerly to the north-west corner of Township one (1) South, Range seven (7) East, the place of beginning: such of the above-named corners as have not been established by the official surveys being intended to be located at the points where such corners would fall in projecting the surveys in the directions indicated without allowing for any irregularities which may occur in actually extending the surveys;

Excepting from the force and effect of this proclamation all lands which may have been, prior to the date hereof, embraced in any legal entry or covered by any lawful filing duly of record in the proper United States Land Office, or upon which any valid settlement has been made pursuant to law, and the statutory period within which to make entry or filing of record has not expired: *Provided*, that this exception shall not continue to apply to any particular tract of land unless the entryman, settler or claimant continues to comply with the law under which the entry, filing or settlement was made. *Lands excepted.*

Warning is hereby expressly given to all persons not to make settlement upon the lands reserved by this proclamation. *Reserved from settlement.*

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington this 14th day of July, in the year of our Lord one thousand nine hundred and five, and of [SEAL.] the Independence of the United States the one hundred and thirtieth.

THEODORE ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

---

15. Presidential Proclamation of July 14, 1905, 34 Stat., 3119, III Kapp. 605 (1913), LD 108:

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

*July 14, 1905.*

*Proclamations.*
*34 Stat., Part 3, 3119.*

Whereas it was provided by the Act of Congress, approved May 27, A. D., 1902 (32 Stat., 263), among other things, that on October first, 1903, the unallotted lands in the Uintah Indian Reservation, in the State of Utah, "shall be restored to the public domain: Provided, That persons entering any of said lands under the homestead laws shall pay therefor at the rate of one dollar and twenty-five cents per acre". *Uintah Indian Reservation, Utah. Preamble. 32 Stat., 263.*

And, whereas, the time for the opening of said unallotted lands was extended to October 1, 1904, by the Act of Congress approved March 3, 1903 (32 Stat., 998), and was extended to March 10, 1905, by the Act of Congress approved April 21, 1904 (33 Stat., 207), and was again extended to not later than September 1, 1905, by the Act of Congress, approved March 3, 1905 (33 Stat., 1069), which last named act provided, among other things: *32 Stat., 998. 33 Stat., 207. 33 Stat., 1069.*

That the said unallotted lands, excepting such tracts as may have been set aside as national forest reserve, and such mineral lands as were disposed of by the Act of Congress of May twenty-seventh, nineteen hundred and two, shall be disposed of under the general provisions of the homestead and townsite laws of the United States, and shall be opened to settlement and entry by proclamation of the President, which proclamation shall prescribe the manner in which these lands may be settled upon, occupied, and entered by persons entitled to make entry thereof; and no person shall be permitted to settle upon, occupy, or enter any of said lands, except as prescribed in said proclamation, until after the expiration of sixty days from the time when the same are thereby opened to settlement and entry: Provided, That the rights of honorably discharged Union soldiers and sailors of the late civil and Spanish war or Philippine insurrection as defined and described in sections twenty-three hundred and four and twenty-three hundred and five of the Revised Statutes, as amended by the Act of March first, nineteen hundred and one, shall not be abridged.

Now, therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said Acts of Congress, do hereby declare and make known that all the unallotted lands in said reservation, excepting such as have at that time been reserved for military, forestry and other purposes, and such mineral lands as may have been disposed of under existing laws, will on and after the 28th day of August, 1905, in the manner hereinafter prescribed, and not otherwise, be opened to entry, settlement and disposition under the general provisions of the homestead and townsite laws of the United States; and it is further directed and prescribed that: *Unallotted lands on reservation opened to entry, etc., Aug. 28, 1905.*

Commencing at 9 o'clock a. m. Tuesday, August 1, 1905, and ending at 6 o'clock p. m. Saturday, August 12, 1905, a registration will be had at Vernal, Price and Provo, State of Utah, and at Grand Junction, State of Colorado, for the purpose of ascertaining what persons desire to enter, settle upon, and acquire title to any of said lands under the homestead law, and of ascertaining their qualifications so to do. To obtain registration each applicant will be required to show himself duly qualified, by written application to be made only on a blank form provided by the Commissioner of the General Land Office, to make homestead entry of these lands under existing laws, and to give the registering officer such appropriate matters of description and identity as will protect the applicant and the Government against any attempted impersonation. Registration cannot be effected through the use of the mails or the employment of an agent, *Places of registration.* *Applications.*

excepting that honorably discharged soldiers and sailors entitled to the benefits of section 2304 of the Revised Statutes of the United States, as amended by the act of Congress, approved March 1, 1901 (31 Stat., 847), may present their applications for registration and due proofs of their qualifications through an agent of their own selection, having a duly executed power of attorney on a blank form provided by the Commissioner of the General Land Office, but no person will be permitted to act as agent for more than one such soldier or sailor. No person will be permitted to register more than once or in any other than his true name.

Each applicant who shows himself duly qualified will be registered and given a nontranferable certificate to that effect, which will entitle him to go upon and examine the lands to be opened hereunder; but the only purpose for which he can go upon and examine said lands is that of enabling him later on, as herein provided, to understandingly select the lands for which he may make entry. No one will be permitted to make settlement upon any of said lands in advance of the opening herein provided for, and during the first sixty days following said opening no one but registered applicants will be permitted to make homestead settlement upon any of said lands and then only in pursuance of a homestead entry duly allowed by the local land officers, or of a soldier's declaratory statement duly accepted by such officers.

The order in which, during the first sixty days following the opening, the registered applicants will be permitted to make homestead entry of the lands opened hereunder, will be determined by a drawing for the district publicly held at Provo, Utah, commencing at 9 o'clock a. m., Thursday, August 17, 1905, and continuing for such period as may be necessary to complete the same. The drawing will be had under the supervision and immediate observance of a committee of three persons whose integrity is such as to make their control of the drawing a guaranty of its fairness. The members of this committee will be appointed by the Secretary of the Interior, who will prescribe suitable compensation for their services. Preparatory to this drawing the registration officers will, at the time of registering each applicant who shows himself duly qualified, make out a card, which must be signed by the applicant, and giving such a description of the applicant as will enable the local land officers to thereafter identify him. This card will be subsequently sealed in a separate envelope which will bear no other distinguishing label or mark than such as may be necessary to show that it is to go into the drawing. These envelopes will be carefully preserved and remain sealed until opened in the course of the drawing herein provided. When the registration is completed, all of these sealed envelopes will be brought together at the place of drawing and turned over to the committee in charge of the drawing, who, in such manner as in their judgment will be attended with entire fairness and equality of opportunity, shall proceed to draw out and open the separate envelopes and to give to each inclosed card a number in the order in which the envelope containing the same is drawn. The result of the drawing will be certified by the committee to the officers of the district and will determine the order in which the applicants may make homestead entry of said lands and settlement thereon.

Notice of the drawings, stating the name of each applicant and number assigned to him by the drawing, will be posted each day at the place of drawing, and each applicant will be notified of his number, and of the day upon which he must make his entry, by a postal card mailed to him at the address given by him at the time of registration. The result of each day's drawing will also be given to the press to be published as a matter of news. Applications for homestead entry of said lands during the first sixty days following the opening can be made only by registered applicants and in the order established by the drawing.

Commencing on Monday, August 28, 1905, at 9 o'clock a. m., the applications of those drawing numbers 1 to 50, inclusive, must be presented at the land office in the town of Vernal, Utah, in the land district in which said lands are situated, and will be considered in their numerical order during the first day, and the applications of those drawing numbers 51 to 100, inclusive, must be presented and will be considered in their numerical order during the second day, and so on

R. S., sec. 2304, p. 422

31 Stat., 847.

Certificate of registration.

Restrictions.

Drawings.

Notice.

Applications.

at that rate until all of said lands subject to entry under the homestead law, and desired thereunder, have been entered. If any applicant fails to appear and present his application for entry when the number assigned to him by the drawing is reached, his right to enter will be passed until after the other applications assigned for that day have been disposed of, when he will be given another opportunity to make entry, failing in which he will be deemed to have abandoned his right to make entry under such drawing.

To obtain the allowance of a homestead entry, each applicant must personally present the certificate of registration theretofore issued to him, together with a regular homestead application and the necessary accompanying proofs, together with the regular land office fees, but an honorably discharged soldier or sailor may file his declaratory statement through his agent, who can represent but one soldier or sailor as in the matter of registration. *Certificates of registration.*

Persons who make homestead entry for any of these lands will be required to pay therefor at the rate of one dollar and twenty-five cents per acre when they make final proof, but no payment, other than the usual fees and commissions will be required at the time the entry is made. *Payments.*

Persons who apply to make entry of these lands prior to October 27, 1905, will not be required to file the usual nonmineral affidavit with their applications to enter, but such affidavit must be filed before final proof is accepted under their entries; but all persons who make entry after that date will be required to file that affidavit with their applications to enter. *Nonmineral affidavits.*

The production of the certificate of registration will be dispensed with only upon satisfactory proof of its loss or destruction. If at the time of considering his regular application for entry it appear that an applicant is disqualified from making homestead entry of these lands, his application will be rejected, notwithstanding his prior registration. If any applicant shall register more than once hereunder, or in any other than his true name, or shall transfer his registration certificate, he will thereby lose all the benefits of the registration and drawing herein provided for, and will be precluded from entering or settling upon any of said lands during the first sixty days following said opening. *Entries.*

Any person or persons desiring to found, or to suggest establishing, a townsite upon any of the said lands, at any point, may, at any time before the opening herein provided for, file in the land office a written application to that effect, describing by legal subdivisions the lands intended to be affected, and stating fully and under oath the necessity or propriety of founding or establishing a town at that place. The local officers will forthwith transmit said petition to the Commissioner of the General Land Office with their recommendation in the premises. Such Commissioner, if he believes the public interests will be subserved thereby, will, if the Secretary of the Interior approve thereof, issue an order withdrawing the lands described in such petition, or any portion thereof, from homestead entry and settlement and directing that the same be held for the time being for disposal under the townsite laws of the United States in such manner as the Secretary of the Interior may from time to time direct; and, if at any time after such withdrawal has been made it is determined that the lands so withdrawn are not needed for townsite purposes they may be released from such withdrawal and then disposed of under the general provisions of the homestead laws in the manner prescribed herein. *Townsites.*

All persons are especially admonished that under the said act of Congress approved March 3, 1905, it is provided that no person shall be permitted to settle upon, occupy, or enter any of said lands except in the manner prescribed in this proclamation until after the expiration of sixty days from the time when the same are opened to settlement and entry. After the expiration of the said period of sixty days, but not before, as hereinbefore prescribed, any of said lands remaining undisposed of may be settled upon, occupied, and entered under the general provisions of the homestead and townsite laws of the United States in like manner as if the manner of effecting such settlement, occupancy, and entry had not been prescribed herein in obedience to law. *Entry of undisposed-of lands.*

The Secretary of the Interior shall prescribe all needful rules and regulations necessary to carry into full effect the opening herein provided for. *Regulations.*

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the city of Washington this 14th July, in the year of our Lord 1905, and of the Independence of the United States [SEAL.] the one hundred and thirtieth.

THEODORE ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

---

16. Presidential Proclamation of July 31, 1905, 34 Stat., pt. 3, 3139, III Kapp. 609 (1913), LD 110:

BY THE PRESIDENT OF THE UNITED STATES.

A PROCLAMATION

*July 31, 1905.*

*Proclamations.
34 Stat., Part 3, 3139.
Uintah Indian Reservation, Utah.
Preamble.*

Whereas, on June 7, 1905, the Secretary of the Interior directed the Commissioner of Indian Affairs to cause to be selected, by the Uintah Allotment Commission, one or more tracts of land, suitable for townsite purposes, in the Uintah Indian Reservation Lands, State of Utah, to the end that the same might be reserved under the provisions of section 2380 of the Revised Statutes of the United States; *R. S., sec. 2380, p. 436.*

And whereas, on July 6, 1905, the Acting Commissioner of Indian Affairs reported that said commission had selected, as suitable for townsite purposes and as natural and prospective centers of population, certain described lands which he recommended be reserved under the provisions of said section 2380;

And whereas, on July 7, and 27, 1905, the Department of the Interior approved said selection and recommendation so far as it related to the following described lands in the Uintah land district, Utah, and has requested that they be reserved for townsites to be created under existing statute, to-wit:

Lots four, six, and seven, the southwest quarter of the northeast quarter, the south half of the northwest quarter, the southwest quarter, and the west half of the southeast quarter of section twenty-five, lot two, the southeast quarter of the northeast quarter, and the east half of the southeast quarter of section twenty-six, in township three south of range two west of the Uintah special meridian; *Lands designated for townsites.*

Also the southwest quarter of the southeast quarter of section thirty-six, in township three south of range five west, the north half, and the north half of the south half of section one, the east half of the northeast quarter, and the northeast quarter of the southeast quarter of section two, in township four south of range five west of the Uintah special meridian.

And also the south half of the northeast quarter, the southeast quarter, and the southeast quarter of the southwest quarter of section seven, and the northeast quarter of the northwest quarter of section eighteen, in township three south of range two east of the Uintah special meridian;

Now therefore, I, Theodore Roosevelt, President of the United States, by virtue of the power in me vested by sections 2380 and 2381 of the Revised Statutes of the United States, do hereby declare and make known that said lands are hereby reserved as townsites, to be disposed of by the United States under the terms of the statutes applicable thereto. *Townsites reserved.
R. S., secs. 2380, 2381, p. 436.*

In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the City of Washington this 31st day of July in the year of our Lord one thousand nine hundred and five, and of [SEAL.] the Independence of the United States the one hundred and thirtieth.

T. ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

17. Presidential Proclamation of August 2, 1905, 34 Stat., pt. 3, 3140, III Kapp. 610 (1913), LD 111:

Aug. 2, 1905.
Proclamations.
34 Stat., Part 3, 3140.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

Uintah Indian Reservation, Utah.
Preamble.

WHEREAS, it was declared in my proclamation of July 14, in the year of our Lord 1905, prescribing the manner in which certain lands within the Uintah Indian Reservation should be opened to settlement and entry under the homestead and townsite laws of the United States, among other things as follows:

Commencing on Monday, August 28, 1905, at 9 o'clock a. m., the applications of those drawing numbers 1 to 50, inclusive, must be presented at the land office in the town of Vernal, Utah, in the land district in which said lands are situated, and will be considered in their numerical order during the first day, and the applications of those drawing numbers 51 to 100, inclusive, must be presented and will be considered in their numerical order during the second day, and so on at that rate until all of said lands subject to entry under the homestead law, and desired thereunder, have been entered. If any applicant fails to appear and present his application for entry when the number assigned to him by the drawing is reached, his right to enter will be passed until after the other applications assigned for that day have been disposed of, when he will be given another opportunity to make entry, failing in which he will be deemed to have abandoned his right to make entry under such drawing.

And, whereas, there now appear to be ample reasons for a modification of said provision;

Modifying provisions for drawings.

Now therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said act of Congress, and for the purpose of modifying the provision of said proclamation above quoted, do hereby declare and direct that said provision be modified to read as follows:

Commencing on Monday, August 28, 1905, at 9 o'clock a. m., the applications of those drawing numbers 1 to 111, inclusive, must be presented at the land office in the town of Vernal, Utah, in the land district in which said lands are situated, and will be considered in their numerical order during the first day, and the applications of those drawing numbers 112 to 222, inclusive, must be presented and will be considered in their numerical order during the second day, and so on at that rate until all of said lands subject to entry under the homestead law, and desired thereunder, have been entered. If any applicant fails to appear and present his application for entry when the number assigned to him by the drawing is reached, his right to enter will be passed until after the other applications assigned for that day have been disposed of, when he will be given another opportunity to make entry, failing in which he will be deemed to have abandoned his right to make entry under such drawing.

In witness whereof, I have hereunto set my hand and caused the seal of the United States to be affixed.

[SEAL.] Done at the city of Washington this 2d day of August, in the year of our Lord 1905, and of the Independence of the United States the one hundred and thirtieth.

T. ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

18. Presidential Proclamation of August 3, 1905, 34 Stat., pt. 3, 3141, III Kapp. 610 (1913), LD 112:

Aug. 3, 1905.
Proclamations.
34 Stat., Part 3, 3141.

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA.

## A PROCLAMATION.

Uintah Indian Reservation, Utah.
Preamble.
33 Stat., Part I, 1070.

WHEREAS, it is provided by the act of Congress approved March 3, 1905, entitled, "An act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling treaty stipulations with various Indian tribes for the fiscal year ending June thirtieth, nineteen hundred and six, and for other purposes", that "Before the opening of the Uintah Indian Reservation, the President is hereby authorized to set apart and reserve any reservoir site or other lands necessary to conserve the water supply for the Indians or for general agricultural development, and may confirm such rights and water thereon as have already accrued";

*Lands reserved for Indians.*

And whereas, it is considered necessary to serve the purposes of the act referred to that certain lands in the Uintah Indian Reservation be withdrawn for the purposes indicated;

Now therefore, I, Theodore Roosevelt, President of the United States, by virtue of the power in me vested by the aforesaid act of Congress, approved March third, nineteen hundred and five, do hereby make known and proclaim that certain lands in the Uintah Indian Reservation are hereby withdrawn from disposal, for reservoir site necessary to conserve the water supply for the Indians, or *Agricultural lands.* for general agricultural development, the following described lands:

### AGRICULTURAL:

All Sections thirty-two (32), thirty-three (33) and thirty-four (34) Township one (1) South, Range five (5) West; all Sections two (2), three (3), four (4), ten (10), eleven (11), twelve (12), thirteen (13), fourteen (14), fifteen (15), south half of Section sixteen (16), south-west quarter of Section seventeen (17), and all Sections eighteen (18) to thirty-six (36) inclusive, Township two (2) South, Range one (1) West; south half of north-east quarter, south half of north-west quarter, south-west quarter and south-east quarter of Section twenty-five (25), south half of north-east quarter, south half of north-west quarter, south-west quarter and south-east quarter of Section twenty-six (26), north-east quarter, north-west quarter, north half of south-west quarter and north half of south-east quarter of Section thirty-five (35), and all of Section thirty-six (36), Township two (2) South, Range three (3) West; all Sections three (3) to eleven (11), inclusive, all Sections fourteen (14) to thirty-two (32), inclusive, and west half of Section thirty-three (33), Township two (2) South, Range four (4) West; all Sections one (1), two (2), three (3), four (4); nine (9), ten (10), eleven (11), and north half of Section sixteen (16), Township two (2) South, Range five (5) West; south half of north-east quarter, north-west quarter, south-east quarter, south-west quarter of Section three (3), all Section four (4), five (5), six (6), seven (7), eight (8), and west half of Section nine (9), Township three (3) South, Range one (1) West; all Sections one (1), two (2), three (3), four (4) and five (5), east half of north-east quarter, south half of south-east quarter, and south-west quarter of Section six (6), north half of Section seven (7), north half of Section eight (8), all Sections nine (9), ten (10), eleven (11) and twelve (12), Township three (3) South, Range two (2) West; south half of section one (1) and all Section eighteen (18), Township three (3) South, Range three (3), West; all Sections three (3), four (4), five (5), six (6), seven (7), eight (8), nine (9), ten (10), Sections thirteen (13) to twenty-three (23), inclusive, Township three (3) South, Range four (4) West; west half of north-east quarter, north-west quarter, west half of south-east quarter, south-west quarter of Section seventeen (17), and all Sections eighteen (18) and nineteen (19), Township two (2) South, Range one (1) East; south-east quarter, south half of south-west quarter of Section twenty-three (23), south-east quarter and south half of south-west quarter of Section twenty-four (24), and all Sections twenty-five (25), twenty-six (26) and thirty-six (36), Township three (3) South, Range one (1) East; all Sections twenty-nine (29), thirty-one (31) and thirty-two (32), south half of Section thirty (30) and west half of Section thirty-three (33), Township three (3) South, Range two (2) East; all Sections four (4), five (5) and nine (9), west half of Section ten (10), all Section fifteen (15), east half of Section sixteen (16), north half of Section twenty-two (22), north-west quarter, south-west quarter and south-east quarter of Section twenty-three (23), north-west quarter of Section twenty-five (25) and north-east quarter of Section twenty-six (26), Township four (4) South, Range two (2) east; all Sections twenty-five (25), twenty-six )26), twenty-seven (27), twenty-eight (28), South half of Section twenty-nine (29), south half of Section thirty (30), and all Sections thirty-one (31) to thirty-six (36), inclusive, Township two (2) South, Range two (2) West; all Uintah Special Meridian.

*Reservoir site.*
### RESERVOIR.

All Section eighteen (18), Township two (2) North, Range five (5) West; west half of north-west quarter, and north-west quarter of south-west quarter of Section six (6), east half of Section twelve

(12), north-east quarter of Section thirteen (13), Township two (2) North, Range six (6) West; east half of Section one (1), Township two (2) North, Range seven (7) West; south-west quarter of Section thirty-one (31), Township three (3) North, Range six (6) West; all of Township two (2) South, Range eleven (11) West; all of Township three (3) South, Range eleven (11) West; all of Township four (4) South, Range eleven (11) West; all of Township two (2) South, Range twelve (12) West; all of Township three (3) South, Range twelve (12) West; all of Township four (4) South, Range twelve (12) West; north-east quarter, east half of north-west quarter, east half of south-west quarter, north half of south-east quarter and south-east quarter of south-east quarter of Section twenty-one (21), Lots three (3) and four (4), Section twenty-two (22), Lots one (1) and two (2) of Section twenty-seven (27), east half of north-east quarter, south-west quarter of north-east quarter, and east half of north-west quarter of Section twenty-eight (28), Township two (2) South, Range one (1) East; all Uintah Special Meridian.

*Reserved from settlement.*

Warning is expressly given to all persons not to make settlement upon the lands reserved by this Proclamation.

In witness whereof I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the city of Washington this 3d day of August in the year of our Lord one thousand nine hundred and five, and of the Independence of the United States the one hundred and thirtieth.

[SEAL.]

THEODORE ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

---

19. Presidential Proclamation of August 14, 1905, 34 Stat., pt. 3, 3142, III Kapp. 612 (1913). LD 113:

*Aug. 14, 1905.*
*Proclamations.*
*34 Stat., Part 3, 3142.*

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA,

A PROCLAMATION.

*Uintah Indian Reservation, Utah.*
*Preamble.*
*Lands designated for townsites.*

WHEREAS, it is believed that the following described lands, to-wit:

Lots three, five, and eight, of section twenty-five, and lot one of section twenty-six, in township three south, of range two west of the Uintah special meridian; and also the southwest quarter of southwest quarter of section nineteen, the northwest quarter of section twenty-nine, and the north half of section thirty, in township three south, of range one west of the Uintah special meridian, in the State of Utah, situate adjacent to other lands in said reservation which were reserved by my proclamation of July 31, in the year of our Lord 1905, are *34 Stat., 153.* natural and prospective centers of population:

Now therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by the act of Congress, entitled "An act making appropriations for the current and contingent expenses of the Indian Department and for fulfilling the treaty stipulations with various Indian tribes for the fiscal year ending June thirty, nineteen hundred and six, and for other purposes," approved March 3, 1905, and by sections 2380 and 2381 of the Revised Statutes of the United States, do hereby declare and make known, that the lands above described are hereby reserved as townsites, to be disposed of by the United States under the terms of the Statutes applicable thereto, in connection with other lands reserved for that purpose by my said proclamation of July 31, 1905.

*Additional townsites reserved.*
*33 Stat., 1069.*

*R. S. secs. 2380, 2381, p. 436.*

*34 Stat., 153.*

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the city of Washington, this fourteenth day of August, in the year of our Lord one thousand nine hundred and five, and of the Independence of the United States the one hundred and thirtieth.

[SEAL.]

T. ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

20. Presidential Proclamation of August 14, 1905, 34 Stat., pt. 3, 3143, III Kapp. 613 (1913), LD 114:

By THE PRESIDENT OF THE UNITED STATES OF AMERICA.

Aug. 14, 1905.
Proclamations
34 Stat., Part 3, 3143.

A PROCLAMATION.

WHEREAS, it has been determined that only that portion of the lands reserved by my proclamation of August 3, 1905, hereinafter described, situated in the Uintah Indian Reservation, in the State of Utah, is required for reservoir sites and to conserve and protect the water supply for the purposes specified in the act of Congress approved March 3, 1905 (33 Stat., 1070), to-wit:

*Uintah Indian Reservation, Utah.*
*Preamble.*
*34 Stat., 156.*
*33 Stat., 1070.*

All of sections eighteen (18), nineteen (19), twenty-nine (29), thirty (30), thirty-one (31), and thirty-two (32), in Township two (2) South, Range eleven (11) West; all of Township three (3) South, Range eleven (11) West; all of sections one (1), to and including section twenty-four (24), and all of sections twenty-six to and including section thirty-two (32), in Township four (4) South, Range eleven (11) West; all of sections one (1), two (2), three (3), ten (10), eleven (11), twelve (12), thirteen (13), fourteen (14), fifteen (15), twenty-two (22), twenty-three (23), twenty-four (24), twenty-five (25), twenty-six (26), twenty-seven (27), thirty-four (34), thirty-five (35), and thirty-six (36), in Township two (2) South, Range twelve (12) West; and all of sections one (1), two (2), and twelve (12), in Township three (3) South, Range twelve (12) West; all in Uintah Special Meridian.

*Reservoir site reduced.*

Now therefore, I, Theodore Roosevelt, President of the United States of America, by virtue of the power in me vested by said act, do hereby make known and proclaim that all lands embraced in my said proclamation of August 3, 1905, saving and excepting those hereinbefore described, are hereby excluded and withdrawn from the effects of said proclamation and are hereby restored to the status they occupied prior to their reservation for said purposes.

*Lands withdrawn from reservoir site restored to former status.*

IN WITNESS WHEREOF, I have hereunto set my hand and caused the seal of the United States to be affixed.

Done at the city of Washington this fourteenth day of August, in the year of our Lord one thousand nine hundred and five,

[SEAL.] and of the Independence of the United States the one hundred and thirtieth.

T. ROOSEVELT

By the President:
ALVEY A. ADEE
*Acting Secretary of State.*

---

21. Act of April 4, 1910, ch. 140, 36 Stat. 269, 285, III Kapp. 429, 445 (1913), LD 139:

That the Secretary of the Interior is hereby authorized to pay from the reclamation fund for the benefit of the Uintah Indians the sum of one dollar and twenty-five cents per acre for the lands in the former Uintah Indian Reservation, in the State of Utah, which were set apart by the President for reservoir and other purposes under the provisions of the act approved March third, nineteen hundred and five, chapter fourteen hundred and seventy-nine, and which were by the Secretary of the Interior withdrawn for irrigation works under the provisions of the reclamation act of June seventeenth, nineteen hundred and two, in connection with the reservoir for the Strawberry Valley project. Such payment shall be made in five annual installments, and the moneys paid shall be subject to the same disposition as the proceeds of the sales of lands in the former Indian reservation. All such payments shall be included in the cost of construction of said Strawberry Valley project to be reimbursed by the owners of lands irrigated therefrom, all receipts from said lands, as rentals or otherwise, being credited to the said owners. All right, title, and interest of the Indians in the said lands are hereby extinguished, and the title, management and control thereof shall pass to the owners of the lands irrigated from said project whenever the management and operation of the irrigation works shall so pass under the terms of the reclamation act.

*Uintah Indians.*
*Payment from reclamation funds for lands withdrawn for Strawberry Valley project.*
*35 Stat., 1099, ante, 146.*
*32 Stat., 388.*
*Installments.*
*Reimbursement.*

* * * *

22. Act of March 11, 1948, P.L. 80-440, 62 Stat. 72, VI Kapp. 375 (1979), LD 187:

[CHAPTER 108]

## AN ACT

To define the exterior boundary of the Uintah and Ouray Indian Reservation in the State of Utah, and for other purposes.

March 11, 1948
[S. 1698]

[Public Law 440]
62 Stat. 72

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the exterior boundary of the Uintah and Ouray Reservation in Grand and Uintah Counties, in the State of Utah, for the benefit of the Ute Indian Tribe of the Uintah and Ouray Reservation, is hereby extended to include the following area:

Beginning at the northwest corner of section 18, township 9 south, range 20 east, Salt Lake meridian, and running thence west to Green River;

⊥Thence northeasterly up Green River approximately thirteen miles to a point where said river intersects the north line of section 11, township 8 south, range 20 east;

Thence east along said section line seven miles to the northeast corner of section 12, township 8 south, range 21 east, Salt Lake meridian;

Thence south along section line two miles to the northeast corner of section 24, township 8 south, range 21 east, Salt Lake meridian;

Thence east one mile to the northeast corner of section 19, township 8 south, range 22 east; thence south one mile to the southeast corner of said section 19; thence east two miles to the northeast corner of section 28;

Thence south six miles to the southeast corner of section 21, township 9 south, range 22 east, Salt Lake meridian;

hence west eleven miles to the northeast corner of section 27, township 9 south, range 20 east, Salt Lake meridian;

Thence south eight miles to the southeast corner of section 34, township 10 south, range 20 east;

Thence west one and one-half miles to the south quarter corner of section 33;

Thence north one-half mile to the center of said section 33;

Thence east one-fourth of a mile to the southwest corner of the southeast quarter northeast quarter, said section 33;

Thence north one mile to the southeast corner of the southwest quarter northeast quarter, section 28;

Thence west one-quarter of a mile to the center of said section 28;

Thence south one-fourth of a mile to the southeast corner of the northeast quarter southwest quarter, said section 28;

Thence west one-fourth of a mile to the north rim of Big Pack Mountain;

Thence southwesterly along said rim approximately one and one-half miles to the north quarter corner of section 4, township 11 south, range 20 east;

Thence south three-fourths of a mile to the southeast corner of the northeast quarter southwest quarter, said section 4;

Thence west one-fourth of a mile to the northeast corner of the southwest quarter southwest quarter, said section 4;

Thence south one-half mile to the southeast corner of the northwest quarter northwest quarter, section 9; .

Thence west one-half mile to the southwest corner of the northeast quarter northeast quarter, section 8;

Thence south three-fourths of a mile to the southeast corner of the southwest quarter southeast quarter, said section 8;

Thence west three-fourths of a mile to the northeast corner of section 18;

Thence south along section line to the southeast corner of said section 18;

Thence southerly along the west rim of Big Pack Mountain approximately three and three-fourths miles to the northeast corner of the southeast quarter southeast quarter, section 1, township 12 south, range 19 east, Salt Lake meridian;

Thence south along the township line five and one-fourth miles to the southeast corner of township 12 south, range 19 east;

Uintah and Ouray Reservation, Utah. Exterior boundary.

Thence following the north and east boundary of Indian Allotment Numbered 353 Uncompahgre on Hill Creek to the southeast corner of said allotment;

Thence along the east line of township 13 south, range 19 east, approximately one and one-half miles to the north rim of East Squaw Canyon;

⊥Thence southeasterly along said rim and up said canyon approximately three and three-fourths miles to the northeast corner of section 33, township 13 south, range 20 east;

Thence south along the section line 6 miles to the northeast corner of section 33, township 14 south, range 20 east;

Thence along the north rim of Flat Rock Mesa approximately six miles to the west quarter corner of section 24;

Thence easterly along the north rim of Ute Canyon approximately two miles to the north quarter corner of section 19, township 14 south, range 21 east, Salt Lake meridian;

Thence continuing along the north rim of said canyon approximately three miles to the center of section 21;

Thence south one mile to the center of section 28;

Thence west one-half mile to the west line of said section;

Thence south one and one-half miles to the southeast corner of section 32;

Thence west along the south line of said township two miles to the southwest corner of township 14 south, range 21 east;

Thence south six miles along the east line of township 15 south, range 20 east, to the southeast corner of said township;

Thence east one-half mile to the center of the north line of section 33, township 15½ south, range 21 east, Salt Lake meridian;

Thence south approximately one and one-half miles to the south quarter corner of section 4, township 16 south, range 21 east, Salt Lake meridian;

Thence west one-half mile to the southwest corner of said section 4;

Thence north one-fourth of a mile to the southeast corner of the northeast quarter southeast quarter, section 5;

Thence west one-half mile to the northeast corner of the southeast quarter southwest quarter, said section 5;

Thence south two and one-fourth miles to the south quarter corner of section 17;

Thence west one-half mile to the northeast corner of section 19;

Thence south one-half mile to the east quarter corner of said section 19;

Thence west one-half mile to the center of said section 19;

Thence south two and one-half miles to the south quarter corner of section 31;

Thence west one-half mile to the southwest corner of said township 16 south, range 21 east;

Thence south one and one-half miles to the east quarter corner of section 12, township 17 south, range 20 east, Salt Lake meridian;

Thence west one mile to the east quarter corner of section 11;

Thence south one-half mile to the southeast corner of said section 11;

Thence west one-half mile to the south quarter corner of said section 11;

Thence south one mile to the south quarter corner of section 14;

Thence west one-half mile to the southwest corner of said section 14;

Thence south one mile to the southeast corner of section 22;

Thence west one mile to the southwest corner of section 22;

Thence south approximately one and one-half miles to a point where the section line intersects the ridge between Supply Canyon and West Willow Creek;

Thence southwesterly along said ridge approximately two and one-half miles to the south quarter corner of section 8, township 18 south, range 20 east;

Thence south to the center of section 17;

Thence east one-half mile to the east quarter corner of said section 17;

⊥Thence south to the southeast corner of said section 17;

Thence east approximately one-third of a mile to the top of the ridge between Clear Creek and West Willow Creek;

Thence southerly along the top of said ridge approximately three miles to the center of section 33;

Thence south one-half mile to the south quarter corner of said section 33;

Thence east one-fourth of a mile;

Thence south two miles to the southeast corner of the southwest quarter southeast quarter, section 9, township 19 south, range 20 east, Salt Lake meridian;

Thence east one-fourth of a mile to the northeast corner of section 16;

Thence south one mile to the southeast corner of said section 16;

Thence west three miles to the southwest corner of section 18;

Thence north 2 and three-fourths miles;

Thence west one-fourth of a mile;

Thence north one-fourth of a mile to the southwest corner of the southeast quarter southeast quarter, section 36, township 18 south, range 19 east;

Thence west three-fourths of a mile to the southwest corner of said section 36;

Thence northwesterly along the watershed divide of Book Cliff Mountains approximately twelve and one-half miles to the east quarter corner of section 6, township 18 south, range 19 east;

Thence southwesterly down Coal Creek Canyon approximately thirteen miles to Green River at a point approximately one-fourth of a mile west of the southeast corner of section 18, township 18 south, range 17 east, Salt Lake meridian;

Thence northerly up Green River to a point two and one-half miles north eighty degrees west from the southwest corner of section 7, township 12 south, range 19 east, Salt Lake meridian;

Thence southwesterly along the east rim of Main Tabyago Canyon approximately three and one-half miles;

Thence south five-eighths of a mile to the rim of the ridge;

Thence southwesterly across West Tabyago Canyon approximately one-half mile to the ridge;

Thence southwesterly along the north rim of the ridge approximately two and one-fourth miles to Rock House Canyon;

Thence southwesterly across Rock House Canyon approximately three-fourths of a mile to the top of knoll in Rock House Canyon;

Thence southeasterly along the south rim of Rock House Canyon approximately two and three-fourths miles to a point approximately one mile north of Gray Knoll;

Thence south one-half mile across bench to north rim of Big Canyon; thence southeasterly along the north rim of Big Canyon approximately two miles to the head of draw approximately one mile east of Gray Knoll;

Thence southeasterly one-fourth of a mile across bench to the north rim of Big Canyon Flat;

Thence southeasterly along north rim of Big Canyon Flat approximately three and one-fourth miles;

Thence east approximately one-fourth of a mile across bench to the north rim of Big Canyon Flat;

Thence southeasterly along the north rim of Big Canyon Flat approximately one mile;

Thence east approximately one-fourth of a mile across bench to north rim of Big Canyon Flat;

Thence southeasterly along the north rim of Big Canyon Flat approximately two and one-half miles;

⊥Thence east approximately one-fourth of a mile across bench;

Thence southeasterly along the north rim of Big Canyon Flat approximately one and three-fourths miles;

Thence east to northwest corner of section 31, township 13 south, range 19 east, Salt Lake meridian;

Thence east one mile;

Thence south one mile;

Thence east one mile to the southeast corner of section 32;

Thence east on section line to CCC road;

Thence northerly along said CCC road to the point where said road intersects rim of a mesa south of the north line of township 13 south, range 19 east, Salt Lake meridian;

Thence northeasterly along said rim to the northeast corner of section 26 of said township and range;

Thence north one-fourth of a mile;

Thence east one-fourth of a mile;

Thence north one-fourth of a mile to the northwest corner of the northeast quarter southwest quarter, section 24;

Thence northerly along Hill Creek approximately one and one-fourth miles;

Thence west one-fourth of a mile;

Thence south one-fourth of a mile to the quarter corner between sections 13 and 14;

Thence west two miles to the quarter corner between sections 15 and 16;

Thence north along the section line one-half mile to the southeast corner of section 9 to the top of the ridge;

All of the foregoing descriptions being in township 12 south, range 19 east, Salt Lake meridian;

Thence northerly along the top of said ridge three and three-fourths miles to the center of section 28, township 11 south, range 19 east, Salt Lake meridian;

Thence northwesterly to the CCC road;

Thence northwesterly along said road to the top rim of Wild Horse Bench;

Thence northeasterly along the top rim of Wild Horse Bench to the southeast corner of section 21;

Thence north one mile;

Thence diagonally northeast to the southwest corner of section 1;

Thence northeasterly to the north quarter corner of said section 1;

Thence east one-half mile to the intersection of CCC road at the northeast corner of said section 1;

Thence northeasterly along said road approximately four miles to where said road intersects the east line of section 20, township 10 south, range 20 east, Salt Lake meridian;

Thence north along said section line to the east quarter corner of section 8, township 10 south, range 20 east, Salt Lake meridian;

Thence northeasterly to the northwest corner of Indian Allotment Numbered 326 Uncompahgre;

Thence east to Willow Creek;

Thence northwesterly down Willow Creek to the west line of section 4, township 10 south, range 20 east, Salt Lake meridian;

Thence south along said section line to the southwest corner of section 4, said township and range;

Thence west one mile;

Thence north four miles to the northwest corner of section 20, township 9 south, range 20 east, Salt Lake meridian;

Thence west one mile;

Thence north one mile to point of beginning.

¹Valid rights and claims of individuals initiated under the public-land laws or otherwise involving any lands within said boundary shall not be affected by this Act.

The foregoing reservation shall not extend to or include deposits of uranium, thorium, and other materials reserved to the United States by section 5 (b) 7 of the Atomic Energy Act of 1946 (60 Stat. 755, 762), and shall include surface rights only in lands withdrawn by Executive Order Numbered 5327, dated April 15, 1930, as interpreted by Circular Numbered 1220, dated June 9, 1930 (53 I. D. 127), and more particularly described in a letter dated April 22, 1931, addressed to the register, Salt Lake City, Utah, by the Commissioner of the General Land Office.

There is hereby reserved, within the area above described, for the benefit and use of grazing-district permittees, a free right-of-way for trailing and watering purposes, subject to the usual and customary rules and regulations concerning stock driveways within grazing districts, the use of said right-of-way for watering purposes being

limited to the usual and customary use of grazing-district permittees adjacent to said right-of-way, over the following lands:

(a) A stock driveway one mile wide along the north side of the White River Road running east from Ouray;

(b) A stock driveway described as beginning at the east quarter corner of section 3, township 9 south, range 20 east, Salt Lake meridian; running thence south eleven and one-half miles to the southeast corner of section 34, township 10 south, range 20 east, Salt Lake meridian; thence west to Willow Creek; thence northerly down Willow Creek to Black Bridge situated in the northwest quarter northeast quarter, section 22, township 10 south, range 20 east, Salt Lake meridian; thence northwesterly following the north and east boundaries of Indian allotments and tribal lands on east side of Willow Creek to the southwest corner of section 32, township 9 south, range 20 east, Salt Lake meridian; thence north five and one-fourth miles to Green River; thence up Green River and White River and on the south side of Indian allotments to point of beginning;

(c) A stock driveway one-half mile on each side of the road running southwesterly from what is known as Squaw Crossing on Willow Creek to the south rim of Wild Horse bench insofar as said road enters or crosses the said reservation;

(d) A stock driveway running from the head of Brown Canyon near the northeast corner of township 11 south, range 19 east, Salt Lake meridian, southeasterly down Brown Canyon across Hill Creek to Big Pack Mountain;

(e) A stock driveway one mile wide across Hill Creek immediately south of Rock House situated in the south half of section 13, township 12 south, range 19 east, Salt Lake meridian.

There is also reserved a watering right on Hill Creek between the Black Bridge and the Brown Ranch for the permittee using the public domain immediately west of said water place.

SEC. 2. The Secretary of the Interior is hereby authorized and directed to revoke the order dated September 26, 1933, temporarily withdrawing in aid of legislation certain lands in the former Uncompahgre Indian Reservation.

SEC. 3. The State of Utah may relinquish to the United States for the benefit of the Indians of the said Ute Reservation such tracts of school or other State-owned lands, surveyed or unsurveyed, within the said reserved area, as it may see fit, reserving to said State, if it so desires, such rights as it may possess to any minerals underlying such State lands as may be relinquished, and said State shall have the right to make selections in lieu thereof outside of the area hereby withdrawn, equal in value, as determined by the Secretary of the Interior, to the lands relinquished, from the vacant, unappropriated, nonmineral public lands, within the State of Utah, such lieu selections to be made in the manner provided in the enabling Act pertaining to said State, except as to the payment of fees or commissions, which are hereby waived. The value of improvements owned by the State on lands relinquished to the United States for the benefit of said Indians shall be taken into consideration and full credit in the form of lands shall be allowed therefor. Any funds now or hereafter on deposit in the United States Treasury to the credit of the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, are hereby made available, and with the consent of the Uintah and Ouray Tribal Business Committee, may be expended for the purchase of privately owned and State-owned lands, including the improvements thereon, and improvements heretofore placed on public lands, together with water rights and water holes, within said boundary. The title to lands purchased under this authorization may, in the discretion of the Secretary of the Interior, be taken for the surface only. Title to any lands and rights acquired hereunder shall be taken in the name of the United States in trust for the Ute Indian Tribe of the Uintah and Ouray Reservation, Utah, and such lands or rights shall be exempt from State or local taxation.

*Title to lands.*

SEC. 4. In any suit now or hereafter brought against the United States by the Ute Indian Tribe of the Uintah and Ouray Reservation, or by any one or more of the separate bands comprising said Ute Indian Tribe of the Uintah and Ouray Reservation, in the Court of Claims, the Indian Claims Commission or before any other

*Judgments against U.S.; offset.*

tribunal, the United States may claim, as an offset against any judgment recovered therein, the fair market value as of the date of this Act of any interest in public lands conveyed by section 1 hereof, and any improvements thereon, and the fair market value as of the date of the transfer of title of the lands and improvements which may be relinquished by the State of Utah to the United States under section 3 of this Act. The validity and amount of any such claim shall be determined by the court, commission, or tribunal in conformity with the provisions of section 2 of the Act of August 13, 1946 (60 Stat. 1049, 1050).

Approved, March 11, 1948.

25 U.S.C. § 70a.

APPENDIX B

**......** Original 1861 and 1882 Reservation Boundaries
**———** Present Boundaries of the Uintah and Ouray Reservation

June 25, 1981.